## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                       Case No. 10-30631-WRS
                                                         Chapter 7

ALLEGRO LAW LLC,

         Debtor

CARLY B. WILKINS, TRUSTEE,

         Plaintiff                                   Adv. Pro. No. 11-3007-WRS

    v.

AMERICORP INC., SETON INC.,
and TIMOTHY McCALLAN

         Defendants

## MEMORANDUM DECISION

      This Adversary Proceeding was called for trial on November 4, 2013. Plaintiff Daniel G. Hamm[1] was present in person and by counsel Steve Olen and Lucy Tufts. Neither the Defendants nor their counsel, Thomas McAlpine, appeared. For the reasons set forth below, the Court enters judgment by default in favor of Plaintiff Carly B. Wilkins and against Defendants Timothy McCallan, AmieriCorp, Inc., and Seton Corp., in the amount of $102,949,220.72. The Court will enter judgment by way of a separate document.

---

[1] Daniel G. Hamm litigated this adversary proceeding as the plaintiff in his official capacity as Trustee of the underlying Chapter 7 bankruptcy cases. Hamm retired in November 2015 and was replaced as the Trustee in the underlying cases by Carly B. Wilkins. (Case No. 10-30631, Doc. 5582). Therefore, although judgment will be entered in Wilkins's name (in her official capacity as Trustee), this Decision will refer to Hamm as the Plaintiff throughout the relevant portions of this litigation.

# I.  FACTS & PROCEDURAL HISTORY

## A.  Overview

This is an extraordinary case of fraud on a massive scale that was perpetrated by

Defendant Timothy McCallan ("McCallan") on thousands of victims.  McCallan masterminded a

debt settlement scheme in which customers were enticed into handing their money to entities

controlled by McCallan with a promise that their debts would be either paid or settled.

Thousands of customers signed up for debt settlement services offered by McCallan and paid

him more than $100,000,000.  Almost none of the money was paid to creditors of the customers

as promised by McCallan.  Instead McCallan, and those in league with him, siphoned off the

money into a vast array of companies controlled by or closely associated with him.  Among these

entities were McCallan's co-defendants: AmeriCorp, Inc. ("AmeriCorp") and Seton Corp.

("Seton").

McCallan used attorneys as a "front" to perpetuate his scheme and to provide it an air of

legitimacy.  McCallan's scheme was most recently fronted by Keith Nelms ("Nelms"), an

Alabama attorney whose license has since been suspended for his many unethical activities.[2]

Allegro Financial and Allegro Law (collectively "Allegro") were instrumentalities controlled by

McCallan and fronted by Nelms as a law firm.  Prior to Nelms, McCallan's front was Laura

Hess, a Florida attorney who was disbarred for actions she took while fronting a previous

---

[2]  Nelms later filed bankruptcy and Chase Bank (a creditor of many of Nelms's victims)
sued him for fraud for his role in fronting McCallan's scheme.  On July 24, 2014, this Court
ruled that $9,797,229.52 in damages caused by Nelms would be excepted from discharge due to
fraud.  Chase Bank USA v. Nelms (In re Nelms), 2014 WL 3700511, 2014 Bankr. LEXIS 3158
(Bankr. M.D. Ala. Jul. 24, 2014), *appeal docketed* 2:14-cv-927-MHT (M.D. Ala. Sept. 5, 2014).
Nelms's activities will be discussed in greater detail below.  A copy of the Court's Memorandum
Decision in Nelms is attached as Appendix A.  (Case No. 10-03042, Doc. 138).

iteration of McCallan's debt settlement scheme, a law firm called Hess-Kennedy.

From the viewpoint of the customer, or victim, McCallan's scheme began with mass media advertising – television, radio, billboards, etc. – designed to appeal to those in financial distress. The potential customer could call a toll-free number and speak with a representative who would then sign the customer up, promising him that his financial worries would be over. The representative would promise the customer that they would deal directly with his creditors, that all the customer would have to do is pay his money to them instead of his creditors, and that they would take care of the rest. Instead, the customer's money would be siphoned off under the guise of hidden fees and costs, the customer would be that much poorer, and he would default on his debts because his creditors would go unpaid. As the District Court has aptly noted, the effect of McCallan's debt settlement scheme on its victims was "personal economic suicide[.]" McCallan v. Hamm, 2012 WL 1392960, *1, 2012 U.S. Dist. LEXIS 56097, *3 (M.D. Ala. Apr. 23, 2012). This adversary proceeding is an attempt by the Trustee in bankruptcy to recover the money that McCallan defrauded from these victims.

### B. The Allegro Bankruptcies

Nelms originally started Allegro in 2007 as a small solo practice law firm. Chase Bank v. Nelms (In re Nelms), 2014 WL 3700511, *3, 2014 Bankr. LEXIS 3158, *7 (Bankr. M.D. Ala. Jul. 24, 2014). At that time, McCallan was perpetrating his debt settlement scheme through the Hess-Kennedy law firm in Florida and was introduced to Nelms through that firm. Nelms, 2014 WL 3700511 at *1-2, 2014 Bankr. LEXIS 3158 at *4-7. After the State of Florida moved against Hess-Kennedy in mid-2008, McCallan tabbed Nelms and Allegro to continue his debt

settlement scheme in Alabama.  Nelms, 2014 WL 3700511 at *3, 2014 Bankr. LEXIS 3158 at *8.

Nelms ostensibly "hired" McCallan and his entities, AmeriCorp and Seton, to handle back-office processing for Allegro; however, McCallan was effectively running Allegro.  Nelms, 2014 WL 3700511 at *3-4, 2014 Bankr. LEXIS 3158 at *8.  Allegro's marketing, form letters, and call centers were provided by McCallan's entities, and payments from Allegro's customers were controlled by McCallan's entities, though the paperwork listed Nelms as the customers' attorney.  Through this setup, McCallan charged Allegro's customers massive up-front hidden fees for merely holding their money, sent a portion of the collected fees to Nelms, and pocketed the rest.

When the State of Alabama learned of the nature of Allegro's activities and fee structure with its clients, it placed Allegro in receivership under the control of Louis Colley ("Colley") in July 2009.  Cut off from the wellspring of his ill-gotten gains, Nelms filed Chapter 7 bankruptcy on February 22, 2010.  (Case No. 10-30430, Doc. 1).  Daniel G. Hamm ("Hamm") was appointed as the Trustee in the Nelms bankruptcy and, upon learning of the nature of Nelms's involvement in Allegro, pulled its components (Allegro Financial and Allegro Law) into Chapter 7 bankruptcy as well.  (Case Nos. 10-30630 and 10-30631).  Hamm was also appointed Trustee in the Allegro bankruptcies.[3]

On May 20, 2010, Colley filed a motion for administrative expenses for the payment of almost $400,000 in invoices sent by AmeriCorp and Seton.  (Case No. 10-30631, Doc. 74).  The

---

[3]  As noted above, Carly B. Wilkins now serves as the Trustee in these bankruptcy cases. *Supra* note 1.

-4-

Court issued a Memorandum Decision in July 2010 in which it deferred payment, expressed its concerns about the value of the services allegedly rendered, and asked the following questions:

> 1. How much money was taken from Allegro clients?
> 2. How much of that money was taken by Nelms?
> 3. How much was paid to AmeriCorp, Seton and other third parties?
> 4. How much was paid to creditors of the Allegro clients?

(Case No. 10-30631, Doc. 105, p. 15).

To answer these questions, one must have the records of the Allegro companies. Yet, Allegro did not keep its own records and it did not own or control the data that its business activities generated. Nelms was incapable of answering these questions because he did not keep his own records. Instead, almost all of the business records of the Allegro companies were kept by AmeriCorp. Therefore, the key to understanding what happened to the money of the victims (creditors in the Allegro bankruptcies) was to get these records from AmeriCorp, which was controlled by McCallan.

As the Court will discuss below, it has taken years of litigation to learn the answers to these questions. However, a review of the Allegro claims register reveals that 5,214 claims have been filed by Allegro's creditors for a total amount of $102,949,220.72. (Case No. 10-30631). The evidence will support a range of figures both as to the numbers of victims and the amount by which they were defrauded. The Court has heard figures as high as 30,000 victims and $160,000,000.00. As a result of the duplicity of McCallan, Nelms, and those in league with them, the true figures will never be known. The Court will limit its judgment here to the 5,214 claimants in the amount of $102,949,220.72. The undersigned, having spent five years and several thousand hours on this case, is of the view that this number of claimants and this amount of claims are reasonable. The true figures are certainly higher.

-5-

## C. The Adversary Proceeding

### 1. Initial Pleadings, Arbitration Motions, and Appeal

In his capacity as Trustee of the Allegro bankruptcies, Hamm filed suit against McCallan, AmeriCorp, and Seton on February 15, 2011. (Doc. 1). In his amended complaint, Hamm asserted that the Defendants served as the alter ego of Allegro, and sought turnover of property of the estate (Count I), avoidance of preferential transactions (Count II), avoidance of post-petition transfers (Count III), avoidance of fraudulent transfers (Count IV), and an accounting of the fees the Defendants collected (Count V). (Doc. 6).

McCallan moved to dismiss (Docs. 28 & 29), while AmeriCorp and Seton moved to compel arbitration (Docs. 31 & 33). The Court denied both motions on July 8, 2011. (Doc. 66). AmeriCorp and Seton appealed the denial of their motion to compel arbitration and moved to stay proceedings pending appeal (Docs. 70 & 74), and McCallan likewise moved to compel arbitration (Doc. 72). The Court denied McCallan's motion to compel arbitration and he appealed. (Docs. 98 & 104). The Court also denied AmeriCorp's and Seton's motions to stay proceedings and ordered the parties to commence discovery. (Doc. 99). The Court subsequently issued a report and recommendation for the benefit of the District Court, to which the Defendants objected. (Docs. 140 & 147). The District Court ultimately affirmed this Court's denial of the Defendants' motion to compel arbitration. McCallan v. Hamm, Case No. 2:11-cv-784-MEF, 2012 WL 1392960, *7, 2012 U.S. Dist. LEXIS 56097, *22 (M.D. Ala. Apr. 23, 2012) (Docs. 194 & 195).

Case 11-03007    Doc 361    Filed 02/16/16    Entered 02/16/16 16:09:58    Desc Main
Document    Page 6 of 160

## 2. Discovery Proceedings: The Allegro Database

### a. First Discovery Order

Hamm learned early in the Allegro bankruptcy proceedings that Nelms and Allegro did not keep and maintain their own business records. He was told by Nelms, McCallan, and others that the Allegro records were kept by AmeriCorp in an electronic form on AmeriCorp's computer servers. Hamm asked McCallan for access to the Allegro records (Docs. 7 & 8) but was refused.

The first discovery hearing in this litigation took place on August 18, 2011, where the Court first discussed production of the Allegro database. As a result of discussions had at the August 18, 2011 hearing, the Court entered its first discovery order on August 22, 2011 ("First Discovery Order"). (Doc. 103). In the First Discovery Order, the Court set out a process that was designed to give Hamm access to the electronic database kept by AmeriCorp that held all of the business records of the Allegro companies. The First Discovery Order called for two things. First, it required a meeting between technical experts for both parties to discuss production of the database and to arrive at means of getting Hamm access to the Allegro records. Second, it called for the lawyers to discuss the matter and then report to the Court whether the problem had been resolved. (Doc. 103).

### b. Second Discovery Order

The intent of the First Discovery Order was to permit Hamm to inspect, copy or clone the database. A trustee in bankruptcy has a right to look at a debtor's books and records. *See* U.S.C.

§ 542(e).[4]  Indeed, it may be said that he has a duty to look at his debtor's books and records.

*See* 11 U.S.C. § 704(a)(4).[5]  As early as August 22, 2011, it was clear that the Court wanted the Defendants to provide Hamm access to the Allegro books and records, which were kept in electronic form by AmeriCorp.  (Doc. 103).

In direct contravention of the First Discovery Order the Defendants refused to permit Hamm access, forcing Hamm to file his first motion to compel.  (Docs. 112 & 113).  The Court held an evidentiary hearing on November 14, 2011, and granted Hamm's motion to compel the same day ("Second Discovery Order").  (Doc. 138).

The Second Discovery Order provided, in part, that:

> The Defendants shall produce the database which is the subject of these proceedings on a server which is to be made accessible to the Plaintiff.  Plaintiff may access the service directly and thereby access the database upon reasonable notice.  Plaintiff shall have reasonable access to the server and the data without interference from or observation by the Defendants, their agents, parties they otherwise control under contact, or otherwise.  Plaintiff may clone the database, the front end application program, and any other electronically stored information, programs or application, which may be necessary for them to access, view, and work with the subject data.  The database shall be produced in its original form and shall not be altered, deleted, or modified.  The Defendants shall cooperate with the Plaintiff in their effort to access the database.

(Doc. 138).

_____

[4]  "Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee."  11 U.S.C. § 542(e).

[5]  "The trustee shall . . . investigate the financial affairs of the debtor[.]" 11 U.S.C. § 704(a)(4).

On January 13, 2012, the Court awarded Hamm attorneys' fees in the amount of $29,687.95 for the costs he incurred in filing his motion to compel. (Doc. 154). The Second Discovery Order was simple and direct: allow Hamm access to the computer servers, so that he could clone the database in order to have his own copy of the data that he could use in his efforts to administer the Nelms and Allegro bankruptcy estates.

### c. Third Discovery Order, Contempt, & Arrest

On January 25, 2012, Hamm filed his first motion for sanctions, claiming that McCallan had not complied with the Second Discovery Order and had committed a host of discovery depredations. (Doc. 155). On February 14, 2012, Charles Parnell, Julian Spirer and Mark Rosenberg – the Defendants' first team of lawyers – moved to withdraw, citing in part McCallan's lack of cooperation in complying with the Second Discovery Order. (Doc. 168).

The Court held a hearing on Hamm's first motion for sanctions on February 16, 2012 and granted it in part and denied it in part. (Doc. 177). Hamm had requested entry of default judgment as a sanction for the Defendants' failure to comply with the Second Discovery Order. (Doc. 155). He also requested an additional $42,787.75 in attorneys' fees. (Doc. 175). The Court denied Hamm's request for default judgment, but it held the Defendants in contempt and again ordered them to produce the requested database, as well as several additional items, in an order dated February 22, 2012 ("Third Discovery Order").[6] (Doc. 177). More significantly, the Court ordered McCallan to appear in person at a hearing scheduled for March 5, 2012, and advised him that "[t]he Court will consider monetary sanctions, incarceration or entry of

---

[6] The Court also eventually approved Hamm's second application for attorneys' fees. (Doc. 296).

judgment by default." (Doc. 177). The Court ordered Parnell and Spirer to use their best efforts to provide McCallan notice of the March 5, 2012 hearing. (Doc. 177).

McCallan did not appear at the March 5, 2012 hearing. The Court found McCallan in contempt of court and issued a warrant for his arrest. (Doc. 183). On March 7, 2012, the Court granted the motion to withdraw as counsel filed by Parnell, Spirer and Rosenberg. (Doc. 184).

On March 8, 2012, McCallan was stopped by police in New Jersey for speeding. The police officer checked the national NCIC database, discovered the bench warrant issued by the Court, and arrested McCallan. The following day McCallan was released from jail and was ordered to appear in this Court not later than March 14, 2012. (Doc. 198).

### d. Defendants' April 2012 Production

On March 14, 2012 a second team of lawyers from the firm Haskell Slaughter entered their appearance on behalf of the Defendants.[7] (Docs. 186, 187, & 191). McCallan appeared before the Court on March 14, 2014 with his new lawyers and promised to produce the Allegro database. The Court scheduled a follow-up hearing for April 9, 2012. (Doc. 188). On April 23, 2012, Thomas Mancuso ("Mancuso") filed a lengthy "notice of compliance" in which the Defendants "assert[ed] emphatically" that they had complied with the Court's order. (Doc. 190).

The Defendants produced data stored on a CD (compact disc) rather than allowing access as ordered by the Court in the Second Discovery Order. (Doc. 138). Since production was made by way of delivering a CD and not by providing Hamm actual access to computer servers, the Defendants' production was facially deficient. The Defendants attempted to cover this defect by

---

[7] Thomas G. Mancuso, Robert H. Adams, C. McDowell Crook, Jr., and Jennifer B. Kimble initially appeared on behalf of the Defendants on March 14, 2012. (Docs. 186 & 187). Meredith J. Lees subsequently appeared on the Defendants' behalf on April 6, 2012. (Doc. 191).

-10-

claiming (falsely as it would turn out) that the servers had been deactivated, and for that reason production by the method called for in the Second Discovery Order was not technologically possible. (Doc. 190).

### e. Hamm's Second Motion to Compel

On September 24, 2012, Hamm filed a second motion to compel in which he asserted that the data produced by the Defendants was not usable.[8] (Doc. 203).

The Court ordered the parties to confer in advance of the evidentiary hearing on Hamm's motion to compel and attempt to resolve their differences. (Doc. 207). Over the objections of Hamm's counsel, the Defendants' lawyers had a court reporter transcribe the meeting, providing the Court a revealing window as to how the case was proceedings. (Doc. 239, Ex. 1, pp. 3-8). At this time, the Defendants' lawyers were claiming that the database could not be produced as called for by the Court's Second Discovery Order, and that production would have to be made by

---

[8] Rule 34(b)(2)(E) of the Federal Rules of Civil Procedure, as incorporated by Bankruptcy Rule 7034, requires as follows:

Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:

(i) A party must produce documents *as they are kept in the usual course of business* or must organize and label them to correspond to the categories in the request; [and]

(ii) If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or *in a reasonably usable form* or forms[.]

FED. R. CIV. P. 34(b)(2)(E) (as incorporated by FED. R. BANKR. P. 7034) (emphasis added).

-11-

alternate means – a claim which was later shown to be false. The following are excerpts from

the October 22, 2012 conference:

> MR. OLEN: Well, that's – that's very, very clear and very easy.
> What we want the defendants to do, and what y'all have not done,
> is to produce all of this information exactly the way it existed
> when the business was operating.
>
> MS. LEES: Well, you know – I mean, **there are some
> technological impossibilities** so – you've already said you don't
> like having to go in through each individual consumer because it's
> slow. So I can't speed it up because of the technology. So how am
> I going to fix that part?
>
> MR. OLEN: No. You're mischaracterizing what I just said. We
> want it to work the way it worked when the business was
> operational, and we are absolutely convinced that it worked
> differently than when – it worked differently when the business
> was operational than the manner in which you have provided it to
> us.

(Doc. 239, Ex. 1, pp. 28-29) (emphasis added).

This discussion went on for some time but this exchange captures the positions of the

parties. Hamm's counsel, Steve Olen, repeatedly demanded that he be given access to the

database as it existed when Allegro was operating and the Defendants' counsel, Meredith Lees

("Lees"), stated that it was technologically impossible, that production would have to be made in

another manner. The problem with the alternate means was that even if the data was contained

in the database, it was not accessible.

The exchange which best captures the duplicity of Defendants' counsel is as follows:

> MR. OLEN: Well, I don't know what the word "conflate" means.
> But what I do know is you are correct that we want the same
> functionality that existed before the defendants went out of
> business. And where we disagree is we believe that is absolutely
> what we're entitled to.

-12-

And when you say what's our proposal, that is our proposal. And according to the testimony, y'all did in fact preserve all of this in its entirety, including its functionality. And so that's what we're looking for.

MR. MANCUSO: And my question, Steve, is did Lewis Colley, under the direction of the Alabama Securities Commission which filed a petition in the circuit court, what steps did Lewis Colley take?

Because we didn't go out of business, Steve. We stopped operations because they were taken over by the Securities Commission.

\* \* \*

MR. MANCUSO: And then – and then, Meredith, there's another intervening step. What did Mr. Hamm do when he became the trustee pursuant to the Court order? What actions did he take to see whether or not that database was in the same state it was in when we were running the company? What did he do? Do you have a report from Mr. Hamm?

MR. OLEN: Why are you asking that question? How is that relevant to this discussion?

MR. MANCUSO: Well, because **we've got a number, Steve, of intervening parties who had access to the database**. And we don't know what they did.

We tried to – we tried to do this, Steve, based on – we're three parties removed at this point in time in your lawsuit. You've got the securities commission, you've got Lewis Colley, you've got his accounting firm and then you've got Mr. Hamm taking over under the Court order.

MR. OLEN: Well, there is absolutely no evidence or any other basis for your suggestion, implication, accusation, whatever it is, that anyone ever did anything to alter the defendants' computerized information in any way.

(Doc. 239, Ex. 1, pp. 33-36) (emphasis added).

-13-

The position taken by Defendants' counsel, Meredith Lees and Thomas Mancuso, here was outrageous. To begin with, the Court's Second Discovery Order required the Defendants to make their computer servers available to Hamm's computer experts, so that he could make his own copy of the database. (Doc. 154). By that time, the Court had already conducted several hearings, as well as one full-blown evidentiary hearing, on the question of production and functionality of the database. The purpose of the Second Discovery Order was to stop just this sort of game-playing. Yet, Lees persisted in the false argument that production could not be made in the manner called for by the Court's order because it was technologically impossible.

Mancuso raised their duplicity to another level when he falsely claimed that Colley and Hamm had obtained control of the Allegro database. But it was McCallan, acting through AmeriCorp and Seton, who controlled the database at all times, because it was McCallan who was running Allegro. Mancuso's claim that his clients no longer controlled the database was patently false. Indeed, it was Mancuso who filed a "Notice of Compliance" five months earlier, contending that the Defendants were then in compliance with the Court's Second Discovery Order – because they had produced a copy of the database. (Docs. 190 & 197). Nowhere in these responses did Mancuso claim the database was no longer in the control of the Defendants.

### f. Database Fundamentals

To understand the problem that Hamm was having with discovery, one must understand something of AmeriCorp's databases and of databases in general. At the evidentiary hearing conducted on February 21-22, 2013, the Court learned that AmeriCorp used Microsoft SQL Server, a relational database. "SQL" means survey query language. Large quantities of data may be stored and later accessed. The data is stored in tables that are defined by the user, and

-14-

the means by which the tables relate to one another is also defined by the user. There are two primary means to accessing data in a database. First, one may write a query – a question – where the database program will access the database and arrive at an answer. Second, the user may use a "front-end application," which is a separate program used to access the data.

### i. Writing a Query

Writing a query requires knowledge of database operations and some expertise. More importantly, in order to write a query one must understand how the tables relate to one another. The following exchange between Defendants' counsel, Meredith Lees, and their database expert, Matthew Long ("Long"), at the February 21-22, 2013 evidentiary hearing is instructive:

> MS. LEES: You heard – Mr. Middleton testified at length the reason he couldn't have written SQL queries is because he didn't understand how the defendant's business operated. Is that – was that necessary for you? Did you have to know how the front end applications worked and how all of the table spoke to one another to be able to write the SQL queries?
>
> MR. LONG: Well, let me be clear here. You combined a couple of things in that question. The front-end applications, no. How, the table related to one another, yes, I did need that information.
>
> MS. LEES: How did you determine how the tables related to on another?
>
> MR. LONG: I interviewed a couple of member of the AmeriCorp previous executive team.

(Doc. 259, pp. 95-96).

The significance of this testimony is that Long had assistance from AmeriCorp personnel to obtain the information necessary to write queries. Hamm's expert, Jeff Middleton, testified that he was not given the information necessary to write a query. Counsel for the Defendants

postured that Hamm did not understand the Defendants' business, or that his experts did not understand the database, but the Defendants' own expert undercut that argument. Long was able to write queries to access the data because AmeriCorp personnel gave him assistance as to how the information in the various tables were related.

The following hypothetical will illustrate this point. Assume that one has a paper telephone directory with 30,000 entries – that is 30,000 names with corresponding addresses and telephone numbers. Assume further that someone takes a pair of scissors and cuts up the directory so that a reader could not tell which name went with which address or telephone number. Assume further that all of these separate tables – names, addresses, and telephone numbers– are thrown into a barrel, shaken up, and given to someone from out-of-town. In theory, the entire directory could be produced without providing any useful information.

The same is true of databases. If there are thousands of entries organized by different tables, but there is no way to relate an entry's information in one table to its corresponding information in other tables, the entire database could be produced without providing anything usable. That is what the Defendants produced throughout the course of this litigation. Even if they produced all of the data – a doubtful assumption in this case – there was no way to relate the data, rendering it useless. In essence, the Defendants produced the barrel with all of the information in it, but no way to relate one piece of information to another.

### ii. Front-End Application

The other means of accessing a database is through a "front-end application." A front-end application is a computer program that enables a user to access data in a database without having to write a query. An example that would be familiar to those who work in the federal

-16-

court system is the CM/ECF system.  The data in a federal court's files is maintained in a database known as "Informix."  That is, all of the information in the various clerks' offices resides in an Informix database.  The means by which users – *e.g.*, lawyers, judges, and administrative staff – access the Informix database is by way of a front-end application called "CM/ECF," which is an internet-based application program.  Most users are not, and need not be, aware that they are accessing an Informix database.

Returning to the AmeriCorp database, the point of the Court's Second Discovery Order was to permit Hamm and his computer experts and accountants to clone or copy the front-end applications.  In spite of repeated orders that the front-end applications be produced, and contrary to repeated representations from the Defendants and their counsel that they had been produced, a database with working front-end applications was not in fact produced until November 26, 2012.  (Doc. 224, p. 30).  The Defendants' actions of producing data without a front-end application effectively kept Hamm and his experts in the dark as to what was actually in the database.

### g.  The February 21–22, 2013 Sanctions Hearing

When Hamm filed his second motion to compel, on September 24, 2012, the Court initially scheduled an evidentiary hearing on Hamm's motion for November 5, 2012.  (Doc. 207).  On October 29, 2012, Defendants filed an "Emergency Motion to Continue" the evidentiary hearing, complaining that Hurricane Sandy made it impossible to prepare for the hearing.  (Doc. 210).  The Defendants attached copies of news articles about Hurricane Sandy's imminent landfall in the New York area, but failed to mention that the computer servers containing the Allegro database had been moved to Florida a year or more earlier.  Not realizing

that it had again been misled by the Defendants and their counsel, the Court rescheduled the evidentiary hearing for January 29, 2013. (Doc. 216).[9]

On January 23, 2013, Hamm filed a second motion for sanctions. (Doc. 224). Thirty pages long, the motion scathingly set out the Defendants' multitudinous discovery violations in excruciating detail. (Doc. 224). This triggered another request for delay from the Defendants, so the Court rescheduled the evidentiary hearing for February 21, 2013. (Doc. 231).

The evidentiary hearing on Hamm's second motion for sanctions lasted two days. (Docs. 259 & 261). Hamm called Jeffrey Middleton ("Middleton"), a computer expert, who testified that the database produced by the Defendants in April 2012 was not accessible, for the reasons already discussed, and was also incomplete based on the presence of additional documents in their November 2012 production. (Doc. 259, pp. 24-67). Middleton's testimony was forthright and credible.

Defendant Timothy McCallan also testified on February 21, 2013. McCallan acknowledged that he was the owner and chief executive officer of AmeriCorp and Seton. (Doc. 259, p. 111). The next exchange was astounding:

> MR. OLEN: Where did you move the servers to after the business closed down on March 31, 2011?
>
> MR. McCALLAN: The servers were migrated to Florida into a center called CNI, which is a third-party hosting company.
>
> MR. OLEN: And are they still there today?
>
> MR. McCALLAN: Yes.

---

[9] That order contains typographical errors. The order states January 29, 2012, which was in error as that date had already passed.

-18-

* * *

> MR. OLEN: Are you aware that, until you testified right here a
> few minutes ago, that nobody told us that the original servers from
> AmeriCorp and Seton are physically located at CNI in Florida?
> Are you aware of that?
>
> MR. McCALLAN: I am not aware of – no, I am not aware of that.

(Doc. 259, pp. 113, 118). Testimony by Oscar Nunez, AmeriCorp's IT manager, was even more

illuminating:

> MR. OLEN: Now, in October, you just testified that in October
> 2011 you had all of the infrastructure in place for someone to work
> from home on those AmeriCorp servers; is that right?
>
> MR. NUNEZ: Yes.
>
> MR. OLEN: And so the system was essentially rebuilt in Florida,
> right?
>
> MR. NUNEZ: Rebuilt in Florida?
>
> MR. OLEN: In other words, when it went to CNI, it was fully
> functioning and someone could have remoted into the servers and
> operated QPS and CreditSoft [AmeriCorp's front-end applications]
> just like you would if you had been in New York, right?
>
> MR. NUNEZ: Yes.
>
> MR. OLEN: Was the system in Florida that was fully operational
> ever dismantled?
>
> MR. NUNEZ: No.
>
> MR. OLEN: So it has worked just like that from October 2011 to
> at least eight months ago [June 2012], which is the last time that
> you had any knowledge of it, the last time you were employed
> there?
>
> MR. NUNEZ: Yes.

(Doc. 259, p. 182) (bracketed matter added).

-19-

Oscar Nunez's testimony shows that the representations made by the Defendants' counsel, Meredith Lees and Thomas Mancuso, were false in two respects. First, their assertion that it was impossible to provide access to the database was proven false because the servers containing the database were fully operational and were being maintained in Florida. There was no reason why the Defendants could not comply with the Court's Second Discovery Order by providing Hamm access to the servers. Second, the Defendants' assertion that they needed a continuance due to Hurricane Sandy was shown to be false, again because the servers were in Florida, not New York.

The Court took Hamm's second motion for sanctions under advisement. In late June of 2013, the Defendants finally provided Hamm access to the servers (and database) in Florida.[10] The Court scheduled trial for November 4, 2013. (Doc. 253).

### 3. Pre-Trial Proceedings

#### a. The Haskell Slaughter Lawyers Withdraw

On June 6 and 7, 2013, the Defendants' second team of lawyers moved to withdraw their appearance, citing the Defendants' refusal to communicate with them or to pay their fees.[11] (Docs. 277, 278, 283, & 293). The Court scheduled a hearing on the motions for July 22, 2013,

---

[10] Even that was not the end of the discovery dispute. In September 2013 Hamm filed a motion requesting access to the cloned servers, averring that on July 9, 2013, the Defendants had raised – for the first time – a blanket assertion of attorney-client privilege. (Doc. 312). Over the Defendants' motion to strike and objection (Docs. 314 & 319), the Court granted Hamm's motion. (Doc. 321).

[11] Mancuso left Haskell Slaughter in April 2013 to start his own firm; however, he did not move to withdraw his appearance in this case until June 7, 2013. (Doc. 278).

and ordered McCallan to appear in person.  (Doc. 279).  At that hearing, the following exchange

occurred:

> THE COURT: . . . My primary concern is I want to get this case tried.  It is scheduled to go to trial in November of this year.  Now, whether that is going to happen or not, we will talk about in a few minutes.
>
> I guess my number one question is where do you stand with respect to the motion to withdraw?
>
> * * *
>
> MR. McCALLAN: I do allow the motion to withdraw.  At this time, Your Honor, I don't have the financial resources and, with the toll that this has taken on my wife, my kids and my family, I just can't defend this case any more.
>
> THE COURT: Okay.  Well, I mean, if that is your position, then that is fine.  I'm going to tell you right up-front I don't believe it.  I mean, I saw an awful lot of money going through this case, an awful lot of money going to AmeriCorp and other entities, you know, owned or at least believed to be controlled by you.  So you are telling me you can't afford it but, I mean, what is . . . so I take it you intention is not to try and retain other counsel?
>
> MR. McCALLAN: I am just trying to sort through what options could be, Your Honor.
>
> THE COURT: Well, I mean, the lawyers you have got right now, the Haskell Slaughter lawyers, have been in for over a year now and we will get to the matter of discovery in a minute.  I want to make sure I understand where were are on that, but I don't have to grant their motion, and you know, I haven't decided that I am going to grant it yet.
>
> One of the things I am concerned about is I want to get this case tried by November, if at all possible, and if you get new counsel, they almost certainly will come in and ask for additional time and ask to kick this off.  So that is one problem and I am sure you have probably been counseled on all of this but the trustee is not just suing the corporations, he is suing you personally and, depending on how this all shakes out, you could end up with a very large nondischargeable liability against you.

-21-

So I don't think you . . . well, you would be taking a real risk if you just let this thing go by default. And, of course, the immediate problem is you can represent yourself, you could maybe stave off default for a while but you can't represent corporations. Alabama law doesn't allow that. So they are going to be in default if you haven't got other counsel.

So, anyway, I guess for now you are telling me you are not opposing the lawyers' motion to withdraw and you are not ... you don't have other counsel that you are going to retain; is that correct?

MR. McCALLAN: No, sir.

(Doc. 303, pp. 4-7). Based on McCallan's representations, the Court granted the motions to withdraw filed by the Defendants' counsel on July 23, 2013. (Doc. 296).

### b. Thomas McAlpine Appears and Attempts to Delay Proceedings

Four days after McCallan indicated to the Court that he would not retain new counsel, Mobile lawyer Thomas McAlpine ("McAlpine") entered his appearance on behalf of the Defendants on July 26, 2013 – a Friday – and moved to quash depositions that were scheduled for the following Monday, precisely as the Court had predicted. (Doc. 301). The Court was troubled with both the timing of McAlpine's motion and the tactics he used in filing it.

McAlpine called the Court's chambers early that Friday and spoke with the undersigned's Judicial Assistant, inquiring about technical matters such as the Court's CM/ECF system. Yet he waited until after 4:00 p.m. to telephone the Court – *ex parte* – with a false claim that he could not file using the Court's CM/ECF filing system. McAlpine represented to the Court that he had been advised by the Clerk's office that it would take five days to be approved for a CM/ECF login, and that he needed to file his motion via facsimile. In fact, McAlpine had not even requested a CM/ECF login and did not do so until 4:40 p.m. that Friday; the Clerk's

-22-

office emailed him his CM/ECF login twenty minutes after it opened the following Monday, less than one business hour after he had requested it. In other words, McAlpine contrived his emergency to try to obstruct the proceedings. Additionally, the Court later learned that McAlpine had not contacted opposing counsel to inform them of his motion to quash.

The Defendants' July 26 "emergency" motion was nothing more than an obstructionist tactic in a case that had seen the Defendants employ a litany of them. The Court denied the Defendants' motion to quash, finding that it was filed in bad faith. (Doc. 300).[12]

On July 29, 2013, counsel requested a telephonic hearing where McAlpine moved to change the location of a deposition scheduled for that Thursday, August 1, from Orlando, Florida to Mobile, Alabama. Again, the Court denied the Defendants' motion, while McAlpine repeatedly interrupted the Court during its ruling. The Court reprimanded McAlpine in its subsequent written order:

> The Court would further caution Attorney McAlpine about what it considers McAlpine's rude and unprofessional behavior. The Court is aware that he is disappointed with this ruling and the Court's Order of July 26, 2013[.] However, McAlpine's recriminations and complaints after an adverse ruling are unacceptable. For example, the fact that McAlpine has been practicing law since 1976, or that he had to spend the whole weekend preparing for depositions, was not pertinent. McAlpine is advised that at some point rude and unprofessional behavior crosses the line and becomes contemptuous.

(Doc. 302) (parenthetical omitted).

### c. Hamm's Third Motion for Sanctions

---

[12] Due to McAlpine's duplicity, the Court's order denying the motion to quash was docketed prior to the motion itself. (Docs. 300 & 301).

On August 20, 2013, Hamm filed a third motion for sanctions. (Doc. 307). He asserted that he was unable to make distributions to creditors of the Allgero bankruptcy estate due to the Defendants' stonewalling on discovery, causing those creditors to incur continual interest on the outstanding debts they owed that in Hamm's estimate amounted to $895,968.32.[13] Hamm had also been forced to post $71,000 in bonds as security for the money in the bankruptcy estate, and had incurred $32,489.63 worth of banking service fees during that time. Altogether, Hamm asked for $999,457.95 in costs incurred due to fees and the lost use of the estate funds. (Doc. 307).

The Defendants, through McAlpine, filed a particularly vituperative response to Hamm's motion. (Doc. 311). They asserted that Allegro should have remained under the control of the Receiver, "stated unequivocally" that Hamm breached his duties as Trustee of the Allegro bankruptcy estate by making "a number of incredibly bad business decisions[,]" and claimed that Hamm's handling of the money was "incredibly inept[]" and bore "very closely to abuse of the discretion" of a Trustee.[14] (Doc. 311). They also claimed that their "duty is only to reasonably

---

[13] As noted above, most of Allegro's creditors were people who had sought financial relief, usually from credit card debt, through debt settlement services offered by Allegro. According to Hamm, he was forced to hold $16,507,937.79 in the Allegro bankruptcy estate between December 2011 and July 2013 because he did not know how much to pay to each creditor. *Cf.* Guide to Judiciary Policy, Vol. 9, § 340.20 (detailing reporting requirements of entities holding bankruptcy estate funds and authorizing trustees to permit withdrawal of the funds for failure to report). Accumulation of interest during that time at the prime rate of 3.25% would equal $895,968.32. (Doc. 307). This is a conservative estimate based on an unrealistically low interest rate. Accumulation of the actual interest Allegro's victims were being charged on their debts was undoubtedly much higher.

[14] As part of their recriminations, the Defendants criticized Hamm for failing to place the estate funds in an interest-bearing account. Their criticism is misplaced for two reasons. First, investment interest rates have been extremely low since the 2008 recession and would not have set off the interest incurred on debt. *Cf.* Guide to Judiciary Policy, Vol. 9, § 340.10.10(b)(3)

respond to discovery," ignoring the fact that they held Allegro's business records and persistently tried to thwart discovery. (Doc. 311).

The Court took Hamm's third motion for sanctions under advisement. Having carefully considered Hamm's motion and the Defendants' response, the Court finds that the motion is well-taken and should be granted as filed. These proceedings were delayed by several years as a result of the Defendants' well-documented obstructionist tactics. The Defendants' intemperate criticism of Hamm's performance as Trustee in the underlying bankruptcy cases is not well-taken. Neither McCallan nor McAlpine have any experience acting as a trustee in cases such as this and they offer no evidence in support of their opposition. Put simply, they do not know of what they speak. The Defendants' objections are overruled and the Court will, by way of a separate document, award sanctions.

### d. The Defendants' Pre-Trial Motions

On September 30, 2013, McCallan individually moved for summary judgment, supporting his motion in part with documents not previously produced to Hamm. (Doc. 320). Hamm moved to strike those documents and opposed summary judgment. (Docs. 327 & 328).

On October 22, 2013 – just thirteen days before trial – the Defendants moved for the undersigned to recuse himself. (Doc. 332). The merits of the Defendants' motion to recuse will

---

(Chapter 7 trustee must consider "whether the interest earned . . . is sufficient to yield a meaningful benefit to claim holders"). Second, that is not the duty of a Chapter 7 trustee. Rather, the trustee must "collect and reduce to money the property of the estate . . . and close such estate *as expeditiously as is compatible* with the best interests of parties in interest[.]" 11 U.S.C. § 704(a)(1) (emphasis added). In other words, a Chapter 7 trustee's job is to collect estate property and distribute those funds to creditors as quickly as possible, not withhold it from creditors by placing it in an interest-bearing account with potential transaction limits. This litigation is ample proof that Hamm zealously attempted to collect and distribute the Allegro estate. His inability to do so "expeditiously" lies at the feet of the Defendants.

be discussed in greater detail below.  Hamm opposed the motion to recuse, reiterating the

Defendants' discovery abuses and the impending trial.  (Doc. 333).  The Defendants dismissed

Hamm's response as "based upon hyperbole and devoid of facts and merit."  (Doc. 337).

The Court heard both motions at a pre-trial hearing on October 28, 2013, and denied

both.[15]  (Docs. 338 & 344).[16]  The parties discussed expected witness and evidence to be offered

at the trial scheduled for November 4, 2013, and McAlpine gave every indication that he would

appear on behalf of the Defendants.  (Doc. 344).  The following colloquy occurred at the October

28 pre-trial hearing:

> MR. McALPINE:  Your Honor, with regard to the Chase records, I
> have seen them.  I have not had an opportunity to go through them
> at length but essentially what they are trying to do with those
> Chase records violates Rule 400 and 401 of the Federal Rules of
> Evidence.  They are trying to prove that Mr. McCallan and/or his
> companies are bad before this court in this case because of
> something that occurred in another case before another court or it
> may be in this court, I am not sure.
>
> THE COURT: Okay.  So if I am understanding Rule 400, you are
> saying that your are not objecting on the grounds of authenticity
> but you want to object on the grounds of relevance and
> materiality?
>
> MR. McALPINE: That's correct. I don't think that we have an
> objection on grounds of authenticity if they are in fact as she says
> they are.  I would reserve any objection to that until the time of
> trial.

---

[15]  The Defendants appealed this Court's denial of their motion to recuse both to the
District Court and to the Eleventh Circuit.  (Docs. 340, 342, & 357).  Both of those courts
dismissed the appeal for want of jurisdiction.  (Docs. 354 & 358).  The Eleventh Circuit also
denied the Defendants' motion to reconsider the dismissal of their appeal.  (Doc. 359).

[16]  Docket entry 344 is the transcript of the October 28, 2013 hearing.  Docket entry 338
is the written order entered by the Court the following day.

With regard to McCallan being called as a witness by order of this court, we do not intend to call Mr. Timothy McCallan as a witness. We do not believe it is necessary.

With regard to the judicial notice, there are a number of things which have come in, in these motions and these hearings from the plaintiffs which are pure hearsay and are not admissible and, therefore, we would object to those and we will be objecting to them.

(Doc. 344, pp. 44-45). The Court reiterated that it would conduct the trial on November 4, 2013.

### e. The Trial

The trial took place as scheduled on November 4, 2013, where the following

proceedings occurred:

THE COURT: Okay. Well, good morning. Let's take appearances. First for the plaintiff.

MR. OLEN: Steve Olen and Lucy Tufts for the plaintff, Daniel Hamm, the trustee.

THE COURT: Good morning.

MR. HAMM: Daniel Hamm, the trustee.

THE COURT: Okay. Well, I do not see anybody. Do we have anybody for the defendants?

[No response.]

THE COURT: By my watch, it is now eleven minutes past nine o'clock. This case was scheduled for 9:00 a.m. this morning. It has been scheduled for many months. We had a pretrial conference just last week. I didn't get any indication at all from Mr. McAlpine that he didn't intend to appear. It was discussed that Mr. McCallan would not appear but we have him by deposition and that was not going to hinder the trial, in my view. If he didn't want to testify live, that was his business.

-27-

We telephoned Mr. McAlpine's office and didn't get any information. He has not telephoned chambers. He has telephoned chambers in the past when it suited him.

So, anyway, I intend to go forward with the trial. You know, it is scheduled, so my recollection was – we had a discussion, I guess – well, Mr. McCallan is not here. You have got his deposition.

I guess the next question is who have we got that you had intended to call live and then, I guess, Mr. Olen, I want your thoughts. I mean, do you want to just proffer or do you want to actually call the witnesses? You know, I am assuming at the end of the day you are going to ask for a substantial money judgment in favor of the plaintiff. I guess I am not giving anything away. I am going to be inclined to grant that at this point.

They have already filed notice or a motion for an interlocutory appeal. We did a little research, just on the off chance that they might have been under the impression that the interlocutory appeal would somehow divest the court of jurisdiction. It does not. They have not moved for a stay. I really don't think they can be under some sort of misimpression that there would not be a trial today.

So, needless to say, you know, I don't know why Mr. McAlpine is not here. I am a little perturbed that, you know, if he has had some sort of difficulty, a car issue or something, that he could have called. It is the age of cell phones. It is a pretty simple matter and, like I said, we did check in with his office.

So I guess, Mr. Olen, what are your thoughts? How do you want to proceed?

MR. OLEN: Your Honor, what I would like to do, if it's okay, is have maybe ten minutes to confer with Ms. Tufts. I am caught off-guard. I did not –

THE COURT: Well, I know you have tried a lot of cases in your life. Have you ever had this happen?

MR. OLEN: Never, never, and particularly where the opposing counsel didn't call the court, or us, or anyone. I have never had

this, and the issue for us is that I would just like a few minutes to discuss how much of the evidence. . . .

(Doc. 349, pp. 3-5).  The Court heard evidence from witnesses called by the Plaintiff until 11:58

a.m. and then broke for lunch.  (Doc. 349, pp. 7-93).  The Court resumed the trial at 1:04 p.m.,

where the following proceedings occurred:

> THE COURT: Please be seated.  Mr. Olen, Ms. Tufts, I just wanted to report Cynthia Sanders, who is one of our Case Administrators – she is actually the case administrator assigned to this adversary proceeding.  She received a phone call from a man who would not identify himself who asked if we were having a trial today.  She said, yes, that the trial was going on.  The man then said, "Well, I filed a motion so that wasn't supposed to happen."  She said, well, she didn't know, that he should call chambers.  She asked the man to identify himself and he did not, but she did note his telephone number on the caller ID and it was in fact Mr. McAlpine.[17]
>
> Whether he really thought – as I am sure you are aware, Mr. Olen, you saw on the 30th, last Wednesday, he filed a motion for leave to take an interlocutory appeal.  I saw is the day it was filed or within a day after and as, as you are aware, I did not ask you to respond because I had no intention of considering the motion prior to the trial; and there was no motion to stay and, as of yet, I have taken no action on the motion for an interlocutory appeal.
>
> I don't know if this is yet more game playing on the part of the defendants or an absolutely shocking ignorance of the law and rules of procedure.  Either way, we're going forward.  I thought I would report the phone call but Ms. Sanders, our case administrator, you know, said that it was going forward and invited him to call chambers, which he did not.

---

[17] McAlpine had previously telephoned the Court and his number was known by Court personnel.

(Doc. 349, pp. 93-94) (footnote added).  The Court continued to hear evidence from witnesses called by the Plaintiff until it adjourned at 3:03 p.m.  (Doc. 349, pp. 95-157).

At the time the this case was called for trial, the Court did not know where McAlpine was or why he was not in court.  It elected to proceed, knowing that if McAlpine had a valid reason for not being present, such as car trouble or a significant health issue, that the November 4 proceedings may have been all for naught.  McAlpine did not telephone the Court to make everyone aware that he had decided not to attend trial.  Moreover, he was not in his office when the Courtroom Deputy telephoned inquiring as to McAlpine's whereabouts.  The individual who answered the telephoned claimed to not know where he was.  Neither McAlpine nor any representative of the Defendants has contacted the Court at any time since the November 4, 2013 trial to explain their absence or request a further hearing.  It is clear beyond all doubt that the Defendants and their counsel wilfully absented themselves from the trial.

All of this smacks of the worst kind of gamesmanship.  McAlpine's actions, leading the Court to believe that he would be present for trial and then not appearing, not advising that he would not appear, and then willfully absenting himself so as to create uncertainty, is utterly inexcusable conduct.

### D.  Findings of Fact

At the conclusion of the November 4, 2013 trial, the Court requested that the Plaintiff provide "Proposed Findings of Fact and Conclusions of Law."  The Plaintiff complied on December 3, 2013.  (Doc. 355).  The Defendants have not filed a response.  The Court accepts the proposed findings of fact and conclusions of law, except to the extent inconsistent with the

-30-

conclusions of law reached in this opinion. The Court attaches a copy of the proposed findings of fact and conclusions of law as Appendix B.

Notwithstanding the Court's acceptance of the proposed findings of fact as submitted by the Plaintiff, a brief summary of the facts is appropriate here. Defendant Timothy McCallan operated a fraudulent debt management and debt settlement business. The primary vehicle through which McCallan operated his scheme was Defendant AmeriCorp. The "front" for the scheme – that is, the face actually shown to the public – was Allegro Finance and Allegro Law. Both of the Allegro entities were owned by Keith Nelms. Nelms was a practicing lawyer with an office on Cobbs Ford Road in Prattville, Alabama. Nelms had no experience in the debt management business and, in his testimony in several proceedings[18] before this Court, Nelms made it clear that he did not have any idea how the business actually works. Indeed, the only reason McCallan used Nelms was because his previous "front," the Hess-Kennedy law firm, had been shut down by the State of Florida.

Using a sophisticated array of advertisements and telemarketers, McCallan induced at least 5,214 individuals to sign up for his program. His victims signed up under the belief that they would be represented by an attorney, Nelms, and that he would negotiate a settlement with their creditors (usually credit card companies). McCallan instructed these individuals to stop paying on their debts directly, and induced them into transferring a portion of their income to entities controlled by him, with the promise that their debts would be taken care of. They were not. Virtually all of the money paid by Allegro customers toward the goal of debt settlement was

---

[18] As noted above, Nelms offered testimony during his own bankruptcy proceedings and as a defendant for a related adversary proceeding, Chase Bank USA v. Nelms, case no. 10-03042. The Court takes judicial notice of Nelms's testimony in these proceedings.

siphoned off by McCallan and those in league with him.  The Court finds that AmeriCorp, Seton, and McCallan defrauded their victims out of $102,949,220.72.

## II.  CONCLUSIONS OF LAW

The Court will divide its Conclusions of Law into three parts.  In Part A, the Court will consider its jurisdiction and adjudicatory power.  In Part B, the Court will discuss the Defendants' motion to recuse the undersigned.  In Part C, the Court will consider whether default judgment is appropriate.

### A.  Jurisdiction & Adjudicatory Power

### 1.  Jurisdiction

A district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  A district court may refer all such cases to the bankruptcy judges for the district, 28 U.S.C. § 157(a), and the District Court for the Middle District of Alabama has done so.  *See* General Order of Reference – Bankruptcy Matters (M.D. Apr. 25, 1985).

"'Arising under' proceedings are matters invoking a substantive right created by the Bankruptcy Code."  Continental Nat'l Bank of Miami v. Sanchez (In re Toledo), 170 F.3d 1340, 1345 (11th Cir. 1999).  A proceeding is "related to" a bankruptcy case when "'the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy.'"  Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.), 910 F.2d 784, 788 (11th Cir. 1990) (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)).  "'An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either

-32-

positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.'" Id. (quoting Pacor, 743 F.2d at 994).

Counts II, III, and IV (avoidance of preferences, post-petition transfers, and fraudulent transfers) of Hamm's amended complaint invoke substantive rights created by the Bankruptcy Code and are thus "arising under" proceedings. In its decision affirming this Court's denial of arbitration, the District Court ruled that Counts I and V (turnover and accounting) are more properly characterized as breach-of-contract claims. McCallan v. Hamm, 2012 WL 1392960, *5, 2012 U.S. Dist. LEXIS 56907, *15 (M.D. Ala. Apr. 23, 2012). These claims could still conceivably have an effect on the Allegro bankruptcy estate and therefore are "related to" proceedings. The Court has jurisdiction under 28 U.S.C. § 1334(b) on all five counts of Hamm's amended complaint.

## 2. Adjudicatory Power

Absent consent of the parties, a bankruptcy court may not enter final judgment in non-core proceedings. 28 U.S.C. § 157(c)(1); *see also* N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 71-72 (1982). A bankruptcy court may enter final judgment in a core proceeding under 28 U.S.C. § 157(b)(1) so long as it involves the restructuring of debtor-creditor relations and not merely the augmentation of the bankruptcy estate. Stern v. Marshall, 131 S. Ct. 2594, 2614 (2010); *see also* N. Pipeline Constr. Co., 458 U.S. at 71; Wellness Int'l Network, Ltd. v. Sharif, 135 S. Ct. 1932, 1951-54 (2015) (Roberts, C.J., dissenting).[19] Congress has provided a non-exhaustive list of core proceedings under 28 U.S.C. § 157(b)(2), but "engrafted

_____

[19] Though designated as a dissent, Chief Justice Roberts's opinion in Wellness Int'l Network is more properly characterized as a concurrence because, like the majority, he would have reversed the Seventh Circuit and remanded.

upon all of them is an overarching requirement that property of the estate under [11 U.S.C.] § 541 be involved." Toledo, 170 F.3d at 1348.

In its decision affirming this Court's denial of arbitration, the District Court held that Counts I and V of Hamm's amended complaint are non-core. McCallan, 2012 WL 1392960 at *5, 2012 U.S. Dist. LEXIS 56097 at *15. Counts II, III, and IV are nominally core proceedings under 28 U.S.C. § 157(b)(2)(F) and (H), but under the facts of this case they merely seek augmentation of the bankruptcy estate and thus fall under the Stern exception to a bankruptcy court's power of final adjudication over core claims.

A bankruptcy court otherwise lacking adjudicatory power may nevertheless enter a final judgment with the express or implied consent of the parties. Wellness Int'l Network, 135 S. Ct. at 1947-48 (majority opinion); 28 U.S.C. § 157(c)(2). Such consent must "be knowing and voluntary." Wellness Int'l Network, 135 S. Ct. at 1948. "[T]he key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." Id. (quoting Roell v. Withrow, 538 U.S. 580, 590 (2003)).

Hamm consented to adjudication by this Court when he filed his complaint. AmeriCorp and Seton asserted counterclaims against Hamm (in his capacity as Trustee of the Allegro estate) for breach of contract and quantum meruit. (Doc. 32). Also, the Receiver, Louis Colley, filed an administrative claim on their behalf in the Allegro bankruptcy for almost $400,000. (Case No. 10-30631, Doc. 74). "A creditor who files a proof of claim in a bankruptcy case submits to the bankruptcy court's equitable jurisdiction for determination not only of the claim itself, but also of any counterclaim or defense that must necessarily be resolved in the claims allowance

process." DePaola v. Sleepy's, LLC (In re Prof'l Facilities Mgmt., Inc.), 61 Bankr. Ct. Dec. 203, 2015 WL 6501231, *4, 2015 Bankr. LEXIS 3643, *10 (Bankr. M.D. Ala. Oct. 27, 2015); *see also* Katchen v. Landy, 382, U.S. 323, 330, 334-35 (1966); Stern, 131 S. Ct. 2607-08, 2616-18. This Court, in Prof'l Facilities Mgmt., extended this principle to counterclaims filed by a defendant in an adversary proceeding against a Chapter 7 trustee acting in her representative capacity. *See* Prof'l Facilities Mgmt., 2015 WL 6501231 at *5-6, 2015 Bankr. LEXIS at *15-18. At the time they were filed, resolution of these claims and counterclaims could not be resolved without determining the merit of Hamm's claims. Given the counterclaims filed by AmeriCorp and Seton, and the claim for administrative expenses filed by the Receiver on their behalf, the Court concludes that they have impliedly consented to adjudication by this Court.[20]

McCallan filed his initial answer as to Counts II, III, and IV on July 21, 2011, and did not expressly refuse his consent to adjudication by this Court.[21] (Doc. 73). When he (and AmeriCorp and Seton) finally answered Counts I and V more than a year later, and nearly two years into the litigation, he – for the first time – demanded a jury trial and expressly refused consent to adjudication by this Court. (Doc. 206). He also subsequently moved for summary judgment on all counts, (Doc. 320), and never again raised his jury trial demand or refusal to consent to adjudication in the hearings leading up to the trial.

After the Supreme Court remanded Wellness Int'l Network to the Seventh Circuit, the Seventh Circuit determined that the defendant had waived his right to an Article III adjudicator

---

[20] The voluntary dismissal by AmeriCorp and Seton of their counterclaims, (Doc. 69), does not change this result. Once given, consent cannot be withdrawn.

[21] McCallan did not file an answer as to Counts I and V at this time because he moved to compel arbitration of those counts on the same day. (Doc. 72).

by failing to timely raise it – a matter of five months.  <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 617 Fed. Appx. 589, 590 (7th Cir. 2015).  Notably, that case, like this one, also involved protracted litigation caused by a "pattern of discovery evasion" by the defendant, and resulted in an entry of default judgment by the bankruptcy court.  <u>Wellness Int'l Network</u>, 135 S. Ct. at 1941.

Here, McCallan and his co-Defendants waited almost two years to demand a jury trial and to refuse consent to adjudication by this Court.  By that time, he had already violated at least three of this Court's discovery orders, provoked two motions to compel by Hamm, and had been arrested as a consequence of the bench warrant issued by this Court.  Under these facts, the Court readily concludes that McCallan's jury trial demand and assertion of his right to an Article III adjudicator were untimely.  Alternatively, McCallan (and his counsel) waived those rights by failing to subsequently reiterate them and by giving the Court (and opposing counsel) the false impression that they intended to defend this suit at a bench trial conducted by this Court.[22]

In short, all of the parties have consented to final adjudication by this Court.

## B.  Motion to Recuse

### 1.  The Defendants' Asserted Grounds for Recusal

The Defendants assert recusal is mandated pursuant to 28 U.S.C. §§ 455(a) and (b)(1).[23] (Doc. 332).  They also attached an affidavit by McCallan, asserting that he is "an objective, disinterested, lay observer," and listing numerous examples from the Court's prior rulings and

---

[22]  These are also alternative grounds for waiver on the part of AmeriCorp and Seton.

[23]  The Court infers that the Defendants only assert 28 U.S.C. § 455(b)(1) and not (b)(2)-(b)(5), though they simply cite § 455(b), based on context.  The motion mentions "bias" and "prejudice" several times, and does not suggest the Court had any personal interest in the matter or any personal relationship with someone involved in the matter.

statements during hearings that purportedly demonstrate the undersigned's bias and prejudice against the Defendants. (Doc. 332). The remarks made by the undersigned that McCallan complains of in his affidavit consist of the following:

> That the Defendants "have a long history of masterminding, orchestrating and facilitation of debt settlement schemes across the United States."

> That Nelms "perpetrat[ed] McCallan's established, fraudulent debt-settlement scheme" and that "[t]he product of this unholy conspiracy . . . was Allegro[.]"

> That the benefits to consumers of the "lengthy dense contracts" between them and Allegro "appear to be largely illusory."

> Questioning Ed Reed, General Counsel of the Alabama Securities Commission, why he thought it was a good idea to continue to operate Allegro and work with AmeriCorp after Allegro's business model had been revealed.

> Reporting to the District Court that "the contract between Allegro Law and . . . Seton is part of a smoke screen used to conceal the true nature of the relationships among between [sic] the parties."

> Referring to the relationship between Allegro and AmeriCorp as a "Ponzi Scheme[.]"

> Admitting that the undersigned "has got a very jaundiced view" of the debt settlement services offered by Allegro and AmeriCorp.

> Mentioning a conversation with U.S. Senator Jeff Sessions at a cocktail party in which the undersigned stated "one of the worst things [Congress] did . . . was to give, you know, these debt settlement outfits an air of legitimacy" and that debt settlement was "a horrible business, horrible idea[.]"

> Questioning why the Receiver wanted to continue operating Allegro and referring to it as "a completely flawed business model from the start[.]"

-37-

Stating, in reference to McAlpine's filing of the motion to quash McCallan's deposition, that "bad faith would be a colossal understatement."

Stating that the "Defendants sabotaged the [discovery] process, producing large quantities of gibberish, in an effort to obstruct the Trustee's access to the database."

Stating that McCallan "flouted the [Court's] order and went on the run, ignoring both orders to produce the database and to appear in Court."

"Impugn[ing]" the Haskell Slaughter lawyers by stating they "continued to misrepresent and stonewall the Trustee and the Court" after McCallan got out of jail.

(Doc. 332, McCallan's affidavit).

The Defendants cite <u>Glassroth v. Moore</u>, 229 F. Supp. 2d 1283, 1285 (M.D. Ala. 2002), for the proposition that the Court "may not pass upon the truthfulness of the facts stated in the affidavit" and that the undersigned must recuse if the facts in the affidavit are material, stated with particularity, and would convince a reasonable person that a personal bias exists. (Doc. 332).

## 2. The Distinction Between 28 U.S.C. §§ 144 and 455

Before addressing the merits of the motion to recuse, it is appropriate to consider the differences between §§ 144 and 455 of Title 28 of the United States Code, both of which address recusal. The Defendants' motion addresses both sections, failing to observe that only § 455 applies here and that § 144 does not apply to a bankruptcy judge.

Section 144 permits a party to file "a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any

-38-

adverse party[.]" 28 U.S.C. § 144. If a party files such an affidavit, the presiding "judge shall proceed no further therein," and "another judge shall be assigned to hear such proceeding." 28 U.S.C. § 144. When a party files an affidavit under § 144, "'the trial judge may not pass upon the truthfulness of the facts stated in the affidavit even when the court knows these allegations to be false.'" Glassroth, 229 F. Supp. 2d at 1285 (quoting United States v. Alabama, 828 F.2d 1532, 1540 (11th Cir. 1987)). "Instead, the judge's inquiry is limited to determining whether the facts alleged are legally sufficient to require recusal." Id. "For an affidavit to be legally sufficient, the party must show that '(1) The facts are material and stated with particularity, (2) The facts are such that, if true they would convince a reasonable person that a bias exists and (3) The facts must show the bias is personal, as opposed to judicial in nature.'" Id. (quoting United States v. Alabama, 828 F.2d at 1540). In other words, § 144 requires a judge to recuse himself upon a party's subjective, good faith, and timely assertion that the judge harbors a personal bias or prejudice for or against a party. However, § 144 only applies to district judges, not bankruptcy judges. See Liteky v. United States, 510 U.S. 540, 548 (1994); Seidel v. Durkin (In re Goodwin), 194 B.R. 214, 221 (9th Cir. B.A.P. 1996).

Section 455, on the other hand, applies to bankruptcy judges under Bankruptcy Rule 5004(a), and has three distinct components. The first component, 28 U.S.C. §§ 455(b)(2)-(b)(5), provides objective bases on which a judge must recuse due to his personal interest in a matter or his personal relationship with someone involved in the matter. Liteky, 510 U.S. at 548. The second component, 28 U.S.C. § 455(b)(1), provides a subjective basis for a judge to recuse due to personal bias or prejudice. Id. In other words, § 455(b)(1) "duplicate[s] the grounds of recusal set forth in § 144 ('bias or prejudice')," but differs from § 144 in that it is applicable to

all judges, it does not require the judge's automatic recusal or his acceptance as truth of an affidavit asserting bias or prejudice, and it places the obligation to identify the existence of bias or prejudice on the judge himself.  Id.  The third component, 28 U.S.C. § 455(a), is a "catchall" provision "covering both 'interest or relationship' and 'bias or prejudice' grounds, but requiring them *all* to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance."  Id. (internal citation omitted, emphasis in original).

The language from Glassroth that the Defendants rely on is in regard to § 144, not § 455, and this Court is not bound by § 144.  *See* Glassroth, 229 F. Supp. 2d at 1285; Goodwin, 194 B.R. at 221.  "Section 455 does not require the judge to accept all allegations by the moving party as true.  If a party could force recusal of a judge by factual allegations, the result would be a virtual 'open season' for recusal."  United States v. Greenough, 782 F.2d 1556, 1558 (11th Cir. 1986).  Moreover, an affidavit offered by McCallan, a Defendant, is clearly not being offered by an "objective" or "disinterested" observer, and his assertion otherwise is disingenuous.  In short, there is no requirement that this Court take McCallan's factual assertions to be true or that it wear blinders as to the nature of the Allegro-AmeriCorp relationship, McCallan's involvement with AmeriCorp, the course of this litigation, or the context in which the undersigned's statements were made.

### 3.  Subjective Bias or Prejudice

A judge shall "disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings[.]"  28 U.S.C. § 455(b)(1).

-40-

The Supreme Court has made clear that the word "personal" in § 455(b)(1) does not "create a complete dichotomy between court-acquired and extrinsically acquired bias[.]" Liteky, 510 U.S. at 550. Rather, the terms "bias" and "prejudice" are pejorative in that they "describ[e] dispositions that are *never* appropriate." Id. at 549 (emphasis in original). However, "[n]ot *all* unfavorable disposition towards an individual (or his case) is properly described by those terms." Id. at 550 (emphasis in original). Rather, "[t]he words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . , or because it is excessive in degree. . . ." Id. (emphasis in original).

To that end, an extrajudicial source, while the most common basis to show bias or prejudice on the part of a judge (*i.e.*, the extrajudicial source doctrine), is not the only basis to assert bias or prejudice. "A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." Id. at 551. This is sometimes referred to as the "pervasive bias" exception to the extrajudicial source doctrine.[24] Id.

However, the burden of proof for "pervasive bias" based on a judicial source is a demanding one. "The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed toward the defendant, who has been shown to be a thoroughly

---

[24] The Supreme Court noted, in regard to the extrajudicial source doctrine, that "there is not much doctrine to the doctrine." Liteky, 510 U.S. at 554. Because an extrajudicial source "is not a *necessary* condition for 'bias or prejudice' recusal," not "a *sufficient* condition . . . it would be better to speak of the existence of a significant (and often determinative) 'extrajudicial source' *factor*, than of an 'extrajudicial source' *doctrine*, in recusal jurisprudence." Id. at 554-55 (emphasis in original).

reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." Id. at 550-51. "Also not subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." Id. at 551.

Consequently, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Id. at 555. "Almost invariably, they are proper grounds for appeal, not for recusal." Id. Moreover, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion *unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible*." Id. (emphasis added). "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Id. (emphasis in original). "*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune." Id. at 555-56 (emphasis in original).

An example of a judicial remark evidencing a deep-seated antagonism that rendered fair judgment impossible was present in Berger v. United States, in which the district judge stated, during a World War I era criminal espionage trial of German-Americans:

> If anybody has said anything worse about the Germans than I have I would like to know so I can use it. . . .  One must have a very judicial mind, indeed, not to be prejudiced against the German Americans in this country.  Their hearts are reeking with disloyalty.

Berger v. United States, 255 U.S. 22, 28 (1921); *see also* Liteky, 510 U.S. 540, 555 (citing this language in Berger as an example of recusable judicial language).

All of the remarks the Defendants cite as examples of the undersigned's bias or prejudice took place in judicial orders, judicial opinions, and judicial hearings; *i.e.*, there is no extrajudicial source.  While strong, the undersigned's language does not demonstrate any pervasive or deep-seated bias within the meaning of Liteky.  Regarding the Allegro business model and its relationship with AmeriCorp, it is important to note that the undersigned presided over the Allegro bankruptcy.  The Court was inundated with letters and phone calls from angry Allegro clients who were victimized by its business practices.  By advising its clients to pay Allegro and to stop paying their debts, Allegro doomed its clients to what the District Court aptly described as "personal economic suicide[.]"  McCallan, 2012 WL 1392960 at *1; 2012 U.S. Dist. LEXIS 56097 at 3.  Allegro's practice of charging its clients massive front-loaded fees for providing (in most cases) no services was both unethical and fraudulent.

The Receiver filed an administrative expense claim in the Allegro bankruptcy on behalf of AmeriCorp and Seton.  In the course of administering the Allegro bankruptcy it soon became apparent that most of the money flowing into Allegro was being siphoned off to AmeriCorp, and

that AmeriCorp was doing the legwork of communicating with Allegro's clients and negotiating settlement of their debts. The undersigned was not required to turn a blind eye to the fact that McCallan and AmeriCorp had a similar arrangement with a Florida law firm, Hess-Kennedy, and that Hess-Kennedy's clients had likewise been defrauded. Faced with such a business, the Court had every right – if not also a duty – to investigate it, criticize its practices, and question the Receiver why he wished to continue operating it.

"'Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.'" Liteky, 510 U.S. at 551 (quoting In re J.P. Linahan, Inc., 138 F.2d 650, 654 (2d Cir. 1943)).

With regard to McCallan, the other Defendants, and their lawyers, all of the complained-of language refers to what McCallan and his lawyers have *done*, not to any inherent personal characteristics they have (unlike the language in Berger). According to Hamm's complaint, which the Court had to accept as true in ruling on the motions to dismiss and to compel arbitration, McCallan acted as the principal of AmeriCorp and Seton and masterminded both the Hess-Kennedy and Allegro schemes. If true, McCallan defrauded thousands of people out of millions of dollars. Criticism of such conduct would not be "undeserved" or "excessive in degree." *See* Liteky, 510 U.S. at 550.

Moreover, McCallan's conduct in this litigation was abusive and contemptuous. He ignored Hamm's initial discovery request of records necessary to administer the Allegro bankruptcy estate. When the Court ordered him to turn over the records, he withheld many computer files and turned over many others that were unreadable. When the Court ordered him

-44-

to turn over *readable* and *usable* files, he ignored that order, forcing the Court to hold him in contempt and to issue a warrant for his arrest. Even after being arrested, McCallan still abused the discovery process and disobeyed the Court's order by sending Hamm millions of files lacking front-end applications to make them readable, or the internal connections to show which piece of information applied to which client. He also continued to withhold key information. In doing so, he and his lawyers lied to the Court about the location and operability of AmeriCorp's servers. He ultimately dragged out discovery for more than two years with his stalling tactics, wasting countless resources and hours of the Court's time, Hamm's time, and even his own lawyers' time.

Finally, McCallan has a history in this litigation of breaking off communication with his lawyers and not paying them when he gets in trouble with the Court over his litigation conduct, or when his lawyers demand payment for the services they have rendered. McCallan had already done this to two sets of lawyers when McAlpine first appeared on his behalf. McAlpine then inauspiciously introduced himself to the Court by means of an improper *ex parte* communication and a falsehood, all for the purpose of filing an eleventh-hour motion that, given the history of this litigation, was blatantly sought in bad faith. McAlpine's demeanor and conduct toward the Court since then has been unprofessional, rude, and deliberately provocative. Finally, despite having ample warning of the trial date, neither McCallan nor McAlpine, nor any other representative of the Defendant, bothered to appear at trial or gave any notice or indication that they would not appear.

Liteky instructs that a court's efforts at ordinary courtroom administration are not grounds for recusal. Id. at 556. Although the Court's efforts at administering this case have

gone far beyond ordinary, they have been necessitated by the Defendants' unwarranted and

persistent conduct. "'We cannot assume that judges are so irascible and sensitive that they

cannot fairly and impartially deal with resistance to their authority or with highly charged

arguments about the soundness of their decisions.'" In re Evergreen Sec., Ltd., 570 F.3d 1257,

1279 (11th Cir. 2009) (quoting Ungar v. Sarafite, 376 U.S. 575, 583 (1964)). "Requiring recusal

for all disruptive, recalcitrant and disagreeable commentary would undermine the judiciary." Id.

(citing Mayberry v. Pennsylvania, 400 U.S. 455, 463 (1971)). Likewise, "[m]ere friction

between the court and counsel . . . is not enough to demonstrate 'pervasive bias.'" Gwynn v.

Walker (In re Walker), 532 F.3d 1304, 1311 (11th Cir. 2008) (internal quotation marks omitted).

"It is improper for a lawyer or litigant . . . to *create* the ground on which he seeks the recusal of

the judge assigned to his case. That is arrant judge-shopping." Sullivan v. Conway, 157 F.3d

1092, 1096 (7th Cir. 1998). "'A judge cannot be driven out of a case.'" Evergreen Sec., 570

F.3d at 1279 (quoting Mayberry, 400 U.S. at 463). In short, the Defendants have not proven that

the Court has any "pervasive bias" or "prejudice" against them that would require the Court's

recusal under 11 U.S.C. § 455(b)(1).

### 4. Objective Reason to Question Impartiality

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in

any proceeding in which his impartiality might reasonably be questioned."[25]  28 U.S.C. § 455(a).

"Under § 455, the standard is whether an objective, fully informed lay observer would

entertain significant doubt about the judge's impartiality." Christo v. Padgett, 223 F.3d 1324,

---

[25]  Although bankruptcy judges are not specifically mentioned in 28 U.S.C. § 455(a), that
statute applies to them as well. FED. R. BANKR. P. 5004(a); *see* Mantiply v. Horne (In re
Horne), 2015 WL 6500754, *2-3, 2015 U.S. App. LEXIS 18742, *5-8 (11th Cir. Oct. 28, 2015)
(addressing a motion to recuse a bankruptcy judge filed by McAlpine).

1333 (11ᵗʰ Cir. 2000); *see also* <u>Mantiply v. Horne (In re Horne)</u>, 2015 WL 6500754, *2, 2015

U.S. App. LEXIS 18742, *5 (11ᵗʰ Cir. Oct. 28, 2015) (unpublished). "'The inquiry of whether a

judge's impartiality might reasonably be questioned under § 455(a) is an objective standard

designed to promote the public's confidence in the impartiality and integrity of the judicial

process.'" <u>Evergreen Sec., Ltd.</u>, 570 F.3d at 1263 (quoting <u>Davis v. Jones</u>, 506 F.3d 1325, 1332

n.12 (11ᵗʰ Cir. 2007)). "Thus, the court looks to 'the perspective of a reasonable observer who is

*informed of all the surrounding facts and circumstances*.'" <u>Id.</u> (quoting <u>Cheney v. U.S. Dist.

Court for the Dist. of Columbia</u>, 541 U.S. 913, 924 (2004)) (emphasis in original).

"There are twin, and sometimes competing, policies that bear on the application of the §

455(a) standard. The first is that courts must not only be, but must seem to be, free of bias or

prejudice. Thus the situation is viewed through the eyes of the objective person. A second

policy is that a judge, having been assigned to a case, should not recuse himself on unsupported,

irrational, or highly tenuous speculation. If this occurred the price of maintaining the purity of

the appearance of justice would the power of litigants or third parties to exercise a veto over the

assignment of judges." <u>Greenough</u>, 782 F.2d at 1558. "[R]eady recusal benefits the judge who

steps aside, and the litigant who sought this outcome, but it may injure the judge who must take

over the case and the litigant aggrieved by the substitution. Until Congress decides that the costs

of recusal on demand are worth bearing, judges must evaluate each motion to decide whether

under objective standards the judge's impartiality might *reasonably* be questioned." <u>N.Y. City

Housing Dev. Corp. v. Hart</u>, 796 F.2d 976, 981 (7ᵗʰ Cir. 1986) (emphasis in original).

The Supreme Court held in <u>Liteky</u> that the extrajudicial source factor applies to § 455(a),

*see* 510 U.S. at 554, and, as noted above, all of the bases the Defendants assert as grounds for

recusal are remarks made in the course of judicial proceedings – either this adversary proceeding or the Allegro bankruptcy.  Thus, the Defendants' recusal motion cannot succeed under § 455(a) unless the undersigned's remarks would display a deep-seated favoritism or antagonism that would lead an objective, fully informed lay observer to question the Court's impartiality.

A lay observer who was fully informed of the nature of the Allegro business model, the ruinous effect Allegro had on its clients, Allegro's relationship with AmeriCorp and McCallan, and McCallan's (and his lawyers') conduct in this litigation would not reasonably question the Court's impartiality based on the remarks the Defendants complain of.  A lay observer with even a modest understanding of finance and credit would conclude that Allegro's activities with AmeriCorp and McCallan were predatory and fraudulent.  Moreover, a fully informed lay observer would not reasonably expect a court to disregard a litigant's or lawyer's misbehavior in front of it, or ignore when a litigant violates its orders or intentionally provokes it.  All of the statements the Defendants complain of have been made by the Court in response to what either Allegro or the Defendants have done in conducting their businesses and this litigation.  That is not a sufficient reason to question the Court's impartiality.

## C.  Default Judgment

Bankruptcy Rule 7055 incorporates Rule 55 of the Federal Rules of Civil Procedure. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  FED. R. CIV. P. 55(a).  "If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk – on the plaintiff's request, with an affidavit showing the amount due – must enter judgment for that amount and costs against a defendant

-48-

who has been defaulted for not appearing and who is neither a minor nor an incompetent person." FED. R. CIV. P. 55(b)(1).

"It is well established that the district court has the authority to dismiss or to enter default judgment, depending on which party is at fault, for failure to prosecute with reasonable diligence or to comply with its orders or rules of procedure." Flaska v. Little River Marine Constr. Co., 389 F.2d 885, 887 (5th Cir. 1968).[26] "[T]he power is one inherent in the interest of the orderly administration of justice. It may be exercised sua sponte under proper circumstances." Id. (internal quotation marks and footnote omitted). However, "[d]ismissal of an action with prejudice and entry of judgment by default are drastic remedies which should be used only in extreme situations, as the court has a wide range of lesser sanctions." Id. at 887-88 (internal footnotes omitted). Entry of default judgment "is only appropriate where there has been a clear record of delay or contumacious conduct." E. F. Hutton & Co., Inc. v. Moffatt, 460 F.2d 284, 285 (5th Cir. 1972).

"The failure to appear at a duly scheduled trial after months of preparation by the parties and by the trial court is a serious offense for which the entry of a default is appropriate." Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc., 740 F.2d 1499, 1512 (11th Cir. 1984). Default has been entered and affirmed for less. In McGrady v. D'Andrea Elec., Inc., 434 F.2d 1000 (5th Cir. 1970), the defendant corporation filed as its purported answer a letter from its president denying the allegations of the complaint. McGrady, 434 F.2d at 1001. When the defendant

---

[26] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down prior to September 30, 1981. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

failed to appear at a pre-trial conference it had received notice of, the district court entered

default, denied the defendant's motion to set aside the default, and later entered final judgment in

favor of the plaintiff.  Id.  The Fifth Circuit affirmed, and "deem[ed] it unnecessary to decide

whether [the defend]ant's purported 'answer' was adequate," because the defendant's failure to

appear at the pre-trial conference "disclose[d] sufficient evidence of [the defend]ant's delay and

failure to comply with court rules to justify the entry of a default" under Rule 55.  Id.

"Put differently, *even assuming* a defendant has appeared and answered, the court *still*

has the authority to order an entry of default when there is sufficient evidence of defendant's

dilatory tactics or failure to comply with court orders and the rules of procedure."  Liberty Mut.

Ins. Co. v. Fleet Force, Inc., 2013 WL 3357167, *9, 2013 U.S. Dist. LEXIS 91716, *28 (N.D.

Ala. Jul. 1, 2013) (emphasis in original).  The record in this case is replete with such conduct.

Although the Defendants filed motions to compel arbitration (Docs. 31 & 72) and answers and

affirmative defenses (Docs. 32, 73, & 206), and McCallan individually filed a motion to dismiss

(Doc. 28) and a motion for summary judgment (Doc. 320), the Defendants also engaged in two

years of abusive and stonewalling conduct during discovery and failed to appear at trial.  They

have also flouted the Court's orders, including a failure to pay prior sanctions the Court has

imposed on them (Doc. 154).

An entry of default in this case would not be at odds with Bass v. Hoagland.  In Bass, the

Fifth Circuit stated that Rule 55(a)

> does not require that to escape default the defendant must not only
> file a sufficient answer to the merits, but must also have a lawyer
> or be present in court when the case is called for a trial.  The words
> 'otherwise defend' refer to attacks on the service, or motions to
> dismiss, or for better particulars, and the like, which may prevent

> default without presently pleading to the merits. When Bass by his attorney filed a denial of the plaintiff's case neither the clerk nor the judge could enter a default against him. The burden of proof was put on the plaintiff in any trial. When neither Bass nor his attorney appeared at the trial, no default was generated; the case was not confessed. The plaintiff might proceed, but he would have to prove his case.

Bass v. Hoagland, 172 F.2d 205, 210 (5th Cir. 1949). Taken out of context, this language

suggests that the Defendants did not subject themselves to default by failing to appear at trial.

However, the Fifth Circuit later clarified its Bass holding:

> In Bass the plaintiff sued to enforce a default judgment obtained in another federal court. In the original trial court the defendant appeared, answered, and requested a jury trial. Defense counsel then withdrew. On the day of trial defendant was not present. The trial judge treated the defendant in default because of the earlier withdrawal of his counsel and entered judgment for the plaintiff in the precise amount requested in his complaint, without a jury trial and apparently without taking any evidence. *Defendant was not aware of the trial date, was given no notice prior to the entry of default judgment, and was fraudulently not informed of the judgment until more than two years after it was entered. The court held that the combination of these errors resulted in a denial of due process.*

Fehlhaber v. Fehlhaber, 681 F.2d 1015, 1027 (5th Cir. Unit B 1982) (emphasis added)[27]; *see also*

id. n.15 (rejecting a reading of Bass that mere denial of a jury trial was the basis for its holding);

Liberty Mut. Ins. Co., 2013 WL 3357167 at *7, 2013 U.S. Dist. LEXIS at *21-22 (adopting the

Fehlhaber court's reading of Bass).

---

[27] In Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions after October 1, 1981, that were handed down by a Unit B panel of that court.

<u>Fehlhaber</u> makes clear that default judgment was improper in <u>Bass</u> because the defendant had not received actual notice of the trial date, not because the defendant's earlier answer denying the claims excused his failure to appear at trial. The former rationale implicated the defendant's due process rights, while the latter rationale did not.

The Fifth Circuit's decision in <u>Seven Elves, Inc. v. Eskenazi</u> is in much the same vein. In <u>Seven Elves</u>, Eskenazi and two other defendants were represented by the same attorney until Eskenazi fired him. <u>Seven Elves, Inc. v. Eskenazi</u>, 635 F.2d 396, 398-99 (5th Cir. Unit A Jan. 1981). The attorney assumed that Eskenazi was acting as the agent of the other two defendants and did not inform them of his termination, and neither did Eskenazi. <u>Id.</u> at 399. When the attorney moved to withdraw from the case, the district court ordered him to personally appear and to mail notice to the other defendants; the attorney did not appear and was not relieved as counsel of record, and his mailings to the other defendants were sent to the wrong address and not returned. <u>Id.</u> When the case was called for trial, neither the attorney nor any of the defendants appeared; the court entered judgment against them, and denied the other defendants' motion to set it aside after they learned of the judgment a year later. <u>Id.</u>

The Fifth Circuit reversed and, although it did not expressly determine that the district court's ruling was a default judgment, noted that "under Bass, a default judgment entered upon the failure of the appellants or their attorney to appear at trial might well be found to have been erroneously entered as a matter of law under Fed. R. Civ. P. 55." <u>Id.</u> at 400 n.2. Nevertheless, the holding in <u>Seven Elves</u> turned on the lack of actual notice afforded the other defendants due to the failure of Eskenazi and their attorney to inform them of what was happening, not on the

idea that default is improper for a defendant's mere failure to appear at trial. As the Fifth Circuit explained:

> The absence of a fair opportunity [for the other defendants] to present their claim or defense is likewise clearly demonstrated. The [other defendants] did not appear at the proceeding below. Their absence resulted from the confluence of a number of unusual circumstances: they were informed by their attorney that no action would be required of them unless and until he contacted them; he subsequently "withdrew" from the case without being relieved as attorney of record or informing the appellants of his withdrawal; he determined he would not appear at trial without informing the [other defendants] of that decision; and although notice of trial was forwarded to the [other defendants], they did not in fact receive it.

Id. at 403.

Unlike Bass and Seven Elves, there are no due process concerns here because the Defendants had actual notice of the trial. The trial date was scheduled nine months in advance, and McCallan and his attorneys at that time would have received electronic notice of it through CM/ECF. Moreover, the Court personally informed McCallan at a July hearing of the November trial date, and reminded McAlpine of the trial date when it denied the motion to recuse. Neither the Defendants nor McAlpine have ever offered any explanation of why they failed to appear, nor have they requested a new trial. Moreover, they have not responded to Hamm's proposed findings of fact and conclusions of law.

This case is also distinguishable from Gulf Coast Fans. In that case, the Eleventh Circuit reversed the district court's denial of the defendant's Rule 60(b) motion to vacate a default judgment in which the defendant did not appear at trial. Gulf Coast Fans, 740 F.2d at 1512.

Although the Eleventh Circuit noted that the defendant's "erratic behavior" and failure to appear at trial would have normally warranted an entry of default, it was concerned that such a ruling would be incongruous with a jury's finding in a related case that the plaintiff had breached the same contract that was at issue in the defendant's case.[28] Id.

Admittedly, Hamm in this case is nominally a representative of Allegro, and Allegro was a complicit tool in McCallan's fraudulent debt settlement scheme. However, a ruling in favor of Hamm will not benefit Allegro, but rather Allegro's creditors – *i.e.*, its victims. There is no internal inconsistency within this case or external inconsistency with the related Nelms case[29] that would result from an entry of default in Hamm's favor.

Default judgment under Rule 55 is appropriate in this case. Although Fifth and Eleventh Circuit precedent limits the applicable scope of Rule 55, that precedent is distinguishable from this case because it revolved around lack of due process due to lack of actual notice, or because it was inconsistent with factual findings from a related proceeding, none of which is present here. There is nothing inadvertent about the Defendants' conduct in litigating this case or in

---

[28] There was a confluence of several other factors that also led to the Eleventh Circuit's reversal in Gulf Coast Fans, such as an unresolved personal jurisdiction defense, the district court's technical violation of Rule 55(b)(2) (for serving the defendant's former counsel instead of the then-*pro se* defendant), the defendant's argument under Bass that it was entitled to a jury trial on damages, and the district court's refusal to allow the defendant to file a memorandum on damages before judgment was actually entered. Gulf Coast Fans, 740 F.2d at 1511-12. However, the Eleventh Circuit indicated its primary concern was the default judgment's inconsistency with the jury verdict in the related case. Id. at 1512.

[29] Chase Bank, USA v. Nelms (In re Nelms), 2014 WL 3700511, 2014 Bankr. LEXIS 3158 (Bankr. M.D. Ala. Jul. 24, 2014), *appeal docketed* 2:14-cv-927-MHT (M.D. Ala. Sept. 5, 2014).

-54-

their refusal to appear at trial. The Defendants had their day in court, and must shoulder the consequences of their decision not to exercise it.

### III. CONCLUSION

The Plaintiff offered a mountain of evidence in support of his claim that the Defendants defrauded a large number of individuals. After almost three years of protracted and often spiteful litigation, the Defendants refused to show up at the trial. The Court will, by way of a separate document, enter judgment in favor of Plaintiff Carly Wilkins, and against Defendants Timothy McCallan, AmeriCorp, Inc., and Seton Corp., in the amount of $102,949,220.72.

Done this 16th day of February, 2016.

United States Bankruptcy Judge


c: Steve Olen, Attorney for Plaintiff
   Lucy E. Tufts, Attorney for Plaintiff
   Thomas R. McAlpine, Attorney for Defendants
   Carly B. Wilkins, Plaintiff/Trustee

# APPENDIX A

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                                     Case No. 10-30430-WRS
                                                          Chapter 7
KEITH A. NELMS,

        Debtor

CHASE BANK USA, NA
and JP MORGAN CHASE
BANK NA,

        Plaintiff                             Adv. Pro. No. 10-3042-WRS

    v.

KEITH A. NELMS,

        Defendant

## MEMORANDUM

This case came before the Court for trial on April 28, 2014. The Plaintiff, Chase Bank,

seeks a determination that the debt is excepted from the bankruptcy discharge of Keith Nelms

pursuant to 11 U.S.C. § 523. For the reasons set forth below, judgment is entered in favor of the

Plaintiff.

## I. FINDINGS OF FACT

### A. History of this Adversary Proceeding

On February 22, 2010, Keith Anderson Nelms filed a voluntary Chapter 7 petition with

this Court, initiating Case No. 10-30430. At the time of his filing, Nelms was the sole owner and

operator of Allegro Law, LLC, and Allegro Financial Services, LLC, operating out of Prattville,

Alabama. Through his Allegro entities, Nelms purported to offer legal and financial services

targeted at consumers in search of debt relief, through debt settlement and debt management schemes. Chase Bank filed a proof of claim for $39 million. (Case No. 10-30430, Claim 2-1).

On June 1, 2010, Chase bank initiated this adversary proceeding by way of a complaint alleging nondischargeability of debt owed to it by Nelms pursuant to 11 § U.S.C. 523. Chase Bank alleged four claims for relief, seeking that their debt be excepted to discharge under § 523(a)(2)(A) for fraud, § 523(a)(4) for fraud in a fiduciary capacity, § 523(a)(4) for embezzlement, and § 523(a)(6) for willful and malicious injury. Chase pled facts alleging that Nelms, through Allegro Law, LLC, operated a fraudulent debt settlement scheme under which he discouraged consumers from paying monthly minimums to Chase on the promise that he would negotiate a reduction in the debt or settle the debt in full. In exchange, Chase alleged, Nelms collected millions of dollars in fees, and made no attempts to actually settle or pay the consumers' debts. As a result, Chase customers "faced increased interest rates, late fees, further damage to their credit ratings, and additional and increased collection activities by their creditors." (Adversary Proc. No. 10-3042, Doc 1). Chase alleged that, as a result of Nelms's fraudulent scheme, "Chase cardmembers responsible for more than 5000 accounts have ceased making payments on at least $39 million in credit card balances owed to Chase." Id. The case came before the Court for trial on April 28, 2014.

## B. Hess-Kennedy as Pre-Cursor

In 2007, a Florida law firm known as Hess-Kennedy began running a debt settlement scheme in the state of Florida. Operating under several names, Hess-Kennedy undertook the business of promising consumers legitimate debt relief. Debt settlement, in a nutshell, is premised on the idea that a consumer in debt signs on with a company which promises to

negotiate with the creditor to settle the debt for less than the balance owed. The Hess-Kennedy scheme, like most debt settlement outfits, operated under the basic premise that consumers in debt would, instead of making monthly payments to their creditors, make monthly lump sum payments to Hess-Kennedy. Hess-Kennedy, in exchange, would attempt to make debt settlement arrangements with the creditors, and then, out of the money sent to them by the consumer, commence payments to the creditor at the newly reduced amount. For their troubles, Hess-Kennedy would collect its fees from the consumers' lump sum payment.

In order to make this scheme work, Hess-Kennedy encouraged the consumers not to pay their debts, but to instead dispute the billings under the Fair Credit Billing Act, 15 U.S.C. §§ 1666 et seq., and Hess-Kennedy would send legal form letters advising the creditor that they were performing a financial evaluation of the consumer's account. These form letters bore the letterhead of either Hess-Kennedy or one of their related entities, such as Campos Chartered Law Firm or Consumer Protection Law Center. The letters were often signed by Jeffrey Campos, an attorney affiliated with Hess-Kennedy. The accounting, clerical work, mailings and the like were handled by a back-office processor, Americorp, Inc., which was headed by Timothy McCallan. Chase proved at trial that between 2007 and April 2008, they received approximately 8,000 such letters from Hess-Kennedy related outfits.

In mid-2008, Hess-Kennedy ran afoul of the Florida Attorney General's Office, who brought legal action alleging an "unscrupulous scheme to divert funds" from consumers and to instead "divert[] millions of dollars to themselves and a coterie of family and associates who were not creditors of consumers." See Office of the Attorney General v. Laura Hess, Esquire, et al., No. 08-007686-08, at p. 15-16 (Cir. Ct. Broward County, Fla. Jul. 17, 2008). On July 18,

2008, the circuit court of Broward County, Florida appointed a receiver to take over Hess-Kennedy, and Hess-Kennedy was permanently enjoined from operating its scheme on November 25, 2008. This ended Hess-Kennedy's debt settlement activities. Representatives of Americorp approached Nelms in 2008, with the proposition that he take over the function previously handled by Hess-Kennedy. Thus, the Allegro entities were born.

### C. Allegro Law, LLC

#### 1. Nelms Continues the Hess-Kennedy Operation

Prior to opening Allegro Law, Nelms was familiar with and involved in the workings of Hess-Kennedy. At trial, Nelms detailed his initial introduction to debt settlement programs and Hess-Kennedy, recalling working with one of Hess-Kennedy's principals, Edward Cherry (also known at one time as Edward Kennedy), several years prior to Allegro taking over in 2008. Nelms was approached by Cherry to build an attorney network for Hess-Kennedy, and testified that he was paid approximately $15,000 for the service, a service that he says he was hired to do several times. Nelms's involvement with Hess-Kennedy became so entwined that upon Hess-Kennedy's assignment into the Florida receivership, the receiver running Hess-Kennedy hired Nelms to represent the entity.

Through his involvement with Hess-Kennedy, Nelms testified to being introduced to Americorp and its CEO Timothy McCallan. While publishing a series of websites that Nelms described as for consumer attorneys, Nelms became acquainted with another debt management operator, Joel Carlsen, who later introduced Nelms to McCallan. While McCallan and Americorp were initially too busy with Hess-Kennedy to work with Nelms's Allegro outfit, that dynamic changed when the Florida Attorney General put Hess-Kennedy out of business. Nelms testified at

4

trial that he did some internet research on McCallan, learning of McCallan's previous operations of AmeriDebt and DebtWorks, both debt relief scams, and but that "nothing scared me too much."[1]

On April 30, 2007, Allegro Law was incorporated as a law firm. Nelms was the sole owner and operator of Allegro Law, and at trial he testified that he was the sole attorney working for Allegro and that he approved every settlement that came through the enterprise. Nelms testified that Allegro Law had at least 15,000 clients, though he thought the number perhaps exceeded 19,000, with each client having an average of five creditors.

In beginning the operation of Allegro Law, Nelms testified that he employed the same personnel and debt settlement tactics as Hess-Kennedy. Nelms admitted to using the identical Hess-Kennedy marketers, back-office processors, phone call center, and the same form letters. The marketers used by Hess-Kennedy simply switched to marketing for Allegro, with one marketer stating that upon switching to Allegro, "the flow kept going. Like nothing changed." Tr. 101:10-21. Nelms hired McCallan and Americorp to handle the back-office processing for Allegro. This included processing of the form letters, manning the call centers, and all the accounting for thousands of customer payments, essentially handling the servicing of all client accounts.[2] Nelms paid a set-up fee and monthly fee per client of Allegro to Americorp, fees

_____

[1]Nelms testified that at the time he was unaware of the Federal Trade Commission's disgorgement of $1.9 million from McCallan as part of the fallout from McCallan's AmeriDebt scheme. Tr. Transcript 136:5-137:13.

[2]Q: You only had a few employees between you and your Cobbs Ford Road. I mean, all the accounting for those thousands of payments wasn't done by the people in your Cobbs Ford Road office, was it? I mean, it was done by Americorp.

Nelms: No. I paid Americorp to do it. Tr. Transcript 165:13-17.

5

derived out of the Allegro customers' monthly payments. The very strategies and tactics

employed by Hess-Kennedy to purport to settle debts were used by Nelms and Allegro. Nelms

directed the customers to stop paying Chase, to instead pay him the money as their attorney, and

then collected substantial amounts of money in fees from those consumer payments.

One of the more telling pieces of evidence shown at trial to prove Nelms's continuation

of the Hess-Kennedy debt settlement scheme were the form letters sent to Chase throughout 2007

and 2008. The letters essentially track the progression of the scheme originally operated as Hess-

Kennedy under Campos to one operated as Allegro Law under Nelms. The letters sent beginning

in late 2007 through early 2008 are headed under a variety of Hess-Kennedy related outfits: Hess-

Kennedy Chartered, December 31, 2007; Campos Chartered Law Firm, January 7, 2008;

Consumer Protection Law Center, February 26, 2008. Each of these letters are signed by Jeffrey

Campos and contain identical language:

> The firm represents the above listed named consumer in regards to the referenced
> account. The above consumer is in the process of receiving a financial evaluation
> and is enrolled in a bankruptcy prevention service.
>
> During the next 60-90 days, our counselors will be reviewing the consumers[3]
> personal financial statements, including the above referenced account. In addition,
> we will be archiving and preparing a summary of all collection activities of any
> original creditor, third party collection agent or collection attorney.
>
> We ask that your representatives not contact our client but instead direct any and
> all correspondence to our firm. Contacting a consumer, which is known to be

---

Nelms further testified that "[b]etween May and maybe early December [2008] they were - those
monies being taken directly by Americorp from the consumer" and put into approximately 15 to
16 bank accounts. Tr. Transcript 162:1-163:17

[3]The referenced form letters are typed and uniform in appearance in all respects, including
that on each letter, both those sent from Hess-Kennedy and those from Allegro, the word
"consumer" is typed with a handwritten "s" inserted at the end of the word.

6

represented by a law firm, can be classified as a deceptive trade practice. Your failure to abide by this request will result in our pursuing all legal and equitable remedies available under state and federal law.

Please direct any and all future correspondence to our attention, including the address and facsimile number of the division to which you would prefer all correspondence and information directed.

Tr. Ex. 3.

Beginning in April 2008, following Hess-Kennedy's initial legal troubles with the state of Florida, Chase Bank began receiving more form letters disputing debts and purporting to settle the debts; letters identical to those received from Hess-Kennedy, only now under the letterhead of Allegro Law. While these letters were initially signed still by Jeffrey Campos, they soon began, in May 2008, appearing with the signature of Keith Anderson Nelms. During Allegro's period of operation, roughly May 2008 thorough May 2009, Chase tracked 5,453 such letters as having come from Allegro. As a collections manager for Chase testified, "as Hess-Kennedy was ramping down, Allegro started ramping up." Tr. Transcript 34:12-18.

### 2. Nelms, through Allegro Law, makes fraudulent representations to Chase Customers

The Court heard testimony from three former Allegro customers who had credit accounts with Chase. Each testified as to their involvement with Allegro, the tactics used to ensnare them in the debt scheme, and the destructive results the Allegro experience had on each of their lives. The experiences were largely similar, and each Allegro customer the Court heard from exited the program in remarkably worse financial, and often even personal, shape than when they entered into business with Nelms and Allegro. The Court found that their testimonies were credible and compelling, and offered a telling insight into the scheme Nelms ran under the name Allegro Law.

7

Darlene Richardson, a hospital employee from Philadelphia, Pennsylvania, testified to becoming involved with Allegro Law after hearing a radio advertisement purporting to be lawyers that could fix her credit. Richardson called Allegro, and was told that she would pay in a fixed monthly amount to Allegro, who would then go to each creditor to obtain settlements for her at lower rates. At the time, Richardson owed $26,000 in debt, approximately $5,000 of that owed to Chase Bank, and entered her entire debt load into the Allegro program. Richardson made payments of $457 monthly, and stayed with Allegro from March 2008 through June 2009, where she was instructed Richardson to stop paying her creditors. During her enrollment with Allegro, Richardson testified to noticing no difference with her creditors, who were still calling in attempts to collect the debts.

Overall, during her fifteen-month involvement with Allegro, Richardson paid in approximately $6,000. Allegro settled one debt for her for around $500. Richardson testified that in November 2008, she received a letter from Chase Bank offering to settle the debt directly with her, outside of the Allegro program. She recalled that the offer from Chase was to settle the debt one of two ways, either through an immediate payment of $503.72, or through two payments of $453.35. Believing Allegro was working on her behalf to achieve these settlements, she forwarded the letter to Allegro, wanting the account to be settled with money she had paid into the program. At this point, having paid $457 per month since March 2008 would have meant Richardson had paid roughly $3,000 into her Allegro account. Upon receipt of the settlement offer from Chase, Allegro informed Richardson that there was not enough money in her escrow account, informing her, "that money, of course, has to be – go to them first to be paid before any

8

creditors could be paid off." Darlene Richardson Dep. Transcript 19:7-10. Richardson was unable to settle the debt with Chase.

Israel Rubinfeld, a small business owner from New Jersey, also entered the Allegro Law program in 2008, after hearing a radio advertisement promising to settle debts. At the time, Rubinfeld had nearly $33,000 in debt, owing around $2,500 to Chase Bank. Rubinfeld explained his dealings with Allegro:

> Okay. So I called them up and I said, you know, I'm looking to settle my debt, what can you do. And they said, how much do you owe. So I said, I – you know, I quickly accumulated in my mind how many credit cards, how much I owed, and I gave them a rough figure. I can't remember, but it could be in the range of 30 - 33,000. So they made a quick calculation and told me, okay we could do it for $600 a month for 37 months and you'll be done. We'll clear your, you know, debt
> ***
> They said they will settle for a certain amount. Basically they accumulate money to a escrow account, and then they take that money after a certain amount of time, let's say they accumulate $5,000, and this is just a rough number, they go then and settle one card. Then after a while, after a few more months, they accumulated more money, they settle the next card. And so forth and so forth until they settled all the cards.

Israel Rubinfeld Dep. Transcript 11:5-24 - 12:1-5. Rubinfeld stated that he continued to pay Allegro through the end of 2009, and that he did not pay his creditors, upon the advice of Allegro. Throughout his involved with Allegro, Rubinfeld paid them $6,442. Only $660.90 was accrued in his escrow account, and none of Rubinfeld's debts were settled.

The court also heard testimony from Melinda Lawley, a retired schoolteacher from Chelsea, Alabama. Ms. Lawley testified to becoming aware of Allegro Law in 2008 through a television advertisement, promising to negotiate with creditors for lower debt loads. Lawley then had a series of conversations with Allegro representatives in which these promises were repeated, that her debts could negotiated down to half, and that by paying through Allegro the rest could be

9

paid. Upon belief that Allegro was a law firm with attorneys qualified to do this, she entered her

entire debt load, nearly $20,000, into the Allegro program, including close to $10,000 with a

Chase credit card account. After entering the program, Lawley began to realize that she had been

fooled. Her credit score began to drop and creditor calls continued because her bills were not

being paid. The pressure from creditors became so intense that one threatened to sue. Upon being

informed of this potential lawsuit, Lawley called Allegro, who she believed to be attorneys acting

on her half, and was informed "that they were not attorneys and they could not stop it if they

proceeded further . . . ." Tr. Transcript 83:9-25.

Ultimately, from April 2008 through May 2009, Lawley paid $5,170 into Allegro Law.

Tr. Ex. 9. Allegro's records show that only $80.70 was on hand in her escrow account to be used

for settlements. Put another way, after a year of paying into Allegro Law in hopes to pay off debt,

only $80.70 did not go towards Nelms and Allegro in the form of fees. None of Lawley's debts

were settled, and no money was paid to her creditors. Before entering the Allegro program,

Lawley testified she and her husband had a credit score close to 700. After her involvement with

Allegro, it fell to around 500.

Allegro Law charged their customers a fee comprised of 16% percent of the client's total

debt load.  The fee was designed to be front-loaded; that is, as monthly payments arrived, the

money was first applied to pay the 16% fee before any money was placed into the client's escrow

account to pay off debts. In addition, Allegro charged a $25 initial fee, and an administrative fee

each month. For example, Ms. Lawley's account showed a recurring monthly charge of $59.99

marked as "Monthly Set Up Fees." Tr. Ex. 9. Of this administrative monthly fee, Nelms collected

$6.00 per customer. He also collected a portion of the 16% front-loaded fee. Each customer

testified to being unaware of the extent of the fee structure, and that the front-loaded nature of the fee was never explained to them by Allegro representatives. Ms. Lawley testified:

> they never once told me that we're not paying this until all of your money is in and we're not paying a penny on your debt. So I started calling around to my debtors to find out what is being paid. There was nothing being paid. So I called back again to find out why are you not paying my bills like you promised and they started explaining, well, we have to get all of your money first.

Tr. Transcript 78:15-25. Nelms reported an income of $50,000 in 2007, which skyrocketed to $200,000 in 2008, the year he did business as Allegro.

After consideration of the accounts told by these customers, a pattern of misrepresentations is clear: Nelms, through Allegro, consistently misrepresented that Allegro Law would settle consumer debts. Nelms induced participation in the programs through misrepresentations that Allegro was a law firm. Further, Nelms misrepresented Allegro's fee structure.

### 3. Chase Bank Refuses to Settle With Allegro Customers

Allegro's very promise to settle any consumer debts with Chase was itself a misrepresentation as Chase had a standing policy of not negotiating settlements with Allegro Law. Over the life of Allegro Law, Nelms and Allegro purported to represent at least 5,453 Chase account holders, at least 20 percent of Allegro's overall business. Chase had a policy of not negotiating with Hess-Kennedy, and continued the policy with the appearance of Allegro Law. Nelms himself was aware of Chase's policy as early as August 2008, yet he continued, through Allegro, to collect money from Chase account holders in exchange for promises to settle their Chase debt. Nelms testified that he first learned that Chase would not settle accounts with Allegro in August 2008 , when Chase rejected an attempt to settle debt for 1,300 Chase

customers when it was apparent the customers had hired Allegro. Nelms testified that he then received a cease and desist letter from Chase in September 2008,which he understood to mean, "Chase was not going to deal with Allegro directly." Tr. Transcript 142:5-143:1. Nelms then testified about attending a meeting with Chase lawyers in New York in November 2008, where he admitted he was told Chase would not negotiate settlements with Allegro Law. Nelms also testified to receiving a follow-up letter to the same effect in February 2009, in which Chase again told him they would not negotiate with Allegro. Nelms testified, "The language of the letter is very clear." Tr. Transcript 146:7.

Despite the repeated communications from Chase, Allegro continued to represent to consumers that they could settle Chase debts. Each of the Allegro customers that the Court heard testimony from were Chase cardholders to whom Allegro had represented the ability to settle Chase debts. None of them were informed that Allegro could not settle with Chase, and Allegro continued to collect monthly fees and payments from them under the guise of attempting to settle the debts. Ms. Richardson was promised her $5,000 debt to Chase could be settled through Allegro. Richardson was an Allegro customer for 15 months beginning in March 2008, and was never informed by Allegro of the Chase policy, otherwise, she testified, she would not have enrolled in the program. The same was true for Mr. Rubinfeld, who owed $2,500 to Chase, and was never informed during his 16 months in the program of the Chase policy. Again, Ms. Lawley, who owed $10,000 to Chase, was promised this debt would be settled and in her year with Allegro was never informed that it could not be done. When asked why he continued to promise existing Chase customers that he could settle their debts, Nelms stated, "I didn't have a reason to tell customers I couldn't settle debts with Chase." Tr. Transcript 146:12-18.

12

Nelms's continued representation of Chase customers, despite awareness of the Chase policy, led to alarming delinquency rates among Allegro-affected Chase account holders. Melanie Cerminara, Chase's operations manager in collections at the time of Allegro's activity, testified that, based on Chase's records, seventy-four percent of the Chase customers associated with Allegro were either current or in early stages of delinquency.[4] Cerminara stated that in 2008, of all Chase accounts, approximately four to four-and-a-half percent of delinquent accounts would go into charge-off status; that is, debts that had been delinquent long enough that Chase wrote them off the books as non-collectable. For Chase customers dealing through Allegro, the charge-off status was "[v]irtually 100 percent." Tr. Transcript 37:12-17. Further, Cerminara testified that as of May 21, 2009, only 58 of the Allegro-affected Chase accounts had been settled. Even more alarming, of the 58 accounts settled, Chase's records show that 30 of the accounts were settled directly by the consumer themselves. Of the remaining 28, it is unclear if Allegro had any involvement. Allegro promised to represent at least 5,453 Chase customers in settling debt, and only 28 accounts had potential involvement from Allegro. Giving Allegro the benefit of the doubt, of the cases in which they were involved, they settled less than half of one percent of them.

---

[4]Cerminara explained that Chase defined the early stages of delinquency as up to 90 days past due; 90-120 days as somewhat early; and 150 or more days as late stage delinquency. For purposes of Allegro, she stated that Chase calculated early stages of delinquency as being "up to 120 days past due because of the lag time in receiving correspondence from Allegro." Tr. Transcript 42:10-25, 43:1-7.

13

**4. Allegro Law Prosecuted by the State of Alabama; Nelms Disciplined by the Alabama State Bar**

In 2009, Nelms ran into trouble with the State of Alabama. The Alabama Attorney General's Office began its prosecution of Nelms and Allegro after receiving several consumer complaints in March and May of 2009 of customers who had been ensnared by the debt settlement scheme. The Alabama State Bar also became involved in the matter, and on June 25, 2009, entered an Order On Conditional Guilty Plea, under which Nelms pled guilty for violating numerous ethics rules. In the Plea, Nelms admitted to holding himself and Allegro out as legal service providers in debt management and debt settlement, and also admitted to collecting fees prior to the performance of services and without those fees being earned. The Alabama Bar suspended Nelms from practicing law for three years, and he was ordered to cease and desist from providing any legal services through Allegro Law. On June 30, 2009, the State of Alabama filed a complaint against Nelms in Autauga County Circuit Court seeking a temporary restraining order, which was granted on July 9, 2009. On the same date, the state court appointed Louis Colley as receiver to oversee Allegro. On February 11, 2010, the state court issued a permanent injunction and permanently appointed Colley as receiver. Allegro Law filed a Chapter 7 petition for bankruptcy on March, 12, 2010. (Case No. 10-30631).

## II. CONCLUSIONS OF LAW

Chase seeks to have the debt owed to it by Nelms excepted from his bankruptcy discharge. Chase alleges that Nelms incurred the debt through fraud, making it nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Chase also alleges that Nelms committed the fraud and embezzlement while in a fiduciary capacity, making the debt nondischargeable pursuant to 11

14

U.S.C. § 523(a)(4). Finally, Chase also seeks an exception to discharge under 11 U.S.C. § 523(a)(6) for willful and malicious injury by Nelms. The Court finds that Chase has proven its case under § 523(a)(2)(A), showing that Nelms perpetrated a massive fraud on thousands of Chase cardholders and diverted millions of dollars due to Chase. While there is a failure to show a sufficient fiduciary relationship under § 523(a)(4), and the Court finds a discussion of § 523(a)(6) unnecessary, the § 523(a)(2)(A) fraud claim provides ample basis for an exception to Nelms's discharge

## A. Actions Challenging Dischargeability

Section 523 provides for exceptions to certain debts from a debtor's discharge. At issue in this case is a debt that Chase alleges should be nondischargeable due to false pretense, false representation, and fraud. The court strictly construes exceptions to discharge in favor of the debtor, St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 680 (11th Cir. 1993), and the plaintiff seeking the exception to discharge bears the burden of proof, Fed. R. Bankr. P. 4005; see also Grogan v. Garner, 498 U.S. 279, 285, 11 S.Ct. 654, 658 (1991) (holding that preponderance of the evidence is the proper burden of proof in nondischargeability proceedings); and In re Bullock, 317 B.R. 885, 889 (Bankr. M.D. Ala. 2004).

## B. The Fraud Committed by Nelms's Agents is Imputed to Nelms

When a creditor can prove the debtor's agent committed fraud, the nondischargeability of the debt incurred through that fraud may be imputed to the debtor. Strang v. Bradner, 114 U.S. 555, 561, 5 S.Ct. 1038 (1885). After Strang, the majority of courts have followed the Supreme Court's holding to mean that an innocent debtor's liability for an agent's wrongdoing is nondischargeable under § 523(a)(2)(A). Indeed under this Circuit's precedent it is recognized

15

that, "[a] debt may be excepted from discharge when the debtor personally commits actual, positive fraud, and also when such actual fraud is imputed to the debtor under agency principles." Hoffend v. Villa (In re Villa), 261 F.3d 1148, 1151 (11th Cir. 2001) (though choosing not to extend the imputation of fraud to § 20(a) of the Securities Exchange Act) (citing Strang). The bankruptcy courts of this district have followed suit, recognizing the imputation of an agent's fraud to the principal for nondischargeability purposes in a commercial or business context. See In re Gordon, 293 B.R. 817, 822 (Bankr. M.D. Ga. 2003) (collecting cases).

Proving fraud liability for a principal through the actions of one's agent for purposes of § 523 nondischargeability has taken the form of two tests. The majority of courts have taken the approach that "an innocent debtor's liability for her agent's wrongdoing is nondischargeable under § 523(a)(2) regardless of the debtor's knowledge or participation." In re Heinz, 501 B.R. 746, 761 (Bankr. N.D. Ala. 2013) (citing Carroll v. Quinlivan (In re Quinlivan), 434 F.3d 314 (5th Cir. 2005)). This test presents the idea that "the culpability of the indebted partner is irrelevant," even when "the partner is innocent of wrongdoing, and had no knowledge or reason to know of the fraud . . . ." Quinlivan, 434 F.3d at 319. Applied to the present case, if Americorp employees, acting as agents for Nelms, committed fraud in incurring the debt to Chase, then Nelms's debt to Chase is not dischargeable under § 523(a)(2)(A). Under this test, the mere presence of an agency relationship combined with fraud by the agent is all that the court examines.

Other courts have required more than the simple presence of an agency relationship to impute an agent's fraud onto the principal. These courts, in the minority, have turned to a "'reckless standard, requiring that the debtor knew or should have known of the agent's fraud in

16

order to impute intent.'" Heinz, 501 B.R. at 762 (citing Treadwell v. Glenstone Lodge (In re Treadwell), 637 F.3d 855 (8th Cir. 2011). While not requiring active participation by the debtor-principal in the fraud, the debtor-principal "cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud." Matter of Walker, 726 F.2d 452, 454 (8th Cir. 1984) (citing In re Savarese, 209 F. 830 (2d Cir. 1913) and David v. Annapolis Banking & Trust Co., 209 F.2d 343, 344 (4th Cir. 1953)).

Courts within our Circuit have contemplated whether the Circuit would apply the majority or the reckless standard approach. See Heinz 501 B.R. 762-765 (choosing the majority view); and Gordon, 293 B.R. at 823 (applying the higher burden of the reckless indifference standard). This stems from the perceived less than full embrace given to the majority approach in Villa. However, for purposes of this case, this Court need not mine Villa for the Circuit's intent on this issue because under either standard Nelms's culpability for fraud can be imputed from the blatant fraud committed by his agents. Nelms is not the truly innocent debtor envisioned in the majority test, and evidence at trial established that he had the knowledge of his agents' fraud necessary to meet the reckless standard test.

The facts proven at trial show that Nelms was certainly aware of the fraud being perpetrated by Americorp in their dealings with Allegro customers. He testified to working very hard to hire the former marketers of the Hess-Kennedy fraud once that operation was ended. Nelms was clearly aware of the fraud being perpetrated by Hess-Kennedy; he, in fact, participated in the fraud himself as an agent of Hess-Kennedy. Further, there is no real dispute as to whether Americorp and its employees operated as agents for Nelms. Americorp and its marketers were hired by Nelms to induce customers into signing up for Allegro, and to act on

17

Nelms's behalf. He hired Americorp with full knowledge of how they had executed fraud for Hess-Kennedy, and it was clear from his testimony at trial that the experience in debt settlement fraud that Americorp possessed was valued by Nelms in his pursuit of them and in his rote use of their letters that he sent verbatim to Chase. Nelms testified that he had been interested in working with Americorp to accomplish his own business purposes when he saw how effective they had been at executing the Hess-Kennedy scheme. Once Hess-Kennedy collapsed, he quickly hired Americorp to effectuate the same fraud for his operation. Nelms testified at trial to being aware of the misrepresentations Americorp marketers were making on behalf of Allegro Law. Under the majority test, which imputes the fraud of an agent regardless of the debtor-principal's knowledge, the fraud committed by Americorp employees is imputed to Nelms. Under the minority reckless standard test, because he did actually know of the fraud being committed, the fraud committed by Americorp employees is imputed to Nelms. Through the vehicle of Allegro Law, and the services of Americorp, Nelms committed a massive fraud on thousands of Chase cardholders.

### C. Through Allegro, Nelms Committed Fraud and Proximately Caused Harm to Chase, Rendering the Debt Nondischargeable Pursuant to § 523(a)(2)(A)

Debts incurred as a result of fraud are excepted from discharge under § 523(a)(2)(A), which provides, in part:

> (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—
> (2) for money, property, services ... to the extent obtained, by—
> (A) false pretenses, a false representation or actual fraud, other than a statement respecting a debtor's or an insider's financial condition.

18

11 U.S.C. § 523(a)(2)(A). "Courts have generally interpreted § 523(a)(2)(A) to require the

traditional elements of common law fraud." <u>Sec. and Exch. Comm'n v. Bilzerian (In re

Bilzerian)</u>, 153 F.3d 1278, 1282 (11th Cir.1998).  Accordingly, there are four elements of a fraud

claim that the plaintiff must prove by a preponderance of the evidence:

> (1) The debtor made a false representation of a past or current material fact;
> (2) With the intent to deceive the creditor;
> (3) The creditor justifiably relied upon the representation; [and]
> (4) The creditor sustained loss as a proximate result of the representation.

<u>Id.</u> at 1281. Section 523(a)(2)(A) captures the Code's competing purpose with giving the debtor a

fresh start. That is, while we generally assume the bankruptcy code's protections to be aimed at

providing a fresh start for the debtor, § 523(a)(2)(A)'s purpose is to protect the victim of fraud.

<u>see</u> <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 223, 1128 S.Ct. 1212 (1998); <u>see also</u> <u>Grogan</u>, 498 U.S.

at 286-287 (explaining the limits on Congress's policy of a fresh start for a debtor under the

Code, confining "the opportunity for a completely unencumbered new beginning to the honest

but unfortunate debtor.") (citations omitted).

### 1. Nelms and Allegro Made False Representations of Material Facts With the Intent to Deceive, Upon Which Chase Cardholders Relied

The misrepresentations of material facts made by Nelms and Allegro to Chase

cardholders are vast and have been well documented in Section I(B)(3), *supra*, of this

Memorandum. For purposes of thoroughness, however, it is worth noting that virtually each

piece of the Allegro operation functioned on the customer being misinformed and kept in the

dark as to what they were paying for and how their debts were being handled. The most basic

promise of Allegro made to customers, that Nelms and Allegro could and would settle the

19

customers' debt, was a blatant misrepresentation. Each Allegro customer from which the Court heard testimony was promised that all of their debts would be settled; this was their primary motivation for entering and paying into the Allegro scheme. Allegro did not fulfill this promise, and the evidence at trial showed that Nelms and Allegro had no intention of settling debts and did not in fact settle customer debts. Nelms and Allegro misrepresented their ability to settle debts with Chase, despite awareness that Chase had a policy of not settling with Allegro. Nelms and Allegro misrepresented their status as a law firm and ability to provide legal services to customers. Further, Nelms and Allegro misrepresented the fee structure of the program, and never informed customers that of their monthly payments, large portions, if not all, would instead go to massive fees to Nelms, Allegro, and Americorp.

Allegro promised to pay off Chase cardholder debts through settlements with the intent to deceive Chase cardholders. Had Chase cardholders known these debts could not be negotiated through Allegro, they would not have paid into the scheme. Indeed, each Allegro-affected Chase customer that provided testimony at trial said they would never have paid into Allegro if they had known their Chase debts could not be settled. Nelms's fee structure made it functionally impossible to settle debts, and he misrepresented the fees in order to deceive customers to continue paying into the scheme so he could collect massive fees without paying off any of their debts. Each of the Allegro customers that testified at trial told that they would never have signed onto the Allegro scheme had they been told the truth about the fee structure. In short, Nelms's deception through Allegro and Americorp purposely induced Chase cardholders into a fraudulent scheme designed to make himself rich.

20

## 2. Nelms's Fraud Proximately Caused Financial Harm to Chase, and Chase has Proven Damages of $9,797,229.52

The damages incurred by Chase as a result of Nelms's fraud were well documented at trial. Susan Coniglio, Chase's business operations director overseeing collections, performed a damages estimate that sought to capture the more nuanced damage Chase incurred from the Allegro scheme, rather than simply the base dollar amount of debt not paid by Allegro-affected cardholders. The total debt owed to Chase by the 5,453 Allegro-affected cardholders is in the neighborhood of $38 million. Chase readily admits, however, that it would be unreasonable to assume every cardholder would have paid every dollar they owed to Chase had they not become involved with Allegro. The more accurate approach, and the one presented by Coniglio, is one that seeks to put a dollar amount on the total that Chase reasonably could have expected to have been paid absent the Allegro fraud.

The first step in Coniglio's process is adjusting the accounts downward to get a more realistic view of which customers may have paid. This means taking off any customer who was in the later stages of delinquency and was not likely to pay (1,197 customers), any customer with whom Chase settled as of December 2012 (649 customers)[5], customers who abandoned Allegro and paid on their own (278 customers), and two fraud accounts. This leaves 3,327 customers for a charge-off balance of $25.9 million. Again, though, this number was adjusted downward by Coniglio to be more accurate. Specifically, she wanted to use the balance from the time when Chase received the Allegro letter rather than the balance at the point of charge-off, at which point

---

[5]While Cirmonara testified that there were only 58 Chase accounts settled while Allegro was active, Chase began to negotiate with the cardholders once Nelms was out of the picture.

the account would have accrued fees and interest. This removes about $3.4 million in fees for a balance of $22,534,096.

Coniglio's next step was to determine the actual likely payment stream from those 3,327 customers by looking for population of Chase customers who were similar to the Chase customers in the Allegero scheme-essentially a blend of customers looking to self-cure and those already in collection.[6] This group made sense as an analogue to Allegro-affected customers because Allegro customers were account holders who were delinquent but yet able to pay over some funds; in other words, but for Allegro, many Allegro customers likely had the funds to make some minimum monthly payment to Chase. Coniglio then did a payment stream analysis of this group out over a 210-day period to determine what percentage of their balance did this similarly situated group pay over a seven-month period.[7] The average payment rate from this grouping was 43 percent. Taking 43 percent of the balance at the time Chase received Allegro letters, $22,534,096.00, produces a balance of $9,979,229.52.[8]

The evidence and testimony at trial showed that Nelms and Allegro proximately caused this damage to Chase. It was largely undisputed at trial that the basic operation of Allegro was

---

[6]Coniglio defined self-cure as "customers that enter delinquency and . . . eventually cure out of delinquency" without having to be pursued by Chase collection attempts. The in collection group was defined as "delinquent, but they were not able to self-cure themselves." Tr. Transcript 196:16-198:15.

[7]Coniglio analyzed this set of Chase cardholders in a period dating back to January 2011 and a period dating back to April 2011. 2011 data compared favorably to 2008 and 2009 data. For example, from February 2008 to June 2009, Chase had a settlement rate of 52.2 percent; for the year of 2011, the settlement rate was 49 percent.

[8]This damages estimate has been adopted by the Eastern District of New York in Chase's suit there against Allegro. See Chase Bank USA, N.A. v. Allegro Law, LLC, et al., 08-cv-4039(PKC) (E.D. N.Y.).

premised on the fact that the creditor would pay money into Allegro rather than to their creditors. In fact, it was shown that Allegro discouraged their customers from paying creditors like Chase as a matter of basic policy. In that sense, Allegro collected money from Chase cardholders that otherwise could have been paid over to Chase directly. Nelms and Allegro misled their customers into thinking this money would be paid to Chase, while failing to inform the customers that Chase's internal policy would not allow settlements with Allegro. Therefore, money otherwise due to Chase was diverted by Nelms and Allegro into a fraudulent scheme, and was instead used by Nelms and Allegro for millions of dollars of profit.

### D. Chase's Allegation of Defalcation Pursuant to § 523(a)(4) Fails for Lack of a Fiduciary Relationship with Nelms

Section 523(a)(4) provides that a debtor cannot discharge a debt incurred through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C § 524(a)(4). A debt is nondischargeable based on defalcation if the creditor proves three elements: (1) the debtor stood in a fiduciary relationship with the creditor; (2) the fiduciary relationship existed prior to the creation of the debt; and (3) the debt resulted from an act of defalcation. Quaif v. Johnson, 4 F.3d 950, 953–55 (11th Cir. 1993). The creditor seeking to except the debt on grounds of § 523(a)(4) bears the burden of proving "the existence of an express or technical trust and not merely the existence and breach of a fiduciary duty." In re Lucas, 477 B.R. 236, 242 (Bankr. M.D. Ala. 2012). Once a fiduciary relationship in the context of a trust is established, the creditor must show a defalcation by the debtor. The Supreme Court has recently examined § 523(a)(4) to discern the meaning of defalcation, finding it to require an intentional wrong, or when "actual knowledge of wrongdoing is lacking, . . . . if the fiduciary consciously disregards

(or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." <u>Bullock v. BankChampaign, N.A.</u>, __U.S. __, 133 S.Ct. 1754, 1759 (2013).

Chase seeks to establish a fiduciary relationship with Nelms with which to base nondischargeability upon the fact that Allegro had its customers authorize limited powers of attorney. There are two problems with Chase's approach. First, the power of attorney does not create the fiduciary duty necessary to give rise to an action under § 523(a)(4). "'As a rule, the general fiduciary duty created by a power of attorney gives rise to an agency relationship, but does not give rise to the fiduciary capacity required by section 523(a)(4).'" <u>In re Scott</u>, 481 B.R. 119, 190 (Bankr. N.D. Ala. 2012) (quoting <u>Pioneer Bank & Trust v. Cameron (In re Cameron)</u>, 2008 WL 5169513 (Bankr. D. S.D. Oct. 17, 2008)). Further, even if it could be shown that some elevated level of fiduciary duty existed giving rise to a nondischargeability action, that fiduciary duty would extend only to Nelms and Allegro and the Chase cardholders. It would not establish a fiduciary duty between Nelms and Chase. Without being in a fiduciary relationship with Chase, Nelms could not commit a defalcation against them. Accordingly, Chase has failed to prove this count of the complaint, and the nondischargeability of Nelms's debt to Chase cannot rest on § 523(a)(4).[9]

### E.  Nelms's Motion to Dismiss Based on Statute of Limitations is Without Merit

On the eve of the trial, Nelms filed a motion to dismiss alleging that Chase's complaint

---

[9]Additionally, Chase has asserted a nondischargeability claim based upon 11 U.S.C. § 523(a)(6), alleging willful and malicious injury by the debtor to Chase. Because a § 523(a)(6) analysis would seem largely redundant in light of the fraud analysis discussed in II(C), the Court declines to reach the § 523(a)(6) claim, and instead rests the nondischargeability of Nelms's debt to Chase on grounds of § 523(a)(2)(A).

should be dismissed based on the grounds that Chase's complaint was barred by the statute of limitations under 11 U.S.C. § 727(e). (Doc. 128). Nelms's motion is without merit for two reasons. First, Chase timely filed its complaint. Second, Nelms waived his statute of limitations argument because he failed to raise it as an affirmative defense in his answer.

Nelms filed his Chapter 7 petition on February 22, 2010, and notice of commencement of the case was given to parties in interest, as well as notice of meeting of creditors, which was scheduled for March 31, 2010. (10-30430, Doc. 5). The deadline to file actions pursuant to 11 U.S.C. § 523(c), was June 1, 2010. Id., see also, Rule 4007(c), Fed. R. Bankr. P. Chase timely filed its complaint on June 1, 2010. (Doc. 1).

Nelms filed his answer on June 29, 2010. (Doc. 10). While he denied a number of the allegations of the complaint and raises several defenses, he did not raise the statute of limitations, or the bar of Rule 4007(c), in his answer. Rule 8(c), Fed. R. Civ. P., states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . . statute of limitations." (Made applicable to these proceedings pursuant to Rule 7008, Fed. R. Bankr. P.). As Nelms failed to plead the statute of limitations in his answer, he has waived it. Id.; Day v. Liberty National Life Ins. Co., 122 F.3d 1012, 1015 (11th Cir. 1997).

Nelms was granted a discharge by this Court on January 23, 2012. (10-30430, Doc. 107). It is important to note that all Chase seeks here is a declaration from this Court, that Nelms's debt to it Chase excepted from that discharge under § 523(a)(2). That is, Chase is not opposing the grant of a discharge to Nelms pursuant to 11 U.S.C. § 727. If Nelms did not receive a discharge pursuant to 11 U.S.C. § 727, it would not be necessary to determine whether Chase's debt was

25

excepted from it. The entry of a discharge in favor of a debtor is a necessary precondition for the efficacy of an exception, rather than–as Nelms alleges–a bar.

Nelms also argues that Chase should have prosecuted its dischargeability action in the context of a civil action in the Eastern District of New York in 2002. See Chase Bank, USA v. Allegro Law, LLC, et. al., Case No. 08-CV-4039. This Court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1334(b). Nelms cites no authority for the proposition that the action should have been prosecuted in the Eastern District of New York rather than here, and this Court is aware of none. Moreover, it appears that the only court in which venue would have been proper is this Court. 28 U.S.C. § 1409(a).

### F. Nelms's Motion to Recuse is Without Merit

Four days prior to the start of trial, Nelms filed a Motion to Recuse. (Doc. 124). Nelms contends that the Bankruptcy Judge was biased against him because he wrote a letter to the Alabama State Bar opposing the reinstatement of Nelms's law license. Before addressing the merits of Nelms's claim, a brief review of the context in which this letter was written would be informative.

On June 25, 2009, the Alabama State Bar suspended Nelms's law license, for a period of three years, for his unethical conduct in connection with the Allegro debt settlement scheme. (Pl. Ex. 13). After serving his suspension, Nelms petitioned the State Bar to reinstate his law license. Dianne Gray, an Investigator for the State Bar sent a copy of Nelms's petition to the Bankruptcy Judge with a request for comments.[10] The October 17, 2013 letter, a copy of which is attached to

---

[10] Nelms law license was originally suspended for three years. During the period of suspension, the Alabama Bar extended the period of suspension by an additional 90 days as a result of several

Nelms's motion, is the Bankruptcy Judge's response. The October 17 letter is five pages long

and addresses three material false statements made by Nelms in detail. The salient point is that

Nelms filed a petition for reinstatement with the Bar which contained false statements relating to

his bankruptcy filing or to this Adversary Proceeding. The Court will attach copies of four items:

(1) Nelms's Petition for Reinstatement; (2) the Bankruptcy Judge's Letter of October 17, 2013;

(3) the Alabama State Bar's Conditional Order on Guilty Plead, dated June 25, 2009 (suspending

Nelms' law license for three years); and (4) the Judgement of the Circuit Court of Autauga

County, Alabama, dated February 11, 2010, in <u>Alabama v. Allegro Law, LLC</u>, CV-09-125

(finding that Nelms has perpetrated a fraud on the Allegro customers, among other things).

Nelms alleges that the October 17 letter shows that there is an appearance of impropriety

or bias and, for that reason, the undersigned should recuse, citing <u>Ex Parte Rollins</u>, 495 So.2d

636 (1986). In <u>Rollins</u>, the Alabama Supreme Court granted a writ of mandamus, requiring a

trial judge to recuse from a case where the judge had "intense negative feelings" against one of

the lawyers. It should first be noted that the "intense negative feelings" arose from prior dealings

between the lawyer in question and the trial judge, issues that had forced the trial judge to recuse

himself in two prior matters. The judge made a complaint against the lawyer with the bar,

however, the bar did not sanction the lawyer.

Nelms misreads the decision in <u>Rollins</u>. It is not a blanket rule that a trial judge must

always recuse if he has made a bar complaint against any lawyer, or party, in a case. The judge's

---

instances of unethical conduct committed by Nelms. Because Nelms' suspension was for a
period of time greater than 90 days, his law license was not automatically reinstated at the
conclusion of the period of suspension. Rather, he was required to petition for reinstatement.
<u>See</u>, Rules 8, 28, Alabama Rules of Disciplinary Procedure.

bar complaint in <u>Rollins</u> was a symptom of the "intense negative feelings," bourne out of extrajudicial animus, and not the bar complaint itself that triggered the need to recuse. The October 17 letter written by the undersigned Bankruptcy Judge was not a formal bar complaint, but instead was in response to a request for information from the bar, based on evidence heard by the Bankruptcy Judge over a period of four years and not the product of any extrajudicial bias of intense negative feelings. To hold that a judge in such a situation must chose between speaking out as to what he knows–based on numerous motions, evidentiary hearings as well as a judgment from the Circuit Court of Autauga County, Alabama-and recuse from a large, complicated case in which he has invested four years, or keep silent and allow a party to make false statements and mislead another tribunal is a dilemma the law does not place on a trial judge.

Recusal is governed by 28 U.S.C. § 455(a) which states that "any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonable be questioned." <u>Ginsberg. v. Evergreen Security, Ltd., (In re Evergreen Security, Ltd.)</u>, 570 F.3d 1257, 1263 (11th Cir. 2009). "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." <u>Liteky v. United States</u>, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157 (1994); <u>see also</u>, <u>Mantiply v. Horne</u>, 2014 WL 1370515 (S.D. Ala. April 8, 2014). The facts which came to the attention of the undersigned Bankruptcy Judge, which underlie the October 17 letter to the State Bar, all

28

came to his attention through the course of the Allegro and Nelms bankruptcy cases and related Adversary Proceedings.  Nelms does not allege any extrajudicial source for the matters he complains of.  Nelms's claim of bias is without merit.

## CONCLUSION

Chase has provided a thorough account of the massive fraud committed by Nelms through Allegro Law on thousands of Chase account holders. Through misleading advertisements and fraudulent promises to solve debt problems for consumers, Nelms orchestrated a scheme that induced thousands to halt payments to their creditors and instead divert the money to him. Millions of dollars otherwise due to Chase were instead collected by Nelms and his agents in the form of costly fees, causing alarming financial harm to consumers in the process. The Court heard ample testimony of the reliance consumers placed on Nelms's misrepresentations, and of the damage caused to Chase as a result. Accordingly, judgment is due to be entered in favor of Plaintiff Chase Bank, and the debt of $9,979,229.52 owed by Nelms is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). A separate order to this effect will be entered.

Done this 24th  day of July, 2014.


/s/ William R. Sawyer
United States Bankruptcy Judge




c: Clark R. Hammond, Attorney for Plaintiffs
   John D. Norris, Attorney for Defendant

# APPENDIX
# B

# UNITED STATES BANKRUPTCY COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA

IN RE:

ALLEGRO LAW, LLC,      Case No. 10-30631-WRS
              Chapter 7

  Debtor.

---

DANIEL G. HAMM, as Trustee for
Debtors Allegro Law, LLC and
Allegro Financial Services, LLC,

  Plaintiff,

vs.            Adv. No. 11-03007

AMERICORP, INC.; SETON, CORP.;
TIMOTHY McCALLAN, and THE
ACHIEVABLE, INC.,

  Defendants.

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

## I. Introduction

The Defendants collected, held, and purportedly processed $127,370,765.89 in payments

received from Allegro customers by Allegro Law. (PX 88, Tab DM2 ("Receipts") and PX 89,

Tab DS1/part 2 ("Total Payments Received")).  Since the February 22, 2010 filing of the Chapter

7 Voluntary Petition for Keith Nelms, (Case No. 10-30430, Doc. No. 1)[1]  and the March 12, 2010

---

[1]  Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice
of a fact not subject to reasonable dispute in that it is either "(1) generally known within the
territorial jurisdiction of the court or (2) capable of accurate and ready determination by resort to

1

filing of the Chapter 7 Voluntary Petition for Allegro Law, LLC and Allegro Financial Services, LLC,[2] (Case No. 10-30631, Doc. No. 1), this Court has been seeking a clear and cogent explanation as to what happened to all of that money. Despite more than a half dozen Orders, 3 evidentiary hearings, over 300 PACER filings, and a full trial on the merits, Defendants have steadfastly refused to provide the answer to that question. Instead, the Defendants have acted with complete and total contempt for this Court, the bankruptcy process, and the tens of thousands of Allegro customers who have been waiting since February 2010 for a resolution of their claims. In order to fully understand the unprecedented scope of the Defendants' wrongful conduct – both with respect to the merits of this case and how they have conducted themselves throughout the course of this litigation – it is necessary to start at the very beginning.

## II.    Allegro Law Replaces Previous Scams Associated With The Defendants, Including Hess Kennedy and Consumer Protection Law Center

Allegro Law was simply another iteration of the same scam that Defendants have been perpetrating for years. Defendants processed and mailed the same letters on behalf of Allegro Law that they did for Hess Kennedy, Consumer Protection Law Center, and Campos Chartered Law Firm. (PX 128). Defendant Americorp's customer service representatives answered the

---

sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. Rule 201(b). A court may take judicial notice "of public records within its files relating to the particular case before it or other related cases." *Cash Inn of Dade, Inc. v. Metropolitan Dade County*, 938 F.2d 1239, 1243 (11th Cir. 1991). "[T]he Court has the right to take notice of its own files, records and experience in the case, and has no duty to 'grind the same corn a second time.'" *In re Aerial Transit Co.*, 190 B.R. 464, 467 (Bkrtcy. S.D. Fla. 1996) (quoting *Aloe Creme Laboratories, Inc. v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir.1970)). If there is a reference in this Order to a document number in PACER rather than an exhibit number, the Court has chosen to take judicial notice of such document.

[2]    The term "Allegro" or "Allegro Law" will hereinafter be used to refer to both Debtors.

2

phone on behalf of Allegro, Hess Kennedy, Campos Chartered Law Firm, and Consumer Protection Law Center all in the same day. (PX 336C; <u>Transcript</u>, page 77, lines 5-6). When one entity was shut down by regulators, the Defendants simply moved the scam – and many of its victims – to another.

In an email dated February 23, 2008, Defendant Timothy McCallan and a man named Joel Carlsen exchanged correspondence evidencing their plans to abandon Hess Kennedy and Consumer Protection Law Center and carry on with Allegro:

Carlsen:  "[W]e have to come from the perspective that we see both HK [Hess Kennedy] and CPLC [Consumer Protection Law Center] go down. What would we do?"

McCallan:  "Nelms is on tap. I have already reached out to him this morning advising him to get ready and asking him for all the details on the legal entities he has ready to go that we can use."

Carlsen:  "I can have the network attorneys sign contracts linking them to Nelms entity should take 30 days. We move forward with our plans of separate contracts for each attorney, tasking out, etc. We take the 30 companies you have on tap and get them under Nelms asap. (Neil can help here). We get your people trained on HK techniques asap to learn aggressive settlement techniques and legal arguments. We use this experience with our Nelms operation. This way if in the future Camp[os] has challenges, we can roll directly into Nelms. Now big question. IF, CPLC or Camp has challenges in the future, and we are ordered to stop, which in theory could freeze Americorp operations, does it make sense to set up Nelms using processing under a completely different name, roof? Meaning not process CPLC and HK under the same roof as Nelms so if something occurred, Nelms would not be implicated?
. . .
We should do this quietly as it could be seen as a "jump ship" move by Ed [Kennedy] at a time of pressure and could be misread.

(PX 337B-2). In a letter dated March 21, 2008, Defendant Timothy McCallan made the transition to Allegro official when he wrote:

3

. . .Consumer Protection Law Center recently informed us that they will not be accepting any new clients starting Thursday March 27, 2008.

On a positive front, we are nonetheless proud to announce that Allegro Law, LLC, a consumer advocacy law firm based in Alabama, has decided to use Americorp/Seton as their sole payment processing agent for their debt management and debt settlement clients. . .This new relationship is effective on Thursday [sic] March 26, 2008.

(PX 125). Many Allegro customers indicated in correspondence with the customer service department that they were formerly customers of Hess Kennedy. (PX 201 and PX 351).[3]

### III.   A Full Accounting From the Defendants Is Sought From The Very Beginning

After the Allegro Law debt elimination program[4] had been in operation for a little over a year, the Autauga County Circuit Court issued a Temporary Restraining Order on July 9, 2009 and appointed Louis Colley as Receiver of the assets of Allegro Law and Allegro Financial. A final judgment was entered by the Circuit Court on February 11, 2010, leaving Mr. Colley in place as the Receiver. (Case No. 10-30631, Doc. No. 8, Exhibit A).

During the Receivership – and while they were still being paid large sums of money by the Receiver – Defendants purportedly continued to perform their "back office processing" work.

---

[3] For example, in an email dated November 5, 2008, customer Joshua Miller wrote: "I had just finished a 12-month program by Hess & Kennedy law firm that was purported to resolve my debts. After completing the program and making all the payments as scheduled, none of my debts had been resolved. So, today my accounts are over 12 months delinquent. Due to excessive late fees, the balances on my accounts are quite larger than when I first joined this last program that I recently completed. I am actively pursuing recouping my money along with thousands of other scam victims that were clients of Hess & Kennedy. In the meantime, I hope that Allegro can help me do what I set out to do over a year ago – settle my credit card debts." (PX 201 and PX 351).

[4] The Allegro Law program had two divisions – "debt settlement" and "debt management." The Court uses the term "debt elimination program" to refer to both. Any reference that is limited to one or the other division will refer to it by name.

4

Indeed, Defendants were elated that they were going to continue to make money despite Allegro's Receivership. An email from Vanessa Vinicombe, Americorp's Chief Financial Officer, to Defendant Tim McCallan and others, dated days after the initial appointment of the Allegro Receiver, stated:

> Tim has asked me to share with you some good news that we have received as he promised you an update. 'We are beginning to see the light.' We have been in contact with the [R]eceiver and they have provided us with the new bank accounts which are located in Alabama. We are currently working with Vanco Processing to change the banking information to the new accounts. We are anticipating that we will be submitting EFT files for both DS [debt settlement] and DM [debt management] within the next 24-48 hours. Payments and Disbursements are diligently working to produce deposits for all of the manual checks that we have stored since July 1, 2009. This is Great News. We will let you know when we have more. Stay focused and Believe.

(PX 108; email dated July 16, 2009) (unconventional capitalization in original).

On July 6, 2010, while the Defendants' businesses remained operational, this Court entered an Order on the Receiver's Motion for Allowance of An Administrative Expense Claim Pursuant to 11 U.S.C. 503(B)(3)(E) and 543(C), which sought payments from the bankruptcy estate for "services" provided by Defendants Americorp, Seton, and The Achievable. (PX 1). In that July 2010 Order, the Court made clear that it would not approve administrative claims for the Defendants until answers to some fundamental questions were provided:

> The Court's second concern is as to the value of the services rendered. The court will require evidence as to precisely what was done and who did what prior to any fees being awarded. Also of considerable interest is the overall disposition of funds flowing through the Allegro accounts. The following questions remain to be answered:
>
> 1.  How much money was taken from Allegro clients?
> 2.  How much of that money was taken by Nelms?
> 3.  How much was paid to Americorp, Seton, and other third parties?
> 4.  How much was paid to creditors of the Allegro clients?

5

The Court has made inquiry from the Trustee as to whether the amounts owed to the 15,000 Allegro clients can be determined. **To date, no accounting has been provided, or shown to exist, which would enable the Court to determine how much is owed. Until this is made clear, the Court will not approve administrative claims in payment of fees to those who were in control of the money and who should be able to answer these questions**.

(PX 4) (emphasis added). More than three years have passed since this Court entered that Order.

## IV. The Defendants Have Consciously and Deliberately Done Everything In Their Power To Thwart Every Effort Made By the Plaintiff To Obtain Critical Information About The Money Flowing Through The Allegro Law Program

### A. The Plaintiff Sought Information From The Defendants Before Filing This Adversary Proceeding

On September 23, 2010, the Trustee wrote a letter to Americorp's attorneys requesting

much of the same information that the Court requested in its July 6, 2010 Order:

Please understand that we are seeking this information for all current and former Allegro customers from about April 2008 through the termination of the business.

1.  For all Debt Management and Debt Management clients: A listing that includes name, address, account number and all debits and credits into that particular account. This report should summarize the information at the conclusion of each customer's account.

2.  For all Debt Settlement clients: A listing that includes all customer account numbers along with the client name, address, account number, and each customer's escrow balance.

3.  The most recent statement issued to all active Allegro debt settlement and debt management customers.

4.  A summary of all payments made to all third parties from Allegro funds from April 2008 through the end of business operations.

5.  We understand that Mr. John Fendley was allowed to access Allegro's customer's account data housed within the

6

> AmeriCorp/Seton system. We would be seeking to have 'inquiry only' access to this same electronic data. . .

(PX 5).

On September 27, 2010, the Trustee wrote a letter to Americorp's attorneys requesting that the Defendants preserve all evidence related to the underlying bankruptcy:

> As you are aware, we are in the process of obtaining certain information/data from Americorp. The information in their New York office is **vital to this case and we need to be assured that it will remain available**. Due to the nature of this information, I am requesting your assurance that Americorp will have a securely protective data "back-up" to guard against any loss of this information from any potential problems and that i[t] will be available to us at a later date. Please discuss this with personnel at Americorp and let me know what you find out.

(PX 6). Thus, long before the Defendants ceased operations, they were fully aware of how critical their data was to cases that were currently pending before this Court and they were fully aware of this Court's demand for that data.

### B.     Defendants Refuse to Completely Or Honestly Answer Written Discovery Requests

On February 15, 2011, Plaintiff filed the Complaint in this case (11-3007, Doc. No. 1). Plaintiff filed an Amended Complaint on March 2, 2011 (PX 7). Defendant Timothy McCallan, CEO and owner of both Americorp and Seton, testified at a February 2013 evidentiary hearing that when he was served with the Complaint in this matter, he read it. (PX 346, page 111, line 25; page 112, lines 1-2). He further testified:

> Q:     And so you knew when you were served with the complaint that it had a specific request in it that said the trustee was requesting what they called turnover, namely that the defendants turn over any and all records whether electronic or hard copy relating to certain aspects of the debt programs or all aspects of the debt programs that the corporate defendants had run, correct?

> A:     Yes.

Case 11-03007    Doc 361    Filed 02/16/16    Entered 02/16/16 16:09:58    Desc Main
Document      Page 93 of 160

(PX 346, page 112, lines 3-10).

On March 10, 2011, Defendants Americorp, Inc., Seton, Corp., and Timothy McCallan were served with Plaintiff's First Request for Production and Plaintiff's First Interrogatories (PX 8, PX 9, and PX 10). Among the many discovery requests included in those pleadings was Request for Production No. 11, which asked for all documents relating to:

    a.     The entire files on each customer.

    b.     Any payments made by each customer.

    c.     Any fees assessed to each customer.

    d.     The identity of each customer's creditors.

    e.     Any communications sent to or received from the creditors of each customer.

    f.     The outcome or result of the debt elimination program as to each customer.

Clearly, Request No. 11 was designed to obtain documents that answered the fundamental questions that were at the heart of the underlying bankruptcy proceeding as well as this adversary proceeding:

    a.     How much money was received from each customer?

    b.     How much money did each customer pay to each Defendant for fees or other charges?

    c.     How much money did each customer pay to Allegro Law, Keith Nelms or any other third party for fees or other charges?

    d.     How much money was paid to each creditor of each customer?

    e.     How much money was being held for each customer when the Defendants last provided services relating to that customer?

8

Only three weeks after they were served with these discovery requests, both Americorp and Seton ceased operations.  (PX 35, <u>Affidavit of Timothy McCallan</u>, at ¶ 7).

### C.  Defendants Do Not Disclose the Existence of Either Database

On May 5, 2011, Defendants responded to Plaintiff's First Request for Production and Plaintiff's First Interrogatories. (PX 15, PX 16, and PX 74).  At the beginning of their Request for Production, Defendants stated that the ". . .[f]iles being made available via DVDs are provided , with limited exceptions, **in the form in which those files have been maintained among the Defendants' business records**." (PX 16) (emphasis added).  This was the first – but certainly not the last – time that the Defendants made misrepresentations in this case.

In Defendants' first response to Request No. 11, they produced 2 folders of documents, one named "All Active Clients" and one named "All Inactive Clients," and stated that additional documents "may be found in other DVD folders," which Defendants did not identify. (PX 16). The contents of those folders were introduced into evidence at the trial as PX 17, PX 18, PX 19, and PX 20.  A brief review of the 4 spreadsheets produced in those 2 folders demonstrates that those spreadsheets did not come anywhere close to containing  all of the information asked for in Request for Production No. 11.

On June 16, 2011, at a hearing conducted by this Court, the Defendants described their May 2011 document production as follows:

> We received discovery from the plaintiff, from the trustee . . . .  **In response to that request, we turned over, Your Honor, all of our records.**  We didn't discriminate.  We didn't parse out which question required what information.  We did, if you will excuse the term, we did a data dump.  **We gave them and structured it by file so they could identify what information we had provided, every single piece of information that we have, which is**

9

> **extensive, about each of the individual clients of Allegro Law,**
> **how much they paid in, how much they received, what was**
> **disbursed on their behalf. And this was produced about a**
> **month ago . . . . [F]rankly there isn't any additional**
> **information**.
> . . .
>
> **These [Americorp and Seton] are two companies with**
> **extensive history in providing back-office services. They have**
> **very good records. We have turned over all of those records** . .
> . .

(PX 26, Transcript of June 16, 2011 Hearing, page 20, lines 2-19; page 21, lines 13-16). This

was untrue. The Defendants later turned over at least 800,000 additional documents, a huge

second database that contained information relating to thousands of additional customers, and a

variety of Excel spreadsheets, none of which were included in the May 2011 production. (PX

346, Transcript of February 21, 2013 Hearing, page 35, lines 23-25; page 36, lines 1-5).

Moreover, less than 4 months before trial and after the entry of more than half a dozen Court

Orders, Defendants revealed even more information – including multiple additional servers,

250,000 audio recordings, and approximately 20 file boxes containing paper documents relating

to Allegro Law. (Transcript of November 4, 2013 Trial, page 24, lines 10-13).

On August 2, 2011, pursuant to Bankruptcy Rule 7037 and Rule 37 of the Federal Rules

of Civil Procedure, Plaintiff sent Defendants a 22-page letter outlining in great detail the

numerous deficiencies in Defendants' discovery responses. (11-3007, Doc. No. 155-9). In that

letter, Plaintiff specifically addressed, among other things, the complete inadequacy of

Defendants' response to Request No. 11 and inquired about accessing a file that Plaintiff had

found **on his own** -- a file named "AllegroLawLLC - Full Database Backup." This database had

been buried in an obscure subfolder, which required clicking on the following folders to find it:

10

"Disk 1," "AllegrolawData2," "AllegroLawLLC - Full Database Backup.zip."  (PX 45,

Transcript of November 14, 2011 Hearing, page 13, lines 22-25; page 14, lines 1-16).  Plaintiff

was unable to open the actual file buried within those 3 subfolders because double-clicking on it

resulted in an error message. (PX 45, Transcript of November 14, 2011 Hearing, page 14, lines

17-25; page 15, lines 1-25, page 16, lines 1-5).  Nevertheless, the name of the file seemed

promising, so it was brought to the attention of Defendants in Plaintiff's August 2, 2011 letter.

(11-3007, Doc. No. 155-9, page 8).

On August 16, 2011, Defendants responded to Plaintiff's Rule 7037 letter. (11-3007 Doc.

No. 155-10; PX 346, page 38, referencing Exhibit 29 introduced in that hearing).  In that letter,

Defendants indicated for the **first time** that the file named "AllegroLawLLC - Full Database

Backup" was responsive not only to Request No. 11, but also to numerous other discovery

requests.  (11-3007, Doc. No. 155-10, page 1, 3-5; PX 346).  Notably, this file had gone

**completely unmentioned** in Defendants' initial discovery responses despite the fact that they

were prepared by Timothy McCallan (the corporate Defendants' sole officer, sole shareholder,

and sole director). (PX 15, Defendants' Response to Interrogatory No. 20).

> **D.**     **Even After Defendants Finally Acknowledge The Existence of The First Database, They Make It Extraordinarily Difficult For Plaintiff to Access**

In their August 16, 2011 letter, Defendants reassured Plaintiff that he now had **all** of the

Defendants' files associated with the operation of the Debtors:

> In their response to Plaintiff's First Request for Production, **Defendants produced its entire database of Debtors' clients within a file headed 'AllegroLawLLC- Full Database Backup'** having a .bak file extension (the "Client Database"). **Defendants also produced numerous other files principally with .pdf extensions.  The latter files are all of the Defendants' files that pertain to the Debtor's operations other than those that are privileged and other than the**

11

**Client Database**.  These latter files, to the extent they contain client information, were principally created in response to specific requests from the Receiver and are necessarily fragmentary.  **All of the client information sought by Plaintiff, including the information identified in items A.1 and A.2 of your letter, appears in readily accessible form in the Client Database files**.

(11-3007, Doc. No. 155-10; PX 346).   Thus, by August 2011, Defendants had again represented both to the Plaintiff and to this Court that they had produced **everything** in their possession that pertained to Allegro's operations.  This was also untrue.

On August 18, 2011, this Court held a hearing on Defendants' request to stay the adversary proceeding pending the resolution of their appeals of this Court's denial of their motions to compel arbitration.  During that hearing, the issue of Plaintiff's access to the database was discussed.   Counsel for Defendants assured the Court that: "if one had access to **this particular database file**, it would be the equivalent of access to the **entire system**."  (PX 30, pages 26, lines 4-6 (emphasis added)).  Again, this was untrue.[5]

Shortly thereafter, on August 22, 2011, this Court entered its first Order in this adversary proceeding related to this discovery dispute.  The Court ordered that the parties each provide an IT consultant to attempt to remedy Plaintiff's lack of access to the database and ordered those consultants to confer on or before September 1, 2011:

Not later than September 1, 2011, the Defendants shall make a technical expert available to the Plaintiff, or his technical expert, to see if access to the Defendants' database can be made readily available.  **By this, the Court means that access such as would normally be made available to a user of the database, such as was had by Allegro Law, LLC and Allegro Financial, LLC**.  The Plaintiff need not be given access to alter the database, but should have reasonable access to use and

_____

[5] Mr. Jeff Middleton, a witness for the Plaintiff who processed each of the Defendants' discovery productions, testified on February 21, 2013 that this was not true because the Defendants later produced numerous other files as well as a completely separate database. (PX 346, page 40, lines 4-11).

manipulate the data.

(11-3007, Doc. No. 103) (emphasis added).

A conference call between Plaintiff's IT consultant and Defendants' IT consultant was held on August 24, 2011. (PX 45, page 23, lines 10-13). However, the IT consultant that Defendants chose to participate in the call, David Torre, was not helpful in any way. (PX 45, page 23, lines 14-22). This is particularly interesting now, given that the Defendants identified Mr. Torre more than a year later as their "former IT director" and described him as "highly skilled." (Doc. No. 208, filed October 8, 2012); see also PX 56, <u>March 19, 2012 Letter from Thomas Mancuso to Steve Olen</u>, page 4). Notably, Defendants did not offer Mr. Torre as a witness to testify about issues regarding access to the database at the evidentiary hearing that was conducted by this Court a year and a half later on February 21 and 22, 2013. (PX 346).

**E.      Defendants Repeatedly Represent To Plaintiff And To The Court That The "Client Database" Is The Only Database And That It Will Answer All of the Fundamental Questions**

Plaintiff filed a Motion To Compel on September 9, 2011 (11-3007, Doc. No. 112). On September 13, 2011, Plaintiff filed his Third Interrogatories and Requests for Production to Defendants. (PX 33). In those discovery requests, the Plaintiff again attempted to obtain an accounting of the money that was paid into the Allegro program, which the Court, by that time, had been demanding for over a year:

> Identify by name, address, phone number, and your ID number each individual customer who participated in the Allegro Law, LLC and/or Allegro Financial Services, LLC debt elimination program and:
>
> a.      The amount of money that was received from each customer during the course of his or her participation in the program.

13

b.    The amount of money that each customer paid in fees during the course of his or her participation in the program to Americorp, Inc., Seton Corp., and/or Timothy McCallan.

c.    The amount of money that each customer paid in fees during the course of his or her participation in the program to Allegro Law, LLC, Allegro Financial Services, LLC, and/or Keith Nelms.

d.    The amount of money that each customer paid in fees during the course of his or her participation in the program to any other third party including but not limited to marketers and processors not listed in your answers to subsections (a)-(c) above, specifically listing the name of each third party to whom fees were paid, the amount that each customer paid to that third party, and the dates on which such amounts were paid.

e.    The amount of money that was paid to each creditor of each customer during the course of that customer's participation in the program, specifically listing the name of each creditor to whom money was paid, the amount paid, and the date on which each payment was made.

f.    The amount of money that was being held for each customer when the Defendants last provided services relating to that customer.

(PX 33).  A request for production included in that filing also requested "any and all documents that Defendants used, referred to, consulted, reviewed, relied on or considered in answering any part of Interrogatory No. 1."  (PX 33).  On October 12, 2011, Defendants responded with a lengthy objection and more misrepresentations:

Defendants object to this interrogatory since, when it is added to the number of interrogatories previously propounded, the total exceeds the number of interrogatories permitted by Bankruptcy Rule 7033 and Rule 33(a)(1) of the Federal Rules of Civil Procedure.  Pursuant to these rules, a party may serve on any other party no more than 25 written interrogatories including all discrete subparts.  Fed. R. Civ. P. 33(a)(1).  Assuming that no interrogatory already served in this proceeding can be deemed to include any discrete subpart, Plaintiff has heretofore served on Defendants 27 written interrogatories in two sets.  Defendants did not object to answering the two interrogatories previously propounded that exceeded the total authorized, but they indicated in their answers to Plaintiff's second set of

14

interrogatories that they would be unwilling to stipulate to the service upon them of any additional interrogatories.

In addition, the information sought by Plaintiff responsive to Interrogatory No. 1 can be determined by examining and compiling information available in the Database (as the term is defined in Defendants' Opposition to Plaintiff's Motion to Compel, Docket Entry #123) previously provided to Plaintiff to which Plaintiff is currently being afforded access. The burden on Plaintiff of ascertaining or deriving the information will be no greater than for Americorp and Seton, particularly given that Americorp and Seton have ceased operations and long stopped active use of the Database. Rule 33 provides that "if the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries." Fed. R. Civ. P. 33(d).

(PX 38). This interrogatory response was signed under oath by Defendant Timothy McCallan, individually and as the corporate representative for Defendants Americorp and Seton. (PX 38). The representations Mr. McCallan made in this interrogatory response were untrue.

On October 11, 2011, Defendants responded to Plaintiff's Motion To Compel (11-3007, Doc. No. 123). Defendants, both in their August 16, 2011 response to Plaintiff's Rule 7037 letter and in their Opposition to Plaintiff's Motion To Compel, emphasized that the database that they had produced contained all of the information needed to answer the "fundamental questions," which included a full accounting of the money paid into the Allegro program.

In their August 16, 2011 response to Plaintiff's Rule 7037 letter, Defendants stated:

- "In their response to Plaintiff's First Request for Production, Defendants produced its [sic] **entire** database of Debtors' clients within a file headed "AllegroLawLLC-Full Database Backup" having a .bak file extension (the "Client Database") . . . . **All of the client information sought by Plaintiff [in response to Request for Production No. 11], including the information identified in items A.1 and A.2**

15

of your [August 2, 2011] letter, appears in readily accessible form in the **Client Database files**" (Doc. No. 155-10; emphasis added).

In their Opposition to Plaintiff's Motion to Compel, Defendants stated:

- **The Database contains detailed customer information responsive to many of Plaintiff's discovery requests**."

- **Defendants believe that the Database contains all of the information sought by Plaintiff [in Request No. 11]**."

- "**Through the access to the Database now being provided to Plaintiff, Defendants believe that Plaintiff should be able to generate for himself the answers to these questions** [i.e., the fundamental questions at the heart of this adversary proceeding] as well as any others regarding the services rendered by Defendants for the benefit of Debtors' customers."

- "**Defendants believe . . . that the access to the Database being given to Plaintiff will enable Plaintiff, with substantially the same effort as would have to have been expended by Defendants, to generate the reports that Plaintiff seeks**."

- "**Access to the Database**, together with other production made by Defendants, affords Plaintiff **all** of the documents and records within the possession, custody, and control of Defendants responsive to Request No. 11 and **should obviate all of the remaining concerns as to Request No. 11 by Plaintiff**."

(Doc. 123, pages 2, 3, 5, and 6) (emphasis added). Moreover, in a sworn affidavit, Defendant

Timothy McCallan stated:

The Database . . . represents the database of information regarding Debtors' clients in the form in which the database was kept in the usual course of Americorp's and Seton's businesses, and **the access being afforded Plaintiff to the database is the same access as the Defendants had when the database was in active use**.

(PX 35, at ¶ 8). Despite all of these unequivocal representations to the Court, at this point in

time (October 2011), Defendants still had not disclosed that there was actually a **second**

database, as discussed in more detail below. Instead, Defendants continued to spend all of their

time and energy making access to the first database impossible.

16

**F.      Defendants Continue To Attempt To Thwart Plaintiff's Access To The First Database**

On the same date that Defendants filed their Opposition to Plaintiff's Motion To Compel, they also filed their Supplemental Responses to Plaintiff's First Request for Production and First Interrogatories. (PX 37). In their supplemental response to Request for Production No. 11, Defendants claimed that Plaintiff could have immediate access to the first database through a secure website, which Plaintiff declined.[6] (PX 45, page 34, lines 7-25; page 35, lines 1-25, page 36, lines 1-20). Alternatively, Defendants offered to provide the software necessary for Plaintiff to access the information on his own computer equipment. (PX 37). On October 17, 2011, Plaintiff requested that the Defendants produce the software that would allow Plaintiff to access the Database using his own equipment. See October 17, 2011 email from Lucy Tufts to Julian Spirer. (Doc. No. 155-15).

Because, according to Defendants, the copying and loading of the software had to be done by an outside consultant, Plaintiff did not receive the software until October 25, 2011. (PX 45, page 27, lines 4-7). Defendants then sent the Plaintiff custom built software without an "installer" (an installation program – including drivers, plugins, etc. – that installs software onto a computer and configures it so that it is compatible with the system). (PX 45, page 26, lines 4-20). Therefore, all installation of the custom built software would have to be done manually. General IT experience will only help so much when dealing with custom built software designed for a specific client and a specific purpose. (PX 45, page 25, lines 13-25; page 26, lines 1-20).

---

[6] It turned out to be extremely wise that Plaintiff refused Defendants' offer to provide access through a website, as it would have only been access to the single database that was at issue at this point in time. Plaintiff's insistence that he be allowed to clone Defendants' server eventually led to the discovery that there were, in fact, 2 different databases.

17

Even worse, the instructions provided with the software (which Defendants obviously knew Plaintiff needed) stated in their entirety:

(1)     Setting up DB (DB Name: QPSData) in SQL Server 2000

(2)     Setting up two Virtual directory in IIS (1. QCS Application 2. Business Service)

(3)     Setting up SQL Report Database in SQL Server 2000 and setup SQL Server Reporting Virtual directory to be able run reports

(4)     Store all correspondence letters, contracts and reports physically on drive to pull from QPS application

(5)     Have their copy of QPS executables which point to QPSData database copy mentioned in point 1.

(PX 45, page 26, line 21 through page 30, line 14).  The second set of instructions read as follows (errors and typos in original):

two aps that need changes: *note: QPS pulls the user credentials from the client ithout password…but the user that they useon their client mahcine must exist in QPS.

QPS CLIENT APP: qps.exe.config may need to be updated

(PX 45, page 30, line 15 through page 32, line 11).  Plaintiff had no idea what these instructions meant and the so-called instructions certainly did not constitute step-by-step directions on how to set up the software in Server 2008 and SQL 2008 environments -- both of which were necessary to make the information in the first database accessible. (PX 45, pages 26 through 30).

On October 27, 2011, this Court entered a second Order regarding access to the database in this case:

The Defendants shall file, not later than November 9, 2011, a statement describing the software necessary to access the database referred to in their Response to the Plaintiff's Motion to Compel. (Doc. No. 123).  This statement shall be sufficiently specific to permit the Court to retain its own expert so that it may make an

18

independent determination as to whether the database in question has, or has not, been produced.

(PX 43). In response to this Order, the Defendants submitted the following:

> Pursuant to this Court's Order for Evidentiary Hearing entered October 27, 2011 (Doc. 127), Defendants Americorp, Inc. ("Americorp"), Seton Corporation ("Seton"), and Timothy McCallan ("McCallan") hereby describe the software necessary to access the database referred to in Defendants' Response to the Plaintiff's Motion To Compel (Doc. 123): **Microsoft (R) SQL Server 2000 Enterprise Edition**.

(PX 44) (emphasis added). This direct representation to this Court also turned out to be false.

Defendants later described the first database and the software that was necessary to access it as follows:

> **CreditSoft application** (used for debt settlement clients) and related database (a **Microsoft SQL Server 2008** database named 'AllegroLawLLC'). This is the front end application for the database produced on 5/6/2011.

(PX 58) (emphasis added). Of course, at this point, the Defendants were still concealing the fact that there were actually 2 databases, as described below.

> **G.    Plaintiff Clones Defendants' Server In An Attempt to Access The Database At Issue, Only To Discover That He Has Been Provided A Second Database**

On November 14, 2011, the Court held a hearing on Plaintiff's Motion To Compel.

(PX 45). The testimony in that hearing established that at one point in time the Defendants had

both the database **and the system on which it was a part** preserved and stored for restoration.

Robert Link, an attorney for the Defendants, testified that "when operations were ceased on

or about April 1st [2011] and things were wound down. . .**all electronic information**, for lack of a

better word, was basically put in a storage format and basically stored in a cloud, so to speak."

(PX 45, Transcript of November 14, 2011 Hearing, page 59, lines 20-24) (emphasis added). He went

on to testify that the database "came off storage media. . .where it was stored for a period of time

19

until the request came up and the need came about to bring the database **and the system** back up."

(PX 45, page 60, lines 9-12 (emphasis added)).  Mr. Link explained that the system had been rebuilt

on a third-party server in Florida, but had been dismantled prior to the November 14, 2011 hearing.

(PX 45,  page 70, lines 15-25; page 71, lines 1-4).  This, not surprisingly, was more false testimony

given under oath on behalf of the Defendants.[7]

On November 15, 2011, this Court entered a third Order on discovery in this

case, which granted Plaintiff's Motion To Compel and awarded Plaintiff his reasonable expenses in

bringing the motion, including attorney's fees. (PX 46).  In addition, the Court ordered as follows:

> The Defendants shall produce the database which is the subject of these proceedings on a server which is to be made accessible to the Plaintiff.  Plaintiff may access the server directly and thereby access the database upon reasonable notice.  Plaintiff shall have reasonable access to the server and the data without interference from or observation by the Defendants, their agents, parties they otherwise control under contract, or otherwise.  **Plaintiff may clone the database, the front end application program, and any other electronically stored information, programs or applications, which may be necessary for them to access, view, and work with the subject data.  The database shall be produced in its original form and shall not be altered, deleted, or modified**.  The Defendants shall cooperate with the Plaintiff in their effort to access the database.

---

[7] In February 2013, Oscar Nunez, IT manager for the Defendants, in his own testimony to this Court, directly contradicted the testimony of Mr. Link:

Q:      Was that system in Florida that was fully operational ever dismantled?

A:      The system in Florida dismantled, no.

Q:      So it has worked just like that from October 2011 to at least eight months ago [August 2012], which is the last time that you had any knowledge of it, the last time you were employed there?

A:      Yes.

(PX 346, page 144, lines 16-21; page 182, lines 13-19).

(PX 46) (emphasis added).

On December 1, 2011, Defendants responded that "Plaintiff may access the server and the data, and perform the other actions specified in the Order, during regular business hours on December 14 and 15, 2011, at the offices of Jason B. Wells and Jackson Thornton Technologies, LLC, 200 Commerce Street, Montgomery, AL 36101." (PX 47).[8]  Plaintiff's counsel and Plaintiff's IT expert went to Montgomery and cloned the database and the server.  (PX 346, page 46, lines 11-15).  After doing so, Plaintiff discovered that the second database (the one obtained in December 2011) and the first database (the one produced in discovery in May 2011) were completely different databases with completely different information.  (PX 346, page 46, lines 22-25; page 47, lines 1-23).

### H. The Threat Of Civil Contempt And The Arrest Of Defendant Timothy McCallan

As a result, Plaintiff filed a Motion for Sanctions on January 25, 2012 (Doc. No. 155).  On February 14, 2012, defense counsel filed motions to withdraw, explaining: "Despite repeated email and voice mail messages, I have had no communications with Defendants regarding the substance of the case since January 25, 2012." (PX 51, Affidavit of Julian Spirer, at ¶ 4).

On February 15, 2012, this Court entered a fourth Order:

The Trustee reports that the Debtors, Allegro Law and Allegro Financial, did not

---

[8] Offering the "database" for cloning in Montgomery, Alabama was peculiar at the time. This Court later discovered that the Defendants had dozens of operational servers responsive to Plaintiff's discovery requests that were being kept in Melbourne, Florida. (Transcript of Novembinger 4, 2013 Trial, page 24, lines 10-13).  It is obvious to this Court that transporting and making one of these servers available in Montgomery was a deliberate attempt to thwart Plaintiff's discovery of the many other operational servers in Florida.

keep their own business records, but rather relied upon Americorp for these services. These business records are crucial to the administration of the underlying Chapter 7 bankruptcy cases as well as for this Adversary Proceeding. **The Defendants have promised to produce the records and have falsely represented to the Court that the records were in fact produced**.

. . .

Counsel should bear in mind that it appears that the Defendants may be held in contempt of court for the failure to produce the business records of the Allegro entities, as called for by this Court's Order of November 14, 2011. **Moreover, it appears that counsel have made representations to the Court which do not appear to have been truthful.** If counsel are permitted to withdraw before the motion for sanctions is resolved, the Court could be left with a situation where Parnell, Rosenberg, and Sprier claim that the client has not been forthcoming and the client, through new counsel, may claim that the wrongdoing was all on the part of Messrs. Parnell, Rosenberg, and Spirer.

(PX 52) (emphasis added). A few days later, on February 22, 2012, this Court entered a fifth

Order, which granted, in part and deferred in part, Plaintiff's Motion for Sanctions. (PX 53). In

addition, the Court stated as follows:

The Court finds that the Defendants have willfully failed to comply with this Court's order of November 15, 2011, (Doc. 138), requiring them to produce the subject database. . .**Accordingly, Defendants are in contempt of court.**
. . .
The Defendants are again ordered to produce and make available to the Trustee, his attorneys, accountants and other representatives, the database which has long been the subject of these proceedings.

(PX 53) (emphasis added).

On March 5, 2012, a warrant was issued for the arrest of Defendant Timothy McCallan.

(PX 54). A little over a week later, the Court noted that "McCallan appeared with new counsel,

who admitted that they could not produce the database, as called for by the November 15, 2011

Order." (PX 55). This Court set another hearing for April 9, 2012 and gave Defendant

McCallan an opportunity to purge himself of contempt. (PX 55).

Incredibly, the Defendants blamed the Bankruptcy Court (and others) for their own discovery abuse:

> It is a fact that the Bankruptcy Court's decision to shut down business operations has created a mountain of impediments with respect to your discovery demands.

(PX 56) (emphasis added).

On March 28, 2012, the Plaintiff – yet again – asked the Defendants for basic information about what happened to the $127,370,765.89 that was paid into the Allegro Law program. This information was still critical to the Plaintiff's causes of action for turnover, accounting, and fraudulent transfers. This time, the Plaintiff submitted the following questions to the second set of attorneys who entered appearances on behalf of the Defendants on March 14, 2012 and April 6, 2012 (11-3007, Doc. Nos. 186, 187, and 191):

1.  The name, address, phone number, and Client ID number of each individual customer who participated in the Allegro Law, LLC and/or Allegro Financial Services, LLC debt management and/or debt settlement program.

2.  The amount of each and every fee that was paid by each customer during the course of his or her participation in the program.

3.  The amount of each and every fee that each customer paid during the course of his or her participation in the program to Americorp, Inc., Seton Corp., Timothy McCallan and/or any other entity owned by, controlled by, affiliated with or related to any of the Defendants.

4.  The amount of each and every fee that each customer paid during the course of his or her participation in the program to Allegro Law, LLC, Allegro Financial Services, LLC, and/or Keith Nelms.

5.  The amount of each and every fee that each customer paid during the course of his or her participation in the program to any other third party, specifically listing the name of each third party to whom each and every such fee was paid, the amount of each and every fee that each customer paid to each third party, and the date on which each and every such fee was paid.

23

6. The amount of each and every payment that was made to each creditor of each customer during the course of that customer's participation in the program, specifically listing the name of each creditor to whom each and every such payment was made, and the date on which each and every such payment was made.

7. The amount of money that was being held for each customer when the Defendants last provided any services relating to that customer.

(PX 59).

On April 6, 2012, Defendants filed Notice of Compliance With Court Order Dated March 15, 2012 Regarding Production of Database and Motion to Remove Sanctions. (PX 58). In that filing, Defendants "assert[ed] emphatically" that "since the entry of the Order, the Defendants, the Defendants' counsel, newly engaged consultants and their staff have expended substantial resources and time and made every effort to comply with the Plaintiff's requests for production of documents as well as the Order." (PX 58). For the first time in a pleading filed with this Court, Defendants admitted that there were actually **2** databases and **2** separate front end applications, describing them as:

QPS application (used for debt management clients) and related database) (a Microsoft SQL Server 2000 database named "QPSData"). This was produced to Plaintiff on 12/14/2011.

CreditSoft application (used for debt settlement clients) and related database (a Microsoft SQL Server 2008 database named "AllegroLawLLC"). This is the front end application for the database produced on 5/6/2011.

(PX 58). The Defendants went on to say that they were "committed henceforth to speedily and thoroughly complying with the rules of discovery" and concluded by saying that they "hereby tender to this Court and to the Plaintiff the database requested by the Plaintiff in a format which

**should be understandable** by the Plaintiff or a third party expert engaged by the Plaintiff."
(PX 58) (emphasis added).

Based on these representations by the Defendants, on April 13, 2012, this Court purged Defendant Timothy McCallan of contempt. (PX 60). This Court discovered much later that the representations made in the Notice of Compliance were also false. For example, Oscar Nunez, the Defendants' IT director, testified almost a year later that he **knew** the links to the documents in the April 2012 production, which were critical to understanding the information in the database, were not functional:

> Q:    And is it your testimony to this Court that, as of April 2012, when you sent those hard drives to the Plaintiff and made the copies for the Court, you knew that the links didn't work?
>
> A:    The links to what?
>
> Q:    The Papervision links.
>
> A:    In the first one?
>
> Q:    Yes.
>
> A:    Yes. That is why – yes, the links didn't work.

(PX 346, page 191, lines 16-24). Thus, Defendants' representations to this Court in their Notice of Compliance that an "understandable" version of the database had been produced simply were not true.

On April 23, 2012, the Defendants produced a series of spreadsheets that provided summary information related to 7 questions that the Plaintiff had submitted to the Defendants in March (PX 59, PX 88, and PX 89), which purported to include answers to three additional (and

related) questions. On the same date, the District Court entered its ruling on the Defendants'

appeal of this Court's denial of their Motion To Compel Arbitration. (Doc. No. 195). The

District Court took note of the Defendants' discovery abuses in this case, observing:

> **McCallan has proven himself contemptuous to compulsory court orders**
> **throughout the bankruptcy process. McCallan's stonewalling regarding these**
> **adversary claims** has caused one set of lawyers to withdraw from his representation
> (of him and his entities), and whatever cooperation to date has been while in civil
> contempt and under the threat of criminal contempt punishment. . .All indications are
> that, once the dispute is out of the Court's control, McCallan will take advantage of
> the lessened authority of the arbitrator in order to frustrate the proceeding.

(11-3007, Doc. No. 195) (emphasis added).

> I.      **Defendants Continued To Obstruct Plaintiff's Ability To Examine And**
>         **Analyze The Documentary Evidence In This Case Even After The**
>         **Production Of Both Databases**

As ordered by this Court, on May 7, 2012, the Plaintiff filed his Third Report on the

Status of Discovery, explaining, in part, that: "Plaintiff has very little documentary evidence

(e.g., actual letters to and from specific creditors evidencing negotiation and/or settlement of a

debt owed) to verify the accuracy of the data input into the various databases by Defendants'

employees." (PX 62). On the same day, Plaintiff also sent the Defendants another Rule 7037

letter requesting that the documentary evidence responsive to Request No. 11 be produced. (PX

62). On May 16, 2012, Defendants filed a response to Plaintiff's Third Report on the Status of

Discovery, but said nothing about the lack of documentary evidence discussed in the Plaintiff's

report. (PX 64).

On May 18, 2012, Defendants wrote to Plaintiff that they were "making every effort. . .to

complete our review as soon as possible and file a further response as we deem appropriate,"

citing "significant geographic issue[s] in coordinating efforts on behalf of our Client in order to properly respond to [Plaintiff's] requests." (PX 65).

On June 4, 2012, Defendants sent additional correspondence to the Plaintiff stating in part as follows: "The majority of the alleged 'deficiencies' in your May 7 letter are included in Defendants' electronic production and it is just a matter of you or your expert locating where on the system the information is stored."   (PX 66).  Defendants offered to participate in a conference call in order to demonstrate where the information Plaintiff requested was located. (PX 66).

On June 18, 2012, the parties participated in a conference call related to determining the exact location of all the actual documents pertaining to each individual customer of Allegro for whom the Defendants purportedly engaged in debt management and debt settlement negotiations. Based on what was discussed in the conference call, Plaintiff wrote to Defendants on July 3, 2012 to summarize Plaintiff's understanding of the universe of available documents in this case:

> Based on our June 18th conference call and our conversation today, it is my understanding that the universe of available documents pertaining to individual customers in the Allegro matter are: (1) the data entered into the QPS (for debt management) and CreditSoft (for debt settlement) programs, respectively, which can be seen as "screenshots" when the programs are loaded and various tabs are selected; (2) downloadable through the correspondence tab of QPS (for debt management); and (3) in a folder that you produced called "PV-Allegro-All" (which has separate subfolders for debt management Paper Vision docs and debt settlement Paper Vision docs).

(11-3007, Doc. No. 203-D).[9]  Additionally, Plaintiff inquired about the documents in folders called

---

[9] The representations made on this telephone conference to the Plaintiff were obviously untrue, as Defendants had 20 boxes of documents in storage in Florida that were not included in the database.  (Transcript of November 4, 2013 Trial, page 24, lines 10-13).

"Allegro Settlement Docs" and "ReportStorage," which appeared to contain additional documents responsive to Plaintiff's discovery requests. (11-3007, Doc. No. 203-D). Defendants responded to these inquiries by indicating that they would "check on the answer." (11-3007, Doc. No. 203-D).

On September 24, 2012, Plaintiff filed a Motion To Amend Scheduling Order and Produce Documents in a Usable Format. (11-3007, Doc. No. 203). Plaintiff was unable to access most of the actual documents relating directly to the customers of Allegro Law. The links between the software that Defendants produced and the document repository to which they were formerly connected were all broken. (PX 346, page 59, lines 7-23). According to testimony at the February 2013 hearing, the **vast majority** of documents associated with each customer were contained in a folder titled "ReportStorage." (PX 346, page 59, lines 24-25; page 60, lines 1-18). This file contained **817,456** separate documents associated with QPS (the debt management side) and 260,000 documents associated with CreditSoft (the debt settlement side). (PX 346, page 60, lines 10-18). To make things worse, the 817,000 documents in the "ReportStorage" folder were organized by **date** – not by customer. (PX 346, page 60, lines 24-25; page 61, lines 1-21). In other words, all letters generated on January 29, 2008 were in one folder, all letters generated on February 7, 2008 were in another folder, all letters generated on February 11, 2008 were in yet another folder, and so on for approximately 880 different days. (PX 346, page 61, lines 2-21).

With the benefit of hindsight and the admissions regarding the inoperable links in the front-end applications, this Court now better understands Defendants' witness Bob Link's very carefully chosen words at the November 14, 2011 hearing. Mr. Link admitted that what was sent to Montgomery for the Plaintiff to clone was **not** the same system that was up and running in

Florida: "The **backup file** [that was delivered to Jason Wells in Montgomery] is not the same as having the **system** up and running on a particular server." (PX 45, <u>Transcript of November 14, 2011 Hearing</u>, page 64, lines 16-17). He explained:

> Q: And you said yourself that defendants Americorp and Seton, at considerable expense and trouble, had the database rebuilt on the server in Florida; correct?
>
> A: Correct.
>
> Q: And with all of that information in the knowledge of Americorp and Seton and some of its attorneys, including you, you are telling us that the defendants and its attorneys took no steps whatsoever to preserve that database that had been rebuilt on that server **in that same format**; is that your sworn testimony to this court this morning?
>
> A: Did anybody take steps to preserve it on a server in Florida which nobody wanted? No. Did we preserve the database and all of the information and all of the software and **applicable necessary pieces**? Absolutely. We have been preserving it since April 1ˢᵗ.

(PX 45, <u>Transcript of November 14, 2011 Hearing</u>, page 70, lines 15-25; page 71, lines 1-4) (emphasis added). This Court concludes that the data's backup file and the software programs were restored to the virtual server in Montgomery. However, during that process, the document repository that was also loaded onto the virtual server was no longer in the same electronic location where the front-end applications were programmed to find it. During the database rebuild in Montgomery, Defendants failed to redirect the front-end applications to find the documents on the local server by specifying the new location of the document repository. Incredibly, Defendants **claimed they could not preserve the ability for these applications to find the repository**. However, once again, this was untrue. Oscar Nunez, IT manager for the Defendants, testified that the system in question was fully operational and functional up through

29

at least August 2012.  (PX 346, page 144, lines 16-21; 178, lines 24-25, page 179, lines 1-2, 23-25, page 180, lines 1-5).  This Court therefore concludes that the Defendants intentionally disabled the links to the documents to make the discovery nearly impossible for the Plaintiff to access and analyze.

### J. Defendants Continue To Make Misrepresentations About The Databases

The Defendants' misrepresentations did not end there.  In their October 8, 2012 Response To Plaintiff's Motion to Produce Documents in a Usable Format, Defendants again asserted – as, by this time, they had asserted many times before –  that they had met their burden under Rule 34 because they had now produced the documents as they were kept in the usual course of business: "Defendants have cloned [their] servers and replicated [their] database for Plaintiff, with the requested information being stored and kept in the **identical manner** in which it was stored **when the Defendants' businesses were in operation**."  (11-3007, Defendants' Response To Plaintiff's Motion to Compel Production Of Documents In A Usable Format, Doc. No. 208, pages 12-13) (emphasis added).

Defendants claimed that the virtual server they produced "allows Plaintiff's computer to function as if their computer was the Defendants' computer (and server) **while Defendants were operating**." (Doc. No. 208, page 4) (emphasis added).  They claimed that the virtual server "allows the Plaintiff to operate the database as if Plaintiff was one of Defendants' employees **when they were operating**."  *Id.* (emphasis added).  They claimed that the virtual server is "the **equivalent** of the remote access that was given to Nelms and Colley. . ."  *Id.* (emphasis added). By their own admissions in that same pleading, none of this is true:

30

. . .Defendants scanned all hard documents they received and saved them to the database.  To accomplish this, Defendants used a commercially available program, PaperVision.  **When the databases were live and running on Defendants' servers and networks, the PaperVision documents were linked to customer files in either the QPS program or the CreditSoft program**.  When Defendants were forced out of business and Defendants' network was no longer functional, some of the PaperVision links **no longer functioned**.

(Doc. No. 208, page 11) (emphasis added).   Their own IT director, Oscar Nunez, later testified:

> Q:  And while the system was operational, they could click on those correspondence tabs, those PaperVision tabs, the document tabs on either front-end application and the document would appear on the screen; right?
>
> A:  Yes.

(PX 346, page 196, lines 17-21).  Thus, the Defendants did not produce the documents as they were kept in the usual course of business – i.e., with functional links for quick retrieval of all documents by customer.

## K.  Defendants Remain Defiant Up Until Default Judgment Is A Realistic Potential Consequence

On October 4, 2012, the Court entered a seventh Order, which required the parties to meet one last time and attempt to resolve this discovery dispute.  (PX 70).  In the event the parties were unable to resolve their differences, the Court set an evidentiary hearing for November 5, 2012.  (PX 70).

On October 22, 2012, the parties participated in a "meet and confer" telephone conference.  Defendants insisted on transcribing the call.  When Plaintiff objected, one of the attorneys for Defendants explained on the record why the Defendants insisted on the presence of a court reporter:

> **We've had a gun at our client's head since the day we got in this case**.  We've had

31

a judge sit there and threaten us in court with sanctions, including a default judgment. We've got a client that's been put in jail. The lawyers should have been put in jail if anybody should have been put in jail.

. . .

I regret that I was not on the [September 27, 2012] call a couple of weeks ago. **But [Defendants' other attorneys] both told me that the judge essentially told them to be quiet, he did not want to hear from them. He obviously had not read our pleading, and he set this hearing on November the 5th, which we think is totally unnecessary.** So now we're forced to have this meet and confer today, and we think we do need a record.

Transcript of Meet and Confer, October 22, 2012, page 7, lines 3-9, 18-23; page 8, lines 1-4 (11-

3007, Doc. No. 239-1). This Court notes that the Defendants' description of the September 27,

2012 telephonic hearing is totally inaccurate.

On the October 22, 2012 call with Plaintiff, Defendants asserted that they simply could

not restore their networks and provide functionality to the system as Plaintiff requested:

The database was preserved exactly how it was when it was operational, but that doesn't mean that it was still operational. Once those - once that network was no longer in place, it doesn't mean that the information was not preserved. But its functionality and how it all talked to the [sic] each other, that's - those are two different things. And I think that's what y'all are. . .I think that's what y'all are conflating. I don't - those are two different things. I can't - **I can't make their networks come back up.**

Transcript of Meet and Confer, October 22, 2012, page 32, lines 16-23; page 33, line 1 and lines

5-8 (emphasis added) (Doc. No. 239-1). Despite these emphatic protestations by Defendants,

their own IT Director, who was responsible for making these links work, testified under oath just

a few months later that the functionality of the links at issue was simply a matter of "want to

have" versus "need to have":

Q:     When you were talking about the links in the April 2012 production, the ones

that did not work, you used a phrase called something are "need-to-have's" and some things are "want to have's."  Do you remember saying that?

A:       Yes.  That's a qualification we use in engineering.

Q:       In April 2012, were you aware of a court order that was entered in November 2011?

A:       No.

(PX 346, page 186, lines 7-14).  Mr. Nunez's testimony further evidences how completely contemptuous the Defendants were about this Court's orders in this litigation, which, as far back as November 2011, included specific instructions that "[t]he database shall be produced in its original form and shall not be altered, deleted, or modified."  (PX 46).

Instead of agreeing to restore the links to the actual documents in their production as Plaintiff requested, Defendants offered these alternatives during the October 2012 "meet and confer":

(1)      Defendants would extract the .pdf documents in the "Reports Storage" folder, run them through a program called "Law," and create a load file for Plaintiff to upload to litigation support that he must purchase.  Transcript of Meet and Confer, October 22, 2012, page 17, lines 21-23; page 18, lines 1-9; page 19, lines 21-23; page 20, lines 1-6 (Doc. No. 239-1).   Defendants also suggested that they perform some part of this process to see if it is adequate before proceeding to complete the rest.  Transcript of Meet and Confer, October 22, 2012, page 37, lines 12-23; page 38, lines 1-4 (Doc. No. 239-1).

(2)      Plaintiff could purchase access to "Relativity," a web-based litigation support software service that stores and hosts the documents at a location other than a local server.   Transcript of Meet and Confer, October 22, 2012, page 25, lines 2-8; page 26, lines 4-6 (Doc. No. 239-1).

Restoring the functionality of the links on the hard drive that was produced by Defendants in

33

April 2012 was **not** among the Defendants' suggested solutions.[10]

**L.      Defendants Misrepresent The Reasons For Which They Wish To Continue An Evidentiary Hearing on the Critical Issue of the Database**

On October 29, 2012 – only one week before the upcoming evidentiary hearing as to whether the database had been produced in a useable format – Defendants filed an emergency Motion To Continue on the grounds that: (1) Hurricane Sandy would impede their ability to communicate with their clients and witnesses;  and (2) while professing not to concede that Plaintiff's Motion To Compel was meritorious, Defendants explained that they were working on yet another production that might "moot" Plaintiff's Motion To Compel.  (11-3007, Doc. No. 210).  After telephonic hearings the Court held on November 5 and 19, 2012 to obtain updates on the status of Defendants' ability to communicate with their counsel following the hurricane, the Court continued the evidentiary hearing on Plaintiff's Motion To Compel to January 29, 2013.  (Doc. No. 216).  As it turns out, again, the Defendants were not telling the truth when they blamed Hurricane Sandy for their inability to be prepared for the November 2012 hearing.  This Court later learned that all of the operational servers and nearly all of Defendants' witnesses were in Florida at the time. (PX 346).

**M.      Defendants Finally Produce a Fully Functional Database More Than A Year And a Half After It Was Originally Requested**

Then, on November 26, 2012 – **567 days** from date the Defendants were originally served with the discovery requests at issue – Defendants delivered yet another hard drive to Plaintiff.  (PX 342).  This time – for the first time – the hard drive delivered by the Defendants contained:

---

[10] It is worth noting again that the hard drive produced in April 2012 was what the Defendants submitted in order to purge Defendant Timothy McCallan of contempt.

34

(1) **both** databases; (2) **both** front end applications; and (3) **operational links** to the documentary evidence (both the correspondence generated by the program and the documents scanned in as hard copies). (PX 342).

### N. Plaintiff Learns There Is Much More Relevant Information That Defendants Refused To Produce

On January 23, 2013, Plaintiff filed another Motion for Sanctions, describing at length the Defendants' conduct in this case. (11-3007, Doc. No. 224). The next day, the Defendants filed an Emergency Motion for Protective Order and for Briefing Schedule on Plaintiff's Motion for Sanctions. (11-3007, Doc. No. 227). On January 25, 2013, this Court scheduled a hearing for Plaintiff's Motion for Sanctions for February 21, 2013. (11-3007, Doc. No. 236).

In their response to Plaintiff's Motion for Sanctions, Defendants unequivocally stated to this Court that "[t]he November 2012 Hard Drive did not contain any new or additional information or documents." (11-3007, Doc. No. 239). However, at the February 2013 hearing, this Court learned that there was, in fact, additional information in the November 2012 production that was not included in the production of April 2012, the production for which Mr. McCallan was purged of contempt. (PX 346, page 64, lines 8-25; page 65, lines 1-25; page 66, lines 1-25; page 67, lines 1-8). In fact, it was not until this February 2013 hearing that Defendants first revealed that there were also multiple servers in Florida that were responsive to Plaintiff's discovery requests that had not been turned over. Defendant McCallan testified:

> Q:   Tell us why you and the other defendants have not been jumping up and
>       down, making it clear these servers physically resided at CNI in Florida,
>       unaltered, that somebody could go and get them, look at them, copy them,
>       whatever, why in the world weren't the court and we told that?

A:    It is a technical question, sir, I can't answer.  It would have saved me a lot of
      money if it was. . .that simple.

(PX 346, page 138, lines 5-13).  Defendant McCallan further testified:

Q:    Since March 2012, have you done everything in your power to assemble the
      correct team and the right people to make sure that you provide the plaintiff
      with what they are looking for?

A:    Since that infamous day in my life, I have done everything in my power
      financially, emotionally, and mentally to make sure that this was delivered to
      the best of my ability and my team's ability with everything that I had; and
      I have done everything in my heart to put this on the table to make it right, at
      a great cost not just monetarily but in many other fashions, and I  intend to
      continue to go ahead and so until this is brought to a head and a final outcome
      on this case.  So absolutely.
. . .

Q:    Are any of the defendants hiding any information from the plaintiff?

A:    No.

(PX 346, page 141, lines 5-17; page 142, lines 5-7).  Moreover, Vanessa Vinicome, the Defendants'

former CFO, testified under oath at that same February 2013 hearing:

Q:    Ms. Vinicombe, since you have been involved in this case, have you made
      every effort to ensure that the Plaintiff has received every bit of information
      that was in Americorp's possession relating to Allegro Law?

A:    Yes, I have.

(PX 346, page 269, lines 24-25; page 270, lines 1-3).  Both Defendant McCallan's testimony and

Vanessa Vinicombe's testimony was false.  On July 2, 2013, Defendant McCallan sent an email to

Ms. Vinicombe and one of his counsel stating that all of the following relevant documents were in

a storage facility in Florida and were not part of the database that Defendants had previously

produced:

36

Allegro wire confirmation – "These would not be included in the database."

Allegro check registers – "These are not in the database."

Allegro transaction journal entries – "This is not part of the database."

Allegro cash receipts journals – "This is not part of the database."

EFT File to Vanco – "These reports are not part of the database."

Allegro bank statements – "These reports are not part of the database."

Allegro wire approvals – "These would not be part of the database."

(PX 337B-1).

On June 6, 2013, Defendants' second set of attorneys filed Motions to Withdraw. (11-3007, Doc. Nos. 277 and 278). This Court set a hearing on the Motions to Withdraw for July 22, 2013 and stated at the end of its Order: "If the Plaintiff has been given access to the Defendant's servers since the February 21-22 hearings, the parties should be prepared to update the Court." (Doc. No. 279). Under the threat of additional sanctions, and with a hearing fast approaching on Plaintiff's Second Motion for Sanctions, Defendants finally made additional Allegro-related servers and documents not previously produced available to the Plaintiff in mid-July, a process that was completed only 5 days before defense counsels' motions to withdraw were to be heard. (PX 108; Transcript of November 4, 2013 Trial, page 24, lines 10-13).

**O.      Defendants Sit For Depositions Before Plaintiff Can Reasonably Process The New Information Obtained in July 2013**

On July 29 and 30, 2013, Defendant Timothy McCallan sat for a deposition in Mobile, Alabama. Vanessa Vinicombe sat for a deposition on August 1, 2013 in Melbourne, Florida. This Court concludes that because of the incredible volume of information that was obtained in

37

Defendants' July 2013 production (PX 108), Defendant McCallan and Ms. Vinicombe knew full well that there was no way that the Plaintiff could have gone through all of it before the depositions. Moreover, Mr. McCallan had made a belated claim of attorney-client privilege as to many of the servers collected in July 2013, so the deponents knew that many of the most damaging emails and documents could not be reviewed by the Plaintiff before the depositions took place. (11-3007, Doc. Nos. 312-3 and 312-4). During their depositions, both Timothy McCallan, the President and CEO of Americorp and Seton, and Ms. Vincombe, the Chief Financial Officer of Americorp, professed a stunning degree of ignorance with respect to basic questions on a wide variety of subjects.

**P.      Defendants Fail To Show Up To Trial And Defend The Case**

As demonstrated above, from the very beginning of this case, the Defendants made a deliberate decision to do everything in their power to avoid producing any documents or answering any questions related to what the Defendants did with the $127,370,765.89 in payments made by Allegro customers to Allegro Law, LLC. When Defendants were finally forced to produce documents, they refused to help educate either the Plaintiff or this Court as to what those documents meant or how they should be interpreted. Every single thing that the Defendants have done in this case has been designed to thwart the Plaintiff's efforts with respect to his claims of turnover, accounting and fraudulent transfers. The trial was no exception.

A trial in this matter was held on November 4, 2013.[11] The November 4th trial date had

---

[11] On September 20, 2013, this Court consolidated for trial the claims against The Achievable, Inc. in Adv. P. No. 11-3015 with the claims against Americorp, Seton, and Timothy McCallan in Adv. P. No. 11-3007. (Doc. No. 316).

been set 8 months earlier on March 8, 2013. (11-3007, Doc. No. 253). Pretrial disclosures were due on October 21, 2013 and objections to those disclosures were due on October 28, 2013. (11-3007, Doc. No. 253). Defendants' new counsel attended the pre-trial conference held by this Court on October 28, 2013. (11-3007, Doc. No. 326). The Defendants filed no pre-trial disclosures of witnesses or exhibits and made no objections to any of Plaintiff's exhibits and witnesses.

After more than 2 ½ years of very aggressive litigation, neither the Defendants nor their counsel showed up for trial. Neither the Defendants nor their counsel informed this Court or Plaintiff of that decision ahead of time. This Court concludes that the decision not to attend the trial was a calculated, deliberate decision to avoid having to do what Defendants should have done all along: come forward and account for the $127,370,765.89 received by the Defendants in connection with the Allegro debt elimination program and related services.

## V.    Plaintiff's Substantive Claims

The Plaintiff in this case has brought claims for, among other things, turnover of estate property, accounting, and fraudulent transfers.[12]

---

[12] In its Memorandum Opinion and Orders affirming this Court's denial of Defendants' Motion To Compel Arbitration (11-3007 Doc. Nos. 194 and 195; 11-3015 Doc. No. 146), the United States District Court for the Middle District of Alabama held that the Plaintiff's claims in this matter for turnover and accounting were actually claims for breach of contract.

Under the "law of the case" doctrine, "an issue decided at one stage of a case is binding at later stages of the same case." *KTK Min. of Virginia, LLC, v. City of Selma, Ala.*, 2013 WL 5883836, *5 (S.D. Ala. 2013). However, in this matter, upon remand to the bankruptcy court, the parties moved forward and litigated by implied consent the Plaintiff's claims of turnover and accounting. Fed. R. Civ. P. 15(b); Fed. R. Bankr. P. Rule 7015 (stating that Fed. R. Civ. P. 15 applies in adversary proceedings). Nothing in the District Court's order prohibited trying claims for turnover and accounting, Defendants never moved to strike or dismiss these causes of action

## A.    Accounting

In order to establish entitlement to an accounting, equitable jurisdiction must first be

established.  *Worley v. Worley*, 388 So. 2d 502, 506 (Ala. 1980).  Equitable jurisdiction with

respect to a claim for accounting exists on at least three grounds: "the complicated character of

the accounts, the need of a discovery, and **the existence of a fiduciary or trust relation**." *Id.*

(emphasis added); *see also Ex parte Deaton*, 8 So. 2d 819, 820 (Ala. 1942).

This Court concludes that Americorp and Seton acted as fiduciaries with respect to all of

the money flowing through Allegro Law accounts.  The Alabama Supreme Court has defined a

_____

from Plaintiff's amended complaint, and Defendants never objected to the introduction of certain specific evidence and testimony at the trial that would only be relevant in actions for turnover or accounting.

Moreover, even if the "law of the case" doctrine applies, there are three principal exceptions to it: "when (1) a subsequent trial produces substantially different evidence (2) controlling authority has since made a contrary decision of law applicable to that issue **or** (3) the law-of-the-case is clearly erroneous and will work manifest injustice if not reconsidered." *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1289 (11th Cir. 2009) (emphasis added). (citing *Culpepper v. Irwin Mortg. Corp.*, 491 F.3d 1260, 1271 (11th Cir.2007) (quotation marks omitted)).

A subsequent trial on this matter has produced substantially different evidence that was not present before the district court when it considered the Defendants' appeal of the denial of their motions to compel arbitration.  The evidence presented at the trial of this matter, including the Defendants' admission that the books and records at issue belong to and are owned by Allegro, demonstrates that the first cause of action is, in fact, one for turnover rather than breach of contract.  Deposition of Timothy McCallan, pages 23, lines 12-25; page 24, lines 1-8. Moreover, the trial revealed that there was, in fact, a fiduciary relationship between the Defendants and Allegro Law, that Defendants had a duty to account for the money paid into the Allegro Law program, and that Defendants utterly failed in their responsibility for doing so.  *See* Section V(A).

fiduciary relationship as one in which:

> [O]ne person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.

*Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003). Defendant Seton Corp. acknowledged in its contract with Allegro Law that it would "at all times act as an agent for and on behalf of Law Firm." (PX 11). Seton subcontracted with Americorp the responsibility of assisting with some of the administrative services for Allegro. (PX 11-2, at ¶¶ 6-7). Given the overwhelming evidence in this case, it is clear that Defendants Americorp and Seton had been trusted with the entire Allegro debt elimination program, through which they gained superiority over Allegro and its customers as well as an overmastering influence on the entire Allegro Law operation. In fact, Americorp had so much control over Allegro Law that Americorp's own customer service representatives told customers that Allegro was located at Americorp's address and that Allegro was "underneath the umbrella" of Americorp:

Cust. Serv.:   **Allegro Law is under the - is in Woodbury**, not Huntington.

LaRusso.:      Ok, because on the letter I got it says Allegro Law, LLC, 223 Wall Street, #201, Huntington, New York.

Cust. Serv.:   Ok, because it'd be - it's in

LaRusso:       And then there's ano... - I think there's another address.

41

| Cust. Serv.: | Where the payments and everything go to, that's in Huntington. It's a PO Box in Huntington, New York. |
| --- | --- |
| LaRusso: | Ok. So the actual Allegro Law is in Woodbury, you say? |
| Cust. Serv.: | Right. |
| LaRusso: | Ok. |
| Cust. Serv.: | Ok. **What it is, it's the lawyers are underneath an umbrella which is Consumer PLC or Americorp.** |
| LaRusso: | Ok. |
| Cust. Serv.: | Ok? **So, the lawyers are hired underneath them.** |

(PX 336B (emphasis added).

Americorp had over 264 employees between January 2008 and March 2010. (PX 74B)

It had offices in New York and Florida. Deposition of Timothy McCallan, page 55, lines 16-22.

Seton had 21 employees during the same time period with offices in New York. (PX 74B);

Deposition of Timothy McCallan, page 56, lines 18-20. Allegro Law had a single office located

in Prattville, Alabama, which had a single point of contact with Defendants – Keith Anderson

Nelms. Deposition of Timothy McCallan, page 52, lines 6-13; (PX 11). According to their

contract with Allegro Law, Americorp and Seton had responsibilities touching every aspect of

the Allegro debt eliminations programs, including:

(a) Producing a standard set of business and operating statements that report transaction activity, client detail list, aged client receivables, checks paid, creditor billings, creditor cancellations and/or decline summaries, productivity and management reports for origination;

(b) Scheduling and producing creditor proposals;

(c)        Scheduling and producing disbursements;

(d)        Scanning, archiving and processing client documents;

(e)        Mailing proposals, disbursement checks, fair share invoices, client statements, and routine customer correspondence;

(f)        Overseeing and maintaining a creditor database;

(g)        Calculating and collecting outstanding balances and applying funds received;

(h)        Recording manual and electronic payments, reversals and returns and reconciling such;

(i)        Administering banking functions;

(j)        Providing general cash management and reconciliation assistance to Allegro;

(k)        Establishing an account for each client;

(l)        Making certain portions of each client's file accessible via the Internet

(m)        Maintaining a call center;

(n)        Maintaining an administrative staff to receive and record documentation received from consumers and their creditors;

(o)        Maintaining a staff to handle client complaints and the escalation of those complaints;

(p)        Communicating on Allegro's behalf with consumers' creditors and collectors;

(q)        Communicating with consumers about the status of their claims;

(r)        Negotiating with each consumer's creditors and attempting to reach a mutually agreeable settlement approved by each client;

(s)        Providing notice of any pattern of client complaints;

(t)        Providing training to Allegro's staff; and

(u)        Providing Allegro with access to reports and queries through the Quality Contact

43

System.

(PX 11).  Additionally, the Defendants were responsible for:

(a)     Collecting and scanning consumers' documents;

(b)     Sending debt settlement proposals to consumers' creditors and negotiating with them;

(c)     Contacting consumers regarding any additional requirements that their creditors may impose;

(d)     Processing consumers' initial payments, recurring payments, and all fees charged;

(e)     Depositing consumers' payments into bank accounts;

(f)     Providing daily deposit reports;

(g)     Disbursing consumers' funds to creditors;

(h)     Handling refunded or returned checks from creditors as well as reconciling discrepancies;

(i)     Operating a fully staffed call center for consumers;

(j)     Recording all calls and all call center activity and evaluating the customer service representatives on a monthly basis;

(k)     Reminding consumers about missed payments;

(l)     Operating a call center for creditors;

(m)     Providing regular reports and financial statements that record all of Allegro Law's revenues and expenses; and

(n)     Establishing bank accounts on behalf of Allegro Law and reconciling them each month.

(PX 11).  The fiduciary capacities in which Americorp and Seton operated are further evidenced by their control of Allegro's bank accounts.  Allegro's bank accounts were set up under the name

44

"Allegro Law, LLC c/o Americorp, Inc." and the address on file with the bank belonged to Americorp, not Allegro. (PX 104, PX 105, and PX 106). Americorp had access to and conducted nearly all of the withdrawals and deposits as to each of Allegro's accounts:

> Q:    Did anybody from Americorp have access to those [Allegro] bank accounts to move money?
>
> A:    We had access to his bank accounts to do things on his behalf.

Deposition of Vanessa Vinicombe, Americorp CFO, page 123, lines 14-17.

> A:    The EFT deposits were initially deposited in the creditors account.
>
> Q:    Then fees are put in the operating account from the creditor account?
>
> A:    Yes.
>
> Q:    Then fund accumulation went from the creditor account to the escrow account?
>
> A:    Escrow account, yes.
>
> Q:    And then who actually did the debit from Mr. Hammons [a debt settlement customer] and the deposit in escrow; what entity did that?
>
> A:    Americorp, Seton as part [of] the services that we provided, we initiated the debits from the account on behalf of Mr. Nelms, Allegro Law. . . .
>
> Q:    Who made the disbursements from the operating account to those entities [referral agencies and Americorp/Seton]?
>
> A:    Americorp did on behalf of Allegro Law.

Deposition of Vanessa Vinicombe, page 116, lines 22-25; page 117, lines 1-20. Similar processing occurred on the debt management side:

> Q:    But was there an Allegro Law creditors account associated with debt management?

45

A:      Yes.

Q:      And that's where the original payment for Ms. Andrews, that's where it
        went?

A:      Yes, correct.

Q:      And then whatever was supposed to go to creditors was taken out of that
        account and put in – like, for example, for Ms. Andrews an FCDC creditor
        account.

A:      Correct.

Q:      And from there Americorp would then disburse it to creditors?

A:      Correct.
. . .
Q:      Then from that creditor account, the fees were deposited into the operating
        account?

A:      That's correct.

Q:      And from that operating account, the fees would be disbursed to the
        entities to whom they were owed?

A:      For the services that whatever the other entities provided, yes.

Q:      One of which would be the referral agent, right?

A:      And one would be either FCDC or The Achievable for the "benefits
        getting," right?

A:      Yes.

Q:      And one would be Americorp for "processing"?

A:      Yes.

<u>Deposition of Vanessa Vinicombe</u>, page 185, line 1; page 186, lines 1-13; page 183, lines 14-25;

page 184; lines 1-3.

Given this extraordinary access to all of the financial accounts associated with Allegro Law, and the overwhelming evidence demonstrating that Americorp and Seton were responsible for the complete, accurate, and timely collection and disbursement of the money flowing through the Allegro Law debt elimination programs, this Court concludes that Americorp and Seton had a fiduciary relationship with Allegro Law, which invokes the equitable jurisdiction of this Court with respect to Plaintiff's claim for accounting.

Under Alabama law, when equitable jurisdiction is invoked, a court has discretion as to whether to order an accounting. *McDuffie v. Holland*, 690 So. 2d 386 (Ala. Civ. App. 1996). The general process for litigating an accounting claim has been outlined in the academic journals as follows:

> [T]he plaintiff must show that some property was entrusted to the defendant's care, so that there is something to account for, and he must also show the amount or value of that property. . .The defendant, in turn, has the burden of proof to establish expenses, losses, or other deductions which it is claimed reduce the amount due the plaintiff. It will be presumed that funds or property unaccounted for were misappropriated, and expenses unexplained were not incurred, with all inferences resolved against the defendant on these issues.

Eichengrun, Joel, *Remedying the Remedy of Accounting,* 60 Ind. L.J. 463, 469-70 (1985). In *Bynum*, the Fifth Circuit Court of Appeals, relying on "broad equitable principles," explained that "having the obligation to account, one whose accounts are demonstrated to be defective and inadequate must shoulder a substantial obligation diligently to make a correct account." *Bynum v. Baggett Transp. Co.*, 228 F.2d 566, 573 (5th Cir. 1956)[13] (citing 1 C.J.S., Accounting, § 39,

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

47

pp. 678-79) (other citations omitted). While declining to put it in terms of "burden of proof" in the body of its opinion, the Fifth Circuit went on to provide the following analysis in an explanatory footnote:

> When the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the plaintiff, because of money or property [e]ntrusted to him, the burden is upon him to show that he has performed his trust and the manner of its performance. He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed his duty.
>
> . . .
>
> He must therefore prove any allowances or credits that he may claim to have made on behalf of his principal. In making proof of credits claimed by him, he should present an itemized statement, showing the details of expenditures, with the vouchers, receipts, and memoranda supporting his claim.
> . . .
>
> The burden of proof is on the accountant after he has admitted the relation and the receipt of a certain sum, to prove that he had disposed properly of the amount for which he is accountable, and to show what that amount is.

*Bynum v. Baggett Transp. Co.*, 228 F.2d 566, 573 fn14 (5th Cir. 1956) (other citations omitted).

Moreover, the Fifth Circuit held that "one obliged to account does not fulfill his duty by supplying only that which the beneficiary requests, that which is conveniently accessible, or remaining silent in the face of the beneficiary's inevitable difficulty in trying to construct or reconstruct accounts which ought to have been kept and available." *Id.* at 574.

Plaintiff introduced summary spreadsheets produced by the Defendants in April 2012, which show a total of $127,370,765.89 paid by consumers into the Allegro debt elimination programs. (PX 88, Tab DM2 ("Receipts") and PX 89, Tab DS1/part 2 ("Total Payments Received")). These documents constitute admissions by the Defendants as to the amount for

which they must account.  Furthermore, the Defendants did not challenge these amounts at trial nor did they offer any evidence that would contradict their own admissions.[14]

After Plaintiff demonstrated through testimony and evidence at trial, including admissions from the Defendants, that $127,370,765.89 was paid into the Allegro Law debt elimination programs, the burden shifts to the Defendants to establish the amount by which that total should be reduced, which requires accounting for how that money was appropriated. Notably, the Defendants must "present an itemized statement, showing the details of expenditures, **with the vouchers, receipts, and memoranda supporting [their] claim**." *Bynum v. Baggett Transp. Co.*, 228 F.2d 566, 573 fn14 (5th Cir. 1956) (emphasis added).

The evidence at trial included a summary statement of the manner in which the money that Defendants received was purportedly appropriated (PX 88, PX 89).  The summary spreadsheets produced by the Defendants suggest that some of the money was paid to creditors ($71,240,476.53)[15], some of it was paid in fees to various entities (including the Defendants) ($37,171,162.93)[16], and some of it remained in "escrow" when the customer ended his or her participation in the program ($11,220,668.37 according to PX 342; $7,015,688.51 according to

---

[14] The Court also notes that the Defendants have no incentive to inflate or exaggerate the total amount paid into the Allegro debt elimination programs, as Defendants will be responsible for any portion of this amount for which they cannot properly account.

[15] $66,107,914.89 through the debt management program according to the DM6 tab of PX 88 and $5,132,561.62 through the debt settlement program according to the DS6 tab of PX 89.

[16] $9,813,737.99 through the debt management program according to the DM2 tab of PX 88 and $27,357,424.94 through the debt settlement program according to the DS2 tab of PX 89.

49

PX 89).  The fact that these summary amounts do not add up to the total amount of money that

Defendants admit was paid into the program by Allegro Law consumers ($127,370,765.89)

makes their summary itemization – just taking it on its face – entirely unreliable.  Thus, because

the law requires it, and because their itemization of the disbursement of the money is flawed on

its face, Defendants Americorp, Seton and McCallan have the obligation to come forward with

vouchers, receipts, and other documentation that demonstrates what happened to the money with

which they were entrusted.

The Defendants refused to do so.  In fact, when asked, Americorp's Chief Financial

Officer, Vanessa Vinicome, testified that the she did nothing to validate any of the initial figures

provided by referral agencies on behalf of customers, claimed she had no idea how the

customers' monthly payments were calculated, and stated that it was not important to her to

know how the fees were calculated.  Deposition of Vanessa Vincombe, page 53, lines 8-15, 20-

22; page 51, lines 15-19; page 52, lines 6-15; page 72, lines 8-14.   In fact, Ms. Vinicombe

testified that, as CFO of Americorp, she never once conducted any kind of evaluation or audit to

determine whether or not the amount that customers paid in fees was even justifiable.  Deposition

of Vanessa Vinicombe, page 92, lines 12-23.

Defendants did not introduce into evidence any vouchers, receipts, or other

documentation to support their contentions as to how the money was allocated. Defendants did

not introduce any evidence or present any testimony that creditors were actually paid.  They did

not introduce any evidence or present any testimony that third parties were actually paid, or, even

if they were, that those parties did anything to earn what they were paid.

With respect to amounts that Defendants claimed were "escrowed" on behalf of Allegro debt settlement customers, the testimony and evidence introduced at trial made clear that those amounts have simply disappeared. For example, money reflected in the "Accumulated Funds" tab of the database (PX 342) evidenced the amount of money that a customer had in escrow at the end of his or her participation in the Allegro debt settlement program. Deposition of Vanessa Vinicombe, page 63, lines 17-20 ("Accumulated funds is what the client had in escrow."). If a total appeared in the "Accumulated Funds" tab of the Defendants' database, there was **no evidence** that the amount was ever refunded to the customer:

> Q: [W]ith respect to the $2,866.66 in the accumulated funds column that the database said was attributable to Mr. Hammons, is it your testimony that there is nothing whatsoever to indicate that any of that money was ever returned to Mr. Hammons?
>
> A: That is correct.

(November 14, 2013 Trial Transcript, page 74, lines 1-7). The database itself evidences this fact as well. When customers did receive a refund of the amount that remained in escrow at the time they ended their participation in the debt settlement program, there was evidence of that refund in their file. (PX 161-30, showing a signed refund check of $300, and PX 342, showing $0.00 in "Accumulated Funds" for the same customer). Thus, for any customer who had money reflected in the "Accumulated Funds" tab of PX 342, that money is entirely unaccounted for and, given the Defendants' lack of accounting at the trial, presumed misappropriated. This amount totals $11,220,668.37 (PX 342).[17]

---

[17] The summary spreadsheet that Defendants produced in April 2012 suggests that the amount of funds remaining in escrow was $7,015,688.51 (PX 89). The Defendants did not provide an explanation for this discrepancy at trial. The Court observes that this is simply more

Because Defendants admitted the total amount of money paid into the Allegro Law debt elimination programs, but have refused to account for how that money was disbursed or whether it was ever disbursed, this Court concludes that Defendants should be held liable for the entire amount that remains unaccounted for: $95,140,576.67 (total amount paid into the debt elimination programs [$127,370,765.89, PX 88 and PX 89] less the fees paid to Defendants themselves [$15,372,894.58, PX 88 and PX 89], which are addressed separately below as part of the claim for turnover, and less the amount turned over to the trustee from accounts previously controlled by Defendants [$16,857,294.64, see Doc. No. 307-1, Estate Cash Receipts and Disbursement Record]).

## B.    Turnover

As part of the Allegro debt elimination program, Seton was paid $9,994,580.25 in fees, Americorp was paid $2,622,610.60 in fees, and The Achievable was paid $2,755,703.73 in fees. (PX 88 and PX 89 [Tabs DM3a, DS3a]; PX 59).[18]   The Court accepts the amounts of fees paid to each of these Defendants based on the admissions of the Defendants.

The evidence in this case overwhelmingly demonstrates that the Defendants accepted fees for services they did not and, in some cases, could not perform.

Among many other things, Defendants Americorp and Seton were responsible for

_____

evidence that the funds were, in fact, misappropriated.

[18] According to a letter from Defendants' counsel, these tabs purported to address "[t]he amount of each and every fee that Allegro paid during the course of its debt management program or debt settlement program to Americorp, Inc., Seton Corp., Timothy McCallan and/or any other entity owned by, controlled by, affiliated with or related to any of the Defendants."

Case 11-03007    Doc 361    Filed 02/16/16    Entered 02/16/16 16:09:58    Desc Main
Document      Page 138 of 160

"[c]ommunicating on Allegro's behalf with consumers' creditors and collectors," and

"[n]egotiating with each consumer's creditors and attempting to reach a mutually agreeable

settlement approved by each client." (PX 11). Americorp's customer service representatives

promised Allegro consumers that debts would be settled and that they would receive settlement

in full letters upon the conclusion of the program:

LaRusso:        But what if, you know, they say no altogether and I'm paying you
                guys and then they say no.

Cust. Serv.:    They say no to the settlement offer?

LaRusso:        Yea.

Cust. Serv.:    We'll send them another one, maybe a little bit higher this time. But,
                you know, if we want to do between 40 and 50, they want to do them
                between 70 and 80 so they'll go with like 70-75%. We'll come back
                with ok, we'll do 50%. If they come back with nah, we don't want
                that, we'll go as high as 60. We're not gonna go right to 60 or right
                to 50 at the time - we're gonna work with them - go back and forth.
                So that's what I'm saying. It could take a week.

LaRusso:        Right. They never, they never really say no altogether?

Cust. Serv.:    I haven't seen it yet. I haven't seen it yet. You know, it is - like I
                said, there's a process so we do have to give them that time and also,
                too, in the beginning of the month is normally when they say no.
                Because the collectors work on commission. They made the
                commission last month. They're not really that hungry this month.
                At the end of the month, they - you'll be on the phone for about a half
                an hour or an hour trying to get through to us because of all the
                creditors calling in trying to settle out the accounts because at the end
                of the month, they want their bonuses.

LaRusso:        Yea.

Cust. Serv.:    So in the beginning they may say no, but at the end of the month they
                are a little        more apt to work with us and that's when we get the
                really good negotiations going - saying ok, you said 50, we said 45 -

53

|            |                                                      |
|------------|------------------------------------------------------|
|            | you know, let's go back and forth.                   |
| LaRusso:   | Right.                                               |
| Cust. Serv.: | **And we'll get them settled out.**                |

. . .

| LaRusso:   | So, after the 48 months - you know, everything that I'm paying - everything is going to be taken care of right and they're not going to leave - |
| Cus Serv:  | Yea.                                                 |
| LaRusso:   | It's not going to be my debt anymore, right?         |
| Cus Serv:  | **No.  Everything should be taken care of.  You have all of the settlement letters once the account gets settled - normally 30 days after the - they put the check into their system as being settled**, these debts should be reported to the credit bureau and then your credit score will come back up because they're not - you're not reporting negatively any more. |

(PX 336A; PX 74B) (emphasis added).  None of this turned out to be true.  Allegro customers

wrote to the Defendants and said so themselves.  For example, one customer wrote: "I would like

to cancel my account and get a complete refund for any fees paid, since I received no services

from you."  (PX 156-27).  Another wrote: "It doesn't look like anything is being done with our

account.  I hope I am not dealing with crooks.  How long will this go on[?] The bill is

increasing."  (PX 192-16).  Another complained: "It is sad when someone has questions and

needs to speak to someone, no one can be reached.  The number I was provided is 800-295-6025

and no one picks up." (PX 192-45).  Another wrote: "Your program has not worked.  I have four

current judgments against me pending and one Court ordered wage garnishment in effect."

(PX 194-42).

On the debt settlement side, it is clear to this Court that customers paid enormous

amounts of money into the program, the majority of which went toward exorbitant up-front fees paid to the Defendants, and the balance of which accumulated so slowly that customers were more likely to be sent to collections, sued in court, or forced into bankruptcy than they were to complete the program. (PX 102, PX 344; PX 138-PX 235; PX 342; PX 340). For example, Mr. Ray Hammons, an Allegro debt settlement customer, paid $5,269 into the program, 46% of which was taken as fees. Mr Hammons never received a single settlement with any of his 5 creditors. (PX 342, PX 114, PX 102). With respect to his Capital One account ending 7256, Mr. Hammons had the following experience in the debt settlement program:

April 2, 2008 - Mr. Hammons signs Contract to Employ and enrolls in the debt settlement program (he is told fee will be 16% of total debt + $25 set-up fee + $59.99 monthly fee). (PX 102A-1)

May 12, 2008 - Defendants send form letter to Capital One regarding Account No. 7256 requesting that all future correspondence be mailed to Allegro. (PX 102B-76)

May 26, 2008 - Mr. Hammons receives a letter indicating Capital One debt on Account No. 7256 totaled $2,717.60. (PX 102B-91)

July 3, 2008 - Mr. Hammons notifies Defendants that he has been contacted a second time by a collection agency regarding the Capital One 7256 debt. (PX 102B-93)

August 6, 2008 - Creditor offers settlement of $1,698.86 to settle Account No. 7256 (Mr. Hammons had paid $1,773.00 into DS program by that time). Defendants decline due to "not enough funds available." (PX 114-21, 36-37)

January 2009 - Mr. Hammons is sued by Capital One to collect the debt on the 7256 account. (PX 114-22)

January 23, 2009 - Defendants require Mr. Hammons to sign a legal disclaimer that it is his responsibility to answer any summons or complaint. (PX 102A-35)

Feb. 4, 2009 - Mr. Hammons files a pro se Answer to Capital One's complaint. (PX 102A(38-42))

July 2, 2009 - Defendants send form letter to Mr. Hammons notifying him that his account has been updated to reflect that the attorneys who sued him acquired the Capital One account. (PX 102B-49)

Mr. Hammons' experience is typical of that of many other Allegro debt settlement customers. (PX 342; PX 340).

The debt management side was no better. Those customers, too, paid enormous amounts of money into the program, a large portion of which was absorbed as fees, and the balance of which Defendants repeatedly refused to account for. (PX 237, PX 115, PX 236-PX 335; PX 339). For example, Wendy Andrews paid $2,218 into the debt management program, 37% of which was taken out as fees, and received no binding agreements with her creditors. (PX 342 and PX 327). Instead, the Defendants claimed to have paid one of her creditors, Landmark Credit Union, 9 months worth of payments that were less than the required monthly minimum in the absence of an agreement with that creditor. (PX 342, PX 237, and PX 115).

Plaintiff called Dr. Jim McClave, President and CEO of InfoTech, Inc., to testify at trial. Based on his training, education, and experience, this Court finds that Dr. McClave is an expert in the fields of statistics and econometrics (the application of the science of statistics to business and economic issues). (PX 343; Transcript, page 95, lines 6 through page 98, line 9). Dr. McClave testified that the 100 debt settlement customers and 100 debt management customers identified on PX 340 and PX 339, respectively, were each statistically valid random samples of the entire populations of those customers found in PX 88 and PX 89. (PX 343; Transcript, page 100, lines 7-22; page 101, lines 8-25). The entire files for each of those 200 representative customers, which the Plaintiff compiled from four different locations within the Defendants'

56

database, are PX 102, PX 344, PX 138-PX 235 (debt settlement), and PX 236-PX 335 (debt management).   (PX 342; <u>Transcript</u>, page 28, lines 3-22).

The testimony and evidence at trial established that, of the 18,884 customers enrolled in the Allegro debt settlement program, 59% made payments into the program.  (PX 340; PX 89; <u>Transcript</u>, page 102, lines 18-22).  The testimony also established that, with a 95% confidence interval, between 95% and 100% of the individuals in the Allegro debt settlement population who actually paid money into the program do not have a single settlement in full letter in their file. (<u>Transcript</u>, page 103, lines 21-25; page 104, lines 1-19).  Given that each customer had an average of 5 creditors (<u>Deposition of Timothy McCallan</u>, page 42, lines 22-25), and given a 59% payer rate, this Court concludes that with respect to over 50,000 of the 50,700 accounts enrolled in the Allegro debt settlement program, no legally enforceable settlements were obtained by Defendants.

Similarly, on the debt management side, the testimony and evidence established that, of the 21,623 customers enrolled in the Allegro debt management program, 81% made payments into the program.  (PX 339, PX 88; <u>Transcript</u>, page 108, lines 15-19).   Of the 81% of customers who actually paid money into the program, the testimony was that at least 63% and as many as 83% did not have an agreed upon proposal in their file.  (<u>Transcript</u>, page 109, lines 21-25; page 110, lines 1-9).   However, this testimony assumed that the "proposals" contained in the files of the representative debt management customers were worth the paper on which they were written. (PX 342B). This Court has reviewed those proposals and concludes that they are not.   None of

57

these proposals are accompanied by any proof that the person who purportedly signed[19] on behalf

of a creditor was authorized to do so. There is no proof that any of these proposals were

provided to Allegro debt management customers. There is no proof that the creditors would not

collect money owed, but which had been temporarily deferred, at the conclusion of the debt

management program. Thus, this Court concludes that none of the proposals in PX 342B

constitute a benefit to the debt management customers and therefore the "error rate" on the debt

management side is, in fact, 100%. Thus, of the 81% of debt management customers that paid

into the program, which translates to over 87,000 separate accounts with creditors,[20] this Court

concludes that none contain a legally enforceable agreed upon proposal in their file.

It is both shocking and appalling to this Court that Allegro debt settlement customers paid

an average of at least 56% of their total payments in fees and that debt management customers

paid an average of at least 21% of their total payments in fees for "services" that they never

received. (Transcript, page 105, lines 22-25; page 106, lines 1-10; page 111, lines 12-19).

Even worse, in both the debt settlement and debt management programs, the Defendants

claimed to perform services that they knew they could never perform.

On the debt settlement side, Defendant Timothy McCallan testified that as of August

2008, the Defendants knew that Chase Bank was not accepting any settlements with customers of

Allegro Law. (Deposition of Timothy McCallan, page 61, lines 3-8; page 95, line 21 through

---

[19] Many of these proposals either lacked a signature of a particular individual, contained
an illegible signature, or contained initials that could not be associated with any particular
person.

[20] Again, assuming 5 creditors per customer, as estimated by Defendant Timothy
McCallan. (Deposition of Timothy McCallan, page 42, lines 22-25)

page 96, line 1; PX 11; page 450, line 6 through 451, line 11 and PX 129). Nevertheless, the

Defendants collected fees from Chase cardholders who signed up for the Allegro Law debt

settlement program **after** August 2008. <u>Deposition of Timothy McCallan</u>, page 241, line 9 -

page 242, line 13; page 251, line 24 - page 252, line 10, page 263, lines 4-7; PX 102 at pp. 102-

25 to 102-30 (demonstrating that Chase cardholder Ray Hammons paid monthly into the Allegro

debt settlement program through August 2009 and that "no offers" were made to Chase);

PX 137).

On the debt management side, Defendant Timothy McCallan, as the 30(b)(6)

representative for both Americorp and Seton, testified that those corporations did not have the

requisite approval to negotiate on behalf of Allegro debt management customers:

> Q: In order to negotiate with creditors on behalf of debt management clients,
> there was some sort of approval with the banks that was required that
> Americorp and Seton lacked but The Achievable and FCDC had. Did I say
> that correctly?
>
> A: Yes.

(<u>Deposition of Timothy McCallan</u>, page 34, lines 11-16). This is confirmed by the fact that not a

single purported "proposal" with creditors is signed or received by Americorp or Seton.

(PX 342B; PX 342; PX 339 (showing the "servicer" for every single debt management customer

in the representative sample is either FCDC or The Achievable)).

Based on all of the foregoing, this Court concludes that the money paid in fees by Allegro

to the Defendants is rightfully the property of the Trustee and therefore should be turned over to

the bankruptcy estate. See 28 U.S.C. § 542 ("[A]n entity, other than a custodian, in possession,

custody, or control, during the case, of property that the trustee may use, sell, or lease under

59

section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.").[21]  These amounts total $9,994,580.25 for Seton, $2,622,610.60 for Americorp, and $2,755,703.73 for The Achievable. (PX 88 and PX 89 [Tabs DM3a, DS3a]; PX 59).

---

[21] This includes books, documents, records, and papers relating to the debtor's property or financial affairs.  11 U.S.C. § 542(e). With respect to the books and records, Defendant Timothy McCallan explained:

> Q:      [A]ll of these records that you had in [the Creditsoft and QPS] databases are records that you maintained in the normal course of  your business for Americorp, Seton and the Achievable?
>
> A:      The fulfillment services that we provided to Allegro Law, **it was their client information and Allegro Law's information they owned**.
>
> Q:      And you kept those records in the normal and regular course of your business, right?
>
> A:      What do you mean by "kept"?
>
> Q:      You stored them.  You maintained them.  You reviewed them.  You distributed them wherever they needed to go.  You had some sort of custodian that was responsible for putting those records in the right place.  You did all of those things, right?
>
> A:      We, as per the contract – and I will continue to refer back to the contract because it has a lot of detail.
>
> Q:      Well, I'm going to go through that in a minute.  That's fine.
>
> A:      So Americorp maintained business records of Allegro and its clients.

Deposition of Timothy McCallan, pages 23, lines 12-25; page 24, lines 1-8 (emphasis added).

## C.        Fraudulent Transfers

Plaintiff also filed a cause of action for the avoidance of fraudulent transfers under 11 U.S.C. § 548.  "The purpose of avoiding fraudulent transfers is to prevent the debtor from diminishing funds that are generally available for distribution to creditors. Consequently, there is a presumption that 'any funds under the control of the debtor, regardless of the source,' are the debtor's property, 'and any transfers that diminish that property are subject to avoidance.'" *In re McMillin*, 482 Fed. Appx. 454 (11th Cir. 2012) (other citations omitted).

A trustee may void fraudulent transfers that meet the requirements of Section 548:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation

61

to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548.

Allegro's bankruptcy petition was filed on March 12, 2010, meaning that all fraudulent transfers that took place after March 12, 2008 fall within the time frame for avoidance permitted by § 548. Given that Allegro's operations began at the end of March 2008, the two-year time period allowed by statute covers the entire period in which Allegro was operational. (PX 125, letter from Defendant Timothy McCallan indicating that Allegro's operations would begin on March 26, 2008).

This Court finds that transfers totaling $110,513,471.25 made to Defendants Americorp and Seton may be voided under either § 548(a)(1)(A) or § 548(a)(1)(B), as described in more detail below, and may therefore be recovered by the trustee under § 550. This amount is derived by taking the total payments made into the Allegro program [$127,370,765.89, PX 88 and PX 89], and subtracting the amount turned over to the trustee from accounts previously controlled by Defendants [$16,857,294.64, see Doc. No. 307-1, Estate Cash Receipts and Disbursement Record]. Of that total, $107,757,767.52 may be recovered from Defendants Americorp and Seton as initial transferees, 11 U.S.C. § 550(a)(1), and $2,755,703.73 (the amount Defendants admit The Achievable received in fees) may be recovered from Defendant The Achievable, Inc. as an immediate transferee. 11 U.S.C. § 550(a)(2).

(i)      **Actual Intent To Hinder, Delay or Defraud**

"Actual intent to hinder, delay, or defraud creditors is ordinarily established by

circumstantial evidence." *In re Vista Bella, Inc.*, 2013 WL 2422703, 14 -15 (Bkrtcy. S.D.Ala.

2013) (J. Mahoney) (citing *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998)). "That

evidence is typically gathered by a court's consideration of certain badges of fraud." *Id.* These

"badges of fraud" are enumerated in Ala. Code § 8–9A–4(b), to which the courts look for

guidance with respect to the factors to consider in making the determination as to whether an

actual intent to hinder, delay, or defraud creditors exists:

1. Whether the transfer was to an insider;

2. Whether the debtor retained possession or control of the property transferred after the transfer;

3. Whether the transfer was disclosed or concealed;

4. Whether before the transfer was made the debtor had been sued or threatened with suit;

5. Whether the transfer was of substantially all the debtor's assets;

6. Whether the debtor absconded;

7. Whether the debtor removed or concealed assets;

8. Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

9. Whether the debtor was insolvent or became insolvent shortly after the transfer was made;

10. Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. Whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

154 F.3d at 1272. "No specific combination of badges is necessary for a finding of actual intent

and the presence of any of the badges of fraud does not compel such a finding." *In re Vista Bella, Inc.*, WL 2422703, *15 (Bkrtcy. S.D.Ala. 2013) (citing *In re Manhattan Inv. Fund Ltd.*, 397 B .R. 1, 10 n. 13 (S.D.N.Y.2007)). "The badges merely highlight circumstances that suggest that a transfer was made with fraudulent intent." *Id.* "Although the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the **'confluence of several can constitute conclusive evidence of an actual intent to defraud.'**" *XYZ Options*, 254 F.3d at 1271 fn.17 (emphasis added).

The evidence in the present case establishes that factors 1, 3, 4, 5, 8, and 9 are all present:

- The transfer was to an insider. An "insider" is defined, among other things, as "a person in control of the debtor." 11 U.S.C. § 101(31)(B)(iii). The term "person" can be an individual, a partnership or a corporation. 11 U.S.C. § 101(41). *See*, *supra*, pages 40-47 for a discussion of the control that the Defendants Americorp and Seton exercised over Allegro.

- The transfers to the Defendants were concealed, as there is no evidence that Allegro or its customers knew that the Defendants Americorp and Seton were not paying the customers' creditors with the money that was being paid into the program.

- Before many of the transfers were made, Allegro Law had been threatened with suit. *See, e.g.*, PX 195 (page 27), in which an Allegro customer indicates he plans to get "help from a lawyer for this matter" (dated June 13, 2008); *see also* PX 194 (page 42), in which a customer copies both the state attorney general for Connecticut and attorney Gilbert Kabak on his letter requesting removal from the Allegro program (dated December 24, 2009). Numerous other complaints to the attorney general's office in various states were also introduced into evidence. *See* PX 74A (folder titled "BBB.AG Complaints").

- The transfer was of substantially all of the debtor's assets. Although $127,370,765.89 was paid into the Allegro Law debt elimination program, only $16,857,294.64 remained in Allegro accounts at the time of the filing of the bankruptcy petition. The remainder of the funds (with the exception of fees transferred directly to Defendants) is unaccounted for and resulted in a near total

64

depletion of Allegro's assets.

- The value of the consideration received by Allegro was not reasonably equivalent to the value of the asset transferred. See Section (V)(C)(ii) below.

- The debtor became insolvent shortly after the transfers were made. See Section (V)(C)(ii) below.

Given how many of the enumerated factors are present in this case, this Court finds that there is conclusive evidence that the transfers from Allegro to Defendants Americorp and Seton totaling $110,513,471.25 were made with actual intent to defraud. Therefore, these transfers can be voided by the trustee under § 548(a)(1)(A).

### (ii) Reasonably Equivalent Value

Alternatively, a trustee can void a transfer for which the debtor did not receive reasonably equivalent value and that meets any one of four other enumerated conditions. 11 U.S.C. § 548(a)(1)(B)(i)-(ii). This Court finds that Allegro received less than reasonably equivalent value in exchange for the transfers it made to Defendants Americorp and Seton and that Allegro became insolvent as a result of these transfers.

> Reasonably equivalent value ("REV") is not specifically defined in the Bankruptcy Code. However, the purpose of the requirement is well known: "to protect creditors against the depletion of a bankrupt's estate." *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir.2012); *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir.1990).

> . . .

> The pivotal question asks what value a debtor received from a transfer. The Bankruptcy Code defines "value" for § 548 purposes in § 548(d)(2)(A), to include "property, or satisfaction or securing of a present or antecedent debt of the debtor." The Bankruptcy Court for the Northern District of Georgia recently utilized the following three-part test for whether a debtor received REV: "(1) whether the debtor received value; (2) whether the value received was in exchange for the property

65

transferred; and (3) whether the value was reasonably equivalent to the value of the property transferred." *In re Knight*, 473 B.R. 847, 850 (Bankr.N.D.Ga.2012).

*In re Vista Bella, Inc.*, 2013 WL 2422703, 16 (Bkrtcy. S.D. Ala. 2013) (J. Mahoney).

As described at length in Section V(A)-(B), it is clear that Allegro received no value for the $110,513,471.25 that passed from Allegro to Defendants Americorp and Seton. Neither Americorp nor Seton had the credentialing necessary to conduct the debt management negotiations for which they were responsible, there is no evidence that creditors of Allegro customers were actually paid by Americorp and Seton, and there was overwhelming evidence that those Defendants took exorbitant up-front fees for programs that, by design, were destined to fail.

Moreover, Allegro became insolvent as a result of the transfers to Americorp and Seton. The term "insolvent" means "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of – (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title." 11 U.S.C. § 101(32)(A). With each transfer of money made to Americorp and Seton instead of to the creditors of the customers of Allegro Law – $95,140,576.67 of which remains unaccounted for and $15,372,894.58 of which was paid to Defendants in fees – Allegro sank deeper into insolvency. Each transfer made it impossible to pay debts that Allegro agreed to pay or to refund money to its customers in the event that their debts were not paid. On March 12, 2010, Allegro filed a Chapter 7 bankruptcy petition.

For all of the reasons stated, this Court concludes that the $110,513,471.25 that passed from Allegro to Defendants Americorp and Seton (which includes the fees taken by the Defendants as well as the amount that remains unaccounted for) was not exchanged for anything of reasonably equivalent value and that Allegro became insolvent as a result of the transfers. Therefore, the transfers at issue can be voided by the trustee under §§ 548(a)(1)(B)(i) and 548(a)(1)(B)(ii)(I).

### (iii)     From Whom Fraudulent Transfers Are Recoverable

Once the Court determines that transfers are avoidable under 11 U.S.C. § 548, it must then determine from whom they can be recovered under 11 U.S.C. § 550(a), which provides:

> . . .[T]o the extent that a transfer is avoided under section. . .548. . .of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from –
>
> (1)     the initial transferee of such transfer of the entity for whose benefit such transfer was made; or
>
> (2)     any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

The terms "immediate" and "mediate" transferee are not defined in the Bankruptcy Code. *In re Palisades at West Paces Imaging Center, LLC*, 2013 WL 6019220, *16 (Bkrtcy. N.D. Ga. 2013). "However, '[a]s a general rule, § 550(a) imposes liability on all recipients in a chain of transfers of fraudulently-conveyed property.'" *Id.* (citing *In re Bower*, 318 B.R. 697, 700 (Bankr. D. Minn. 2005) (other citations omitted). "An immediate or mediate transferee is 'one who takes in a later transfer down the chain of title or possession.'" *Id.* (citing *In re Knippen*, 355 B.R. 710,

Case 11-03007    Doc 361    Filed 02/16/16    Entered 02/16/16 16:09:58    Desc Main
Document      Page 153 of 160

728 (Bankr.N.D.Ill.2006) (other citations omitted), *aff'd Knippen v. Grochocinski*, 2007 WL

1498906 (N.D. Ill. 2007)). "The immediate transferee is the one who receives a transfer from the

initial transferee and all other recipients are mediate transferees." *Id.* (citing *In re Appleseeds*

*Intermediate Holdings, LLC*, 470 B.R. 289, 301 (D. Del. 2012) (citation omitted)).

In the present case, this Court concludes that $107,757,767.52 is recoverable from

Defendants Americorp and Seton as the initial transferees under § 550(a)(1). This Court also

concludes that $2,755,703.73 is recoverable from The Achievable, Inc. as an immediate

transferee under § 550(a)(2). The Defendants admit that $2,755,703.73 was transferred to The

Achieveable (PX 88 and PX 89 [Tabs DM3a, DS3a]; PX 59) by Americorp. <u>Deposition of</u>

<u>Vanessa Vinicombe</u>, page 116, lines 22-25; page 117, lines 1-20; page 185, line 1; page 186,

lines 1-13; page 183, lines 14-25; page 184; lines 1-3.

The transfers to The Achievable, however, require additional analysis. Section 550(b)

makes clear that the Trustee may not recover from "any immediate or mediate transferee of such

initial transferee" if such subsequent transferee "takes for value, including satisfaction or

securing of a present or antecedent debt, in good faith, and without knowledge of the voidability

of the transfer avoided." 11 U.S.C. § 550(b)(1). As this Court has previously explained:

> Examination of § 550(a) and (b) reveals two things. First, subsection (a) divides the
> universe of possible fraudulent transferees into two categories. The first category
> consists of those called "initial transferees." The second category consists of those
> called "immediate or mediate" transferees from the initial transferee. Second, those
> in the later category are allowed a defense pursuant to § 550(b) that is not given to
> those in the first category. In other words, an immediate or mediate transferee from
> the initial transferee may avoid liability if she can prove two things. First, she must
> prove that she took the transfer for value; and second, she must prove that she did not
> have knowledge that the transfer in question was avoidable. The law does not provide

68

the initial transferee this defense.

*In re Terry Mfg. Co., Inc.*, 363 B.R. 233, 237 (Bkrtcy. M.D. Ala. 2007) (J. Sawyer). The Achievable failed to raise any defense pursuant to § 550(b) or present any evidence at trial in support of such a defense. Therefore, this Court concludes that The Achievable did not take the transfers at issue for value, in good faith, and without knowledge of the voidability of the transfer avoided. As a result, the amount of $2,755,703.73 may be recovered from The Achievable as the immediate transferee. 11 U.S.C. § 550(a)(2).

## VI.    Defendants Timothy McCallan, Seton Corp., and Americorp, Inc. Are Alter Egos Of One Another

As a general matter, under the "internal affairs doctrine," courts in Alabama "look to a corporation's state of incorporation as the source of *substantive* law governing claims regarding that corporation's internal affairs." *Scrushy v. Tucker*, 70 So. 3d 289, 298 (Ala. 2011) (emphasis in original). Americorp and Seton were both incorporated in the state of New York. (PX 74B, folder titled "Corporate Docs"). "Under New York law, the corporate veil can be pierced where there has been, *inter alia*, a failure to adhere to corporate formalities, inadequate capitalization, use of corporate funds for personal purpose, overlap in ownership and directorship, or common use of office space and equipment." *Forum Ins. Co. v. Texarkoma Transp. Co.*, 229 A.D.2d 341, 342, 645 N.Y.S.2d 786, 787-88 (N.Y.A.D. 1996) (other citations omitted).[22]

_____

[22] In the event that Alabama law applies, it is virtually identical to New York law as to this issue. Alabama law permits piercing the corporate veil "when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of the person owning and controlling it . . .A corporation and the individual or individuals owning all its stock and assets can be treated as identical, even in the absence of

69

Based on the testimony presented and the evidence introduced at trial, the Court concludes that Defendants Timothy McCallan, Americorp, and Seton are all alter egos of one another. Vanessa Vinicombe, Americorp's Chief Financial Officer, was unable to explain or articulate any meaningful difference between Americorp and Seton:

Q:      What was the difference in Americorp and Seton?

A:      They were similar, some of the services that were provided.

Q:      What did Americorp do that Seton did not; or the other way around, whatever is easier for you to answer?

A:      I couldn't really explain the difference.

Q:      Let me ask you this: We've talked a whole lot about Americorp, whole lot about The Achievable; what did Seton do?

A:      Seton was a processor like Americorp.

Q:      Did it have its own system?

A:      No.

. . .

Q:      So Seton did debt settlement for Allegro?

---

fraud, to prevent injustice or inequitable consequences." *Deupree v. Anderson*, 505 So. 2d 1218, 1222 (Ala. 1987) (other citations omitted; emphasis added). In addition, "[t]he corporate veil may be pierced where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, **or** where an individual drains funds from the corporation." *Econ Marketing, Inc. v. Leisure American Resorts, Inc.,* 664 So. 2d 869, 870 (Ala. 1994) (other citations omitted; emphasis added)

A:     Yes.  We didn't – you couldn't really separate it.

Q:     You mean Seton/Americorp?

A:     Seton/Americorp, from that point of view.

Deposition of Vanessa Vinicombe, page 195, lines 14-25; page 196, lines 1, 20-25.  Americorp

and Seton had the same sole owner, the same sole director, and the same sole officer.  (PX 27).

The Defendants introduced no evidence at trial that either of these companies observed the

corporate form.

This Court also concludes that Timothy McCallan should be held personally liable for the

wrongdoing of Americorp and Seton based on the principle of piercing the corporate veil.

Timothy McCallan is the sole shareholder, director, and the President of Americorp, Inc. and

Seton Corp.  In that capacity, he is "ultimately responsible for the operations" of both companies.

(PX 27).   McCallan served as the President, Vice President, Secretary, and Treasurer of

Americorp.  (PX 27).  He served as the President and Secretary of Seton – the only officer

positions that existed.  (PX 27).  McCallan holds 100% of the outstanding stock of both

Americorp and Seton. (PX 27).

Timothy McCallan admitted at his deposition that he **alone** "was the board" and

controlled the affairs of both Americorp and Seton.

Q:     You testified under oath at the hearing in February that you personally
       instructed your lawyers to comply with the Court's orders in this case; is
       that right?

A:     Correct.

Q:     And you personally instructed the Americorp IT team to migrate

information in the system to a third-party system hosted in Florida, right?

A:     Correct.

Q:     You didn't have to get any approval from any board of directors of Americorp or Seton to give that instruction, did you?

A:     I was listed on the board of directors, I believe, for multiple positions, so **I was the board.**

Deposition of Timothy McCallan, page 182, lines 2-15.   McCallan admitted that he signed rental contracts and real estate agreements on behalf of Americorp and Seton; that he had the authority to, and, in fact, did make the decision when to hire legal counsel and who to hire; and that he decided whether or not Americorp and Seton would enter into large and lucrative contracts. Deposition of Timothy McCallan, page 200, lines 22-25; page 201, lines 1-17.

## A.     The Corporate Defendants Maintain No Corporate Records

Although McCallan answered untruthfully about it in his sworn interrogatory answers, the uncontroverted evidence at trial was that he did receive distributions from both Americorp and Seton.  (PX 27, claiming McCallan received no compensation from Americorp or Seton; PX 338B, in which Americorp's CFO confirms he did receive distributions).  Although they were requested in discovery by Plaintiff (see PX 27), the Defendants produced no annual reports, no minutes of any board meetings, and no corporate resolutions.  (PX 27, stating **"Defendants have no such documents in their possession, custody, or control"**).  Nor did Defendants introduce any such records at trial.  In short, Defendants did not produce any corporate records whatsoever regarding their corporate operations.  It is clear that money flowed through these corporations directly to McCallan, but with no corporate records whatsoever to provide

72

authorization for these disbursements. The absence of these documents, by itself, establishes that McCallan ignored the corporate form and failed to comply with corporate legal requirements.

### B. Timothy McCallan Intermingled Corporate and Personal Funds

Vanessa Vinicombe testified at the February 2013 hearing that she worked as a consultant for Americorp. (PX 346, page 238, lines 20-22). She also testified that she was paid to do this consulting work on behalf of Americorp by Defendant Timothy McCallan with the use of his personal funds:

Q:    What entity actually paid you? Is it Americorp or some other entity?

A:    Tim McCallan has paid me.

Q:    Personally?

A:    Yes.

Q:    And not one of his other entities?

A:    No.

(PX 346, page 242, lines 9-15). Thus, in addition to exercising complete control over Americorp, McCallan paid its corporate debts with personal money.

### VII.   Conclusion

For all of the foregoing reasons, it is therefore ordered and adjudged by this Court that a final judgment in favor of Plaintiff, Daniel Hamm, as Trustee for Debtors Allegro Law, LLC and Allegro Financial Services, LLC, and against Defendants Americorp, Inc., Seton, Corp., The Achievable, Inc., and Timothy McCallan as follows:

Americorp, Inc., Seton, Corp., and McCallan in the amount of:$107,757,767.52

73

The Achievable, Inc. in the amount of: $2,755,703.73

The same is hereby entered together with costs taxed in favor of the Plaintiff, Daniel

Hamm, as Trustee for Debtors Allegro Law, LLC and Allegro Financial Services, LLC, and

against Defendants Americorp, Inc., Seton Corp., The Achievable, Inc., and Timothy McCallan,

for the recovery of which let execution issue in accordance with Rule 62(a) of the Federal Rules

of Civil Procedure, made applicable in adversary proceedings pursuant to Fed. R. Bankr. P. Rule

7062.

Respectfully submitted,

*/s/ Steve Olen*
STEVE OLEN  (OLENS7621)
LUCY E. TUFTS  (TUFTL1447)
Cunningham Bounds, LLC
1601 Dauphin Street
Mobile, Alabama  36604
251-471-6191
251-479-1031 (fax)

*Attorneys for Trustee Daniel G. Hamm*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 3rd day of December, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Steve Olen*
STEVE OLEN