## UNITED STATES BANKRUPTCY COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA

IN RE:

**ALLEGRO LAW, LLC,**
    **Debtor.**

**Case No. 10-30631-WRS**
**Chapter 7**

**CARLY B. WILKINS, TRUSTEE,**
    **Plaintiff,**

    v.

**Adv. No. 11-03007**

**AMERICORP, INC.,**
**SETON, INC., and**
**TIMOTHY McCALLAN,**
    **Defendants.**

## <u>MEMORANDUM DECISION</u>

### I.    A BRIEF HISTORY AS TO HOW WE GOT HERE

This Adversary Proceeding came before the Court for an evidentiary hearing on January 30-31, 2018. Defendant Timothy McCallan has been incarcerated since October 23, 2017, for contempt of court (Doc. 583). On February 16, 2016, the Court entered judgment in favor of the Trustee in the amount of $102,949,220.72. (Docs. 361, 362). The Trustee has commenced proceedings against the Defendants, primarily Defendant Timothy McCallan, in an effort to collect the judgment. As will be set out in detail below, several orders compelling responses to discovery have been entered by the Court. McCallan has had ample opportunity to respond. Instead, he has engaged in a protracted effort, hiding assets and making numerous misrepresentations to the Trustee, all in an effort to thwart her efforts to seek a recovery for the victims of McCallan's fraud.

1

McCallan operated a complex web of business entities purporting to be in the debt management and debt collection businesses. The Court described McCallan's business methods in some detail in its February 16, 2016, Memorandum Decision. (Doc. 361). Suffice to say here, that McCallan's scheme was large, complex and sophisticated, resulting in losses to as many as 30,000 victims. McCallan is a professional fraudster–quite a good one.

McCallan's web of deceit did not end when he was sued by the Trustee in this Adversary Proceeding. McCallan used dozens of corporate entities and more than 100 bank accounts to hide what he was doing. He did not willingly give up his business records. Rather, he continued his pattern of deceit, obfuscation and delay during the discovery phase of the trial. In her Proposed Findings of Fact and Conclusions of Law, the Trustee did a yeoman's job of setting out, in excruciating detail, all of McCallan's misrepresentations during that phase. While the Court will not insert all of that detail here, a reader interested in a deep dive into McCallan's discovery atrocities during the pretrial phase should read Pages 1-35 of the Trustee's Proposed Findings. (Doc. 661).[1]

One of several interesting aspects of this case is that the judgment entered in this case was technically a default judgment–as neither McCallan nor his lawyer appeared for trial.[2]   Yet, the Defendants have prosecuted four appeals.[3] This history is offered to demonstrate that McCallan

---

[1] Interestingly, McCallan dismisses this as irrelevant in his filing. (Doc. 692). The Court disagrees. The Trustee has shown an uninterrupted arc from McCallan's long standing business practices, to his bad faith conduct during the pretrial phase of this litigation, through the post-judgment phase, which has landed McCallan where he now sits.

[2] McCallan's third lawyer, Thomas McAlpine was disbarred from practice in this Court as a result of a pattern of misconduct, including his failure to appear for trial–all the while giving the impression he would appear for trial.   The Alabama Bar imposed reciprocal discipline on McCallan, disbarring him from the Alabama bar as a result of his disbarment here.

[3] The first appeal was filed on July 21, 2011, by Defendants Americorp and Seton Corp.  (Doc. 70). The second appeal was filed August 23, 2011, by McCallan. (Doc. 104). The third appeal was filed October 30, 2013, by all three

2

has the wherewithal to litigate where it suits him. He and his lawyers on any number of occasions have pled the inability to comply with discovery obligations due to hurricanes, technological impossibilities, geographical limitations, incarceration, and poverty. This Court has rejected all of McCallan's claims of inability to comply with discovery. The only reason McCallan has not complied with the Trustee's discovery requests is that he chooses not to do so, which is what has landed him in jail.

## II.   THE PATTERN OF DISCOVERY ABUSE REPEATED ITSELF IN THE POST-JUDGMENT DISCOVERY PHASE OF THIS LITIGATION

Following the entry of the February 2016 judgment, which McCallan and the other defendants did not appeal, the Trustee commenced post-judgment discovery as part of her[4] collection efforts on behalf of the Allegro estate. Post-judgment, this Court has entered 14 additional orders and conducted 4 evidentiary hearings[5] to compel McCallan to fully and truthfully respond to the Trustee's post-judgment discovery requests. (Doc. Nos. 383, 391, 396, 449, 450, 451, 461, 572, 576, 583, 588, 592, 618, and 629). McCallan's pattern of behavior in the post-judgment phase of this litigation is remarkably like McCallan's behavior during the merits phase.

### A. McCallan Failed to Respond to Post-Judgment Interrogatories and Requests for Production

On May 18, 2016, the Trustee filed her First Post-Judgment Interrogatories (Doc. No. 372) and First Post-Judgment Request for Production (Doc. No. 373) to McCallan, Americorp, Inc.,

---

Defendants. (Doc. 340). That appeal, was appealed further to the Eleventh Circuit. (11th Cir. No. 14-10073-D). The fourth appeal was filed on April 12, 2018, by McCallan. (Doc. 634). To date, all of the Defendant's appeals have failed.

[4] Daniel G. Hamm litigated this adversary proceeding as the plaintiff in his official capacity as Trustee of the underlying Chapter 7 bankruptcy cases. Hamm retired in November 2015 and was replaced as the Trustee in the underlying cases and this adversary proceeding by Carly B. Wilkins. (Case No. 10-30631, Doc. 5582).

[5] These hearings took place on October 6, 2016, October 21, 2016, October 23, 2017, and January 30-31, 2018.

3

Seton Corp., and The Achievable, Inc. McCallan is the 100% owner of all three of these companies (16-07524, Doc. No. 13, at pages 7-8), which were all defendants in the underlying merits litigation. McCallan's responses were due on June 17, 2016, but he did not file any responses. On June 24, 2016, the Trustee filed a Motion to Compel responses to her first post-judgment discovery (Doc. No. 375).

After a hearing, on August 9, 2016, this Court entered an Order giving McCallan and the other defendants until August 16, 2016 to serve their responses to the Trustee's post-judgment Interrogatories and Request for Production (Doc. No. 383). Neither McCallan nor any of the other defendants filed any discovery responses by the August 16, 2016 deadline. On August 17, 2016, the Trustee filed a Motion for Sanctions based on McCallan's and the other defendants' failure to comply with this Court's August 9, 2016 Order requiring them to respond to the Trustee's post-judgment discovery requests. (Doc. No. 386).

On September 29, 2016, this Court entered an order finding that neither McCallan nor any of his companies had made any effort to comply with the Court's August 9, 2016 Order. (Doc. No. 391). This Court then ordered McCallan to appear on October 6, 2016 to show cause why he should not be held in contempt of court. (Doc. No. 391).

On October 5, 2016, hours before the show cause hearing was scheduled to take place, McCallan filed his responses to the Trustee's First Post-Judgment Request for Production. McCallan did not supplement his answers to the Trustee's First Post-Judgment Interrogatories at that time.

## B. This Court Entered an Order Finding McCallan in Civil Contempt Again

On Thursday, October 6, 2016, this Court conducted an evidentiary hearing on the order to

4

show cause. At the conclusion of that hearing, this Court found:

> I entered an order on August 9 requiring the defendants to comply with a previous, you know, order granting them – there's been a motion to compel – the motion for sanctions. Heard the testimony of Mr. McCallan, who testified for well over an hour, maybe an hour and a half, a number of witnesses. It's clear beyond all doubt that the – that, number one, the production of documents and the interrogatories was not complete; therefore, he is in contempt of court. You know that there were questions about things like offshore income and trusts and things like that and, Mr. McCallan, you're not telling the truth. I've looked at the documents. I've listened to you, you know. You're in contempt of court and you've come here and you've lied today.

Transcript of October 6, 2016 Hearing, at page 79, lines 3-16. (emphasis added).

On October 6, 2016, this Court entered an order finding McCallan in contempt of court and compelling him to purge himself of contempt. (Doc. No. 396). This Court found that McCallan "willfully violated" the Court's Order of August 9, 2016 and that McCallan's testimony on certain subjects was "incredible." Id. This Court ordered McCallan to file and serve supplemental answers to the Trustee's Post-Judgment Interrogatories and supplemental responses to the Trustee's Post-Judgment Request for Production by October 18, 2016. (Doc. No. 396). At the end of the hearing, this Court concluded:

> I'm going to put this in writing, going to give it to everybody who cares to look that I've heard the testimony and that **I've found that Mr. McCallan is in contempt. And just the fact that you're not in jail doesn't mean you're not in contempt and – or that you're not under a duty to purge yourself.** And you're going to have to do that. The second go around we have, you know, things may be different.

Transcript of October 6, 2016 Hearing, at page 80, lines 22-25, page 81, lines 1-4 (emphasis added). This Court warned McCallan: "[Y]ou're under a duty, you know, and I want no more

5

oversights, omissions, you know, I forgot about this or I forgot about that." Transcript of October 6, 2016 Hearing, page 81, lines 15-17.

### C. McCallan Continued to Hide Assets While He Remained in Contempt

On Friday, October 7, 2016, the Trustee filed a Request for Entry Upon and Inspection of Premises, seeking an inspection of McCallan's property at 6730 Still Point Drive in Melbourne, Florida and requesting that the Court enter an order prohibiting McCallan from removing personal property or allowing it to be removed.

On Monday, October 10, 2016, the Trustee filed a Process of Garnishment to Wells Fargo Bank seeking money and property for the satisfaction of the February 2016 judgment against McCallan. (Doc. No. 300). On Tuesday, October 11, 2016, before the Process of Garnishment could be served on Wells Fargo, McCallan obtained a cashier's check from Wells Fargo in the amount of $388,285.14, which he withdrew from his account ending 0716. Transcript of March 27, 2017 Hearing, page 38, lines 16-20. On October 10 and 11, 2016, the Trustee filed her Second and Third Post-Judgment Requests for Production to McCallan, respectively. (Doc. Nos. 399 and 407).

On Saturday, October 15, 2016 – 8 days after the Trustee filed her Request for Inspection – the Trustee's investigator videotaped McCallan and Joseph Sclezo, III at McCallan's residence loading items from McCallan's garage into a U-haul truck. Mr. Sclezo also was videotaped removing boxes from a storage unit rented in McCallan's name at Viera Storage in Melbourne, Florida and transporting those boxes to a storage unit rented only in Mr. Sclezo's name at a different storage facility, StoreSmart Storage in Rockledge, Florida. Transcript of the October 21, 2016 Hearing, page 19, line 2 through page 21, line 10.

6

On Monday, October 17, 2016, McCallan filed an Objection to the Trustee's Request for Inspection, representing to the Court that "due to the recent hurricane in Florida, Defendant has been delayed." (Doc. No. 437, at ¶ 9). McCallan also represented to the Court that, because "Defendant's home has suffered damage due to the recent hurricane," McCallan needed "the inspection [to] be delayed for a short amount of time." (Doc. No. 437, at ¶ 3). This Court set the matter for a hearing on Friday, October 21, 2016. The uncontradicted testimony and evidence at the October 21, 2016 hearing conclusively proved that there was no hurricane damage whatsoever to McCallan's property at 6730 Still Point Drive. Transcript of October 21, 2016 Hearing, page 23, line 25 through page 24, line 5. Just as McCallan had falsely claimed that Hurricane Sandy inhibited his ability to produce databases that were actually stored on servers 1,100 miles away in Florida, McCallan falsely claimed that Hurricane Matthew inhibited his ability to make his home available for inspection.

After conducting a hearing on October 21, 2016, this Court entered an order finding that "Defendant McCallan remains in contempt, has failed to purge himself of contempt, and has committed additional acts of contempt since the October 6, 2016 hearing." (Doc. No. 449, at ¶ 4) (emphasis added). This Court also found that "Defendant Timothy McCallan has perpetrated a fraud upon the Court by misrepresenting the reasons that he failed to purge himself of contempt and instead seeking additional time from this Court for the purpose of moving, hiding, and otherwise disposing of assets that could otherwise be used to satisfy the judgment against him in this matter." (Doc. No. 449, at ¶ 3) (emphasis added).

In its October 21, 2016 Order, this Court made clear that "[i]f Defendant McCallan fails to comply fully with this [October 21, 2016] Order, and/or if he fails to fully and accurately respond

7

to all of [the Trustee's] post-judgment discovery within 7 days of the entry of this Order, this Court will order the United States Marshall to arrest Defendant McCallan and bring him before this Court forthwith." (Doc. No. 449, at ¶ 11) (emphasis added). The deadline for McCallan's compliance was Friday, October 28, 2016. Six days after that deadline had lapsed, McCallan asked this Court to extend the deadline to account for the money until November 10, 2016. (11-3007, Doc. No. 476). McCallan never complied.

### D. McCallan Filed Chapter 7 Bankruptcy Petition in an Attempt to Obtain a Change of Venue

McCallan's answers to the Trustee's second and third post-judgment discovery requests were due on November 11, 2016, and an extension was granted until November 18, 2016. (Doc. Nos. 399 and 407). These discovery requests sought detailed information and documents regarding financial transactions and transfers involving McCallan. Instead of responding to the Trustee's discovery on November 18, 2016 (the date of the extended deadline), McCallan filed his Chapter 7 bankruptcy petition. The filing of McCallan's Chapter 7 petition was designed to avoid having to comply with the orders of this Court.

On February 17, 2017, the Trustee filed a Motion to Transfer McCallan's bankruptcy case pursuant to Rule 1014(b), Fed. R. Bankr. P. and 11 U.S.C. § 105(a). (10-30631, Doc. No. 5613). In McCallan's response to the Motion yo Transfer, he represented that the "sole purpose in filing this Chapter 7 was to have an independent Chapter 7 trustee properly collect and reduce the money and property of the estate." (10-30631, Doc. No. 5620, at pages 1-2). The Trustee, on the other hand, took the position that the real purpose for which McCallan filed a Chapter 7 petition in Florida was to have the Florida trustee "administer those assets which he saw fit to disclose…and something substantially less than all of his assets." Transcript of March 27, 2017 Hearing, page

8

4, lines 17-20. This Court conducted an evidentiary hearing on the Motion to Transfer on March 27, 2017.

At the March 27, 2017 evidentiary hearing, the Trustee introduced McCallan's testimony from the January 31, 2017 Meeting of Creditors conducted in Orlando, Florida, which included the following:

> Ms. Tufts: Other than what's listed on Exhibit 1, [your bankruptcy] schedules, is there any money, personal property, real property, anywhere in the world which you could [get] or could have gotten money to pay for any expense of yours in 2014, 2015, or 2015?
>
> McCallan: That I don't have listed?
>
> Ms. Tufts: Right.
>
> McCallan: No.

(TX 9, page 18, lines 18-25).[6]

In his original bankruptcy schedules, McCallan reported $16,366 in income from January 1, to December 31, 2015 and no income from January 1, 2014 to December 31, 2014. (TX 3, pages 1-2).[7] McCallan also reported $12,533 in rental income in 2015. (TX 3, page 2).[8] McCallan had previously testified that his wife made $1,000 or less each month in 2015. (TX 9, page 30, lines 13-20).

---

[6] References to Trustee's Exhibits in Section III of this order are references to exhibits introduced in the post-judgment phase of this case, the majority of which were introduced at evidentiary hearings in March 2017, October 2017, and January 2018. Exhibits introduced in the post-judgment phase contain the prefix "TX" while those introduced in the merits phase contain the prefix "PX."

[7] In his June 23, 2017 amended schedules, McCallan revised these figures to $5,944 in income for 2015 and $171,927 in income for 2014. (17-30961, Doc. No. 178, page 18).

[8] In his June 23, 2017 amended schedules, McCallan disclosed $187,908 in additional income from Peter McCallan in 2015. (17-30961, Doc. No. 178, page 18). This transfer is discussed in greater detail below, but this transfer occurred in late December 2015 and cannot explain the other evidence presented by the Trustee that McCallan's income was substantially more in 2015 than McCallan represented on his schedules. (TX 168, reflecting a $187,908 deposit into McCallan's Wells Fargo bank account ending 0716 on December 28, 2015).

9

At the March 27, 2017 evidentiary hearing, the Trustee called Allen Carroll, an expert in forensic accounting, who testified that McCallan's testimony at the 341 Meeting of Creditors and the statements he made on his bankruptcy schedules were "wildly different" from the amount of money going in and out of McCallan's bank accounts in 2015 and 2016. Transcript of March 27, 2017 Hearing, page 24, lines 18-23.

Mr. Carroll testified that, based on his analysis of only one of McCallan's hundreds of bank accounts over the last 10 years, McCallan deposited approximately $350,000 in 2015 that was neither a transfer from another account nor a tax refund. Additionally, his bank statements for that account also reflected $347,650.48 in withdrawals for 2015. Transcript of March 27, 2017 Hearing, page 27, lines 3-12; TX 16. Mr. Carroll also analyzed an income and expense spreadsheet for 2015 that was obtained from McCallan's computer that was cloned by the Trustee as part of the October 21, 2016 inspection of McCallan's home. Transcript of March 27, 2017 Hearing, page 29, lines 12-20; TX 17. McCallan's personal income and expense spreadsheet for 2015 reflected that he had $679,073.82 in income from all sources in 2015 and approximately $420,000 in expenses paid in 2015. Transcript of March 27, 2017 Hearing, page 29, lines 21-25; page 30, lines 1-9; TX 17. Mr. Carroll concluded:

> McCallan's spending far exceeds the amount that he's reported as being earned by he and his wife...he's either earning monies that have not been disclosed or he has undisclosed assets from which he's drawing upon to make up the difference.

Id., page 28, line 25, page 29, lines 1, 4-6. The Trustee then offered evidence of large undisclosed transfers, which included transfers between Timothy McCallan and his brothers Peter McCallan ($187,908) and Robert McCallan ($15,000), as well as an undisclosed coin sale in June 2015 of over $23,000. Id., page 31, lines 20-25; page 32, lines 1-9; page 34, lines 1-13; page 17, lines 5-

10

22. The evidence also showed an unexplained transfer to McCallan's wife in the amount of $330,000. (TX 195).

On March 30, 2017, this Court entered an order transferring McCallan's Florida bankruptcy case to the Middle District of Alabama. (17-30961, Doc. Nos. 61 and 62). On May 2, 2017, the Trustee filed a Motion for Relief from the Automatic Stay to pursue "post-judgment discovery, contempt proceedings, sanctions, and any other aspect of the 11-3007 adversary proceeding with the exception of duplicative collection." (17-30961, Doc. No. 99). This Court granted the Motion for Relief from the Automatic Stay on June 22, 2017. (17-30961, Doc. No. 175). Notably, while the Trustee was prohibited from pursuing post-judgment discovery in the 11-3007 matter until the relief from stay was entered, nothing prohibited McCallan from responding to the Trustee's post-judgment discovery.

## E. Following the Transfer of McCallan's Bankruptcy Case to Alabama and the Order on Relief from the Automatic Stay, Post-Judgment Discovery Recommenced

On the same date that the automatic stay was lifted, Plaintiff sent a letter to McCallan requesting that he do the following within 7 days:

- Submit complete and accurate responses to Plaintiff's First and Second Post-Judgment Interrogatories to McCallan;

- Submit complete and accurate responses to Plaintiff's First, Second, and Third Post- Judgment Requests for Production to McCallan;

- Produce all documents necessary to comply with the Court's October 21, 2016 Order; and

- Submit complete and accurate responses to Plaintiff's First Post-Judgment Interrogatories and Requests for Production to Americorp, Inc., Seton Corp., and The Achievable, Inc.

(Doc. No. 569).

11

On June 23, 2017, Defendant McCallan responded that he could not produce the discovery requested within 7 days and requested clarification with respect to the outstanding discovery requests. The Trustee responded by extending Defendant's deadline to respond by 3 weeks to July 14, 2017. (Doc. No. 569).

Also on June 23, 2017, McCallan amended his bankruptcy schedules to include items that the Trustee in this litigation had already questioned him about in previous hearings (e.g., Peter McCallan transfer of $187,908 and the "sale of coins"). (17-30961, Doc. No. 178). Notably, neither the transfer from McCallan's brother nor the sale of coins was disclosed on the original Statement of Financial Affairs filed with the bankruptcy court in Florida (and might very well have gone undiscovered by a Trustee unfamiliar with the history of this case). Instead, McCallan only disclosed these assets once the case was transferred back to Alabama, where the Trustee had already discovered them on her own. (Compare 17-30961, Doc. 14, Question 5 with 17-30961 Doc. 178, Question 5).

On June 29, 2017, the Trustee provided McCallan with a detailed description of the deficiencies in his discovery responses. (Doc. No. 569). On July 14, 2017, McCallan requested an additional two weeks to respond to the Trustee's discovery. The Trustee refused to extend the deadline again. Id.

**F. The Trustee Filed a Third Motion for Sanctions for Repeated Abusive Discovery Practices and McCallan Blamed a Third Hurricane for His Inability to Timely Respond to Post-Judgment Discovery**

On July 22, 2017, the Trustee filed her Third Motion for Sanctions in this matter. (Doc. No. 569). This Court conducted a hearing on August 15, 2017. (Doc. No. 570). On August 22, 2017, this Court entered an order requiring as follows:

12

(1) McCallan shall comply fully with all outstanding post-judgment discovery requests and orders not later than September 15, 2017. Each response shall be clearly labeled so that it can be readily determined which response corresponds to which request.

...

(2) All post-judgment discovery shall be supplemented so that it is current as of September 15, 2017. For example, if McCallan had a bank account in First Bank on January 1, 2017, but closed the account and transferred all funds to Second Bank on September 1, 2017, the supplemental response should include the new bank account.

(3) McCallan shall provide a complete accounting for all funds in his Wells Fargo Account No. XXX-0716. The accounting shall be complete through September 15, 2017. For all amounts transferred out of the account, McCallan shall provide an accounting for any account into which funds were transferred.

(Doc. No. 572).

One week before the new deadline, McCallan filed an Emergency Motion to Extend Time to Submit Post-Judgment Discovery Responses (Doc. No. 575). Incredibly, McCallan blamed a third hurricane for his inability to comply with this Court's orders. This time, McCallan asserted that Hurricane Irma rendered him "unable to spend time on the discovery request[s] for the last two days due to the necessary preparations before the storm arrives." (Doc. No. 575, ¶ 2). In its order granting McCallan one additional week to comply (making the deadline September 22, 2017), this Court noted that "McCallan has a history of misrepresenting the effects of natural disasters on his ability to prepare." (Doc. No. 576).

### G. McCallan Filed Another False Affidavit Regarding His Attempts to Comply with Discovery Requests

McCallan produced a few documents by the September 22, 2017 deadline. (Doc. No. 578).

13

He produced a set of tax returns on September 28, 2017. (Doc. No. 578). McCallan did not produce any additional documents until October 16, 2017 – just one week before the scheduled evidentiary hearing. On the same day, McCallan filed a response to this Court's show cause order. (Doc. No. 578). In it, McCallan made the following representations, none of which turned out to be true:

- "Mr. McCallan has taken all steps humanly possible to comply [sic] the most accurate information." (Doc. No. 578, ¶ 3).

- "Mr. McCallan has taken every effort to collect the data requested." (Doc. No. 578, ¶ 4).

- "Mr. McCallan has provided the information request[ed] to the best of his ability and has therefore purged himself of any contempt." (Doc. No. 578, ¶ 6).

- "I have uploaded most, if not all, relevant documents to Dropbox and organize[d] them according to the questions asked, documents requested and subject matter." Affidavit of Timothy McCallan, page 2 (attached to Doc. No. 578).

(Doc. No. 578). In his response to the Show Cause Order, McCallan stated that he had signature authority on 194 bank accounts over the last eleven years. (Doc. No. 578, ¶ 4). However, the list of bank accounts that McCallan produced only included 158 accounts. (TX61). This left 36 bank accounts that McCallan has admitted exist but for which he has provided no identifying information.[9]

On October 19, 2017 – four days before the scheduled evidentiary hearing – McCallan sought yet another continuance. (Doc. No. 580, ¶ 6). McCallan again misrepresented that he had "complied with the post-judgment discovery request." (Doc. No. 580, ¶ 2). This Court denied the

---

[9] Mr. Carroll later testified that he has never in his 30 years of practicing public accounting seen either an individual or an entity have more than 150 bank accounts. Transcript of October 23, 2017 Hearing, page 30, lines 18-23.

request for continuance. (Doc. No. 583).

## H. McCallan was Arrested a Second Time for Civil Contempt

At the October 23, 2017 evidentiary hearing, Mr. Carroll, the Trustee's forensic accountant, testified about a schedule he developed regarding McCallan's net income less taxes for 2007, 2008 and 2009, which totaled $12,442,501. (TX 117). Mr. Carroll testified that had this money been prudently invested and grown at 5% per year from the time it was earned to the present, the sum would have grown (before deduction of living expenses and things of that nature) to $19,266,081. (TX 117). McCallan indicated on his Second Supplemental Responses to Plaintiff's First Post-Judgment Interrogatories that he "no longer has any bank accounts joint or single." (TX 53). After going back over the evidence of McCallan's income and expenses in 2015 and 2016, Mr. Carroll testified again, as he had at the hearing on March 27, 2017: "[McCallan's] income and expenses far outpace those reflected on the bankruptcy schedules and [what's] been reported. And again, which means that there are either earnings that are not disclosed or there are assets – undisclosed assets which are being drawn upon to make up the difference." Transcript of the October 23, 2017 Hearing, page 36, lines 10-15.

McCallan testified at the October 23, 2017 hearing that the discovery responses he provided were "an open book" and that he was "confident" of that representation. Transcript of the October 23, 2017 Hearing, page 45, lines 5-15. Under cross examination, however, McCallan admitted that all the Dropbox folders[10] associated with the post-judgment requests for production about which the Trustee's counsel inquired – including those relating to transfers to McCallan,

---

[10] Dropbox is an online service used, in part, for file sharing. Dropbox was the primary way that McCallan produced documents to the Trustee.

15

transfers by McCallan, money paid to McCallan, money paid out by McCallan, documents relating to his financial status, and documents relating to financial information about him – were empty. Transcript of the October 23, 2017 Hearing, page 83, line 24 through page 86, line 13.

After that hearing, this Court found that McCallan remained in contempt of court and ordered him taken into custody by the U.S. Marshal. (11-3007, Doc. No. 583). This Court concluded that "McCallan's claims of compliance were false," ordered McCallan to "produce the required discovery or prove that he cannot," and cautioned McCallan to be candid with the Court in the future "[g]iven [his] long history of lying to the Court and flouting its orders." (11-3007, Doc. No. 583).

## I. Despite Having the Burden of Proof, McCallan Offers No Evidence at the Next Evidentiary Hearing to Demonstrate He Had Complied with the Court's Discovery Orders or that Compliance was Impossible

Following another hearing on January 9, 2018, this Court entered an order stating that it "previously found that the Trustee had shown, with clear and convincing evidence, that McCallan had violated this Court's August 22, 2017 Order...The burden is now on McCallan to show, by a preponderance of the evidence, that he is in compliance and that to require any more of him is impossible." (11-3007, Doc. No. 618). This Court also reiterated, as it had previously held: "McCallan's incarceration is civil in nature and therefore coercive and not punitive. McCallan holds the keys to his jail cell in his pocket. He need only produce the required discovery or prove that he cannot, to secure his release." (11-3007, Doc. Nos. 583 and 618).

This Court set a fourth post-judgment evidentiary hearing for January 30, 2018 to receive McCallan's testimony and evidence on compliance and/or impossibility. McCallan offered no evidence at the January 30, 2018 evidentiary hearing. Despite having the burden of proof,

16

McCallan's counsel stated at the outset of the hearing that "we have no presentation, we just have rebuttal…we have nothing to present at this time." <u>Transcript of January 30, 2018 Hearing</u>, page 6, lines 15-16, 18-19. Following the Trustee's presentation of evidence, McCallan called no witnesses and offered no evidence in rebuttal. After that hearing, this Court again found that McCallan had failed to purge himself of contempt and ordered that his incarceration continue. (11-3007, Doc. No. 629).

### III.  MCCALLAN'S FAILURE TO PURGE HIMSELF OF CONTEMPT

As this Court previously held, "[g]iven the size of this Court's record, the voluminous documentary evidence submitted, and the nature of the production made to date, determining what is in dispute is a daunting task." (11-3007, Doc. No. 629). However, this Court believes the best approach is to explain at a high level the assets for which McCallan has failed to account, followed by specific examples of the great lengths to which McCallan has gone to hide those assets.

At the January 3, 2017 Meeting of Creditors that took place in Florida, McCallan falsely testified that he never received any money from the Allegro scam:

> Mr. Bomkamp[11]:  So, you know, the [Alabama Bankruptcy Court's] opinion more or less paints you as the person who – who took that hundred million dollars. Would you agree that that's how the opinion paints you?
>
> McCallan:  That's how it's written.
>
> Mr. Bomkamp:  And can you account for that money? Do you know where that money is?
>
> McCallan:  I never received the money.

(TX 3, page 28, lines 16-24).

---

[11] Scott Bomkamp is an attorney for the Region 21 U.S. Trustee Program of the Department of Justice.

17

At the January 30, 2018 hearing, the Trustee offered the testimony of Allen Carroll, the expert in financial forensics who had testified twice before. Mr. Carroll prepared a schedule of the McCallans' net cash between 2007 and 2015, which was introduced into evidence as Trustee's Exhibit 257.[12] The Court has attached TX 257 to this opinion as Exhibit A. Explaining TX 257, Mr. Carroll testified as follows:

> Ms. Tufts: What does the new schedule in Trustee's Exhibit 257 tell us, generally, about Mr. McCallan's net cash coming in between 2007 and 2015?
>
> Mr. Carroll: Your Honor, the bottom line is that there's $16.2 million that remains unaccounted for after taking into consideration income taxes, an estimate for annual living expenses, and then purchases related to the big ticket purchases that we know of. And then, Your Honor, assuming that those amounts were invested each year and then grew at 5 percent annually, then the figure grows to $21.9 million unaccounted for.
>
> Ms. Tufts: When you say "unaccounted for," Mr. Carroll, what do you mean?
>
> Mr. Carroll: What I mean is, we have a sum of money that's being reflected as coming in to Mr. McCallan for which there's no definitive evidence as to ultimately what happened to it. And so, you know, we're – we haven't seen the documentation and the evidence that bridges the gap between what we have here at $16.2 million as being received and now what Mr. McCallan claims is zero. And simply, Your Honor, Mr. McCallan hasn't bridged that gap for us.

Transcript of the January 30, 2018 Hearing, at page 16, lines 4-23. The vast majority of the

---

[12] TX 257 was a more refined version of TX 117. TX 257 analyzed distributions (less income taxes, living expenses, and big purchases), while TX 117 analyzed net income less taxes only.

Case 11-03007   Doc 707   Filed 05/23/18   Entered 05/23/18 17:01:25   Desc Main
Document      Page 18 of 35

distributions to McCallan between 2007 and 2015 came from Seton Corp., one of the defendants in this adversary proceeding that also is subject to a judgment in excess of $100 million for its part in the Allegro scam. (TX 257, page 2; Doc. Nos. 361 and 362).

The fact that so much money is unaccounted for is of particular concern to the Court because McCallan's lifestyle and recent spending habits are not commensurate with his claims of poverty. According to the Trustee's forensic accountant: "[McCallan's] income and expenses far outpace those reflected on the bankruptcy schedules and been reported. And again, which means that there are either earnings that are not disclosed or there are assets – undisclosed assets which are being drawn upon to make up the difference." Transcript of the October 23, 2017 Hearing, page 36, lines 10-15.

As a first step toward purging himself of contempt, McCallan must fully account for the $16.2 million in distributions that he received between 2007 and 2015. McCallan has repeatedly and persistently failed to disclose assets and transfers of assets until after the Trustee has already discovered them. Even when confronted with evidence of a previously undisclosed asset or transfer, McCallan offers only enough information, if any, to acknowledge that he has been caught.

This Court returns to its phonebook analogy. Assume again that one has a paper telephone directory with 30,000 entries – i.e., 30,000 names with corresponding addresses and telephone numbers. Assume further that someone rips each of the hundreds of pages out of the phonebook individually. Assume further that only a few of those pages are thrown into a barrel, shaken up, and given to someone from out-of-town. The rest of the pages are hidden in a safety deposit box in an offshore bank. Throughout the post-judgment phase of this litigation, McCallan has only produced the few random pages of the phonebook he has seen fit to share. The rest of the pages

19

that would provide a complete picture of his assets are nowhere to be found. Occasionally, when the Trustee uncovers a previously undisclosed fact, McCallan produces the portion of the missing page of the phonebook that reveals the existence of that fact, but nothing else.[13]

Although there are numerous examples of McCallan's conduct in this regard, the best illustration is the history of McCallan's failure to disclose purchases and transfers of coins and precious metals. Thus, the Court will undertake to follow the disclosures (or lack thereof) related only to that subject to demonstrate the egregious nature of McCallan's contempt and the urgent need for documentary evidence to account for the missing money.

In the Trustee's May 2016 post-judgment discovery requests, McCallan was asked whether he had transferred or disposed of any real or personal property in the past 10 years, which covered a period back to 2006. (TX 50, Interrogatory No. 12). In McCallan's sworn responses on September 29, 2016, he did not disclose any purchases, sales, or transfers of coins or precious metals. (TX 50).

During the October 6, 2016 hearing, despite no previous disclosure from McCallan of any purchases of coins or precious metals at any point in the past, the Trustee made known to McCallan that she knew that such transactions had occurred[14]:

> Mr. Olen:    You don't disclose anywhere in your discovery responses that you bought any gold or silver or disposed of any gold or silver in the last five years, did you?
>
> McCallan:    I – it's an oversight.

---

[13] This Court has previously warned McCallan not to engage in this behavior: "[T]ell me not just what I already know, but tell me everything." Transcript of October 6, 2016 Hearing, page 80, lines 6-7.

[14] The Trustee discovered some of these transactions in the workpapers produced by McCallan's accountants in response to a non-party subpoena. Transcript of October 6, 2016 Hearing, page 38, lines 4-8.

20

Transcript of October 6, 2016 Hearing, page 39, lines 18-21.

> Mr. Olen: So what you're telling us is the most reliable way for everybody to know just what you bought in the way of gold and silver coins and just what you bought in the way of gold and silver where there's bars or whatever would be to have the records, right?
>
> McCallan: Yes.
>
> Mr. Olen: The very records that as you sit here today showing the Judge why you shouldn't be held in contempt you haven't produced, not one record about any gold and silver coins or bars or anything, right?
>
> McCallan: I thought that that would be in my accounting records.

Transcript of October 6, 2016 Hearing, page 39, line 25 through page 40, line 10.

McCallan also testified that the $1.1 million he admitted to receiving from the sale of coins and precious metals was spent on living expenses:

> Mr. Olen: Mr. McCallan, where is the $1.1 million or so that you received from selling these gold and silver coins? Where is the money?
>
> McCallan: The monies were put into my bank accounts and it was used.
>
> …
>
> Mr. Olen: Well, tell me about – what you know about where [the $1.1 million] went.
>
> McCallan: It was used for living expenses because all my companies were defunct completely.

Transcript of October 6, 2016 Hearing, page 35, lines 14-17; page 37, lines 17-20. As later evidence demonstrated, McCallan's testimony about this portion of the proceeds from the sale of coins and precious metals was false. He did not spend it all on living expenses.

Shortly after the October 6, 2016 hearing, and after the Trustee revealed she had learned

21

of the coins and precious metals transactions through other means, McCallan produced a set of

invoices that evidenced sales of gold and silver coins and other precious metals between 2007 and

2014.[15] McCallan had not previously produced these invoices. As is shown later in this

chronology, these invoices did not reflect all of McCallan's coins and precious metals transactions.

On October 10, 2016, the Trustee filed her second and third post-judgment discovery requests

to McCallan.[16] Responses to these requests for production, which would have required extensive

---

[15] Although most of these invoices are not in the record, Allen Carroll testified at the March 27, 2017 hearing that he relied upon those invoices, together with information obtained from McCallan's accountants, to develop a schedule of McCallan's gold and silver transactions from 2007 through 2014. Transcript of March 27, 2017 Hearing, page 9, line 18 through page 12, line 17. The record does not disclose precisely when those invoices were produced, but given Mr. Carroll's reliance on them, the Court can deduce that they were produced at some point between October 6, 2016 and March 27, 2017. The Trustee represents in her proposed findings of fact and conclusions of law that the invoices were produced by McCallan on October 20, 2016.

[16] These discovery requests included all of the following:

13.     Any and all documents and records which evidence, reflect, refer or relate to any income, payment, compensation, fees, revenues, money or debt paid to you, or owed to you, by any person, partnership corporation, business, fund, trust or entity at any time from January 1, 2006 through the present.

18.     Any and all documents and records which evidence, reflect, refer or relate to any checks written to you or written for your benefit at any time from January 1, 2006 through the present.

20.     Any and all documents and records which evidence, reflect, refer or relate to any wire or electronic transfers made to you or made for your benefit at any time from January 1, 2006 through the present.

(TX 59).

1.      Any and all documents and records which evidence, reflect, refer or relate to any distributions, assignments, sales, changes in ownership or transfers by you, or on your behalf, of any interest of any kind in any real property, personal property, lease, leasehold, investment, fund, trust, intellectual property or assets or any other property or assets of any kind to any of the following at any time from January 1, 2006 through the present [individuals and entities listed].

2.      Any and all documents and records which evidence, reflect, refer or relate to any payments, compensation, fees or money paid by you, or transferred by you, to any of the following at any time from January 1, 2006 through the present [individual and entities listed].

4.      Any and all documents and records which evidence, reflect, refer or relate to any wire or electronic transfers made by you or made on your behalf to any of the following at any time from January 1, 2006 through the present [individuals and entities listed].

22

disclosure about coin and precious metal purchases, sales, and transfers, were due on November 10, 2016. McCallan did not file any responses to the Second Post Judgment Request for Production until September 2017. (TX 59) McCallan did not file any responses to the Third Post Judgment Request for Production until October 2017. (TX 60).

McCallan did not disclose any coin or precious metals sales or transfers on his December 9, 2016 Statement of Financial Affairs, which was filed in his Florida bankruptcy and would have been reviewed by a new trustee and a new judge who would not have been familiar with his long history of dealings in coins and precious metals. (TX 3). McCallan also did not disclose any transfers involving coins or precious metals to or from his brother Peter McCallan. (TX 3). McCallan testified under oath at the January 3, 2017 Florida Meeting of Creditors that he had disclosed all of his property on his bankruptcy schedules, that he had reviewed the petition before he filed it, and that there were no changes he wanted to make. (TX 3, page 6, lines 9-25). McCallan also testified that he had not sold or transferred any property in the last two years (other than what was listed on his Chapter 7 Petition). (TX 3, page 7, lines 6-16).

McCallan further testified under oath at the January 31, 2017 Meeting of Creditors as follows:

> Ms. Tufts: Other than what's listed on Exhibit 1 [Statement of Financial Affairs], is there any money, personal property, real property anywhere in the world which you got or could have gotten money to pay for any expense of yours in 2014, 2015, or 2016?
>
> McCallan: That I don't have listed?
>
> Ms. Tufts: Right.

_____

(TX 60).

23

| | |
|---|---|
| McCallan: | No. (TX 9, page 45, lines 18-25). |
| Ms. Tufts: | Does anyone in the world have money or assets that belong to you but that is under their possession or control other than what you disclosed in your bankruptcy forms and schedules? |
| McCallan: | One of my WaveRunners that was being fixed by a guy is at his house, but I think I put that address. It's worth less than a thousand dollars. |
| … | |
| Ms. Tufts: | Okay. Does anyone in the world, other than what you just said, have money or assets that belong to you but is currently under their possession and control? |
| McCallan: | No. |

(TX 9, page 55, lines 3-9;17-21).

At the March 27, 2017 hearing on the Trustee's Motion To Transfer, Allen Carroll testified that based on his review of *the documents that had been produced*, McCallan had at least "201 one-ounce silver CMLs," "2,700 Silver Eagle coins," "1,002 one-ounce silver no names," "eight gold American Buffalo coins," and "two 32.15 ounce Johnson Matthey gold bars" for which he had failed to account. Transcript of March 27, 2017 Hearing, page 13, line 18 through page 14, line 2. See also TX19. Of course, to the extent that McCallan has purchased additional coins or precious metals, but has failed to produce the invoices for those purchases, neither this Court nor the Trustee would know the full extent of the amount of gold and silver coins and other precious metals for which McCallan has failed to account. Transcript of March 27, 2017 Hearing, page 13, lines 10-14. This concern was borne out by the evidence.

At the March 27, 2017 hearing, the Trustee elicited testimony from Mr. Carroll regarding

24

a coin sale that was neither listed on McCallan's tax returns nor disclosed in any discovery responses to date. McCallan's June 2015 Wells Fargo bank account statement evidenced a deposit from Southland Coins for $23,854.38. Transcript of March 27, 2017 Hearing, page 17, lines 5-19. Mr. Carroll testified that McCallan had not reported the income from this sale on his 2015 tax return. Transcript of March 27, 2017 Hearing, page 17, lines 12-22. McCallan withdrew $13,000 of the proceeds from that coin sale from the bank the same day he deposited it. Transcript of March 27, 2017 Hearing, page 18, lines 6-10. On June 12, 2015, in a series of transactions, McCallan transferred the majority of the remaining of proceeds from this coin sale to a joint account that he shared with his wife. Transcript of March 27, 2017 Hearing, page 18, lines 11-13. McCallan then attributed those same amounts on his personal income records to business income from companies called Alpha Mar and Vortex Debt Group, concealing the true source of the money. (TX 18).

On May 12, 2017, the Trustee issued a non-party subpoena to Peter McCallan, Tim McCallan's brother, which asked Peter McCallan to produce the following, among other things:

> Any and all documents and records which reflect, evidence, refer, or relate to any…transfers by Timothy McCallan or on his behalf of any interest of any kind in any real property, personal property, lease, leasehold, investment fund, trust, intellectual property, or assets in tangible property or assets or any other property or assets of any kind to you or for your benefit at any time from January 1, 2006 through the present.

(TX 219). The non-party subpoena also sought documents specifically related to transfers, checks, and wires to Sigmed or "any other business partnership, corporation, joint venture, trust, investment fund, or entity of any kind which you [Peter McCallan] have owned or which you have owned any interest of any kind." (TX 219). Peter McCallan's response, which included a

25

photograph of a spreadsheet detailing the breakdown of the $74,000 from Cloud Medical Imaging to Sigmed, was identical to a spreadsheet that the Trustee obtained from Tim McCallan's computer. (TX 213 and TX 220).[17] Peter McCallan did not disclose any transfer of coins or precious metals from his brother Tim McCallan.

On August 8, 2017, McCallan filed supplemental responses to Plaintiff's First Post-Judgment Interrogatories. (TX 52). In response to Interrogatory No. 12, which requested information on the transfer or disposal of any real or personal property in the past 10 years, McCallan added: "Various coins over the last 10 years. I have [sic] and sold silver coins. I do not have records that show all the coins that I have sold." (TX 52). McCallan did not list any transfers to or from his brother Peter McCallan. (TX 52).

On September 22, 2017, McCallan filed his second supplemental responses to Plaintiff's First Post-Judgment Interrogatories. (TX 53). In response to Interrogatory No. 12, McCallan answered that there had been "[t]he sale of various coins" to an "unrelated party" for "unknown" consideration. (TX 53).

McCallan did not produce an accounting for any coins or precious metals sales until October 16, 2017 – one week before the October 23, 2017 contempt hearing. (TX 160). The accounting that McCallan finally produced was both inaccurate and incomplete. McCallan was incarcerated following the October 23, 2017 contempt hearing. (Doc. No. 583). On November 28, 2017, McCallan produced a second accounting of coin and metal sales. (TX 221). Neither "accounting" indicated when or where any of the coins and precious metals were purchased. (TX

---

[17] At a later hearing, when asked whether he took a picture of the spreadsheet and sent it to his brother, Timothy McCallan only stated: "I don't recall if I did." Transcript of January 30, 2018 Hearing, page 69, lines 1-5.

26

160 and TX 221). The second accounting included McCallan's sale of $23,854.38 worth of coins to Southland Coins in June 2015 that had previously been falsely categorized as business income. (TX 221). McCallan then falsely testified that the second accounting was complete and accurate:

| | |
|---|---|
| Mr. Olen: | All right. Look at the accounting… You see "Lou Maddaloni Jewelers"? |
| McCallan: | Yeah. |
| Mr. Olen: | Do you see Coin Galleries of Oyster Bay? |
| McCallan: | Yes. |
| Mr. Olen: | Bullion Trading? McCallan: Yes. |
| Mr. Olen: | And Southland Coins? You see that? |
| McCallan: | Yeah. |
| Mr. Olen: | All right. So it was a complete listing of all the sales to all the coin dealers, correct? |
| McCallan: | At that – it looks like this was the complete list at the time. |

Transcript of January 30, 2018 Hearing, page 81, lines 15, 20-25; page 82, lines 1-6. Again, McCallan's testimony was false.

Back on April 29, 2014, McCallan had invested $111,600 in an Interactive Brokers account in his brother Peter McCallan's name. (TX 223). Confronted with evidence that the source of $73,575.20 of this initial investment was a check written by Central Florida Coin and Bullion to his brother Peter McCallan, Tim McCallan admitted for the first time that he had given coins to his brother Peter to sell on his behalf.[18] Transcript of January 30, 2018 Hearing, page 86, lines 19-

---

[18] This check was finally produced only when McCallan was incarcerated and someone else was in charge of the production on his behalf.

27

25. McCallan gave no explanation as to why he structured the transaction with his brother the way he did:

> Mr. Olen: Why didn't you simply take the $73,000 worth of coins to a coin dealer in your geographic area in the state of New York and sell the coins and get a check yourself and then send Peter a check or wire?
>
> McCallan: I don't know.

Transcript of the January 30, 2018 Hearing, page 101, lines 22-25; page 102, line 1. Nor could McCallan remember a single other detail of how, when, or why these coins came into his brother Peter McCallan's possession:

> Mr. Olen: When did you give these coins to your brother, Peter McCallan?
>
> McCallan: I don't know when I gave them.
>
> Mr. Olen: What about the year in which you gave them to your brother, Peter McCallan?
>
> McCallan: I don't know.
>
> Mr. Olen: How did you physically deliver the coins to your brother, Peter McCallan?
>
> McCallan: I don't know.
>
> Mr. Olen: And which types of coins did you deliver to your brother, Peter McCallan?
>
> McCallan: I don't know exactly the type or style of them.
>
> Mr. Olen: How long before the coins were sold by your brother, Peter McCallan, how long before that was it you delivered these coins to him?
>
> McCallan: I don't know.

28

...

| Mr. Olen: | Is it your goal to purge yourself of contempt? |
| --- | --- |
| McCallan: | Yes. |
| Mr. Olen: | All right. With that goal in mind, tell us where you bought the coins that you gave to your brother Peter to sell for you. |
| McCallan: | I don't know. |
| Mr. Olen: | Tell us how much you paid for the coins that you gave to your brother Peter to sell for you. |
| McCallan: | I don't know. |
| Mr. Olen: | Certainly when you bought the coins you had records of where you bought them from correct? |
| McCallan: | No. I don't have any records that were in my control. |
| Mr. Olen: | When you bought the coins, did you at that point have records of buying the coins? |
| McCallan: | I don't know. |
| ... | |
| Mr. Olen: | So are you saying that it was your practice to buy coins and not keep any record of where you bought them from? |
| McCallan: | No. |

Transcript of January 30, 2018 Hearing, page 87, lines 6-21; page 90, lines 18-25; page 91, lines 1-7; page 92, lines 21-23. Given yet another opportunity to explain the transfer of coins to his brother Peter, McCallan refused to do so:

| Mr. Olen: | Why didn't you take the coins to – the coins and metals to a dealer in your area in New York, or anywhere in New York, and have them wire the sale proceeds or write a check for the sale proceeds |
| --- | --- |

29

|  |  |
|---|---|
| | payable to your brother, Peter McCallan? |
| McCallan: | I don't recall. |
| Mr. Olen: | The truth is you put these coins in the possession of your brother, Peter McCallan, for him to sell because you wanted to hide the transaction. Now, that's the real truth of it, isn't it? |
| McCallan: | No, it's not the truth. |
| Mr. Olen: | Then give me **any credible explanation** of why you structured the transaction that way, **any credible explanation**. |
| McCallan: | As I had said many times in this transaction, I didn't recall. |
| Mr. Olen: | Since you don't recall, it could be that it was that you were doing it to hide the transaction? |
| McCallan: | And it could be that I wasn't. |

Transcript of January 30, 2018 Hearing, page 105, lines 23-25; page 106, lines1-14 (emphasis added).

Indeed, McCallan failed to disclose this transfer of more than $73,000 worth of coins to his brother Peter at any point prior to the January 30, 2018 hearing despite the following myriad of opportunities:

- September 23, 2016 Responses to Plaintiff's First Post-Judgment Interrogatories (TX 49);
- September 29, 2016 Responses to Plaintiff's First Post-Judgment Interrogatories (TX 50);
- October 6, 2016 Testimony at the Show Cause Hearing;
- October 20, 2016 Production of Invoices Reflecting Coin and Metals Sales (TX 19);
- October  19, 2016 Amended Responses to Plaintiff's First Post-Judgment Interrogatories (TX 51);

- December 9, 2016 Statement of Financial Affairs (TX 3);
- Testimony at the January 3, 2017 Meeting of Creditors (TX 8);
- Testimony at the January 31, 2017 Meeting of Creditors (TX 9);
- Testimony at the May 15, 2017 Meeting of Creditors (TX 68);
- August 8, 2017 Supplemental Responses to Plaintiff's First Post-Judgment Interrogatories (TX 52);
- September 22, 2017 Second Supplemental Responses to Plaintiff's First Post-Judgment Interrogatories (TX 53);
- October 16, 2017 Response to Plaintiff's Second Post-Judgment Request for Production;
- October 16, 2017 Response to Plaintiff's Third Post-Judgment Request for Production;
- October 16, 2017 Summary of Precious Metals Sales (TX 160);
- Testimony at the October 23, 2017 Contempt Hearing; and
- November 28, 2017 Amended Summary of Precious Metals Sales (TX 221).

With respect to the remainder of the $306,000 that McCallan had transferred to his brother Peter – none of which was disclosed until after McCallan was incarcerated – McCallan testified that he transferred it in cash:

| | |
|---|---|
| Mr. Olen: | [T]ell us how you transferred any of the $306,000 that your brother, Peter, invested on your behalf in the Interactive Brokers account? |
| McCallan: | I transferred cash that I had on hand. |
| Mr. Olen: | Cash how? How did you get it to Peter, by check, by wire, by bills? |
| McCallan: | By actual physical cash. |

Transcript of January 30, 2018 Hearing, page 110, lines 19-25; page 111, line 1. McCallan testified that he put the cash bills – in denominations of hundreds and fifties – in a knapsack and flew it from New York to Florida. Transcript of January 30, 2018 Hearing, page 111, lines 5-6; page 113, lines 15-19. McCallan offered no explanation for his failure to disclose this information

31

in his discovery responses:

> Mr. Olen: Why in the world didn't you tell us in the very first interrogatory answers that you transferred all of these cash bills to your brother, Peter, instead of telling me just now for the first time after you've been in jail all this time?
>
> McCallan: I made a mistake.
>
> …
>
> Mr. Olen: Tell us why we are here today, on January 30, 2018, after you were first held in contempt on October 6, 2016, and today is the first time you've ever uttered a word to this Court about keeping large amounts of cash? What are you just now telling us about this today?
>
> McCallan: I had always kept large amounts of cash.
>
> Mr. Olen: All the more reason why are you just now telling the Court about it today?
>
> McCallan: I don't have an answer.

Transcript of January 30, 2018 Hearing, page 116, lines 4-9; page 120, lines 1-9.

The evidence further demonstrated that McCallan has a lengthy history of attempting to hide coin and precious metals transactions. He deposited $739,467.87 in proceeds from coin sales into his daughter's account before transferring it in smaller increments into the joint account he shared with his wife. (TX 211). When asked about it, McCallan offered no explanation:

> Mr. Olen: Why in the world did you put the $739,000 into the first bank   account and then promptly start moving it to another bank account in smaller increments? Why the need to do that?
>
> McCallan: I don't know.

32

| Mr. Olen: | Hide the money, right? It's to hide the transaction, isn't it? |
| McCallan: | No. |

Transcript of January 30, 2018 Hearing, page 137, lines 13-20. Structuring the transaction this way and then producing only the bank statements makes it impossible to discover the original source of a deposit.

There was additional evidence of McCallan hiding purchases, sales, and transfers of coins and precious metals. On May 21, 2012, McCallan transferred his 100% ownership in Hello Performance, Inc. to his wife Jeannie McCallan. (TX 236). Immediately following the transfer of ownership of Hello Performance to his wife Jeannie McCallan, McCallan sold one kilo of fine gold on May 25, 2012 and one kilo of fine gold on May 26, 2012 to Lou Maddaloni Jewelers in New York and deposited the proceeds of each sale into Hello Performance. Transcript of January 30, 2018 Hearing, page 145, lines 11-14. McCallan realized a $10,000 gain on the sale of the gold, but did not disclose this gain on his tax returns. (TX 19; TX 107). McCallan testified that he deposited the $98,000 in proceeds from the sale of his coins into Hello Performance because the company needed cash.   Transcript of the January 30, 2018 Hearing, page 152, lines 14-17). However, 6 days after the deposits were made the company transferred $19,000 to Wav Team, which was 100% owned by McCallan. (TX 274). Over the next few weeks, Hello Performance wired over $36,000 more back to McCallan. (TX 274; Transcript of January 30, 2018 Hearing, page 152, lines 22-25; page 153, lines 1-10).

In summary, despite selling or transferring $1.1 million or more of coins or precious metals in the past decade, McCallan did not disclose a single coin or precious metal transaction until after the Trustee had information about some of these transactions in the

accounting workpapers she obtained through a non-party subpoena. McCallan failed to list any coin or precious metal transaction on his original bankruptcy schedules. McCallan refused to identify a single specific coin or precious metal purchase, sale, or transfer in his responses to interrogatories. McCallan submitted two separate accountings of coins and precious metal transactions that were both incomplete and false. McCallan disguised coin and precious metal sales by running them through bank accounts in the names of his children. McCallan disguised coin and precious metal sales by incorrectly categorizing the sale proceeds on his personal accounting records as business income. McCallan disguised coin and precious metal sales by transferring his ownership of an entire corporation to his wife, depositing the proceeds from those sales of those coins and precious metals in that corporation's bank account, and distributing the proceeds back to himself in smaller increments through transfers to other companies that he owns. Despite these sophisticated machinations, McCallan's memory regarding the coin and precious metal transactions about which he has been asked has been virtually nonexistent – completely devoid of any useful details or salient facts.

This Court has used the coin and precious metals transfers as one example, but this Court also finds a pattern of similar abusive discovery tactics with respect to other topics including, but not limited to, McCallan's foreign bank accounts, transfers made to his wife, and purported "investments" McCallan has made in his brother Peter's company, Sigmed.

## IV. CONCLUSION

For all of the length, breadth, and weight of these proceedings, the bottom line remains simple. McCallan owes more than $100,000,000. The evidence shows and the Court finds that McCallan has secreted millions of dollars' worth of money and property in locations presently

unknown to the Trustee. Until he discloses all of his property and turns over all of his ill-gotten gains, he remains in contempt.

Done this 23rd day of May, 2018.

United States Bankruptcy Judge

c:      Steve Olen, Attorney for Plaintiff
        Lucy Tufts, Attorney for Plaintiff
        Carly B. Wilkins, Trustee
        Michael A. Fritz Sr., Attorney for Defendant
        Scott D. Widerman, Attorney for Defendant

35