**UNITED STATES BANKRUPTCY COURT FOR THE**
**MIDDLE DISTRICT OF ALABAMA**

IN RE:

ALLEGRO LAW, LLC,                          Case No. 10-30631-WRS
                                           Chapter 7

      Debtor.

---

CARLY WILKINS, as Trustee for
Debtors Allegro Law, LLC and
Allegro Financial Services, LLC,

      Plaintiff,

vs.                                        Adv. No. 11-03007

AMERICORP, INC.; SETON, CORP.;
TIMOTHY McCALLAN, and THE
ACHIEVABLE, INC.,

      Defendants.

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

## I.    <u>Introduction</u>

On February 16, 2016, after nearly 5 years of litigation, this Court entered a judgment

against Defendant Timothy McCallan and defendants Americorp, Inc. and Seton Corp. in the

amount of $102,949,220.72 for their role in "an extraordinary case of fraud on a massive scale that

was perpetrated by Defendant Timothy McCallan…on thousands of victims." (Doc. No. 361, page

2). On February 16, 2016, this Court also sanctioned McCallan $999,457.95 for discovery abuse

committed during the merits portion of the underlying litigation. (Doc. No. 363). McCallan has

not paid any portion of that sanction.

1

McCallan's scheme involved using a Montgomery law firm, Allegro Law, LLC, as a front to induce victims to sign up for debt settlement or debt management services operated by McCallan's companies Americorp, Inc., Seton Corp., and The Achievable, Inc. Victims were promised that they would be represented by an attorney who would negotiate a settlement of their debts for a fraction of what they owed. The defendants instructed victims to stop making payments to their creditors and instead to make payments to Americorp and Seton. Virtually all the money paid by the victims was siphoned off by McCallan and the other defendants, and the victims were then held to be in default on their debts – with nothing to show for the money they had paid to the defendants. This Court found in its order that the effect of the fraudulent debt settlement scheme on the victims was "personal economic suicide." (Doc. No. 361, page 3).

This Court feels it appropriate to outline its findings on the underlying merits of this case, as they reveal an all too familiar pattern of discovery abuse by McCallan and his companies that is now being repeated in the post-judgment discovery process: (1) dumping large volumes of data on Plaintiff shortly before court hearings; (2) falsely representing that all responsive discovery has been produced; (3) refusing to acknowledge the existence of something before Plaintiff finds and specifically asks about it; (4) filing false affidavits; (5) providing false and incomplete answers to interrogatories; (6) producing selected information in piecemeal fashion; (7) escalating non-compliance to the point of contempt and arrest; (8) hiring new counsel and seeking delay; (9) blaming hurricanes for the inability to comply with court deadlines; and (10) falsely denying that any information is being hidden from the Plaintiff.

The contemptuous pattern of brazen discovery abuse during the merits portion of this litigation provides important context for how dismissively and impudently McCallan approaches

2

his discovery obligations.  This pattern has once again repeated itself, this time with the production of approximately 6.4 million pages of accounting and financial records that McCallan has, for years, denied its existence by proclaiming that he had produced all relevant documents.

This Court finds that McCallan remains in contempt, that the production of additional documents is evidence that the coercive nature of the contempt is having an effect, and that he will remain incarcerated until he purges himself of contempt.

## II.     The Defendants Consciously And Deliberately Did Everything In Their Power To Thwart Every Effort Made By The Plaintiff To Obtain Critical Information About The Money Flowing Through The Allegro Law Program

After the March 12, 2010 filing of the Chapter 7 voluntary petitions for Allegro Law, LLC and Allegro Financial Services, LLC, (Case No. 10-30630, Doc. No. 1; Case No. 10-30631, Doc. No. 1), this Court sought an explanation from McCallan and the other defendants as to what had happened to the money paid by thousands of victims to McCallan and his companies through McCallan's debt management scheme.  Despite more than a half dozen orders, 3 evidentiary hearings, over 300 PACER filings, McCallan's arrest for civil contempt for discovery abuse, and a full trial on the merits, McCallan steadfastly refused to provide any answer to that question.

### A. The Plaintiff Sought Information From The Defendants Before Filing This Adversary Proceeding

On September 23, 2010, the Trustee wrote a letter to Americorp's attorneys requesting much of the same information that the Court requested in its July 6, 2010 Order:

> Please understand that we are seeking this information for all current and former Allegro customers from about April 2008 through the termination of the business.

> 1.     For all Debt Management and Debt Management [sic] clients: A listing that includes name, address, account number and all debits and credits into that particular account.  This report should summarize the information at the conclusion of each customer's account.

3

2.      For all Debt Settlement clients: A listing that includes all customer account numbers along with the client name, address, account number, and each customer's escrow balance.

3.      The most recent statement issued to all active Allegro debt settlement and debt management customers.

4.      A summary of all payments made to all third parties from Allegro funds from April 2008 through the end of business operations.

5.      We understand that Mr. John Fendley was allowed to access Allegro customer's account data housed within the AmeriCorp/Seton system. We would be seeking to have 'inquiry only' access to this same electronic data. . .

(PX 5).[1]

On September 27, 2010, the Trustee wrote a letter to Americorp's attorneys requesting that the Defendants preserve all evidence related to the underlying bankruptcy:

As you are aware, we are in the process of obtaining certain information/data from Americorp. The information in their New York office is **vital to this case and we need to be assured that it will remain available**. Due to the nature of this information, I am requesting your assurance that Americorp will have a securely protective data "back-up" to guard against any loss of this information from any potential problems and that i[t] will be available to us at a later date. Please discuss this with personnel at Americorp and let me know what you find out.

(PX 6) (emphasis added). Thus, long before the Defendants ceased operations, they were fully aware of how critical their data was to cases that were currently pending before this Court and they were fully aware of this Court's demand for that data.

### B. Defendants Refused To Completely Or Honestly Answer Written Discovery Requests

---

[1] References to Plaintiffs' Exhibits in Section II of this order are references to exhibits introduced in the underlying merits portion of this case, the majority of which were introduced at trial on November 4, 2013. They are identified by the prefix "PX" to differentiate them from exhibits introduced in the post-trial proceedings, which are identified by the prefix "TX" in Section III.

On February 15, 2011, Plaintiff filed the Complaint in this case (11-3007, Doc. No. 1).

Plaintiff filed an Amended Complaint on March 2, 2011 (PX 7). Defendant Timothy McCallan,

CEO and owner of both Americorp and Seton, testified at a February 2013 evidentiary hearing that

when he was served with the Complaint in this matter, he read it. (PX 346, page 111, line 25; page

112, lines 1-2). He further testified:

> Q: And so you knew when you were served with the complaint that it had a specific request in it that said the trustee was requesting what they called turnover, namely that the defendants turn over any and all records whether electronic or hard copy relating to certain aspects of the debt programs or all aspects of the debt programs that the corporate defendants had run, correct?
>
> A: Yes.

(PX 346, page 112, lines 3-10).

On March 10, 2011, Defendants Americorp, Inc., Seton, Corp., and Timothy McCallan

were served with Plaintiff's First Request for Production and Plaintiff's First Interrogatories (PX

8, PX 9, and PX 10). Among the many discovery requests included in those pleadings was Request

for Production No. 11, which asked for all documents relating to:

> a. The entire files on each customer.
>
> b. Any payments made by each customer.
>
> c. Any fees assessed to each customer.
>
> d. The identity of each customer's creditors.
>
> e. Any communications sent to or received from the creditors of each customer.
>
> f. The outcome or result of the debt elimination program as to each customer.

Clearly, Request No. 11 was designed to obtain documents that answered the fundamental questions that were at the heart of the underlying bankruptcy proceeding as well as this adversary proceeding:

    a.    How much money was received from each customer?

    b.    How much money did each customer pay to each Defendant for fees or other charges?

    c.    How much money did each customer pay to Allegro Law, Keith Nelms or any other third party for fees or other charges?

    d.    How much money was paid to each creditor of each customer?

    e.    How much money was being held for each customer when the Defendants last provided services relating to that customer?

Only three weeks after they were served with these discovery requests, both Americorp and Seton ceased operations. (PX 35, <u>Affidavit of Timothy McCallan</u>, at ¶ 7).

### C. Defendants Did Not Disclose the Existence of Either Database

On May 5, 2011, Defendants responded to Plaintiff's First Request for Production and Plaintiff's First Interrogatories. (PX 15, PX 16, and PX 74). At the beginning of their Request for Production, Defendants stated that the ". . .[f]iles being made available via DVDs are provided, with limited exceptions, **in the form in which those files have been maintained among the Defendants' business records**." (PX 16) (emphasis added). This was the first – but certainly not the last – time that the Defendants made misrepresentations in this case.

In Defendants' first response to Request No. 11, they produced 2 folders of documents, one named "All Active Clients" and one named "All Inactive Clients," and stated that additional documents "may be found in other DVD folders," which Defendants did not identify. (PX 16). The contents of those folders were introduced into evidence at the trial as PX 17, PX 18, PX 19,

6

and PX 20.  A brief review of the 4 spreadsheets produced in those 2 folders demonstrates that those spreadsheets did not come anywhere close to containing all of the information asked for in Request for Production No. 11.

On June 16, 2011, at a hearing conducted by this Court, the Defendants described their May 2011 document production as follows:

> We received discovery from the plaintiff, from the trustee . . . .  **In response to that request, we turned over, Your Honor, all of our records.**  We didn't discriminate.  We didn't parse out which question required what information.  We did, if you will excuse the term, we did a data dump.  **We gave them and structured it by file so they could identify what information we had provided, every single piece of information that we have, which is extensive, about each of the individual clients of Allegro Law, how much they paid in, how much they received, what was disbursed on their behalf.  And this was produced about a month ago** . . . .  **[F]rankly there isn't any additional information**.
> . . .
> **These [Americorp and Seton] are two companies with extensive history in providing back-office services.  They have very good records.  We have turned over all of those records** . . . .

(PX 26, <u>Transcript of June 16, 2011 Hearing</u>, page 20, lines 2-19; page 21, lines 13-16).  This was untrue.  The Defendants later turned over at least 800,000 additional documents, a huge second database that contained information relating to thousands of additional customers, and a variety of Excel spreadsheets, none of which were included in the May 2011 production.  (PX 346, <u>Transcript of February 21, 2013 Hearing</u>, page 35, lines 23-25; page 36, lines 1-5).  Moreover, less than 4 months before trial and after the entry of more than a half dozen Court Orders, Defendants revealed even more information – including multiple additional servers, 250,000 audio recordings, and approximately 20 file boxes containing paper documents relating to Allegro Law. (<u>Transcript of November 4, 2013 Trial</u>, page 24, lines 10-13).

7

On August 2, 2011, pursuant to Bankruptcy Rule 7037 and Rule 37 of the Federal Rules of Civil Procedure, Plaintiff sent Defendants a 22-page letter outlining in great detail the numerous deficiencies in Defendants' discovery responses. (11-3007, Doc. No. 155-9). In that letter, Plaintiff specifically addressed, among other things, the complete inadequacy of Defendants' response to Request No. 11 and inquired about accessing a file that Plaintiff had found **on his own** -- a file named "AllegroLawLLC - Full Database Backup." This database had been buried in an obscure subfolder, which required clicking on the following folders to find it: "Disk 1," "AllegrolawData2," "AllegroLawLLC - Full Database Backup.zip." (PX 45, Transcript of November 14, 2011 Hearing, page 13, lines 22-25; page 14, lines 1-16). Plaintiff was unable to open the actual file buried within those 3 subfolders because double-clicking on it resulted in an error message. (PX 45, Transcript of November 14, 2011 Hearing, page 14, lines 17-25; page 15, lines 1-25, page 16, lines 1-5). Nevertheless, the name of the file seemed promising, so it was brought to the attention of Defendants in Plaintiff's August 2, 2011 letter. (11-3007, Doc. No. 155-9, page 8).

On August 16, 2011, Defendants responded to Plaintiff's Rule 7037 letter. (11-3007 Doc. No. 155-10; PX 346, page 38, referencing Exhibit 29 introduced in that hearing). In that letter, Defendants indicated for the **first time** that the file named "AllegroLawLLC - Full Database Backup" was responsive not only to Request No. 11, but also to numerous other discovery requests. (11-3007, Doc. No. 155-10, page 1, 3-5; PX 346). Notably, this file had gone **completely unmentioned** in Defendants' initial discovery responses despite the fact that they were prepared by Defendant Timothy McCallan, the corporate Defendants' sole officer, sole shareholder, and sole director. (PX 15, Defendants' Response to Interrogatory No. 20).

8

**C. Even After Defendants Finally Acknowledged The Existence Of The First Database, They Made It Extraordinarily Difficult For Plaintiff To Access**

In their August 16, 2011 letter, Defendants reassured Plaintiff that Defendants now had produced **all** of the Defendants' files associated with the operation of the Debtors:

> In their response to Plaintiff's First Request for Production, **Defendants produced its entire database of Debtors' clients within a file headed 'AllegroLawLLC-Full Database Backup'** having a .bak file extension (the "Client Database"). **Defendants also produced numerous other files principally with .pdf extensions. The latter files are all of the Defendants' files that pertain to the Debtor's operations other than those that are privileged and other than the Client Database**. These latter files, to the extent they contain client information, were principally created in response to specific requests from the Receiver and are necessarily fragmentary. **All of the client information sought by Plaintiff, including the information identified in items A.1 and A.2 of your letter, appears in readily accessible form in the Client Database files**.

(11-3007, Doc. No. 155-10; PX 346). Thus, by August 2011, Defendants had again represented both to the Plaintiff and this Court that they had produced **everything** in their possession that pertained to Allegro's operations. Again, this was untrue.

On August 18, 2011, this Court held a hearing on Defendants' request to stay the adversary proceeding pending the resolution of their appeals of this Court's denial of their motions to compel arbitration. During that hearing, the issue of Plaintiff's access to the database was discussed. Counsel for Defendants assured the Court that: "if one had access to **this particular database file**, it would be the equivalent of access to the **entire system**." (PX 30, pages 26, lines 4-6 (emphasis added)). Again, this was untrue.[2]

---

[2] Mr. Jeff Middleton, a witness for the Plaintiff who electronically processed and compared each of the Defendants' discovery productions, testified on February 21, 2013 that this was not true because the Defendants later produced numerous other files as well as a completely separate database. (PX 346, page 40, lines 4-11).

9

Shortly thereafter, on August 22, 2011, this Court entered its first Order in this adversary proceeding related to this discovery dispute. The Court ordered that the parties each provide an IT consultant to attempt to remedy Plaintiff's lack of access to the database and ordered those consultants to confer on or before September 1, 2011:

> Not later than September 1, 2011, the Defendants shall make a technical expert available to the Plaintiff, or his technical expert, to see if access to the Defendants' database can be made readily available. **By this, the Court means that access such as would normally be made available to a user of the database, such as was had by Allegro Law, LLC and Allegro Financial, LLC**. The Plaintiff need not be given access to alter the database, but should have reasonable access to use and manipulate the data.

(11-3007, Doc. No. 103) (emphasis added).

A conference call between Plaintiff's IT consultant and Defendants' IT consultant was held on August 24, 2011. (PX 45, page 23, lines 10-13). However, the IT consultant that Defendants chose to participate in the call, David Torre, was not helpful in any way. (PX 45, page 23, lines 14-22). This is particularly interesting given that the Defendants identified Mr. Torre more than a year later as their "former IT director" and described him as "highly skilled." (Doc. No. 208, filed October 8, 2012); see also PX 56, <u>March 19, 2012 Letter from Thomas Mancuso to Steve Olen</u>, page 4). Notably, Defendants did not offer Mr. Torre as a witness to testify about issues regarding access to the database at the evidentiary hearing that was conducted by this Court a year and a half later on February 21 and 22, 2013. (PX 346).

### D. Defendants Repeatedly Represented To Plaintiff And To The Court That The "Client Database" Was The Only Database And That It Would Answer All Of the Fundamental Questions

Plaintiff filed a Motion To Compel on September 9, 2011 (11-3007, Doc. No. 112). On September 13, 2011, Plaintiff filed his Third Interrogatories and Requests for Production to

10

Defendants. (PX 33).  In those discovery requests, the Plaintiff again attempted to obtain an

accounting of the money that was paid into the Allegro program, which the Court, by that time,

had been demanding for over a year:

> Identify by name, address, phone number, and your ID number each individual customer who participated in the Allegro Law, LLC and/or Allegro Financial Services, LLC debt elimination program and:
>
> a.    The amount of money that was received from each customer during the course of his or her participation in the program.
>
> b.    The amount of money that each customer paid in fees during the course of his or her participation in the program to Americorp, Inc., Seton Corp., and/or Timothy McCallan.
>
> c.    The amount of money that each customer paid in fees during the course of his or her participation in the program to Allegro Law, LLC, Allegro Financial Services, LLC, and/or Keith Nelms.
>
> d.    The amount of money that each customer paid in fees during the course of his or her participation in the program to any other third party including but not limited to marketers and processors not listed in your answers to subsections (a)-(c) above, specifically listing the name of each third party to whom fees were paid, the amount that each customer paid to that third party, and the dates on which such amounts were paid.
>
> e.    The amount of money that was paid to each creditor of each customer during the course of that customer's participation in the program, specifically listing the name of each creditor to whom money was paid, the amount paid, and the date on which each payment was made.
>
> f.    The amount of money that was being held for each customer when the Defendants last provided services relating to that customer.

(PX 33).  A request for production included in that filing also requested "any and all documents

that Defendants used, referred to, consulted, reviewed, relied on or considered in answering any

part of Interrogatory No. 1." (PX 33).  On October 12, 2011, Defendants responded with a lengthy

objection and more misrepresentations:

Defendants object to this interrogatory since, when it is added to the number of interrogatories previously propounded, the total exceeds the number of interrogatories permitted by Bankruptcy Rule 7033 and Rule 33(a)(1) of the Federal Rules of Civil Procedure. Pursuant to these rules, a party may serve on any other party no more than 25 written interrogatories including all discrete subparts. Fed. R. Civ. P. 33(a)(1). Assuming that no interrogatory already served in this proceeding can be deemed to include any discrete subpart, Plaintiff has heretofore served on Defendants 27 written interrogatories in two sets. Defendants did not object to answering the two interrogatories previously propounded that exceeded the total authorized, but they indicated in their answers to Plaintiff's second set of interrogatories that they would be unwilling to stipulate to the service upon them of any additional interrogatories.

In addition, the information sought by Plaintiff responsive to Interrogatory No. 1 can be determined by examining and compiling information available in the Database (as the term is defined in Defendants' Opposition to Plaintiff's Motion to Compel, Docket Entry #123) previously provided to Plaintiff to which Plaintiff is currently being afforded access. The burden on Plaintiff of ascertaining or deriving the information will be no greater than for Americorp and Seton, particularly given that Americorp and Seton have ceased operations and long stopped active use of the Database. Rule 33 provides that "if the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries." Fed. R. Civ. P. 33(d).

(PX 38). This interrogatory response was signed under oath by Defendant Timothy McCallan, individually and as the corporate representative for Defendants Americorp and Seton. (PX 38). The representations Mr. McCallan made in this interrogatory response were untrue.

On October 11, 2011, Defendants responded to Plaintiff's Motion To Compel (11-3007, Doc. No. 123). Defendants, both in their August 16, 2011 response to Plaintiff's Rule 7037 letter and in their Opposition to Plaintiff's Motion To Compel, emphasized that the database that they

12

had produced contained all of the information needed to answer the "fundamental questions," which included a full accounting of the money paid into the Allegro program.

In their August 16, 2011 response to Plaintiff's Rule 7037 letter, Defendants stated:

- "In their response to Plaintiff's First Request for Production, Defendants produced its [sic] **entire** database of Debtors' clients within a file headed "AllegroLawLLC-Full Database Backup" having a .bak file extension (the "Client Database") . . . . **All of the client information sought by Plaintiff [in response to Request for Production No. 11], including the information identified in items A.1 and A.2 of your [August 2, 2011] letter, appears in readily accessible form in the Client Database files**" (Doc. No. 155-10; emphasis added).

In their Opposition to Plaintiff's Motion to Compel, Defendants stated:

- **The Database contains detailed customer information responsive to many of Plaintiff's discovery requests**."

- **Defendants believe that the Database contains all of the information sought by Plaintiff [in Request No. 11]**."

- "**Through the access to the Database now being provided to Plaintiff, Defendants believe that Plaintiff should be able to generate for himself the answers to these questions** [i.e., the fundamental questions at the heart of this adversary proceeding] as well as any others regarding the services rendered by Defendants for the benefit of Debtors' customers."

- "**Defendants believe . . . that the access to the Database being given to Plaintiff will enable Plaintiff, with substantially the same effort as would have to have been expended by Defendants, to generate the reports that Plaintiff seeks**."

- "**Access to the Database**, together with other production made by Defendants, affords Plaintiff **all** of the documents and records within the possession, custody, and control of Defendants responsive to Request No. 11 and **should obviate all of the remaining concerns as to Request No. 11 by Plaintiff**."

(Doc. 123, pages 2, 3, 5, and 6) (emphasis added). Moreover, in a sworn affidavit, Defendant Timothy McCallan stated:

The Database . . . represents the database of information regarding Debtors' clients in the form in which the database was kept in the usual course of Americorp's and

13

Seton's businesses, and **the access being afforded Plaintiff to the database is the same access as the Defendants had when the database was in active use**.

(PX 35, at ¶ 8). Despite all of these unequivocal representations to the Court, at this point in time (October 2011), Defendants still had not disclosed that there was actually a **second** database, as discussed in more detail below. Instead, Defendants continued to spend all of their time and energy making access to the first database impossible.

### E. Defendants Continued To Attempt To Thwart Plaintiff's Access To The First Database

On the same date that Defendants filed their Opposition to Plaintiff's Motion To Compel, they also filed their Supplemental Responses to Plaintiff's First Request for Production and First Interrogatories. (PX 37). In their supplemental response to Request for Production No. 11, Defendants claimed that Plaintiff could have immediate access to the first database through a secure website, which Plaintiff declined.[3] (PX 45, page 34, lines 7-25; page 35, lines 1-25, page 36, lines 1-20). Alternatively, Defendants offered to provide the software necessary for Plaintiff to access the information on his own computer equipment. (PX 37). On October 17, 2011, Plaintiff requested that the Defendants produce the software that would allow Plaintiff to access the Database using his own equipment. See October 17, 2011 email from Lucy Tufts to Julian Spirer. (Doc. No. 155-15).

Because, according to Defendants, the copying and loading of the software had to be done by an outside consultant, Plaintiff did not receive the software until October 25, 2011. (PX 45, page 27, lines 4-7). Defendants then sent the Plaintiff custom built software without an "installer"

---

[3] It turned out to be extremely wise that Plaintiff refused Defendants' offer to provide access through a website, as it would have only been access to the single database that was at issue at this point in time. Plaintiff's insistence that he be allowed to clone Defendants' server eventually led to the discovery that there were, in fact, 2 different databases.

14

(an installation program – including drivers, plugins, etc. – that installs software onto a computer and configures it so that it is compatible with the system). (PX 45, page 26, lines 4-20). Therefore, all installation of the custom built software would have to be done manually. General IT experience will only help so much when dealing with custom built software designed for a specific client and a specific purpose. (PX 45, page 25, lines 13-25; page 26, lines 1-20).

Even worse, the instructions provided with the software (which Defendants obviously knew Plaintiff needed) stated in their entirety:

(1)     Setting up DB (DB Name: QPSData) in SQL Server 2000

(2)     Setting up two Virtual directory in IIS (1. QCS Application 2. Business Service)

(3)     Setting up SQL Report Database in SQL Server 2000 and setup SQL Server Reporting Virtual directory to be able run reports

(4)     Store all correspondence letters, contracts and reports physically on drive to pull from QPS application

(5)     Have their copy of QPS executables which point to QPSData database copy mentioned in point 1.

(PX 45, page 26, line 21 through page 30, line 14). The second set of instructions read as follows (errors and typos in original):

two aps that need changes: *note: QPS pulls the user credentials from the client ithout password…but the user that they useon their client mahcine must exist in QPS.

QPS CLIENT APP: qps.exe.config may need to be updated

(PX 45, page 30, line 15 through page 32, line 11). Plaintiff had no idea what these instructions meant, and these so-called instructions certainly did not constitute step-by-step directions on how

15

to set up the software in Server 2008 and SQL 2008 environments – both of which were necessary to make the information in the first database accessible. (PX 45, pages 26 through 30).

On October 27, 2011, this Court entered a second Order regarding access to the database in this case:

> The Defendants shall file, not later than November 9, 2011, a statement describing the software necessary to access the database referred to in their Response to the Plaintiff's Motion to Compel. (Doc. No. 123). This statement shall be sufficiently specific to permit the Court to retain its own expert so that it may make an independent determination as to whether the database in question has, or has not, been produced.

(PX 43). In response to this Order, the Defendants submitted the following:

> Pursuant to this Court's Order for Evidentiary Hearing entered October 27, 2011 (Doc. 127), Defendants Americorp, Inc. ("Americorp"), Seton Corporation ("Seton"), and Timothy McCallan ("McCallan") hereby describe the software necessary to access the database referred to in Defendants' Response to the Plaintiff's Motion To Compel (Doc. 123): **Microsoft (R) SQL Server 2000 Enterprise Edition**.

(PX 44) (emphasis added). This direct representation to this Court also turned out to be false.

Defendants later described the first database and the software that was necessary to access it as follows:

> **CreditSoft application** (used for debt settlement clients) and related database (a **Microsoft SQL Server 2008** database named 'AllegroLawLLC'). This is the front end application for the database produced on 5/6/2011.

(PX 58) (emphasis added). Of course, at this point, the Defendants were still concealing the fact that there were actually 2 databases, as described below.

> ### F. Plaintiff Cloned Defendants' Server In An Attempt to Access The Database At Issue, Only To Discover That He Had Been Provided A Second Database

16

On November 14, 2011, the Court held a hearing on Plaintiff's Motion To Compel. (PX 45). The testimony in that hearing established that at one point in time the Defendants had both the database **and the system on which it was a part** preserved and stored for restoration.

Robert Link, an attorney for the Defendants, testified that "when operations were ceased on or about April 1st [2011] and things were wound down. . .**all electronic information**, for lack of a better word, was basically put in a storage format and basically stored in a cloud, so to speak." (PX 45, <u>Transcript of November 14, 2011 Hearing</u>, page 59, lines 20-24) (emphasis added). Mr. Link went on to testify that the database "came off storage media. . .where it was stored for a period of time until the request came up and the need came about to bring the database **and the system** back up." (PX 45, page 60, lines 9-12 (emphasis added)). Mr. Link explained that the system had been rebuilt on a third-party server in Florida, but had been dismantled prior to the November 14, 2011 hearing. (PX 45, page 70, lines 15-25; page 71, lines 1-4). This was more false testimony given under oath on behalf of the Defendants.[3]

On November 15, 2011, this Court entered a third Order on discovery in this

---

[3] In February 2013, Oscar Nunez, IT manager for the Defendants, in his own testimony to this Court, directly contradicted the testimony of Mr. Link:

Q: Was that system in Florida that was fully operational ever dismantled?

A: The system in Florida dismantled, no.

Q: So it has worked just like that from October 2011 to at least eight months ago [August 2012], which is the last time that you had any knowledge of it, the last time you were employed there?

A: Yes.

(PX 346, page 144, lines 16-21; page 182, lines 13-19).

17

case, which granted Plaintiff's Motion To Compel and awarded Plaintiff his reasonable expenses in bringing the motion, including attorney's fees. (PX 46). In addition, the Court ordered as follows:

> The Defendants shall produce the database which is the subject of these proceedings on a server which is to be made accessible to the Plaintiff. Plaintiff may access the server directly and thereby access the database upon reasonable notice. Plaintiff shall have reasonable access to the server and the data without interference from or observation by the Defendants, their agents, parties they otherwise control under contract, or otherwise. **Plaintiff may clone the database, the front end application program, and any other electronically stored information, programs or applications, which may be necessary for them to access, view, and work with the subject data. The database shall be produced in its original form and shall not be altered, deleted, or modified**. The Defendants shall cooperate with the Plaintiff in their effort to access the database.

(PX 46) (emphasis added).

On December 1, 2011, Defendants responded that "Plaintiff may access the server and the data, and perform the other actions specified in the Order, during regular business hours on December 14 and 15, 2011, at the offices of Jason B. Wells and Jackson Thornton Technologies, LLC, 200 Commerce Street, Montgomery, AL 36101." (PX 47).[4] Plaintiff's counsel and Plaintiff's IT expert went to Montgomery and cloned the database and the server. (PX 346, page 46, lines 11-15). After doing so, Plaintiff discovered that the second database (the one obtained in December 2011) and the first database (the one produced in discovery in May 2011) were completely different databases with completely different information. (PX 346, page 46, lines 22-25; page 47, lines 1-23).

---

[4] Offering the "database" for cloning in Montgomery, Alabama was peculiar at the time. This Court later discovered that the Defendants had dozens of operational servers responsive to Plaintiff's discovery requests that were being kept in Melbourne, Florida. (Transcript of November 4, 2013 Trial, page 24, lines 10-13). It is obvious to this Court that transporting and making one of these servers available in Montgomery was a deliberate attempt to thwart Plaintiff's discovery of the many other operational servers in Florida.

18

### G. The Threat Of Civil Contempt And The Arrest Of Defendant Timothy McCallan

As a result, Plaintiff filed a Motion for Sanctions on January 25, 2012 (Doc. No. 155). On February 14, 2012, defense counsel filed motions to withdraw, explaining: "Despite repeated email and voice mail messages, I have had no communications with Defendants regarding the substance of the case since January 25, 2012." (PX 51, <u>Affidavit of Julian Spirer</u>, at ¶ 4).

On February 15, 2012, this Court entered a fourth Order:

> The Trustee reports that the Debtors, Allegro Law and Allegro Financial, did not keep their own business records, but rather relied upon Americorp for these services. These business records are crucial to the administration of the underlying Chapter 7 bankruptcy cases as well as for this Adversary Proceeding. **The Defendants have promised to produce the records and have falsely represented to the Court that the records were in fact produced**.
> . . .
> Counsel should bear in mind that it appears that the Defendants may be held in contempt of court for the failure to produce the business records of the Allegro entities, as called for by this Court's Order of November 14, 2011. **Moreover, it appears that counsel have made representations to the Court which do not appear to have been truthful.** If counsel are permitted to withdraw before the motion for sanctions is resolved, the Court could be left with a situation where Parnell, Rosenberg, and Spirer claim that the client has not been forthcoming and the client, through new counsel, may claim that the wrongdoing was all on the part of Messrs. Parnell, Rosenberg, and Spirer.

(PX 52) (emphasis added). A few days later, on February 22, 2012, this Court entered a fifth Order, which granted, in part and deferred in part, Plaintiff's Motion for Sanctions. (PX 53). In addition, the Court stated as follows:

> The Court finds that the Defendants have willfully failed to comply with this Court's order of November 15, 2011, (Doc. 138), requiring them to produce the subject database. . . **Accordingly, Defendants are in contempt of court.**
> . . .
> The Defendants are again ordered to produce and make available to the Trustee, his attorneys, accountants and other representatives, the database which has long been the subject of these proceedings.

19

(PX 53) (emphasis added).

On March 5, 2012, a warrant was issued for the arrest of Defendant Timothy McCallan. (PX 54).  A little over a week later, the Court noted that "McCallan appeared with new counsel, who admitted that they could not produce the database, as called for by the November 15, 2011 Order."  (PX 55).  This Court set another hearing for April 9, 2012 and gave Defendant McCallan an opportunity to purge himself of contempt.   (PX 55).

Incredibly, the Defendants blamed the Bankruptcy Court (and others) for their own discovery abuse:

> It is a fact that the Bankruptcy Court's decision to shut down business operations has created a mountain of impediments with respect to your discovery demands.

(PX 56) (emphasis added).

On March 28, 2012, the Plaintiff – yet again – asked the Defendants for basic information about what happened to over one hundred million dollars that was paid into the Allegro Law program.  This information was still critical to the Plaintiff's causes of action for turnover, accounting, and fraudulent transfers.  This time, the Plaintiff submitted the following questions to the second set of attorneys who entered appearances on behalf of the Defendants on March 14, 2012 and April 6, 2012 (11-3007, Doc. Nos. 186, 187, and 191):

1.  The name, address, phone number, and Client ID number of each individual customer who participated in the Allegro Law, LLC and/or Allegro Financial Services, LLC debt management and/or debt settlement program.

2.  The amount of each and every fee that was paid by each customer during the course of his or her participation in the program.

3.  The amount of each and every fee that each customer paid during the course of his or her participation in the program to Americorp, Inc., Seton Corp., Timothy McCallan and/or any other entity owned by, controlled by, affiliated with or related to any of the Defendants.

20

4.      The amount of each and every fee that each customer paid during the course of his or her participation in the program to Allegro Law, LLC, Allegro Financial Services, LLC, and/or Keith Nelms.

5.      The amount of each and every fee that each customer paid during the course of his or her participation in the program to any other third party, specifically listing the name of each third party to whom each and every such fee was paid, the amount of each and every fee that each customer paid to each third party, and the date on which each and every such fee was paid.

6.      The amount of each and every payment that was made to each creditor of each customer during the course of that customer's participation in the program, specifically listing the name of each creditor to whom each and every such payment was made, and the date on which each and every such payment was made.

7.      The amount of money that was being held for each customer when the Defendants last provided any services relating to that customer.

(PX 59).

On April 6, 2012, Defendants filed Notice of Compliance With Court Order Dated March 15, 2012 Regarding Production of Database and Motion to Remove Sanctions. (PX 58). In that filing, Defendants "assert[ed] emphatically" that "since the entry of the Order, the Defendants, the Defendants' counsel, newly engaged consultants and their staff have expended substantial resources and time and made every effort to comply with the Plaintiff's requests for production of documents as well as the Order." (PX 58). For the first time in a pleading filed with this Court, Defendants admitted that there were actually **2** databases and **2** separate front end applications, describing them as:

QPS application (used for debt management clients) and related database) (a Microsoft SQL Server 2000 database named "QPSData"). This was produced to Plaintiff on 12/14/2011.

21

CreditSoft application (used for debt settlement clients) and related database (a Microsoft SQL Server 2008 database named "AllegroLawLLC"). This is the front end application for the database produced on 5/6/2011.

(PX 58). The Defendants went on to say that they were "committed henceforth to speedily and thoroughly complying with the rules of discovery" and concluded by saying that they "hereby tender to this Court and to the Plaintiff the database requested by the Plaintiff in a format which **should be understandable** by the Plaintiff or a third party expert engaged by the Plaintiff." (PX 58) (emphasis added).

Based on these representations by the Defendants, on April 13, 2012, this Court purged Defendant Timothy McCallan of contempt. (PX 60). This Court discovered much later that the representations made in the Notice of Compliance were also false. For example, Oscar Nunez, the Defendants' IT director, testified almost a year later that he **knew** the links to the documents in the April 2012 production, which were critical to understanding the information in the database, were not functional:

> Q:   And is it your testimony to this Court that, as of April 2012, when you sent those hard drives to the Plaintiff and made the copies for the Court, you knew that the links didn't work?
>
> A:   The links to what?
>
> Q:   The Papervision links.
>
> A:   In the first one?
>
> Q:   Yes.
>
> A:   Yes. That is why – yes, the links didn't work.

22

(PX 346, page 191, lines 16-24). Thus, Defendants' representations to this Court in their Notice of Compliance that an "understandable" version of the database had been produced simply were false.

On April 23, 2012, the Defendants produced a series of spreadsheets that provided summary information related to 7 questions that the Plaintiff had submitted to the Defendants in March (PX 59, PX 88, and PX 89), which purported to include answers to three additional (and related) questions. On the same date, the District Court entered its ruling on the Defendants' appeal of this Court's denial of their Motion To Compel Arbitration. (Doc. No. 195). The District Court took note of the Defendants' discovery abuses in this case, observing:

> **McCallan has proven himself contemptuous to compulsory court orders throughout the bankruptcy process. McCallan's stonewalling regarding these adversary claims** has caused one set of lawyers to withdraw from his representation (of him and his entities), and whatever cooperation to date has been while in civil contempt and under the threat of criminal contempt punishment. . .All indications are that, once the dispute is out of the Court's control, McCallan will take advantage of the lessened authority of the arbitrator in order to frustrate the proceeding.

(11-3007, Doc. No. 195) (emphasis added).

## H. Defendants Continued To Obstruct Plaintiff's Ability To Examine And Analyze The Documentary Evidence In This Case Even After The Production Of Both Databases

As ordered by this Court, on May 7, 2012, the Plaintiff filed his Third Report on the Status of Discovery, explaining, in part, that: "Plaintiff has very little documentary evidence (e.g., actual letters to and from specific creditors evidencing negotiation and/or settlement of a debt owed) to verify the accuracy of the data input into the various databases by Defendants' employees." (PX 62). On the same day, Plaintiff also sent the Defendants another Rule 7037 letter requesting that the documentary evidence responsive to Request No. 11 be produced. (PX 62). On May 16, 2012,

23

Defendants filed a response to Plaintiff's Third Report on the Status of Discovery, but said nothing about the lack of documentary evidence discussed in the Plaintiff's report. (PX 64).

On May 18, 2012, Defendants wrote to Plaintiff that they were "making every effort. . .to complete our review as soon as possible and file a further response as we deem appropriate," citing "significant geographic issue[s] in coordinating efforts on behalf of our Client in order to properly respond to [Plaintiff's] requests." (PX 65).

On June 4, 2012, Defendants sent additional correspondence to the Plaintiff stating in part as follows: "The majority of the alleged 'deficiencies' in your May 7 letter are included in Defendants' electronic production and it is just a matter of you or your expert locating where on the system the information is stored." (PX 66). Defendants offered to participate in a conference call in order to demonstrate where the information Plaintiff requested was located. (PX 66).

On June 18, 2012, the parties participated in a conference call related to determining the exact location of all the actual documents pertaining to each individual customer of Allegro for whom the Defendants purportedly engaged in debt management and debt settlement negotiations. Based on what was discussed in the conference call, Plaintiff wrote to Defendants on July 3, 2012 to summarize Plaintiff's understanding of the universe of available documents in this case:

> Based on our June 18th conference call and our conversation today, it is my understanding that the universe of available documents pertaining to individual customers in the Allegro matter are: (1) the data entered into the QPS (for debt management) and CreditSoft (for debt settlement) programs, respectively, which can be seen as "screenshots" when the programs are loaded and various tabs are selected; (2) downloadable through the correspondence tab of QPS (for debt management); and (3) in a folder that you produced called "PV-Allegro-All" (which has separate subfolders for debt management Paper Vision docs and debt settlement Paper Vision docs).

(11-3007, Doc. No. 203-D).[5]  Additionally, Plaintiff inquired about the documents in folders called "Allegro Settlement Docs" and "ReportStorage," which appeared to contain additional documents responsive to Plaintiff's discovery requests.   (11-3007, Doc. No. 203-D).  Defendants responded to these inquiries by indicating that they would "check on the answer." (11-3007, Doc. No. 203-D).

On September 24, 2012, Plaintiff filed a Motion To Amend Scheduling Order and Produce Documents in a Usable Format.  (11-3007, Doc. No. 203).  Plaintiff was unable to access most of the actual documents relating directly to the customers of Allegro Law.  The links between the software that Defendants produced and the document repository to which they were formerly connected were all broken.  (PX 346, page 59, lines 7-23).  According to testimony at the February 2013 hearing, the **vast majority** of documents associated with each customer were contained in a folder titled "ReportStorage." (PX 346, page 59, lines 24-25; page 60, lines 1-18). This file contained **817,456** separate documents associated with QPS (the debt management side) and 260,000 documents associated with CreditSoft (the debt settlement side). (PX 346, page 60, lines 10-18).   To make things worse, the 817,000 documents in the "ReportStorage" folder were organized by **date** – not by customer.  (PX 346, page 60, lines 24-25; page 61, lines 1-21).   In other words, all letters generated on January 29, 2008 were in one folder, all letters generated on February 7, 2008 were in another folder, all letters generated on February 11, 2008 were in yet another folder, and so on for approximately 880 different days.  (PX 346, page 61, lines 2-21).

---

[5] The representations made on this telephone conference to the Plaintiff were obviously untrue, as Defendants had 20 boxes of documents in storage in Florida that were not included in the database.  (Transcript of November 4, 2013 Trial, page 24, lines 10-13).

With the benefit of hindsight and the admissions regarding the inoperable links in the front-end applications, this Court now better understands Defendants' witness Bob Link's very carefully chosen words at the November 14, 2011 hearing. Mr. Link admitted that what was sent to Montgomery for the Plaintiff to clone was **not** the same system that was up and running in Florida: "The **backup file** [that was delivered to Jason Wells in Montgomery] is not the same as having the **system** up and running on a particular server." (PX 45, Transcript of November 14, 2011 Hearing, page 64, lines 16-17). Mr. Link explained:

> Q:  And you said yourself that defendants Americorp and Seton, at considerable expense and trouble, had the database rebuilt on the server in Florida; correct?
>
> A:  Correct.
>
> Q:  And with all of that information in the knowledge of Americorp and Seton and some of its attorneys, including you, you are telling us that the defendants and its attorneys took no steps whatsoever to preserve that database that had been rebuilt on that server **in that same format**; is that your sworn testimony to this court this morning?
>
> A:  Did anybody take steps to preserve it on a server in Florida which nobody wanted? No. Did we preserve the database and all of the information and all of the software and **applicable necessary pieces**? Absolutely. We have been preserving it since April 1st.

(PX 45, Transcript of November 14, 2011 Hearing, page 70, lines 15-25; page 71, lines 1-4) (emphasis added). This Court concluded that the data's backup file and the software programs were restored to the virtual server in Montgomery. However, during that process, the document repository that was also loaded onto the virtual server was no longer in the same electronic location where the front-end applications were programmed to find it. During the database rebuild in Montgomery, Defendants failed to redirect the front-end applications to find the documents on the local server by specifying the new location of the document repository. Incredibly, Defendants

26

**claimed they could not preserve the ability for these applications to find the repository**. However, once again, this was untrue. Oscar Nunez, IT manager for the Defendants, testified that the system in question was fully operational and functional through at least August 2012. (PX 346, page 144, lines 16-21; 178, lines 24-25, page 179, lines 1-2, 23-25, page 180, lines 1-5).

This Court previously observed that after years of attempts to obtain an electronic database that contained information about the amount of money stolen from victims, McCallan finally produced the electronic equivalent of taking a paper telephone directory, shredding it, placing the pieces in a barrel, shaking it up, and then producing the pieces:

> Assume that one has a paper telephone directory with 30,000 entries – that is 30,000 names with corresponding addresses and telephone numbers. Assume further that someone takes a pair of scissors and cuts up the directory so that a reader could not tell which name went with which address or telephone number. Assume further that all of these separate tables – names, addresses, and telephone numbers – are thrown into a barrel, shaken up, and given to someone from out-of-town.
> …
> That is what the Defendants produced throughout the course of this litigation. Even if they produced all of the data – a doubtful assumption in this case – there was no way to relate the data, rendering it useless. In essence, the Defendants produced the barrel with all of the information in it, but no way to relate one piece of information to another.

(Doc. No. 361, page 16). The Defendants intentionally disabled the links to the documents to make the discovery nearly impossible for the Plaintiff to access and analyze.

## I. Defendants Continued To Make Misrepresentations About The Databases

The Defendants' misrepresentations did not end there. In their October 8, 2012 Response To Plaintiff's Motion to Produce Documents in a Usable Format, Defendants again asserted – as, by this time, they had asserted many times before – that they had met their burden under Rule 34 because they had now produced the documents as they were kept in the usual course of business: "Defendants have cloned [their] servers and replicated [their] database for Plaintiff, with the

requested information being stored and kept in the **identical manner** in which it was stored **when the Defendants' businesses were in operation**." (11-3007, <u>Defendants' Response To Plaintiff's Motion to Compel Production Of Documents In A Usable Format</u>, Doc. No. 208, pages 12-13) (emphasis added).

Defendants claimed that the virtual server they produced "allows Plaintiff's computer to function as if their computer was the Defendants' computer (and server) **while Defendants were operating**." (Doc. No. 208, page 4) (emphasis added). They claimed that the virtual server "allows the Plaintiff to operate the database as if Plaintiff was one of Defendants' employees **when they were operating**." *Id.* (emphasis added). They claimed that the virtual server is "the **equivalent** of the remote access that was given to Nelms and Colley. . ." *Id.* (emphasis added). By their own admissions in that same pleading, none of this was true:

> . . .Defendants scanned all hard documents they received and saved them to the database. To accomplish this, Defendants used a commercially available program, PaperVision. **When the databases were live and running on Defendants' servers and networks, the PaperVision documents were linked to customer files in either the QPS program or the CreditSoft program**. When Defendants were forced out of business and Defendants' network was no longer functional, some of the PaperVision links **no longer functioned**.

(Doc. No. 208, page 11) (emphasis added). Their own IT director, Oscar Nunez, later testified:

> Q: And while the system was operational, they could click on those correspondence tabs, those PaperVision tabs, the document tabs on either front-end application and the document would appear on the screen; right?
>
> A: Yes.

(PX 346, page 196, lines 17-21). Thus, the Defendants did not produce the documents as they were kept in the usual course of business – i.e., with functional links for quick retrieval of all documents by customer.

28

**J. Defendants Remained Defiant Right Up Until Default Judgment Was A Realistic Potential Consequence**

On October 4, 2012, the Court entered a seventh Order, which required the parties to meet one last time and attempt to resolve this discovery dispute. (PX 70). In the event the parties were unable to resolve their differences, the Court set an evidentiary hearing for November 5, 2012. (PX 70).

On October 22, 2012, the parties participated in a "meet and confer" telephone conference. During that call, Defendants asserted that they simply could not restore their networks and provide functionality to the system as Plaintiff requested:

> The database was preserved exactly how it was when it was operational, but that doesn't mean that it was still operational. Once those - once that network was no longer in place, it doesn't mean that the information was not preserved. But its functionality and how it all talked to the [sic] each other, that's - those are two different things. And I think that's what y'all are. . .I think that's what y'all are conflating. I don't - those are two different things. I can't - **I can't make their networks come back up.**

(Transcript of Meet and Confer, October 22, 2012, page 32, lines 16-23; page 33, line 1 and lines 5-8 (emphasis added) (Doc. No. 239-1)). Despite these emphatic protestations by Defendants, their own IT Director, who was responsible for making these links work, testified under oath just a few months later that the functionality of the links at issue was simply a matter of "want to have" versus "need to have":

> Q:   When you were talking about the links in the April 2012 production, the ones that did not work, you used a phrase called something are "need-to-have's" and some things are "want to have's." Do you remember saying that?
>
> A:   Yes. That's a qualification we use in engineering.
>
> Q:   In April 2012, were you aware of a court order that was entered in November 2011?

29

A:     No.

(PX 346, page 186, lines 7-14).   Mr. Nunez's testimony further evidences how completely

contemptuous the Defendants were about this Court's orders in this litigation, which, as far back

as November 2011, included specific instructions that "[t]he database shall be produced in its

original form and shall not be altered, deleted, or modified."  (PX 46).

Instead of agreeing to restore the links to the actual documents in their production as

Plaintiff requested, Defendants offered these alternatives during the October 2012 "meet and

confer":

(1)     Defendants would extract the .pdf documents in the "Reports Storage" folder, run them through a program called "Law," and create a load file for Plaintiff to upload to litigation support that he must purchase.  (Transcript of Meet and Confer, October 22, 2012, page 17, lines 21-23; page 18, lines 1-9; page 19, lines 21-23; page 20, lines 1-6 (Doc. No. 239-1)).  Defendants also suggested that they perform some part of this process to see if it is adequate before proceeding to complete the rest.  (Transcript of Meet and Confer, October 22, 2012, page 37, lines 12-23; page 38, lines 1-4 (Doc. No. 239-1)).

(2)     Plaintiff could purchase access to "Relativity," a web-based litigation support software service that stores and hosts the documents at a location other than a local server.     (Transcript of Meet and Confer, October 22, 2012, page 25, lines 2-8; page 26, lines 4-6 (Doc. No. 239-1)).

Restoring the functionality of the links on the hard drive that was produced by Defendants

in April 2012 was **not** among the Defendants' suggested solutions.[6]

## K. Defendants Misrepresented The Reasons Why They Wanted To Continue An Evidentiary Hearing on the Critical Issue of the Database

---

[6] It is worth noting again that the hard drive produced in April 2012 was what the Defendants submitted in order to purge Defendant Timothy McCallan of contempt.

30

On October 29, 2012 – only one week before the upcoming evidentiary hearing as to whether the database had been produced in a useable format – Defendants filed an emergency Motion To Continue on the grounds that: (1) Hurricane Sandy would impede their ability to communicate with their clients and witnesses; and (2) while professing not to concede that Plaintiff's Motion To Compel was meritorious, Defendants explained that they were working on yet another production that might "moot" Plaintiff's Motion To Compel. (11-3007, Doc. No. 210). After telephonic hearings the Court held on November 5 and 19, 2012 to obtain updates on the status of Defendants' ability to communicate with their counsel following the hurricane, the Court continued the evidentiary hearing on Plaintiff's Motion To Compel to January 29, 2013. (Doc. No. 216). As it turns out, again, the Defendants were not telling the truth when they blamed Hurricane Sandy for their inability to be prepared for the November 2012 hearing. This Court later learned that all of the operational servers and nearly all of Defendants' witnesses were in Florida at the time. (PX 346).

### L. Defendants Finally Produced a Fully Functional Database More Than A Year And a Half After It Was Originally Requested

Then, on November 26, 2012 – **567 days** from date the Defendants were originally served with the discovery requests at issue – Defendants delivered yet another hard drive to Plaintiff. (PX 342). This time – for the first time – the hard drive delivered by the Defendants contained: (1) **both** databases; (2) **both** front end applications; and (3) **operational links** to the documentary evidence (both the correspondence generated by the program and the documents scanned in as hard copies). (PX 342).

### M. Plaintiff Learned There Was Much More Relevant Information That Defendants Had Refused To Produce

On January 23, 2013, Plaintiff filed another Motion for Sanctions, describing at length the Defendants' conduct in this case. (11-3007, Doc. No. 224). The next day, the Defendants filed an Emergency Motion for Protective Order and for Briefing Schedule on Plaintiff's Motion for Sanctions. (11-3007, Doc. No. 227). On January 25, 2013, this Court scheduled a hearing for Plaintiff's Motion for Sanctions for February 21, 2013. (11-3007, Doc. No. 236).

In their response to Plaintiff's Motion for Sanctions, Defendants unequivocally stated to this Court that "[t]he November 2012 Hard Drive did not contain any new or additional information or documents." (11-3007, Doc. No. 239). However, at the February 2013 hearing, this Court learned that there was, in fact, additional information in the November 2012 production that was not included in the production of April 2012, the production for which Mr. McCallan was purged of contempt. (PX 346, page 64, lines 8-25; page 65, lines 1-25; page 66, lines 1-25; page 67, lines 1-8). In fact, it was not until this February 2013 hearing that Defendants first revealed that there were also multiple servers in Florida that were responsive to Plaintiff's discovery requests that had not been turned over. Defendant McCallan testified:

> Q: Tell us why you and the other defendants have not been jumping up and down, making it clear these servers physically resided at CNI in Florida, unaltered, that somebody could go and get them, look at them, copy them, whatever, why in the world weren't the court and we told that?
>
> A: It is a technical question, sir, I can't answer. It would have saved me a lot of money if it was. . .that simple.

(PX 346, page 138, lines 5-13). Defendant McCallan further testified:

> Q: Since March 2012, have you done everything in your power to assemble the correct team and the right people to make sure that you provide the plaintiff with what they are looking for?
>
> A: Since that infamous day in my life, I have done everything in my power financially, emotionally, and mentally to make sure that this was delivered

32

to the best of my ability and my team's ability with everything that I had; and I have done everything in my heart to put this on the table to make it right, at a great cost not just monetarily but in many other fashions, and I intend to continue to go ahead and so until this is brought to a head and a final outcome on this case.  So absolutely.

. . .

Q:      Are any of the defendants hiding any information from the plaintiff?

A:      No.

(PX 346, page 141, lines 5-17; page 142, lines 5-7).   Moreover, Vanessa Vinicombe, the Defendants' former CFO, testified under oath at that same February 2013 hearing:

Q:      Ms. Vinicombe, since you have been involved in this case, have you made every effort to ensure that the Plaintiff has received every bit of information that was in Americorp's possession relating to Allegro Law?

A:      Yes, I have.

(PX 346, page 269, lines 24-25; page 270, lines 1-3).  Both Defendant McCallan's testimony and Vanessa Vinicombe's testimony was false.  On July 2, 2013, Defendant McCallan sent an email to Ms. Vinicombe and one of his counsel stating that all of the following relevant documents were in a storage facility in Florida and were not part of the database that Defendants had previously produced:

Allegro wire confirmation – "These would not be included in the database."

Allegro check registers  – "These are not in the database."

Allegro transaction journal entries – "This is not part of the database."

Allegro cash receipts journals – "This is not part of the database."

EFT File to Vanco – "These reports are not part of the database."

Allegro bank statements – "These reports are not part of the database."

Allegro wire approvals – "These would not be part of the database."

33

(PX 337B-1).

On June 6, 2013, Defendants' second set of attorneys filed Motions To Withdraw. (11-3007, Doc. Nos. 277 and 278). This Court set a hearing on the Motions To Withdraw for July 22, 2013 and stated at the end of its Order: "If the Plaintiff has been given access to the Defendant's servers since the February 21-22 hearings, the parties should be prepared to update the Court." (Doc. No. 279). Under the threat of additional sanctions, and with a hearing fast approaching on Plaintiff's Second Motion for Sanctions, Defendants finally made additional Allegro-related servers and documents not previously produced available to the Plaintiff in mid-July, a process that was completed only 5 days before defense counsels' motions to withdraw were to be heard. (PX 108; Transcript of November 4, 2013 Trial, page 24, lines 10-13).

### N.        Defendants Failed To Show Up At Trial

As demonstrated above, from the very beginning of this case, the Defendants made a deliberate decision to do everything in their power to avoid producing any documents or answering any questions related to what the Defendants did with over one hundred million dollars in payments made by Allegro customers to Allegro Law, LLC. When Defendants were finally forced to produce documents, they refused to help educate either the Plaintiff or this Court as to what those documents meant or how they should be interpreted. Every single thing that the Defendants have done in this case has been designed to thwart the Plaintiff's efforts with respect to his claims of turnover, accounting and fraudulent transfers. The trial was no exception.

A trial in this matter was held on November 4, 2013.[7] The November 4th trial date had been set 8 months earlier on March 8, 2013. (11-3007, Doc. No. 253). Pretrial disclosures were

---

[7] On September 20, 2013, this Court consolidated for trial the claims against The Achievable, Inc. in Adv. P. No. 11-3015 with the claims against Americorp, Seton, and Timothy McCallan in Adv. P. No. 11-3007. (Doc. No. 316).

due on October 21, 2013 and objections to those disclosures were due on October 28, 2013. (11-3007, Doc. No. 253). Defendants' new counsel attended the pre-trial conference held by this Court on October 28, 2013. (11-3007, Doc. No. 326). The Defendants filed no pre-trial disclosures of witnesses or exhibits and made no objections to any of Plaintiff's exhibits and witnesses. However, after more than 2 ½ years of very aggressive litigation, neither the Defendants nor their counsel showed up for trial. Neither the Defendants nor their counsel informed this Court or Plaintiff of that decision ahead of time.

As reflected above, the years of litigation leading up to the trial were arduous, as McCallan and the other defendants went to extraordinary lengths to hide their fraudulent scheme. McCallan has acted with utter contempt for this Court, the Trustee, and the tens of thousands of Allegro victims.

### III. The Pattern Of Discovery Abuse Repeated Itself In The Post-Judgment Discovery Phase Of This Litigation

Following the entry of the February 2016 judgment, which McCallan and the other defendants did not appeal, the Trustee commenced post-judgment discovery as part of her[8] collection efforts on behalf of the Allegro estate. Post-judgment, this Court has entered 19 additional orders and conducted 7 evidentiary hearings[9] to compel McCallan to fully and truthfully respond to the Trustee's post-judgment discovery requests. (Doc. Nos. 383, 391, 396, 449, 450, 451, 461, 572, 576, 583, 588, 592, 618, 629, 707, 709, 771, 790, 800). McCallan's pattern of

---

[8] Daniel G. Hamm litigated this adversary proceeding as the plaintiff in his official capacity as Trustee of the underlying Chapter 7 bankruptcy cases. Hamm retired in November 2015 and was replaced as the Trustee in the underlying cases and this adversary proceeding by Carly B. Wilkins. (Case No. 10-30631, Doc. 5582).

[9] These hearings took place on October 6, 2016, October 21, 2016, October 23, 2017, January 30-31, 2018, May 24-25, 2018, November 8, 2018, and May 6-7, 2019.

behavior in the post-judgment phase of this litigation is remarkably like McCallan's behavior during the merits phase.

### A. McCallan Failed To Respond To Post-Judgment Interrogatories And Requests For Production

On May 18, 2016, the Trustee filed her First Post-Judgment Interrogatories (Doc. No. 372) and First Post-Judgment Request for Production (Doc. No. 373) to McCallan, Americorp, Inc., Seton Corp., and The Achievable, Inc. McCallan is the 100% owner of all three of these companies (16-07524, Doc. No. 13, at pages 7-8), which were all defendants in the underlying merits litigation. McCallan's responses were due on June 17, 2016, but he did not file any responses. On June 24, 2016, the Trustee filed a Motion To Compel responses to her first post-judgment discovery (Doc. No. 375).

After a hearing, on August 9, 2016, this Court entered an Order giving McCallan and the other defendants until August 16, 2016 to serve their responses to the Trustee's post-judgment Interrogatories and Request for Production (Doc. No. 383). Neither McCallan nor any of the other defendants filed any discovery responses by the August 16, 2016 deadline. On August 17, 2016, the Trustee filed a Motion For Sanctions based on McCallan's and the other defendants' failure to comply with this Court's August 9, 2016 Order requiring them to respond to the Trustee's post-judgment discovery requests. (Doc. No. 386).

On September 29, 2016, this Court entered an order finding that neither McCallan nor any of his companies had made any effort to comply with the Court's August 9, 2016 Order. (Doc. No. 391). This Court then ordered McCallan to appear on October 6, 2016 to show cause why he should not be held in contempt of court. (Doc. No. 391).

Case 11-03007    Doc 806    Filed 06/07/19    Entered 06/07/19 10:26:17    Desc Main
Document        Page 36 of 89

On October 5, 2016, hours before the show cause hearing was scheduled to take place, McCallan filed his responses to the Trustee's First Post-Judgment Request for Production. McCallan did not supplement his answers to the Trustee's First Post-Judgment Interrogatories at that time.

### B. This Court Entered An Order Finding McCallan In Civil Contempt Again

On Thursday, October 6, 2016, this Court conducted an evidentiary hearing on the order to show cause. At the conclusion of that hearing, this Court found:

> I entered an order on August 9 requiring the defendants to comply with a previous, you know, order granting them – there's been a motion to compel – the motion for sanctions. Heard the testimony of Mr. McCallan, who testified for well over an hour, maybe an hour and a half, a number of witnesses. It's clear beyond all doubt that the – that, number one, the production of documents and the interrogatories was not complete; therefore, he is in contempt of court. You know that there were questions about things like offshore income and trusts and things like that and, Mr. McCallan, you're not telling the truth. I've looked at the documents. I've listened to you, you know. You're in contempt of court and you've come here and you've lied today.

(Transcript of October 6, 2016 Hearing, at page 79, lines 3-16. (emphasis added)).

On October 6, 2016, this Court entered an order finding McCallan in contempt of court and compelling him to purge himself of contempt. (Doc. No. 396). This Court found that McCallan "willfully violated" the Court's Order of August 9, 2016 and that McCallan's testimony on certain subjects was "incredible." Id. This Court ordered McCallan to file and serve supplemental answers to the Trustee's Post-Judgment Interrogatories and supplemental responses to the Trustee's Post-Judgment Request for Production by October 18, 2016. (Doc. No. 396). At the end of the hearing, this Court concluded:

> I'm going to put this in writing, going to give it to everybody who cares to look that I've heard the testimony and that **I've found that Mr. McCallan is in contempt. And just the fact that you're not in jail doesn't mean you're not in contempt**

37

**and – or that you're not under a duty to purge yourself.** And you're going to have to do that. The second go around we have, you know, things may be different.

(Transcript of October 6, 2016 Hearing, at page 80, lines 22-25, page 81, lines 1-4 (emphasis added)). This Court warned McCallan: "[Y]ou're under a duty, you know, and I want no more oversights, omissions, you know, I forgot about this or I forgot about that." (Transcript of October 6, 2016 Hearing, page 81, lines 15-17).

### C. McCallan Continued To Hide Assets While He Remained In Contempt

On Friday, October 7, 2016, the Trustee filed a Request for Entry Upon and Inspection of Premises, seeking an inspection of McCallan's property at 6730 Still Point Drive in Melbourne, Florida and requesting that the Court enter an order prohibiting McCallan from removing personal property or allowing it to be removed.

On Monday, October 10, 2016, the Trustee filed a Process of Garnishment to Wells Fargo Bank seeking money and property for the satisfaction of the February 2016 judgment against McCallan. (Doc. No. 300). On Tuesday, October 11, 2016, before the Process of Garnishment could be served on Wells Fargo, McCallan obtained a cashier's check from Wells Fargo in the amount of $388,285.14, which he withdrew from his account ending 0716. (Transcript of March 27, 2017 Hearing, page 38, lines 16-20). On October 10 and 11, 2016, the Trustee filed her Second and Third Post-Judgment Requests for Production to McCallan, respectively. (Doc. Nos. 399 and 407).

On Saturday, October 15, 2016 – 8 days after the Trustee filed her Request for Inspection – the Trustee's investigator videotaped McCallan and Joseph Sclezo, III at McCallan's residence loading items from McCallan's garage into a U-haul truck. Mr. Sclezo also was videotaped removing boxes from a storage unit rented in McCallan's name at Viera Storage in Melbourne,

Florida and transporting those boxes to a storage unit rented only in Mr. Sclezo's name at a different storage facility, StoreSmart Storage in Rockledge, Florida.  (Transcript of October 21, 2016 Hearing, page 19, line 2 through page 21, line 10).

On Monday, October 17, 2016, McCallan filed an Objection to the Trustee's Request for Inspection, representing to the Court that "due to the recent hurricane in Florida, Defendant has been delayed."  (Doc. No. 437, at ¶ 9).  McCallan also represented to the Court that, because "Defendant's home has suffered damage due to the recent hurricane," McCallan needed "the inspection [to] be delayed for a short amount of time."  (Doc. No. 437, at ¶ 3).  This Court set the matter for a hearing on Friday, October 21, 2016.  The uncontradicted testimony and evidence at the October 21, 2016 hearing conclusively proved that there was no hurricane damage whatsoever to McCallan's property at 6730 Still Point Drive.  (Transcript of October 21, 2016 Hearing, page 23, line 25 through page 24, line 5).  Just as McCallan had falsely claimed that Hurricane Sandy inhibited his ability to produce databases that were actually stored on servers 1,100 miles away in Florida, McCallan falsely claimed that Hurricane Matthew inhibited his ability to make his home available for inspection.

After conducting a hearing on October 21, 2016, this Court entered an order finding that "Defendant McCallan remains in contempt, has failed to purge himself of contempt, and has committed additional acts of contempt since the October 6, 2016 hearing."  (Doc. No. 449, at ¶ 4) (emphasis added).  This Court also found that "Defendant Timothy McCallan has perpetrated a fraud upon the Court by misrepresenting the reasons that he failed to purge himself of contempt and instead seeking additional time from this Court for the purpose of moving, hiding, and

39

otherwise disposing of assets that could otherwise be used to satisfy the judgment against him in this matter." (Doc. No. 449, at ¶ 3) (emphasis added).

In its October 21, 2016 Order, this Court made clear that "[i]f Defendant McCallan fails to comply fully with this [October 21, 2016] Order, and/or if he fails to fully and accurately respond to all of [the Trustee's] post-judgment discovery within 7 days of the entry of this Order, this Court will order the United States Marshall to arrest Defendant McCallan and bring him before this Court forthwith." (Doc. No. 449, at ¶ 11) (emphasis added). The deadline for McCallan's compliance was Friday, October 28, 2016. Six days after that deadline had lapsed, McCallan asked this Court to extend the deadline to account for the money until November 10, 2016. (11-3007, Doc. No. 476). McCallan never complied.

### D. McCallan Filed Chapter 7 Bankruptcy Petition In An Attempt To Obtain A Change Of Venue

McCallan's answers to the Trustee's second and third post-judgment discovery requests were due on November 11, 2016, and an extension was granted until November 18, 2016. (Doc. Nos. 399 and 407). These discovery requests sought detailed information and documents regarding financial transactions and transfers involving McCallan. Instead of responding to the Trustee's discovery on November 18, 2016 (the date of the extended deadline), McCallan filed his Chapter 7 bankruptcy petition. The filing of McCallan's Chapter 7 petition was designed to avoid having to comply with the orders of this Court.

On February 17, 2017, the Trustee filed a Motion To Transfer McCallan's bankruptcy case pursuant to Rule 1014(b), Fed. R. Bankr. P. and 11 U.S.C. § 105(a). (10-30631, Doc. No. 5613). In McCallan's response to the Motion To Transfer, he represented that the "sole purpose in filing this Chapter 7 was to have an independent Chapter 7 trustee properly collect and reduce the money

40

and property of the estate." (10-30631, Doc. No. 5620, at pages 1-2). The Trustee, on the other hand, took the position that the real purpose for which McCallan filed a Chapter 7 petition in Florida was to have the Florida trustee "administer those assets which he saw fit to disclose…and something substantially less than all of his assets." (Transcript of March 27, 2017 Hearing, page 4, lines 17-20). This Court conducted an evidentiary hearing on the Motion To Transfer on March 27, 2017.

At the March 27, 2017 evidentiary hearing, the Trustee introduced McCallan's testimony from the January 31, 2017 Meeting of Creditors conducted in Orlando, Florida, which included the following:

> Ms. Tufts: Other than what's listed on Exhibit 1, [your bankruptcy] schedules, is there any money, personal property, real property, anywhere in the world which you could [get] or could have gotten money to pay for any expense of yours in 2014, 2015, or 2015?
>
> McCallan: That I don't have listed?
>
> Ms. Tufts: Right.
>
> McCallan: No.

(TX 9, page 18, lines 18-25). [10]

In his original bankruptcy schedules, McCallan reported $16,366 in income from January 1, to December 31, 2015 and no income from January 1, 2014 to December 31, 2014. (TX 3,

---

[10] References to Trustee's Exhibits in Section III of this order are references to exhibits introduced in the post-judgment phase of this case, the majority of which were introduced at evidentiary hearings in March 2017, October 2017, and January 2018. Exhibits introduced in the post-judgment phase contain the prefix "TX" while those introduced in the merits phase contain the prefix "PX."

Case 11-03007   Doc 806   Filed 06/07/19   Entered 06/07/19 10:26:17   Desc Main
Document      Page 41 of 89

pages 1-2).[11]  McCallan also reported $12,533 in rental income in 2015.  (TX 3, page 2).[12]

McCallan had previously testified that his wife made $1,000 or less each month in 2015.  (TX 9, page 30, lines 13-20).

At the March 27, 2017 evidentiary hearing, the Trustee called Allen Carroll, an expert in forensic accounting, who testified that McCallan's testimony at the 341 Meeting of Creditors and the statements he made on his bankruptcy schedules were "wildly different" from the amount of money going in and out of McCallan's bank accounts in 2015 and 2016.  (Transcript of March 27, 2017 Hearing, page 24, lines 18-23).

Mr. Carroll testified that, based on his analysis of only one of McCallan's hundreds of bank accounts over the last 10 years, McCallan deposited approximately $350,000 in 2015 that was neither a transfer from another account nor a tax refund.  Additionally, his bank statements for that account also reflected $347,650.48 in withdrawals for 2015.  (Transcript of March 27, 2017 Hearing, page 27, lines 3-12; TX16).  Mr. Carroll also analyzed an income and expense spreadsheet for 2015 that was obtained from McCallan's computer that was cloned by the Trustee as part of the October 21, 2016 inspection of McCallan's home.  (Transcript of March 27, 2017 Hearing, page 29, lines 12-20; TX17).  McCallan's personal income and expense spreadsheet for 2015 reflected that he had $679,073.82 in income from all sources in 2015 and approximately

---

[11] In his June 23, 2017 amended schedules, McCallan revised these figures to $5,944 in income for 2015 and $171,927 in income for 2014. (17-30961, Doc. No. 178, page 18).

[12] In his June 23, 2017 amended schedules, McCallan disclosed $187,908 in additional income from Peter McCallan in 2015. (17-30961, Doc. No. 178, page 18).  This transfer is discussed in greater detail below, but this transfer occurred in late December 2015 and cannot explain the other evidence presented by the Trustee that McCallan's income was substantially more in 2015 than McCallan represented on his schedules.  (TX 168, reflecting a $187,908 deposit into McCallan's Wells Fargo bank account ending 0716 on December 28, 2015).

$420,000 in expenses paid in 2015. (Transcript of March 27, 2017 Hearing, page 29, lines 21-25; page 30, lines 1-9; TX17). Mr. Carroll concluded:

> McCallan's spending far exceeds the amount that he's reported as being earned by he and his wife…he's either earning monies that have not been disclosed or he has undisclosed assets from which he's drawing upon to make up the difference.

Id., page 28, line 25, page 29, lines 1, 4-6. The Trustee then offered evidence of large undisclosed transfers, which included transfers between Timothy McCallan and his brothers Peter McCallan ($187,908) and Robert McCallan ($15,000), as well as an undisclosed coin sale in June 2015 of over $23,000. Id., page 31, lines 20-25; page 32, lines 1-9; page 34, lines 1-13; page 17, lines 5-22. The evidence also showed an unexplained transfer to McCallan's wife in the amount of $330,000. (TX 195).

On March 30, 2017, this Court entered an order transferring McCallan's Florida bankruptcy case to the Middle District of Alabama. (17-30961, Doc. Nos. 61 and 62). On May 2, 2017, the Trustee filed a Motion for Relief from the Automatic Stay to pursue "post-judgment discovery, contempt proceedings, sanctions, and any other aspect of the 11-3007 adversary proceeding with the exception of duplicative collection." (17-30961, Doc. No. 99). This Court granted the Motion For Relief from the Automatic Stay on June 22, 2017. (17-30961, Doc. No. 175). Notably, while the Trustee was prohibited from pursuing post-judgment discovery in the 11-3007 matter until the relief from stay was entered, nothing prohibited McCallan from responding to the Trustee's post-judgment discovery.

**E. Following The Transfer Of McCallan's Bankruptcy Case To Alabama And The Order On Relief From The Automatic Stay, Post-Judgment Discovery Recommenced**

On the same date that the automatic stay was lifted, Plaintiff sent a letter to McCallan requesting that he do the following within 7 days:

- Submit complete and accurate responses to Plaintiff's First and Second Post-Judgment Interrogatories to McCallan;

- Submit complete and accurate responses to Plaintiff's First, Second, and Third Post-Judgment Requests for Production to McCallan;

- Produce all documents necessary to comply with the Court's October 21, 2016 Order; and

- Submit complete and accurate responses to Plaintiff's First Post-Judgment Interrogatories and Requests for Production to Americorp, Inc., Seton Corp., and The Achievable, Inc.

(Doc. No. 569).

On June 23, 2017, Defendant McCallan responded that he could not produce the discovery requested within 7 days and requested clarification with respect to the outstanding discovery requests. The Trustee responded by extending Defendant's deadline to respond by 3 weeks to July 14, 2017. (Doc. No. 569).

Also on June 23, 2017, McCallan amended his bankruptcy schedules to include items that the Trustee in this litigation had already questioned him about in previous hearings (e.g., Peter McCallan transfer of $187,908 and the "sale of coins"). (17-30961, Doc. No. 178). Notably, neither the transfer from McCallan's brother nor the sale of coins was disclosed on the original Statement of Financial Affairs filed with the bankruptcy court in Florida (and might very well have gone undiscovered by a Trustee unfamiliar with the history of this case). Instead, McCallan only disclosed these assets once the case was transferred back to Alabama, where the Trustee had already discovered them on her own. (Compare 17-30961, Doc. 14, Question 5 with 17-30961 Doc. 178 Question 5).

44

On June 29, 2017, the Trustee provided McCallan with a detailed description of the deficiencies in his discovery responses. (Doc. No. 569). On July 14, 2017, McCallan requested an additional two weeks to respond to the Trustee's discovery. The Trustee refused to extend the deadline again. Id.

### F. The Trustee Filed A Third Motion For Sanctions For Repeated Abusive Discovery Practices And McCallan Blamed A Third Hurricane For His Inability To Timely Respond To Post-Judgment Discovery

On July 22, 2017, the Trustee filed her Third Motion for Sanctions in this matter. (Doc. No. 569). This Court conducted a hearing on August 15, 2017. (Doc. No. 570). On August 22, 2017, this Court entered an order requiring as follows:

(1) McCallan shall comply fully with all outstanding post-judgment discovery requests and orders not later than September 15, 2017. Each response shall be clearly labeled so that it can be readily determined which response corresponds to which request.

...

(2) All post-judgment discovery shall be supplemented so that it is current as of September 15, 2017. For example, if McCallan had a bank account in First Bank on January 1, 2017, but closed the account and transferred all funds to Second Bank on September 1, 2017, the supplemental response should include the new bank account.

(3) McCallan shall provide a complete accounting for all funds in his Wells Fargo Account No. XXX-0716. The accounting shall be complete through September 15, 2017. For all amounts transferred out of the account, McCallan shall provide an accounting for any account into which funds were transferred.

(Doc. No. 572).

One week before the new deadline, McCallan filed an Emergency Motion To Extend Time to Submit Post-Judgment Discovery Responses (Doc. No. 575). Incredibly, McCallan blamed a third hurricane for his inability to comply with this Court's orders. This time, McCallan asserted that Hurricane Irma rendered him "unable to spend time on the discovery request[s] for the last

45

two days due to the necessary preparations before the storm arrives." (Doc. No. 575, ¶ 2). In its order granting McCallan one additional week to comply (making the deadline September 22, 2017), this Court noted that "McCallan has a history of misrepresenting the effects of natural disasters on his ability to prepare." (Doc. No. 576).

### G. McCallan Filed Another False Affidavit Regarding His Attempts To Comply With Discovery Requests

McCallan produced a few documents by the September 22, 2017 deadline. (Doc. No. 578). He produced a set of tax returns on September 28, 2017. (Doc. No. 578). McCallan did not produce any additional documents until October 16, 2017 – just one week before the scheduled evidentiary hearing. On the same day, McCallan filed a response to this Court's show cause order. (Doc. No. 578). In it, McCallan made the following representations, none of which turned out to be true:

- "Mr. McCallan has taken all steps humanly possible to comply [sic] the most accurate information." (Doc. No. 578, ¶ 3).

- "Mr. McCallan has taken every effort to collect the data requested." (Doc. No. 578, ¶ 4).

- "Mr. McCallan has provided the information request[ed] to the best of his ability and has therefore purged himself of any contempt." (Doc. No. 578, ¶ 6).

- "I have uploaded most, if not all, relevant documents to Dropbox and organize[d] them according to the questions asked, documents requested and subject matter." <u>Affidavit of Timothy McCallan</u>, page 2 (attached to Doc. No. 578).

(Doc. No. 578). In his response to the Show Cause Order, McCallan stated that he had signature authority on 194 bank accounts over the last eleven years. (Doc. No. 578, ¶ 4). However, the list of bank accounts that McCallan produced only included 158 accounts. (TX61). This left 36 bank

46

accounts that McCallan has admitted exist but for which he has provided no identifying information.[13]

On October 19, 2017 – four days before the scheduled evidentiary hearing – McCallan sought yet another continuance. (Doc. No. 580, ¶ 6). McCallan again misrepresented that he had "complied with the post-judgment discovery request." (Doc. No. 580, ¶ 2). This Court denied the request for continuance. (Doc. No. 583).

### H. McCallan Was Arrested A Second Time For Civil Contempt

At the October 23, 2017 evidentiary hearing, Mr. Carroll, the Trustee's forensic accountant, testified about a schedule he developed regarding McCallan's net income less taxes for 2007, 2008 and 2009, which totaled $12,442,501. (TX 117). Mr. Carroll testified that had this money been prudently invested and grown at 5% per year from the time it was earned to the present, the sum would have grown (before deduction of living expenses and things of that nature) to $19,266,081. (TX 117). McCallan indicated on his Second Supplemental Responses to Plaintiff's First Post-Judgment Interrogatories that he "no longer has any bank accounts joint or single." (TX 53). After going back over the evidence of McCallan's income and expenses in 2015 and 2016, Mr. Carroll testified again, as he had at the hearing on March 27, 2017: "[McCallan's] income and expenses far outpace those reflected on the bankruptcy schedules and [what's] been reported. And again, which means that there are either earnings that are not disclosed or there are assets – undisclosed assets which are being drawn upon to make up the difference." (Transcript of the October 23, 2017 Hearing, page 36, lines 10-15).

---

[13] Mr. Carroll later testified that he has never in his 30 years of practicing public accounting seen either an individual or an entity have more than 150 bank accounts. (Transcript of October 23, 2017 Hearing, page 30, lines 18-23).

McCallan testified at the October 23, 2017 hearing that the discovery responses he provided were "an open book" and that he was "confident" of that representation. (Transcript of the October 23, 2017 Hearing, page 45, lines 5-15). Under cross examination, however, McCallan admitted that all the Dropbox folders[14] associated with the post-judgment requests for production about which the Trustee's counsel inquired – including those relating to transfers to McCallan, transfers by McCallan, money paid to McCallan, money paid out by McCallan, documents relating to his financial status, and documents relating to financial information about him – were empty. (Transcript of the October 23, 2017 Hearing, page 83, line 24 through page 86, line 13).

After that hearing, this Court found that McCallan remained in contempt of court and ordered him taken into custody by the U.S. Marshal. (11-3007, Doc. No. 583). This Court concluded that "McCallan's claims of compliance were false," ordered McCallan to "produce the required discovery or prove that he cannot," and cautioned McCallan to be candid with the Court in the future "[g]iven [his] long history of lying to the Court and flouting its orders." (11-3007, Doc. No. 583).

## I. Despite Having The Burden Of Proof, McCallan Offers No Evidence At The January 2018 Evidentiary Hearing To Demonstrate He Had Complied With The Court's Discovery Orders Or That Compliance Was Impossible

Following another hearing on January 9, 2018, this Court entered an order stating that it "previously found that the Trustee had shown, with clear and convincing evidence, that McCallan had violated this Court's August 22, 2017 Order…The burden is now on McCallan to show, by a preponderance of the evidence, that he is in compliance and that to require any more of him is impossible." (11-3007, Doc. No. 618). This Court also reiterated, as it had previously held:

---

[14] Dropbox is an online service used, in part, for file sharing. Dropbox was the primary way that McCallan produced documents to the Trustee.

"McCallan's incarceration is civil in nature and therefore coercive and not punitive. McCallan holds the keys to his jail cell in his pocket. He need only produce the required discovery or prove that he cannot, to secure his release." (11-3007, Doc. Nos. 583 and 618).

This Court set a fourth post-judgment evidentiary hearing for January 30, 2018 to receive McCallan's testimony and evidence on compliance and/or impossibility. McCallan offered no evidence at the January 30, 2018 evidentiary hearing. Despite having the burden of proof, McCallan's counsel stated at the outset of the hearing that "we have no presentation, we just have rebuttal…we have nothing to present at this time." (Transcript of January 30, 2018 Hearing, page 6, lines 15-16, 18-19). Following the Trustee's presentation of evidence, McCallan called no witnesses and offered no evidence in rebuttal. After that hearing, this Court again found that McCallan had failed to purge himself of contempt and ordered that his incarceration continue. (11-3007, Doc. No. 629).

### J. McCallan Unsuccessfully Attempts To Discredit TX257

On April 11, 2018, after an unsuccessful appeal, McCallan filed a signed certification that he had complied with the Court's February 6, 2018 Order (11-3007, Doc. No. 629). In that certification, McCallan wrote: "My wife, Jeannie McCallan, and Kellie Eckstein have reviewed and organized the documents and accountings. I trust that they have provided any and all documents that have been requested. I have given them instructions on where the documents are located." (11-3007, Doc. No. 699). On April 17, 2018, for the purpose of helping improve the efficiency of Plaintiff's review of the production, Plaintiff sought from McCallan "[a]n accounting of the $16 million in distributions described in TX257, directing us to the documents that demonstrate (a) how that money was spent or used; (b) the assets that money was used to purchase;

49

(c) the accounts where that money is saved; and/or (d) the gifts that money was used to make."
(11-3007, Doc. No. 703, at ¶ 4). On May 9, 2018 – two days before Plaintiff's response to
McCallan's certification was due – Defendant produced a 48-page[15] spreadsheet that purports to
"account" for the $16 million in distributions he received between 2007 and 2015 (as summarized
on TX257).

On May 15, 2018, McCallan filed another Motion for Immediate Release of Defendant and
Request for Emergency Hearing. (11-3007, Doc. No. 704). In that motion, McCallan argued that
"the attorneys for the [T]rustee are searching for 'phantom documents" and "[w]hen given an
explanation, backed by numbers and documents, they are not satisfied." (11-3007, Doc. No. 704,
at ¶ 8).

On May 23, 2018, this Court entered an Order that drew a simple conclusion:

> For all of the length, breadth, and weight of these proceedings, the bottom line
> remains simple. McCallan owes more than $100,000,000. The evidence shows
> and the Court finds that McCallan has secreted millions of dollars' worth of money
> and property in locations presently unknown to the Trustee. Until he discloses all
> of his property and turns over all of his ill-gotten gains, he remains in contempt.

(11-3007, Doc. No. 707).

This Court conducted a hearing on May 24-25, 2018 to determine whether McCallan had
purged himself of contempt by making the full and complete disclosure of his secreted money and
property that the Court has repeatedly ordered him to make. At that hearing, McCallan and Kellie
Eckstein testified at length about her 48-page spreadsheet (TX297). Among the myriad of errors
and falsehoods in the spreadsheet produced by McCallan and revealed on cross examination were:

- Cash withdrawals from banks and ATMs totaling more than $1.4 million were assumed
  to be spent and were therefore deducted from the $16.2 million gap (Transcript of May
  24, 2018 Hearing, page 161, lines 2-10);

---

[15] This spreadsheet is 48 pages only when printed on 11"x17" paper.

- Coins and metals purchases in excess of $920,000 were deducted from the $16.2 million gap even though McCallan still had possession of the asset in a different form (Transcript of May 24, 2018 Hearing, page 190, lines 5-18);

- $4.76 million of "checks posted," without any information as to whom the checks were written or for what purpose, was deducted from the $16.2 million gap, even though one of these checks was a $330,000 check to Jeannie McCallan (Transcript of May 24, 2018 Hearing, page 219, lines 11-25; page 220, lines 1-7; page 223, lines 19-25; page 224, lines 1-5; TX195);

- Any money that was moved to a company account, no matter what the reason or how long it stayed there, was deducted from the $16.2 million gap despite evidence that these monies often made their way right back to McCallan or his wife (Transcript of May 24, 2018 Hearing, page 233, lines 12-18; page 236, lines 5-12);

- Money that was loaned was deducted from the $16.2 million gap even though the note payable was an asset (Transcript of May 25, 2018 Hearing, page 23, lines 10-13).

At the conclusion of the May 2018 hearing, this Court concluded: "I think that Ms. Eckstein's analysis was thoroughly discredited in cross." (Transcript of May 25, 2018 Hearing, page 2019, lines 9-10). This Court also concluded: "So not only did McCallan fail to debunk the Carroll analysis, the Carroll analysis I think is brilliant. It stood up to everything, in my view, and it's the Eckstein analysis that's failed." (Transcript of May 25, 2018 Hearing, page 2019, lines 10-13).

In addition to thoroughly discrediting Ms. Eckstein's analysis, the Trustee elicited additional admissions from McCallan that strongly evidenced that he was secreting money and assets. For example, McCallan testified that he had given Mr. Bobby San Filippo over $1.3 million, that Mr. San Filippo had only paid him back a total of $16,000, and, despite that, McCallan was doing consulting work for Mr. San Filippo's Island Vibes Tours business in Turks and Caicos and Jeannie McCallan had dinner with Mr. San Filippo in the summer of 2018. (Transcript of May 25, 2018 Hearing, page 164, lines 11-13; page 165, lines 7-9, 16-22; Transcript of November 8, 2018 Hearing, page 54, lines 18-25; page 55, lines 1-4). McCallan also admitted that Mr. San

Filippo's Island Vibes Tours wrote checks to Jeannie McCallan, but testified "I don't know why." (Transcript of May 25, 2018 Hearing, page 165, line 25; page 166, lines 1-19). McCallan professed not to have the passwords to encrypted "BS spreadsheets" believed to be related to Bobby San Filippo transactions (TX600), but jailhouse recordings made clear that McCallan knew exactly what the password was. (TX601A, TX601B, TX601C, and TX601D). For example:

| | |
|---|---|
| Tim McCallan: | The only other outstanding thing is umm that BS Excel spreadsheet, and think what that stands for. |
| Bob McCallan: | Do what?  Which Excel spreadsheet are you talking about? |
| Tim McCallan: | Jeannie knows the guy…friends. |
| Jeannie McCallan: | Oh. |
| Tim McCallan: | Old friend. |
| Jeannie McCallan: | The old (*inaudible*). |
| Tim McCallan: | Yeah, yeah. |
| Bob McCallan: | Okay. Alright, very good. |
| Tim McCallan: | Um…Those are… |
| Jeannie McCallan: | Are they? |
| Tim McCallan: | Please don't…Just let me… |
| Bob McCallan: | Yeah, okay, we got it, we got it.  What else do we got? |
| Tim McCallan: | Umm…Those are…remember the words for that? |
| Bob McCallan: | Remember the words? |
| Tim McCallan: | We had…uh…the old dog.  The first dog…Susie's. |
| Jeannie: | Oh, okay. |

Bob McCallan: Okay, we got it.

The password to the "Bobby San Filippo Excel Spreadsheets" did, indeed, turn out to be the name of Mr. McCallan's sister Susie's dog, which he disclosed at the November 2018 hearing after being confronted with this and other similar recordings. (Transcript of November 8, 2018 Hearing, page 115, lines 18-24). Evidence also later revealed that in August 2016, McCallan sent an email to Mr. San Filippo with the subject line "Pass" and with the following in the body of the email:

)ytp" JB l b#h$CA& )gPqwQK(f

(TX636). When asked what was so important that it had a password with this many characters in it, McCallan testified that "partially that was a joke" and "it was access to some of the marketing material that I was doing for them on their website." (Transcript of November 8, 2018 Hearing, page 122, lines 12-17).

By way of other examples, McCallan also admitted that there was a second safe in his New York house that he had not previously disclosed to the Trustee, that he stored cash and/or coins under the stairs in his New York home, on a top sill in the wine cellar of his Florida home, and elsewhere in Florida. (Transcript of May 25, 2018 Hearing, page 170, lines 6-9, 21-25; page 171, lines 1-2; page 177, lines 13-17; page 178, lines 24-25; page 179, line 1).

### K. There Is Substantial Evidence Of Offshore Activity By and Through McCallan's Closely Held Corporations

At the November 8, 2018 hearing, the Trustee introduced numerous documents evidencing offshore banking and business activity by and through McCallan's closely held companies. For example, the evidence demonstrated that McCallan's companies were making substantial progress on business arrangements with Allied Bank of Ireland and Visa/Cal out of Israel: "On the offshore front I am attempting to finish up your deal with both Ireland and V/Cal." (TX615). McCallan's

passport evidences a trip to Dublin, Ireland in July 2012. (Transcript of November 8, 2018 Hearing, page 135, lines 18-20). McCallan professed to have no knowledge whatsoever about these banks:

> Q: And so you're telling us that you're getting all these emails to and from people talking about Allied Bank of Ireland and Visa/Cal Bank in Israel, and you're saying under oath you don't have any idea what these banks are?
>
> A: Absolutely, yes, that's what I'm saying.

(Transcript of November 8, 2018 Hearing, page 136, lines 1-5).

There is also evidence that McCallan had offshore interests in the Caribbean. McCallan accepted an appointment as an officer in the Internet Millionaire Next Door, Ltd., a Nevis Corporation (TX618), and his email correspondence made clear he had an account in Nevis: "I just got the go-ahead on Tim's account so let's move forward with getting his Nevis Corp set up." (TX616). McCallan admitted that the Internet Millionaire Next Door, Ltd. was an offshore corporation. (Transcript of November 8, 2018 Hearing, page 137, lines 22-25; page 138, lines1-5). Notably, McCallan did not initially[16] deny that he had an account in Nevis:

> Q: [I]s it your sworn testimony that you went through all this and you never set up a bank account in Nevis?
>
> A: If I could get access to my computer, I could find out. If I could get access to contacting [sic], looking around, I would be able to find out.

(Transcript of November 8, 2018 Hearing, page 139, lines 4-8).

**L. McCallan Produces Approximately 6.4 Million More Pages Of Documents Despite Having Repeatedly Told The Court Since 2011 That He Has Produced Everything**

---

[16] McCallan later denied having any offshore bank accounts. (Transcript of November 8, 2018 Hearing, page 149, lines 15-18).

As described in detail above, since the first days of this litigation, McCallan has, directly and through his attorneys, professed to have provided all relevant documents in response to the Trustee's discovery requests and then, only when confronted with proof he has not, provided more. This pattern has repeated itself once again.

On April 11, 2018, McCallan certified in a notarized pleading filed with this Court: "I certify that the information provided is all of the information I have." (11-3007, Doc. No. 699). At the May 25, 2018 hearing, McCallan testified to the same thing:

> Q:      To your knowledge, has every document that you have in your care, custody, and control been produced?
>
> A:      Every one, yes.

(Transcript of May 25, 2018 Hearing, page 183, lines 23-25).

Echoing McCallan's testimony, his counsel told the Court that "we are going to be 100 percent helpful" (Transcript of May 25, 2018 Hearing, page 199, lines 23-24), and went on to argue:

> He's given everything in his care, custody, and control and like the last time – and I'm sorry, your Honor, one last point, there wasn't a single document that came out here in these two days, not a single document that hasn't been provided. If he's supposed to purge by answering the rogs and answering the interrogatories and doing the schedules, Your Honor, there's not a single thing that came out when we were asking what's missing, nothing.

(Transcript of May 25, 2018 Hearing, page 209, lines 19-25; page 210, line 1).[17]

---

[17] In the same argument, McCallan's counsel argued: "You're going to get assumption. You're going to get innuendo. You're going to get flat-out lies about what something means on a document from the plaintiff's side because it's a single piece of paper with no ability to go look at back-up. And that's what we got today." (Transcript of May 25, 2018 Hearing, page 205, lines 22-25; page 2016, line 1). On May 29, 2018, this Court entered an order warning McCallan and his counsel that this type of baseless accusation will not be tolerated:

> During closing arguments, McCallan's counsel Scott Widerman accused the Trustee and her lawyers of lying and further complained they had not come to speak to McCallan. The Court notes that Widerman did not produce one shred of evidence that Trustee Carly Wilkins or her lawyers, Steve

55

Then, on September 13, 2018, Defendant filed yet another Motion To Determine Compliance, asserting that he had purged himself of contempt and again requesting his release. (11-3007, Doc. No. 765). The Court set a hearing on this motion for November 8, 2018. (11-3007, Doc. No. 768). Two months later, on November 1, 2018, McCallan filed a Motion To Continue, asserting that he had "voluminous" "newly discovered corporate accounting records" that are "critical to both McCallan's contempt issues in this Adversary Proceeding and the Objection to Exemption Contested Matter in McCallan's Chapter 7 proceeding." (11-3007, Doc. No. 773). McCallan's Motion to Continue was denied. (11-3007, Doc. No. 777).

At the November 8, 2018 Hearing, McCallan's counsel asked to address the Motion To Continue, asserting: "There was data that was held by the trustee that they sent back to us, and we were able – there was a company that had a backup and some different – and I'm not the best with computers, but they were able to unlock some of the things." (Transcript of November 8, 2018 Hearing, page 5, lines 16-20). McCallan's counsel went on to claim:

> There's a group called CIN [CNI], Creative Networks Innovations. And they held the backup, and they were able to piece together this program called MAS 200. It's an accounting similar to Peachtree or some of these accounting. And they were able to piece together from what we got from the trustee, you know, they had these servers. And we got – they mailed them back when I asked for them. And so they're digging through mountains of raw data.

(Transcript of November 8, 2018 Hearing, page 6, lines 19-25; page 7, line 1). McCallan's counsel argued to the Court that "[t]hose other documents were always on that thing – on the servers that

---

Olen and Lucy Tufts, lied to the Court. While Widerman and co-counsel Fritz's representation of McCallan has been diligent and zealous, without otherwise stepping over the lines of the rules of ethics, the Court would caution Widerman that he did step over the line when he made that allegation during closing.

(11-3007, Doc. No. 709).

56

the trustee had." (Transcript of the November 8, 2018 Hearing, page 9, lines 14-16). Notably, at the May 2018 hearing, Ms. Eckstein made the same allegation: "If we actually got the servers that you guys have. You then – we could pull it out and it would specifically show us which tax payments were paid for him [Tim McCallan] directly." (Transcript of the May 24, 2018 Hearing, page 155, lines 9-11).

On January 4, 2019, McCallan filed yet another Motion To Determine Compliance, again asserting he had purged himself of contempt and seeking immediate release. (11-3007, Doc. No. 787). In that motion, McCallan asserted that his team was able "to review every posted transaction from the McCallan controlled companies and his personal check register." (11-3007, Doc. No. 787, ¶ 13). McCallan also asserted that "[a]ll of the information used in the MAS 200 was in the possession of the Trustee or CNI. The information was not in the care, custody or control of McCallan until they responded to the subpoena. The Trustee was aware that CNI had previously held such data. McCallan never hid that fact." (11-3007, Doc. No. 787, ¶ 14). In his opening statement at the May 6, 2019 Hearing, McCallan's counsel made a similar assertion: "And so the McCallan team went in to find this MAS 200. We got the servers that the trustee was holding. We took those servers to CNI and, through the subpoena through CNI, we were able to open this." (Transcript of May 6, 2019 Hearing, page 12, lines 24-25; page 13, lines 1-2).

The evidence did not support these assertions. On June 24, 2013, McCallan's former attorney Meredith Lees wrote a letter to the Trustee's counsel related to cloning the servers located at CNI in Florida. (TX653). NY-MAS was one of the servers listed in Ms. Lees's letter as being at CNI in June 2013. (TX653). Mr. Jeff Middleton, the Trustee's IT expert, testified at the May 7, 2019 hearing that he cloned every server made available to him at both racks at CNI while he

Case 11-03007   Doc 806   Filed 06/07/19   Entered 06/07/19 10:26:17   Desc Main
Document      Page 57 of 89

was there in July 2013, and that he did so by starting at the top of the rack and working his way down. (Transcript of May 7, 2019 Hearing, page 31, lines 14-25). He also testified that he cloned both physical and virtual servers that were identified by Synthis employee Pedro Castro[18] as belonging to McCallan. (Transcript of May 7, 2019 Hearing, page 32, lines 1-25; page 33, lines 3-6). Mr. Middleton testified that later he identified the servers that he cloned by returning to his office, opening the hard drive on which the cloned servers had been placed, and reviewing a list of folders that populated with the names of each of those servers. (Transcript of the May 7, 2019 Hearing, page 33, lines 7-17). After McCallan produced the CNI data again in December 2018, Mr. Middleton compared what he cloned in July 2013 with Defendant's December 2018 production. (Transcript of May 7, 2019 Hearing, page 35, lines 12-19). Mr. Middleton discovered that three servers were included in the December 2018 production that were not made available to him to clone in July 2013. (TX646). One of these servers was identified as "NY-MAS." (TX646). Mr. Middleton testified that the Trustee never was in possession of the NY-MAS server before December 2018. (Transcript of May 7, 2019 Hearing, page 38, lines 7-10).

McCallan's own exhibit list described all the following documents as having been exported from the MAS 200 program: the detailed general ledger, income statement, sales reports, check history, and balance sheets for Allegro Law, LLC, Seton Corp., Americorp, Inc., and The Achievable, Inc. (11-3007, Doc. No. 792). Notably, this information would have also been responsive to the discovery requests the Trustee propounded in the underlying litigation. (PX8, PX9, PX27, and PX33).

---

[18] Synthis is Vanessa Vinicombe's company that began its operations in Florida the day after Americorp shut its operations down. (Transcript of the May 7, 2019 Hearing, page 32, lines 7-10). Vanessa Vinicombe is the former CFO of Americorp.

Following the presentation of this testimony and evidence, McCallan's counsel admitted in closing arguments that the Trustee never was in possession of MAS-200: "I don't want the Court to think that the trustee was holding anything. They were not." (<u>Transcript of May 9, 2019 Closing Arguments</u>, page 7, lines 18-20).

## IV.    <u>McCallan's Failure To Purge Himself Of Contempt</u>

As this Court previously held, "[g]iven the size of this Court's record, the voluminous documentary evidence submitted, and the nature of the production made to date, determining what is in dispute is a daunting task." (11-3007, Doc. No. 629). However, this Court believes the best approach is to explain at a high level the assets for which McCallan has failed to account, followed by specific examples of the great lengths to which McCallan has gone to hide those assets.

At the January 3, 2017 Meeting of Creditors that took place in Florida, McCallan falsely testified that he never received any money from the Allegro scam:

| | |
|---|---|
| Mr. Bomkamp[19]: | So, you know, the [Alabama Bankruptcy Court's] opinion more or less paints you as the person who – who took that hundred million dollars. Would you agree that that's how the opinion paints you? |
| McCallan: | That's how it's written. |
| Mr. Bomkamp: | And can you account for that money? Do you know where that money is? |
| McCallan: | I never received the money. |

(TX 3, page 28, lines 16-24).

At the January 30, 2018 hearing, the Trustee offered the testimony of Allen Carroll, the expert in financial forensics who had testified twice before. Mr. Carroll prepared a schedule of

---

[19] Scott Bomkamp is an attorney for the Region 21 U.S. Trustee Program of the Department of Justice.

Case 11-03007    Doc 806    Filed 06/07/19    Entered 06/07/19 10:26:17    Desc Main
Document      Page 59 of 89

the McCallans' net cash and property between 2007 and 2015, which was introduced into evidence

as Trustee's Exhibit 257.[20] The Court has attached TX 257 to this opinion as Exhibit A.

Explaining TX 257, Mr. Carroll testified as follows:

> Ms. Tufts: What does the new schedule in Trustee's Exhibit 257 tell us, generally, about Mr. McCallan's net cash coming in between 2007 and 2015?
>
> Mr. Carroll: Your Honor, the bottom line is that there's $16.2 million that remains unaccounted for after taking into consideration income taxes, an estimate for annual living expenses, and then purchases related to the big ticket purchases that we know of. And then, Your Honor, assuming that those amounts were invested each year and then grew at 5 percent annually, then the figure grows to $21.9 million unaccounted for.
>
> Ms. Tufts: When you say "unaccounted for," Mr. Carroll, what do you mean?
>
> Mr. Carroll: What I mean is, we have a sum of money that's being reflected as coming in to Mr. McCallan for which there's no definitive evidence as to ultimately what happened to it. And so, you know, we're – we haven't seen the documentation and the evidence that bridges the gap between what we have here at $16.2 million as being received and now what Mr. McCallan claims is zero. And simply, Your Honor, Mr. McCallan hasn't bridged that gap for us.

(Transcript of the January 30, 2018 Hearing, at page 16, lines 4-23). The vast majority of the

distributions to McCallan between 2007 and 2015 came from Seton Corp., one of the defendants

in this adversary proceeding that also is subject to a judgment in excess of $100 million for its part

in the Allegro scam. (TX 257, page 2; Doc. Nos. 361 and 362).

The fact that so much money is unaccounted for is of particular concern to the Court

because McCallan's lifestyle and recent spending habits are not commensurate with his claims of

poverty. According to the Trustee's forensic accountant: "[McCallan's] income and expenses far

---

[20] TX 257 was a more refined version of TX 117. TX 257 analyzed distributions (less income taxes, living expenses, and big purchases), while TX 117 analyzed net income less taxes only.

60

outpace those reflected on the bankruptcy schedules and been reported. And again, which means that there are either earnings that are not disclosed or there are assets – undisclosed assets which are being drawn upon to make up the difference." (Transcript of October 23, 2017 Hearing, page 36, lines 10-15).

As a first step toward purging himself of contempt, McCallan must fully account for the $16.2 million in distributions that he received between 2007 and 2015. McCallan has repeatedly and persistently failed to disclose assets and transfers of assets until after the Trustee has already discovered them. Even when confronted with evidence of a previously undisclosed asset or transfer, McCallan offers only enough information, if any, to acknowledge that he has been caught.

This Court returns to its phonebook analogy. Assume again that one has a paper telephone directory with 30,000 entries – i.e., 30,000 names with corresponding addresses and telephone numbers. Assume further that someone rips each of the hundreds of pages out of the phonebook individually. Assume further that only a few of those pages are thrown into a barrel, shaken up, and given to someone from out-of-town. The rest of the pages are hidden in a safety deposit box in an offshore bank. Throughout the post-judgment phase of this litigation, McCallan has only produced the few random pages of the phonebook he has seen fit to share. The rest of the pages that would provide a complete picture of his assets are nowhere to be found. Occasionally, when the Trustee uncovers a previously undisclosed fact, McCallan produces the portion of the missing page of the phonebook that reveals the existence of that fact, but nothing else.[21]

**A. McCallan's History Of Failing To Fully Disclose Metals Transactions Evidences Both His Refusal To Fully Answer The Trustee's Discovery And That He Continues To Secrete Assets**

---

[21] This Court has previously warned McCallan not to engage in this behavior: "[T]ell me not just what I already know, but tell me everything." (Transcript of October 6, 2016 Hearing, page 80, lines 6-7).

Although there are numerous examples of McCallan's conduct in this regard, the best illustration is the history of McCallan's failure to disclose purchases and transfers of coins and precious metals. Thus, the Court will undertake to follow the disclosures (or lack thereof) related only to that subject to demonstrate the egregious nature of McCallan's contempt and the urgent need for documentary evidence to account for the missing money.

In the Trustee's May 2016 post-judgment discovery requests, McCallan was asked whether he had transferred or disposed of any real or personal property in the past 10 years, which covered a period back to 2006. (TX 50, Interrogatory No. 12). In McCallan's sworn responses on September 29, 2016, he did not disclose any purchases, sales, or transfers of coins or precious metals. (TX 50).

During the October 6, 2016 hearing, despite no previous disclosure from McCallan of any purchases of coins or precious metals at any point in the past, the Trustee made known to McCallan that she knew that such transactions had occurred[22]:

> Mr. Olen:    You don't disclose anywhere in your discovery responses that you bought any gold or silver or disposed of any gold or silver in the last five years, did you?
>
> McCallan:    I – it's an oversight.

(Transcript of October 6, 2016 Hearing, page 39, lines 18-21).

> Mr. Olen:    So what you're telling us is the most reliable way for everybody to know just what you bought in the way of gold and silver coins and just what you bought in the way of gold and silver where there's bars or whatever would be to have the records, right?
>
> McCallan:    Yes.

---

[22] The Trustee discovered some of these transactions in the workpapers produced by McCallan's accountants in response to a non-party subpoena. (Transcript of October 6, 2016 Hearing, page 38, lines 4-8).

| Mr. Olen: | The very records that as you sit here today showing the Judge why you shouldn't be held in contempt you haven't produced, not one record about any gold and silver coins or bars or anything, right? |
|---|---|
| McCallan: | I thought that that would be in my accounting records. |

(Transcript of October 6, 2016 Hearing, page 39, line 25 through page 40, line 10).

McCallan also testified that the $1.1 million he admitted to receiving from the sale of coins and precious metals was spent on living expenses:

| Mr. Olen: | Mr. McCallan, where is the $1.1 million or so that you received from selling these gold and silver coins?  Where is the money? |
|---|---|
| McCallan: | The monies were put into my bank accounts and it was used. |
| … | |
| Mr. Olen: | Well, tell me about – what you know about where [the $1.1 million] went. |
| McCallan: | It was used for living expenses because all my companies were defunct completely. |

(Transcript of October 6, 2016 Hearing, page 35, lines 14-17; page 37, lines 17-20).  As later evidence demonstrated, McCallan's testimony about this portion of the proceeds from the sale of coins and precious metals was false.  He did not spend it all on living expenses.

Shortly after the October 6, 2016 hearing, and after the Trustee revealed she had learned of the coins and precious metals transactions through other means, McCallan produced a set of invoices that evidenced sales of gold and silver coins and other precious metals between 2007 and 2014.[23]  McCallan had not previously produced these invoices.  As is shown later in this chronology, these invoices did not reflect all of McCallan's coins and precious metals transactions.

---

[23] Although most of these invoices are not in the record, Allen Carroll testified at the March 27, 2017 hearing that he relied upon those invoices, together with information obtained from McCallan's accountants, to develop a schedule of McCallan's gold and silver transactions from 2007 through 2014.  (Transcript of March 27, 2017 Hearing, page 9, line 18 through page 12, line 17).  The record does not disclose precisely when those invoices were produced, but given Mr. Carroll's reliance on them, the Court can deduce that they were produced at some point between October

63

On October 10, 2016, the Trustee filed her second and third post-judgment discovery

requests to McCallan.[24]  Responses to these requests for production, which would have required

---

6, 2016 and March 27, 2017.  The Trustee represents in her proposed findings of fact and conclusions of law that the invoices were produced by McCallan on October 20, 2016.

[24]  These discovery requests included all of the following:

13.     Any and all documents and records which evidence, reflect, refer or relate to any income, payment, compensation, fees, revenues, money or debt paid to you, or owed to you, by any person, partnership corporation, business, fund, trust or entity at any time from January 1, 2006 through the present.

18.     Any and all documents and records which evidence, reflect, refer or relate to any checks written to you or written for your benefit at any time from January 1, 2006 through the present.

20.     Any and all documents and records which evidence, reflect, refer or relate to any wire or electronic transfers made to you or made for your benefit at any time from January 1, 2006 through the present.

(TX 59).

5.      Any and all documents and records which evidence, reflect, refer or relate to any checks written to you or written for your benefit by or on behalf of any of the following at any time from January 1, 2006 through the present [individuals and entities listed].

6.      Any and all documents and records which evidence, reflect, refer or relate to any wire or electronic transfers made to you or made for your benefit by or on behalf of any of the following at any time from January 1, 2006 through the present [individual and entities listed].

(TX 60).

15.     Any and all documents and records which evidence, reflect, refer or relate to any distributions, assignments, sales, changes in ownership or transfers by you, or on your behalf, of any interest of any kind in any real property, personal property, lease, leasehold, investment, fund, trust, intellectual property or assets, intangible property or assets or any other property or assets of any kind to any person, corporation, business or entity at any time from January 1, 2006 through the present.

16.     Any and all documents and records which evidence, reflect, refer or relate to any payments, compensation, fees or money paid by you, or transferred by you, to any person, corporation, business or entity at any time from January 1, 2006 through the present.

17.     Any and all checks written by you or written on your behalf at any time from January 1, 2006 through the present.

19.     Any and all documents and records which evidence, reflect, refer or relate to any wire or electronic transfers made by you or made on your behalf at any time from January 1, 2006 through the present.

(TX 59).

1.      Any and all documents and records which evidence, reflect, refer or relate to any distributions, assignments, sales, changes in ownership or transfers by you, or on your behalf, of any interest of any kind in any real property, personal property, lease, leasehold, investment, fund, trust, intellectual property or

64

extensive disclosure about coin and precious metal purchases, sales, and transfers, were due on November 10, 2016. McCallan did not file any responses to the Second Post Judgment Request for Production until September 2017. (TX 59) McCallan did not file any responses to the Third Post Judgment Request for Production until October 2017. (TX 60).

McCallan did not disclose any coin or precious metals sales or transfers on his December 9, 2016 Statement of Financial Affairs, which was filed in his Florida bankruptcy and would have been reviewed by a new trustee and a new judge who would not have been familiar with his long history of dealings in coins and precious metals. (TX 3). McCallan also did not disclose any transfers involving coins or precious metals to or from his brother Peter McCallan. (TX 3). McCallan testified under oath at the January 3, 2017 Florida Meeting of Creditors that he had disclosed all of his property on his bankruptcy schedules, that he had reviewed the petition before he filed it, and that there were no changes he wanted to make. (TX 3, page 6, lines 9-25). McCallan also testified that he had not sold or transferred any property in the last two years (other than what was listed on his Chapter 7 Petition). (TX 3, page 7, lines 6-16).

McCallan further testified under oath at the January 31, 2017 Meeting of Creditors as follows:

---

assets or any other property or assets of any kind to any of the following at any time from January 1, 2006 through the present [individuals and entities listed].

2. Any and all documents and records which evidence, reflect, refer or relate to any payments, compensation, fees or money paid by you, or transferred by you, to any of the following at any time from January 1, 2006 through the present [individual and entities listed].

4. Any and all documents and records which evidence, reflect, refer or relate to any wire or electronic transfers made by you or made on your behalf to any of the following at any time from January 1, 2006 through the present [individuals and entities listed].

(TX 60).

| Ms. Tufts: | Other than what's listed on Exhibit 1 [Statement of Financial Affairs], is there any money, personal property, real property anywhere in the world which you got or could have gotten money to pay for any expense of yours in 2014, 2015, or 2016? |
| --- | --- |
| McCallan: | That I don't have listed? |
| Ms. Tufts: | Right. |
| McCallan: | No. |

(TX 9, page 45, lines 18-25).

| Ms. Tufts: | Does anyone in the world have money or assets that belong to you but that is under their possession or control other than what you disclosed in your bankruptcy forms and schedules? |
| --- | --- |
| McCallan: | One of my WaveRunners that was being fixed by a guy is at his house, but I think I put that address. It's worth less than a thousand dollars. |
| … | |
| Ms. Tufts: | Okay. Does anyone in the world, other than what you just said, have money or assets that belong to you but is currently under their possession and control? |
| McCallan: | No. |

(TX 9, page 55, lines 3-9;17-21).

At the March 27, 2017 hearing on the Trustee's Motion To Transfer, Allen Carroll testified that based on his review of *the documents that had been produced*, McCallan had at least "201 one-ounce silver CMLs," "2,700 Silver Eagle coins," "1,002 one-ounce silver no names," "eight gold American Buffalo coins," and "two 32.15 ounce Johnson Matthey gold bars" for which he had failed to account. (Transcript of March 27, 2017 Hearing, page 13, line 18 through page 14, line 2. See also TX19). Of course, to the extent that McCallan has purchased additional coins or precious metals, but has failed to produce the invoices for those purchases, neither this Court nor

66

the Trustee would know the full extent of the amount of gold and silver coins and other precious metals for which McCallan has failed to account.  (Transcript of March 27, 2017 Hearing, page 13, lines 10-14).  This concern was borne out by the evidence.

At the March 27, 2017 hearing, the Trustee elicited testimony from Mr. Carroll regarding a coin sale that was neither listed on McCallan's tax returns nor disclosed in any discovery responses to date.  McCallan's June 2015 Wells Fargo bank account statement evidenced a deposit from Southland Coins for $23,854.38.  (Transcript of March 27, 2017 Hearing, page 17, lines 5-19).   Mr. Carroll testified that McCallan had not reported the income from this sale on his 2015 tax return.  (Transcript of March 27, 2017 Hearing, page 17, lines 12-22).  McCallan withdrew $13,000 of the proceeds from that coin sale from the bank the same day he deposited it. (Transcript of March 27, 2017 Hearing, page 18, lines 6-10).   On June 12, 2015, in a series of transactions, McCallan transferred the majority of the remaining of proceeds from this coin sale to a joint account that he shared with his wife.  (Transcript of March 27, 2017 Hearing, page 18, lines 11-13).  McCallan then attributed those same amounts on his personal income records to business income from companies called Alpha Mar and Vortex Debt Group, concealing the true source of the money.  (TX 18).  Mr. Carroll testified that the following graphic (displayed for the Court during the hearing) accurately showed a side-by-side comparison of the money reflected in McCallan's 2015 bank statements as proceeds from the sale of gold and silver coins, compared to what McCallan had recorded as "business income" in his accounting records.

Case 11-03007   Doc 806   Filed 06/07/19   Entered 06/07/19 10:26:17   Desc Main
Document      Page 67 of 89



On May 12, 2017, the Trustee issued a non-party subpoena to Peter McCallan, Tim McCallan's brother, which asked Peter McCallan to produce the following, among other things:

> Any and all documents and records which reflect, evidence, refer, or relate to any …transfers by Timothy McCallan or on his behalf of any interest of any kind in any real property, personal property, lease, leasehold, investment fund, trust, intellectual property, or assets in tangible property or assets or any other property or assets of any kind to you or for your benefit at any time from January 1, 2006 through the present.

(TX 219).  The non-party subpoena also sought documents specifically related to transfers, checks, and wires to Sigmed or "any other business partnership, corporation, joint venture, trust, investment fund, or entity of any kind which you [Peter McCallan] have owned or which you have owned any interest of any kind."  (TX 219).   Peter McCallan's response, which included a photograph of a spreadsheet detailing the breakdown of the $74,000 from Cloud Medical Imaging

to Sigmed, was identical to a spreadsheet that the Trustee obtained from Tim McCallan's computer. (TX 213 and TX 220).[25] Peter McCallan did not disclose any transfer of coins or precious metals from his brother Tim McCallan.

On August 8, 2017, McCallan filed supplemental responses to Plaintiff's First Post-Judgment Interrogatories. (TX 52). In response to Interrogatory No. 12, which requested information on the transfer or disposal of any real or personal property in the past 10 years, McCallan added: "Various coins over the last 10 years. I have [sic] and sold silver coins. I do not have records that show all the coins that I have sold." (TX 52). McCallan did not list any transfers to or from his brother Peter McCallan. (TX 52).

On September 22, 2017, McCallan filed his second supplemental responses to Plaintiff's First Post-Judgment Interrogatories. (TX 53). In response to Interrogatory No. 12, McCallan answered that there had been "[t]he sale of various coins" to an "unrelated party" for "unknown" consideration. (TX 53).

McCallan did not produce an accounting for any coins or precious metals sales until October 16, 2017 – one week before the October 23, 2017 contempt hearing. (TX 160). The accounting that McCallan finally produced was both inaccurate and incomplete. McCallan was incarcerated following the October 23, 2017 contempt hearing. (Doc. No. 583). On November 28, 2017, McCallan produced a second accounting of coin and metal sales. (TX 221). Neither "accounting" indicated when or where any of the coins and precious metals were purchased. (TX 160 and TX 221). The second accounting included McCallan's sale of $23,854.38 worth of coins

---

[25] At a later hearing, when asked whether he took a picture of the spreadsheet and sent it to his brother, Timothy McCallan only stated: "I don't recall if I did." (Transcript of January 30, 2018 Hearing, page 69, lines 1-5).

to Southland Coins in June 2015 that had previously been falsely categorized as business income.

(TX 221). McCallan then falsely testified that the second accounting was complete and accurate:

| | |
|---|---|
| Mr. Olen: | All right. Look at the accounting… You see "Lou Maddaloni Jewelers"? |
| McCallan: | Yeah. |
| Mr. Olen: | Do you see Coin Galleries of Oyster Bay? |
| McCallan: | Yes. |
| Mr. Olen: | Bullion Trading? |
| McCallan: | Yes. |
| Mr. Olen: | And Southland Coins? You see that? |
| McCallan: | Yeah. |
| Mr. Olen: | All right. So it was a complete listing of all the sales to all the coin dealers, correct? |
| McCallan: | At that – it looks like this was the complete list at the time. |

(Transcript of January 30, 2018 Hearing, page 81, lines 15, 20-25; page 82, lines 1-6). Again, McCallan's testimony was false.

Back on April 29, 2014, McCallan had invested $111,600 in an Interactive Brokers account in his brother Peter McCallan's name. (TX 223). Confronted with evidence that the source of $73,575.20 of this initial investment was a check written by Central Florida Coin and Bullion to his brother Peter McCallan, Tim McCallan admitted for the first time that he had given coins to his brother Peter to sell on his behalf.[26] (Transcript of January 30, 2018 Hearing, page 86, lines

---

[26] This check was finally produced only when McCallan was incarcerated and someone else was in charge of the production on his behalf.

19-25). McCallan gave no explanation as to why he structured the transaction with his brother the way he did:

> Mr. Olen: Why didn't you simply take the $73,000 worth of coins to a coin dealer in your geographic area in the state of New York and sell the coins and get a check yourself and then send Peter a check or wire?
>
> McCallan: I don't know.

(Transcript of the January 30, 2018 Hearing, page 101, lines 22-25; page 102, line 1). Nor could McCallan remember a single other detail of how, when, or why these coins came into his brother Peter McCallan's possession:

> Mr. Olen: When did you give these coins to your brother, Peter McCallan?
>
> McCallan: I don't know when I gave them.
>
> Mr. Olen: What about the year in which you gave them to your brother, Peter McCallan?
>
> McCallan: I don't know.
>
> Mr. Olen: How did you physically deliver the coins to your brother, Peter McCallan?
>
> McCallan: I don't know.
>
> Mr. Olen: And which types of coins did you deliver to your brother, Peter McCallan?
>
> McCallan: I don't know exactly the type or style of them.
>
> Mr. Olen: How long before the coins were sold by your brother, Peter McCallan, how long before that was it you delivered these coins to him?
>
> McCallan: I don't know.
>
> …
>
> Mr. Olen: Is it your goal to purge yourself of contempt?

71

| | |
|---|---|
| McCallan: | Yes. |
| Mr. Olen: | All right. With that goal in mind, tell us where you bought the coins that you gave to your brother Peter to sell for you. |
| McCallan: | I don't know. |
| Mr. Olen: | Tell us how much you paid for the coins that you gave to your brother Peter to sell for you. |
| McCallan: | I don't know. |
| Mr. Olen: | Certainly when you bought the coins you had records of where you bought them from correct? |
| McCallan: | No. I don't have any records that were in my control. |
| Mr. Olen: | When you bought the coins, did you at that point have records of buying the coins? |
| McCallan: | I don't know. |
| … | |
| Mr. Olen: | So are you saying that it was your practice to buy coins and not keep any record of where you bought them from? |
| McCallan: | No. |

(Transcript of January 30, 2018 Hearing, page 87, lines 6-21; page 90, lines 18-25; page 91, lines 1-7; page 92, lines 21-23). Given yet another opportunity to explain the transfer of coins to his brother Peter, McCallan refused to do so:

| | |
|---|---|
| Mr. Olen: | Why didn't you take the coins to – the coins and metals to a dealer in your area in New York, or anywhere in New York, and have them wire the sale proceeds or write a check for the sale proceeds payable to your brother, Peter McCallan? |
| McCallan: | I don't recall. |

72

| Mr. Olen: | The truth is you put these coins in the possession of your brother, Peter McCallan, for him to sell because you wanted to hide the transaction. Now, that's the real truth of it, isn't it? |
|---|---|
| McCallan: | No, it's not the truth. |
| Mr. Olen: | Then give me **any credible explanation** of why you structured the transaction that way, **any credible explanation**. |
| McCallan: | As I had said many times in this transaction, I didn't recall. |
| Mr. Olen: | Since you don't recall, it could be that it was that you were doing it to hide the transaction? |
| McCallan: | And it could be that I wasn't. |

(Transcript of January 30, 2018 Hearing, page 105, lines 23-25; page 106, lines1-14 (emphasis added)).

Indeed, McCallan failed to disclose this transfer of more than $73,000 worth of coins to his brother Peter at any point prior to the January 30, 2018 hearing despite the following myriad of opportunities:

- September 23, 2016 Responses to Plaintiff's First Post-Judgment Interrogatories (TX 49);
- September 29, 2016 Responses to Plaintiff's First Post-Judgment Interrogatories (TX 50);
- October 6, 2016 Testimony at the Show Cause Hearing;
- October 20, 2016 Production of Invoices Reflecting Coin and Metals Sales (TX 19);
- October 19, 2016 Amended Responses to Plaintiff's First Post-Judgment Interrogatories (TX 51);
- December 9, 2016 Statement of Financial Affairs (TX 3);
- Testimony at the January 3, 2017 Meeting of Creditors (TX 8);
- Testimony at the January 31, 2017 Meeting of Creditors (TX 9);
- Testimony at the May 15, 2017 Meeting of Creditors (TX 68);
- August 8, 2017 Supplemental Responses to Plaintiff's First Post-Judgment Interrogatories (TX 52);
- September 22, 2017 Second Supplemental Responses to Plaintiff's First Post-Judgment Interrogatories (TX 53);
- October 16, 2017 Response to Plaintiff's Second Post-Judgment Request for Production;

73

- October 16, 2017 Response to Plaintiff's Third Post-Judgment Request for Production;
- October 16, 2017 Summary of Precious Metals Sales (TX 160);
- Testimony at the October 23, 2017 Contempt Hearing; and
- November 28, 2017 Amended Summary of Precious Metals Sales (TX 221).

With respect to the remainder of the $306,000 that McCallan had transferred to his brother Peter – none of which was disclosed until after McCallan was incarcerated – McCallan testified that he transferred it in cash:

Mr. Olen:    [T]ell us how you transferred any of the $306,000 that your brother, Peter, invested on your behalf in the Interactive Brokers account?

McCallan:    I transferred cash that I had on hand.

Mr. Olen:    Cash how? How did you get it to Peter, by check, by wire, by bills?

McCallan:    By actual physical cash.

(Transcript of January 30, 2018 Hearing, page 110, lines 19-25; page 111, line 1). McCallan testified that he put the cash bills – in denominations of hundreds and fifties – in a knapsack and flew it from New York to Florida. (Transcript of January 30, 2018 Hearing, page 111, lines 5-6; page 113, lines 15-19). McCallan offered no explanation for his failure to disclose this information in his discovery responses:

Mr. Olen:    Why in the world didn't you tell us in the very first interrogatory answers that you transferred all of these cash bills to your brother, Peter, instead of telling me just now for the first time after you've been in jail all this time?

McCallan:    I made a mistake.

…

Mr. Olen:    Tell us why we are here today, on January 30, 2018, after you were first held in contempt on October 6, 2016, and today is the first time you've ever uttered a word to this Court about keeping large amounts of cash? What are you just now telling us about this today?

| | |
|---|---|
| McCallan: | I had always kept large amounts of cash. |
| Mr. Olen: | All the more reason why are you just now telling the Court about it today? |
| McCallan: | I don't have an answer. |

(Transcript of January 30, 2018 Hearing, page 116, lines 4-9; page 120, lines 1-9).

The evidence further demonstrated that McCallan has a lengthy history of attempting to hide coin and precious metals transactions. He deposited $739,467.87 in proceeds from coin sales into his daughter's account before transferring it in smaller increments into the joint account he shared with his wife. (TX 211). When asked about it, McCallan offered no explanation:

| | |
|---|---|
| Mr. Olen: | Why in the world did you put the $739,000 into the first bank account and then promptly start moving it to another bank account in smaller increments? Why the need to do that? |
| McCallan: | I don't know. |
| Mr. Olen: | Hide the money, right? It's to hide the transaction, isn't it? |
| McCallan: | No. |

(Transcript of January 30, 2018 Hearing, page 137, lines 13-20). Structuring the transaction this way and then producing only the bank statements makes it impossible to discover the original source of a deposit, as this graphic from the hearing shows:

75



(TX 211; TX 212). This graphic clearly illustrates why the bank records showing the immediately preceding transfer are utterly inadequate and why McCallan must produce original source documents (such as checks, wires, invoices, receipts, etc.) in order to purge himself of contempt.

There was additional evidence of McCallan hiding purchases, sales, and transfers of coins and precious metals. On May 21, 2012, McCallan transferred his 100% ownership in Hello Performance, Inc. to his wife Jeannie McCallan. (TX 236). Immediately following the transfer of ownership of Hello Performance to his wife Jeannie McCallan, McCallan sold one kilo of fine gold on May 25, 2012 and one kilo of fine gold on May 26, 2012 to Lou Maddaloni Jewelers in New York and deposited the proceeds of each sale into Hello Performance. (Transcript of January 30, 2018 Hearing, page 145, lines 11-14). McCallan realized a $10,000 gain on the sale of the gold, but did not disclose this gain on his tax returns. (TX19; TX107). McCallan testified that he deposited the $98,000 in proceeds from the sale of his coins into Hello Performance because the

company needed cash. (Transcript of the January 30, 2018 Hearing, page 152, lines 14-17). However, 6 days after the deposits were made the company transferred $19,000 to Wav Team, which was 100% owned by McCallan. (TX 274). Over the next few weeks, Hello Performance wired over $36,000 more back to McCallan. (TX 274; Transcript of January 30, 2018 Hearing, page 152, lines 22-25; page 153, lines 1-10).

Additionally, in May 2018, when confronted with information on a spreadsheet from his personal computer suggesting his brother Chris was holding coins for McCallan (TX321), McCallan testified as follows:

Q:    So some of these coins [listed on TX321] were in the possession of your brother, Chris McCallan, right?

A:    I don't know.

Q:    Your spreadsheet on your computer says you had put coins in the possession of your brother Chris McCallan, right? It's what it says.

A:    I don't know. I'm telling you, I don't know.
. . .
Q:    Did you give coins to your brother, Chris?

A:    I don't know.

Q:    So you may have?

A:    I don't think I did.
. . .
Q:    Have you ever given any coins or metals to anybody to keep for you other than your brother, Peter?

A:    No.

(Transcript of May 25, 2018 Hearing, page 178, lines 8-14; page 180, lines 19-22; page 181, lines 5-7).

This now familiar pattern continues. Once caught, McCallan included in his December 2018 production evidence of a $50,000 coin transaction with his brother Chris (TX701) and another $20,000 metals transaction with a vendor previously undisclosed to the Trustee – Erik's Jewelry in New York (TX702). Additionally, in the May 2018 hearing, McCallan admitted that his own accounting of gold and silver in his possession as of April 17, 2011 valued his collection at $2.4 million, far more than the $1.85 million his previous accounting had disclosed. (Transcript of May 25, 2018 Hearing, page 175, line 25; page 176, lines 1-3).

In summary, despite selling or transferring $1.1 million or more of coins or precious metals in the past decade, McCallan did not disclose a single coin or precious metal transaction until after the Trustee had information about some of these transactions in the accounting workpapers she obtained through a non-party subpoena. McCallan failed to list any coin or precious metal transaction on his original bankruptcy schedules. McCallan refused to identify a single specific coin or precious metal purchase, sale, or transfer in his responses to interrogatories. McCallan submitted two separate accountings of coins and precious metal transactions that were both incomplete and false. McCallan disguised coin and precious metal sales by running them through bank accounts in the names of his children. McCallan disguised coin and precious metal sales by miscategorizing the sale proceeds on his personal accounting records as business income. McCallan disguised coin and precious metal sales by transferring his ownership of an entire corporation to his wife, depositing the proceeds from the sales of those coins and precious metals in that corporation's bank account, and distributing the proceeds back to himself in smaller increments through transfers to other companies that he owns. Despite these sophisticated machinations, McCallan's memory regarding the coin and precious metal transactions about which

78

he has been asked has been virtually nonexistent – completely devoid of any useful details or salient facts.

This Court has used the coin and precious metals transfers as one example, but this Court also finds a pattern of similar abusive discovery tactics with respect to other topics including, but not limited to, McCallan's foreign bank accounts, transfers made to his wife, and purported "investments" McCallan has made in his brother Peter's company, Sigmed.

## B. The Trustee's Analysis Of The $16.2 Million In Money And Property That McCallan Has Put Outside The Reach Of The Trustee Continues To Be Confirmed By The Evidence

The other compelling evidence that McCallan has failed to purge himself of contempt by continuing to hide the location of money and assets is the strength of the Trustee's analysis of the $16.2 million gap in unaccounted for money and property contained within TX257. In its January 11, 2019 Order, this Court made two observations about the Trustee's analysis:

> In view of the undersigned, the $16.2 Million figure is probably a significant understatement for two reasons. First, the calculation takes into account only taxable income reported by McCallan to the Internal Revenue Service from 200[7] forward. Yet, the Court is aware that McCallan has significant business activities before that time which are not taken into account. Thus, the calculation assumes that McCallan had no business activity and that his net worth was zero prior to 200[7]. Second, the calculation takes into account only that income which was reported to the Internal Revenue Service. Yet, the Trustee has produced evidence that McCallan did not report income on his gold coin transactions to the Internal Revenue Service. From this, the Court infers that McCallan likely did not report any income which was not easily traceable to him.

(11-3007, Doc. No. 790).

The conservative nature of Mr. Carroll's $16.2 million analysis as well as McCallan's underreporting of income on his tax returns were both borne out by the evidence in the May 6-7, 2019 evidentiary hearing.

Case 11-03007   Doc 806   Filed 06/07/19   Entered 06/07/19 10:26:17   Desc Main
Document      Page 79 of 89

As part of McCallan's attempt to rebut and discredit the Trustee's analysis in TX257, McCallan introduced into evidence a large spreadsheet,[27] which he produced to the Trustee on March 12, 2019. (TX669).[28] Contained within TX669 was a Cash Deposit Analysis Spreadsheet put together by Ms. Eckstein, which contained information on McCallan's cash deposits into known bank accounts between 2007 and 2017. (TX669). To more easily compare the Cash Deposit Analysis to TX257, the Trustee reorganized this Cash Deposit Analysis and limited the information so that it only contained deposits into known bank accounts between 2007 and 2015. (TX671). The analysis in TX257 done in January 2018 concluded that McCallan would have about $22 million after taxes and before expenses.[29] (TX257). McCallan's own analysis demonstrated that he deposited more than $18 million into known bank accounts between 2007 and 2015. To this, the Trustee added $2 million in known bank account balances at the end of 2006 (TX675), $879,000 in tax refunds received in 2007 related to prior years' taxes (TX703), $780,000 in interest and dividend income (TX705), $3.8 million in distributions omitted from McCallan's tax returns (discussed below), and $480,000 in gains on metals (TX669), bringing the total of unaccounted for money in TX257 to $24.1 million.

From that total, living expenses and "big ticket" purchases must be deducted. The Trustee had been consistently using a $422,595 estimate for annual living expenses because this was the amount of McCallan's 2015 living expenses that was found on a spreadsheet on his home computer, projected backward each year from 2007 through 2014. (TX17). However, following

---

[27] This spreadsheet was 153 pages long, if printed on 11"x17" paper.

[28] This spreadsheet was first introduced by McCallan as Defense Exhibit A, which was later admitted as Defense Exhibit 1.

[29] Because some of the distributions on TX257 consisted of McCallan's companies making payments to third parties (including the IRS) on his behalf (meaning those distributions never went into a McCallan bank account), McCallan's cash deposits in TX671 were compared to estimated cash after taxes on TX257 for a proper apples-to-apples analysis.

the production of more detailed annual living expense data from the MAS-200 system, the Trustee credited McCallan with the difference between her original projection ($3.8 million in expenses) and that which the new evidence showed he had spent ($4.3 million + the payment of a $1.3 million FTC judgment for a total of $5.6 million). (TX665). Thus, expenses increased by about $1.8 million over and above what the Trustee originally concluded in TX257. When the additional $1.8 million in expenses not previously incorporated into TX257 are deducted from the $24.1 million total, the new unaccounted for cash and property is $22.3 million.[30] (Transcript of May 7, 2019 Hearing, page 145, lines 22-25; page 146, lines 1-25; page 147, lines 1-5).

Thus, on both the income and expense side of the equation, TX257 was broadly consistent with McCallan's analysis of cash deposited into his known bank accounts as well as the new evidence he produced about his living expenses. The deductions for "big ticket" items such as the Florida mortgage, 529 Plan contributions, and IRA contributions were also comparable. So, the question is: how did McCallan conclude that he spent $1.3 million more between 2007 and 2015 than he brought in during that period, while the Trustee concludes that there is a $22.3 million gap in unaccounted for cash and property?

A large part of the answer relates to the parties' disputes about millions of dollars McCallan withdrew in cash from his known bank accounts and incredibly large sums of money that flowed through and between McCallan's numerous companies.

---

[30] The Trustee was careful to note that, giving McCallan every benefit of the doubt, some portion of the distributions in TX257 are likely non-cash distributions, so the gap is something less than $22.3 million. (Transcript of the May 7, 2019 Hearing, page 147, lines 18-25). Also, the Trustee noted that – even giving McCallan full credit for the $6.296 million in annual living expenses he claims he identified, despite the flaws in McCallan's expense analysis, this figure would be approximately $21 million (Transcript of the May 7, 2019 Hearing, page 147, lines 6-17).

81

McCallan claims that $1.59 million in cash that he withdrew from known bank accounts between 2007 and 2015 should be considered by this Court as money "taken out, saved, invested, and then lost." (TX669 and TX672). However, nearly all the entries in the "cash used" column of TX672 describe metals purchases or so-called "investments" with Bobby San Filippo – these entries do not tell the Court the ultimate disposition of that cash and therefore are not properly deducted from the $22.3 million gap.

McCallan seeks a $2.8 million deduction for money he claims he put back into his companies directly from his known bank accounts. (TX669; TX674, Row 18). However, the Trustee's expert in forensic accounting tested multiple components of that figure and concluded that it was overstated by at least $1,150,000 – a 40% error. (Transcript of the May 7, 2019 Hearing, page 87, lines 20-23; page 89, lines 19-22).

McCallan seeks a $595,000 deduction for money he claims constituted distributions not taken as cash but instead that were paid directly to third parties on his behalf. (TX669; TX674, Row 17). However, the Trustee tested various components of the $595,000 figure and concluded that, for example, Americorp's payments of McCallan's personal bills between 2009 and 2011 (listed as distributions on the company's books) were not reflected on McCallan's K-1s as distributions and therefore were not included on TX257 in the first place. (TX676; TX677). The Trustee argued, and this Court accepts, that because TX257 was built on distributions and wages reported on McCallan's tax returns, McCallan cannot deduct from the $22.3 million gap distributions to or for his benefit paid directly by his companies to third parties if he did not also list them as distributions on his tax returns. To the extent that McCallan takes a position in these

proceedings that those sums are, in fact, distributions to him, then he has understated his reported income to the Internal Revenue Service.

McCallan also asserts that an additional $1.4 million should be deducted from TX257, but he describes it as "Additional Paid in Capital Unsure." (TX669; TX674, Row 20). McCallan has provided absolutely no support for the source or disposition of any of these transactions and therefore they are not properly deducted. (TX695).

McCallan seeks a $7.9 million deduction for "money moved from one company to another." (TX669; TX674, Row 19). McCallan asserts that, although this money is reflected as distributions to him on his K-1s, this $7.9 million constituted intercompany transfers that never hit a McCallan bank account and therefore should be deducted from the $22.3 million gap in TX257.

As a threshold matter, Mr. Carroll, the Trustee's expert in forensic accounting, characterized the money moving among and between McCallan's companies as "wild and unusual," and unlike anything Mr. Carroll had seen in his decades of accounting practice. (Transcript of May 7, 2019 Hearing, page 116, lines 12-19; page 137, lines 1-4). At the highest level, what the Trustee described was one McCallan company moving money to another McCallan company, and then, at the end of the year, the company would "adjust" these receivables to distributions to McCallan. The company receiving the money would then "adjust" its payable to record those monies received as if they were a personal capital contribution by McCallan when no real cash was contributed by him. (Transcript of May 7, 2019 Hearing, page 116, lines 20-25; page 117, lines 1-21). The Trustee's forensic accounting expert testified that it is not within generally accepted tax and accounting principles for a company to turn transactions among related entities into personal capital contributions of its shareholder. (Transcript of May 7, 2019 Hearing,

page 117, lines 22-25; page 118, lines 1-7).  In order for McCallan to appropriately treat something as a capital contribution, he had to actually make a personal contribution of cash or property. (Transcript of May 7, 2019 Hearing, page 117, lines 15-21).  If McCallan wants to take the position in these proceedings that this $7.9 million was merely money that went from one of his companies to another without ever hitting his personal bank accounts, then he had no right to treat it as a capital contribution for tax purposes by which he gained a substantial tax benefit.  (Transcript of May 7, 2019 Hearing, page 118, lines 12-21).

For example, in 2008, Seton Corporation's books reflected approximately $1.8 million due from Media Mogul, $920,000 due from Americorp, and $1.2 million due from Intermark.  (TX692, page 7; Transcript of May 7, 2019 Hearing, page 128, lines 20-25; page 129, lines 1-3).  In August 2009 – nine months after the end of the year – each of these receivables was "reclassified" as a distribution to Tim McCallan.  (TX692; Transcript of May 7, 2019 Hearing, page 129, lines 19-25; page 130, lines 1-4).  Seton's receivables in these same amounts were concomitantly reduced to zero and no significant advances to other companies are reported on Seton's tax returns.  (TX692, pages 9-10, 13; Transcript of May 7, 2019 Hearing, page 129, lines 14-17).  On the other side of the transaction, Media Mogul's 2008 K-1 data to McCallan shows an increase of $1.8 million in paid in capital (TX692, page 14); Americorp's 2008 K-1 data to McCallan shows an increase in paid in capital of $920,000 (TX692, page 15 and 17); and Intermark's tax returns show a repayment of loan from shareholder of $1.2 million.  (TX692, pages 18-22).  These transactions among related entities were turned into personal contributions of their sole shareholder – Tim McCallan.  There were numerous other examples of similar conduct:

- In 2010, Americorp's books reflected $3.5 million in distributions to McCallan, but there were no such distributions reflected on his tax returns or K-1.  (TX682).  Instead,

those distributions were netted with $3.9 million in contributions, resulting in an increase of paid-in capital of approximately $364,000. (TX682). Both the distribution and contribution accounts included significant adjustments by Americorp related to the elimination of due to/due froms of other McCallan companies. (<u>Transcript of May 7, 2019 Hearing</u>, page 100, lines 16-20).

- In 2010, the detail general ledger of The Achievable reflects $177,000 in distributions to McCallan, but there were no such distributions reflected on his tax returns or K-1. (TX686). Instead, those distributions were netted with $2.3 million in contributions, resulting in an increase of paid-in capital of approximately $2.1 million. (TX686).

- In 2012, WAV Team's books showed $92,000 in distributions to McCallan that were not reflected on his tax return or K-1, but instead were netted with $738,000 in contributions during the year resulting in $646,000 in additional paid-in capital attributed to McCallan. (TX685).

The evidence showed that distributions to McCallan reflected on the detailed general ledgers of many of McCallan's companies were netted with "paid-in capital" of those corporations, many of which were largely the product of transactions among related entities, resulting in the failure to report the distributions on McCallan's K-1s. "[I]n effect, what they've done is just simply move money amongst corporations and then consider it a capital contribution by Mr. McCallan." (<u>Transcript of May 7, 2019 Hearing</u>, page 117, line 25; page 118, lines 1-2). There was no economic substance underlying these transactions. (<u>Transcript of May 7, 2019 Hearing</u>, page 118, lines 3-7).

The Trustee argued, and this Court agrees, that there are two possible (but not mutually exclusive) explanations for the evidence presented: (1) McCallan engaged in this scheme to manufacture a tax basis in entities that reflected a tax loss so that he could personally get the benefit of a tax loss when one was not otherwise available; or (2) McCallan engaged in this scheme to hide millions of dollars. (<u>Transcript of May 7, 2019 Hearing</u>, page 145, lines 17-21).

As evidence of the second explanation, the Trustee demonstrated that components of this $7.9 million transferred from one McCallan company to another ultimately made its way right back to McCallan and his family. For example, McCallan argued that one element of this $7.9 million in intercompany transfers that should be deducted from distributions and wages in TX257 were two Hello Performance transfers totaling $49,401 each. (TX669; TX688). However, the evidence demonstrates that most or all of these transfers ended up right back in the possession of McCallan or his wife. McCallan bought 3 gold bars in 2010 for a total of $131,000. (TX19). On May 21-22, 2012, McCallan transferred his 100% interest in Hello Performance to his wife, Jeannie McCallan. (TX236). A few days later, McCallan sold two kilos of gold to Maddaloni Jewelers for $49,401 each. (TX214 and TX215). Hello Performance treated the proceeds from McCallan's gold sale as a capital contribution to a company in which he no longer had any interest. (TX280). Hello Performance then wired much of the proceeds from that "capital contribution" right back to McCallan personally and WAV Team, a company of which he was the 100% owner, and which also happened to also be paying a salary to his wife that same year (TX698 and TX699).

This Court has previously seen evidence of McCallan putting money into one of his companies only for it to surreptitiously end up back in McCallan's personal possession. For example, on October 22, 2012, McCallan wrote a check to Vortex Debt Group in the amount of $170,000.00. (TX385). Only a few weeks later, McCallan began wiring money, primarily in $2,000 increments, from Vortex Debt Group to his wife, Jeannie McCallan, and the total of those wires over the next two years was $180,000.00. (TX240).

McCallan has made absolutely no effort to explain what happened to the money that was transferred from one McCallan company to another. Thus, until McCallan presents evidence to

Case 11-03007    Doc 806    Filed 06/07/19    Entered 06/07/19 10:26:17    Desc Main
Document    Page 86 of 89

this Court that this $7.9 million was lost in legitimate business operations supported by checks or wires showing the money went to third parties in arms-length transactions, it remains unaccounted for. (Transcript of May 7, 2019 Hearing, page 119, lines 6-14).

### C. Other Tax And Accounting Irregularities

The Trustee offered other instances of tax and accounting irregularities by McCallan and his companies. For example, in 2012, McCallan personally paid Haskell Slaughter, Jackson Thornton, and Bates White fees for legal services and legal support services McCallan received in this litigation. (TX697). However, those amounts were treated as being contributed to Vortex Debt Group and expensed on its books. (TX697). However, McCallan's own personal expense records for 2012 reflected these legal fees as a personal expense rather than an expense associated with Vortex Debt Group. (TX658, page 12; Transcript of May 7, 2019 Hearing, page 143, lines 20-25; page 144, lines 1-6). Vortex Debt Group reported $395,000 of taxable income in 2012, for which legal fees in the amount of $366,000 were taken as a deduction. (TX697). As a result, McCallan received a personal tax benefit because the income of Vortex Debt Group would have been $366,000 more without this improper deduction that was not related to the business of Vortex. (Transcript of May 7, 2019 Hearing, page 142, lines 13-23).

### V. Conclusion

This Court has repeatedly held that McCallan is in civil contempt, which is coercive in nature. On October 24, 2017, this Court held: "McCallan is in direct civil contempt for his failure to produce post-judgment discovery as required by the Court's Order of August 22, 2017." (Doc. No. 583) (emphasis added). On both October 24, 2017 and January 16, 2018, this Court made clear: "McCallan's incarceration is civil in nature and therefore coercive and not punitive.

McCallan holds the keys to his jail cell in his pocket. He need only produce the required discovery, or prove that he cannot, to secure his release." (11-3007, Doc. Nos. 583 and 618). At the conclusion of the January 30, 2018 hearing, this Court stated: "I want to stress that I see this as civil contempt, and I see it as coercive, and the purpose is to coerce you [McCallan] to give complete, full answers to the post-judgment discovery previously served by the Trustee." (Transcript of January 30, 2018 Hearing (second day), page 145, lines 13-16).

This Court reiterates and reaffirms today that McCallan is being held in civil contempt, which is coercive and not punitive in nature. With each evidentiary hearing, McCallan produces new documents and the amount of unaccounted for money and assets increases. The United States Marshal shall continue to hold Timothy McCallan in custody, on the Court's finding of contempt, until further order of this Court.

Respectfully submitted,

*/s Steve Olen*
STEVE OLEN (OLENS7621)
   ASB-7621-N64S
LUCY E. TUFTS (TUFTL1447)
   ASB-1447-C52T
Cunningham Bounds, LLC
1601 Dauphin Street
Mobile, Alabama 36604
251-471-6191
251-479-1031 (fax)
*Attorneys for Plaintiff Carly Wilkins*

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on this the 7th day of June, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record, as described below:

Michael A. Fritz, Sr.
Fritz Law Firm, LLC
25 South Court Street
Suite 200
Montgomery, AL 36104
michael@fritzlawalabama.com

   The following non-CM/ECF participants were served by email and/or U.S. mail, postage prepaid:

Scott D. Widerman
James Ippoliti
Widerman Malek, PL
1990 W. New Haven Avenue
Suite 201
Melbourne, FL 32904
scott@uslegalteam.com
jim@uslegalteam.com

         */s Steve Olen*
         Steve Olen