# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                                  Case No. 10-30631-WRS
                                                       Chapter 7

ALLEGRO LAW LLC,

       Debtor.

_____

CARLY B. WILKINS,

       Plaintiff,                              Adv. Pro. No. 11-3007-WRS

   v.

AMERICORP INC., et al.,

       Defendants.


## AMENDED MEMORANDUM DECISION


      This Adversary Proceeding came before the Court for an evidentiary hearing on May 6,

7, and 9, 2019, on Defendant Timothy McCallan's "Motion to Determine Compliance with the

Civil Contempt Orders and for the Immediate Release of Defendant McCallan from

Incarceration." (Doc. 787). Evidence was concluded on May 7, 2019, and the Court heard

closing arguments telephonically on May 9, 2019. For the reasons set forth below, the motion is

denied. McCallan shall remain in custody until further order of this Court.[1]

---

[1] This is the sixth evidentiary hearing the Court has held on the subject of McCallan's contempt
of court insofar as it relates to his failure to respond to post-judgment discovery and to turn over
assets. (McCallan was previously held in contempt for his failure to turn over a database during
the discovery phase of this litigation). The Court's first hearing on McCallan's contempt was
held October 6, 2016. At the conclusion of that hearing, McCallan was held in contempt but not
jailed (Doc. 396). The second hearing was October 23, 2017, where the Court found that
McCallan had failed to purge himself of contempt and sent to jail (Doc. 581). A third
evidentiary hearing was held on January 30-31, 2018 (Doc. 707). A Fourth evidentiary hearing

## I.  Case History

This case has generated a daunting amount of case history.  The two most complete summaries may be found in the Court's Memorandum Decision of February 16, 2016 (Doc. 361), reported at 545 B.R. 675 (Memorandum Decision of trial on the merits); and its Memorandum Decision dated May 23, 2018 (Doc. 707), reported at 2018 WL 2373639 (Memorandum Decision concerning McCallan's contempt hearing which was held January 30-31, 2018).  A common theme which runs through all of this is McCallan's dishonesty and his obstinance.  He cheated thousands of consumers out of more than $100,000,000.  During the discovery phase of trial, McCallan repeatedly lied about and concealed the business records of AmeriCorp.  Since judgment has entered, he has stonewalled and lied to the Trustee about the existence of his assets to avoid paying his creditors.  The most recent hearing, on May 6-7, 2019, is more of the same.

## II.  Contempt Proceedings

### A.  Previous Proceedings

The contempt proceedings, through January 31, 2018, are summarized in this Court's May 23, 2018 Memorandum Decision.  (Doc. 707).  A few points are worth revisiting.  Between the date of judgment, which was February 16, 2016, and January 31, 2018, which was the date of the evidentiary hearing giving rise to the May 23, 2018 Memorandum Decision, a period of

---

was held May 24-25, 2018.  (Doc. 709). A fifth evidentiary hearing was held on November 8, 2018 (Doc. 780).  This latest hearing held May 6-7 is the sixth evidentiary hearing.  There have been a number of non-evidentiary hearings as well.

about two years, the Court entered 14 orders and held four evidentiary hearings in an effort to get McCallan to comply with his obligation to provide post-judgment discovery. (Doc. 707, p. 3). McCallan was first held in contempt of court, for his failure to respond to post-judgment discovery, on October 6, 2016. (Doc. 396). He was not incarcerated until October 23, 2017, a year later, after another evidentiary hearing. (Doc. 583–Order; Doc. 594, pp. 224-27– Transcript). The basis of the contempt order was McCallan's failure to respond to discovery and to disclose his assets. (Doc. 583).

Several examples of McCallan's misdeeds are as follows:

1. The October 24, 2017 Order scheduled a hearing for November 6, 2017. On the eve of the November 6, 2017 hearing, McCallan's lawyers disclosed that they would be making a massive supplement to the prior disclosures. The Court lamented that there was yet another last minute "document dump" engineered by McCallan and his lawyers in an effort to surprise the Trustee and her lawyers. The Court set another hearing for November 16, 2017 to review this newly promised production. (Doc. 587–Order dated November 7, 2017).

2. On November 14, 2017, two days prior to the scheduled November 16, 2017 Hearing, McCallan produced additional documents–another document dump. In light of the fact that production was not yet complete, the Court scheduled a telephonic hearing for January 9, 2018. (Doc. 592). An evidentiary hearing was scheduled for January 30, 2018. It was that hearing which yielded this Court's Memorandum Decision of May 23, 2018. (Doc. 707). After all of these proceedings, McCallan's counsel announced at the January 30, 2018 Hearing that "we have no presentation, we just have rebuttal . . . we have nothing to present at this time." (Doc. 636, p. 6). Following the January 30-31, 2018 evidentiary hearing, the Court made detailed findings of

Case 11-03007    Doc 818    Filed 09/17/19    Entered 09/17/19 07:31:32    Desc Main
Document      Page 3 of 22

fact, ultimately finding that McCallan had failed to purge himself of contempt. (Doc. 707, pp. 17-35).

3. The Court conducted yet another evidentiary hearing on May 24-25, 2018. (Docs. 715-16–Transcripts of proceedings). The Court again concluded McCallan had failed to purge himself of contempt. (Doc. 709–Order). One of the more surprising pieces of testimony was McCallan's admission that he had given $800,000 to Robert Sanfilippo in 2015 to "invest" for him. (Doc. 715, p. 150). The Trustee has now brought suit against Robert Sanfilippo in an effort to recover money transferred to him by McCallan. Adv. Pro. 18-3091. In addition, the Trustee has brought Adversary Proceedings against Jeanne McCallan, Timothy McCallan's wife, Adv. Pro. 18-3084; Peter McCallan, Timothy McCallan's brother, Adv. Pro. 18-3089; and Vanessa Vinicombe, Adv. Pro. 18-3092. While these Adversary Proceedings are yet to be resolved, the Trustee has brought suits for more than $10,000,000 based upon documents and evidence obtained from McCallan, after he claimed he had nothing more to produce.

## B. The January 4, 2019 Motion to Release

The May 6-7, 2019 evidentiary hearing is responsive to McCallan's January 4, 2019 Motion to Release. (Doc 787). To understand McCallan's January 4, 2019 Motion (Doc. 787), one must return to the conclusion of the May 25, 2018 hearing, where the Court found that McCallan had filed complete responses to the post-judgment discovery. (Doc. 716, pp. 216-17– Transcript of Proceedings held May 25, 2018). The following are excerpts from the Court's May 25, 2018 oral ruling.

-4-

I want to make clear that -- and Mr. McCallan with Ms. Eckstein's help did, in fact, file a complete set of responses, answers to interrogatories, requests for production of documents.[2]

* * *

I want to point out that I see . . . Mr. McCallan's obligation as something more than that. [W]hat we're doing here is more than just a paper chase.

* * *

[T]his is a sentence or two from Judge Watkins' decision of March 20, 2018, starting at the top of page 6. . . . "The bankruptcy court cautioned McCallan that to purge himself of contempt, he must demonstrate that he has fully disclosed all the matters requested to the best of his ability and that given McCallan's long history of lying to the Court and flouting its orders, he is cautioned that he must be candid with the appellee, with the trustee, that is, and with the Court." p. 217 (citing the District Court's Order of March 29, 2018, Case No. 18-CV-117, p. 6).

(Doc. 716, pp. 216-17)(citing in part the District Court's Order of March 29, 2018).

The Court goes on to discuss at length the analysis done by Alan Carrol, the Trustee's forensic accountant at Exhibit 257, which proves that McCallan has concealed $16.2 million in assets. In addition to the $16.2 million, $1.82 million in unreported income, of which the Court was not previously aware, was turned up at the May 24-25 hearing. Moreover, $3.2 million was shown to have been accumulated by McCallan prior to the time period covered by the Carrol analysis. (Doc. 716, pp. 218-19). Adding the $3.2 million and the $1.82 million, the total becomes $21,220,000 in undisclosed assets.

---

[2] Six months later, in November 2018, McCallan produced the MAS 200 information, consisting of a massive amount of documents (by some accounts millions of pages). This is yet another example of McCallan's dishonesty.

The underpinning of McCallan's contempt changed during the May 24-25, 2018 hearing. Prior to May 24, 2018, the basis of McCallan's contempt was his failure to respond to discovery, as well as his failure to disclose assets. McCallan provided responses to the discovery at the May 24-25 hearing. The problem is that while he provided responses to the discovery, the evidence produced at the May 24-25 hearing showed, by a preponderance of the evidence, that McCallan was continuing to hide assets from the Trustee and from the Court. This is more than a paper chase. McCallan is required to disclose his assets for the express purpose of assisting the Trustee in collecting her judgment against him. McCallan was found to be concealing assets at the May 24-25, 2018 hearing.

Following the May 25, 2018 hearing, the Court entered an order on May 29, 2018, which provided as follows:

> At the conclusion of the two-day hearing, the Court made findings
> of fact and conclusions of law orally on the record, to the effect
> that McCallan was continuing to hide and secrete assets and that he
> had not truthfully disclosed the existence and location of his
> money and other valuable property. Those findings and
> conclusions are incorporated here and will not be restated. The
> Court ordered McCallan returned to jail on its finding that he
> remains in contempt. (Doc. 709, p.1).

McCallan states, in Paragraph 8 of his January 4, 2019 Motion, that:

> It is uncontested that Defendant's discovery responses pursuant
> to the February 6, 2018 Order were complete. Judge Sawyer
> acknowledged that fact within his oral pronouncement on May
> 25, 2018 by stating "I want to make clear that – and Mr.
> McCallan with Ms. Eckstein's help did, in fact, file a
> complete set of responses, answers to interrogatories, requests
> for production of documents.

* * *

However, despite filing complete responses to the documents required to purge his contempt, Defendant McCallan is still in jail for the same continued contempt. (Doc. 787).

However, also within the January 4 Motion, McCallan acknowledges that he did not produce to the Trustee, until October 23, 2018, data held on its MAS 200 software, that had been held by Creative Networks Innovations, Inc. (Doc. 787). This admission, by itself, justifies McCallan's continued incarceration because it demonstrates that McCallan continues to produce documents and information in response to his incarceration. The more rapidly he produces documents and information, the sooner he will be released from custody.

The recent production of the MAS 200 software to the Trustee is one of the latest in a long series of galling misrepresentations by McCallan and his lawyers. In Paragraph 11 of the January 4, 2019 Motion, McCallan alleges "11. To further his assertions, the McCallan team requested the servers that were confiscated by the Trustee prior to judgment." This statement is patently false. McCallan has possession of his servers and they were never confiscated by the Trustee. In Paragraph 12 of the Motion, McCallan alleges:

> 12. It was determined that a cloud hosting data company, Creative Networks Innovations, Inc. (CNI) held all backup storage of all of McCallan's company servers. CNI would not release the information voluntarily. On September 25, 2018 McCallan subpoenaed the information held by CNI. That information was provided to McCallan about October 19, 2018.

The Court made an effort to clear this up prior to the hearing when it asked the following of McCallan's lawyer Michael Fritz.

> THE COURT: All right. Mr. Fritz, the spreadsheet that you mentioned, is that a summary of this evidence from the MAS -- you said MAS 200

MR. FRITZ: 200, yes, Your Honor.

THE COURT: Okay. Now, is this newly discovered evidence, or what is this?

MR. FRITZ: It is newly -- we'll say newly discovered. It was the raw -- we had the raw data for the companies. You know, when -- the spreadsheet that they were using with the $16 million. The question was, where did the money go after? You know, it went from -- there's a lot of company-to-company transfers. What is this money used for? This MAS 200 shows the underlying, and it also breaks out the expenses for each year in that. So it is newly discovered evidence.

(Doc. 803, pp. 11-12).

When the Trustee's lawyer examined Kellie Eckstein, McCallan's bookkeeper, the story changed considerably.

Q: Ms. Eckstein, when did you first hear about MAS 200?

A: I've actually known about MAS 200 because many, many, many years ago Tim [McCallan] needed a little extra help doing bank recs, so I went into his companies, and I did a couple of months worth of bank recs for him. So I was a little – I was familiar with the accounting program that they used at the time.

Q: What year would that be?

A: Gosh, it was – I don't know but I – there is actual evidence of when I was actually paid.

Q: Well, prior to 2010?

A: It could have been around that time.

(Doc. 803, pp. 150-51).

Thus, the factual underpinning alleged by McCallan in his January 4, 2019 Motion was false. To begin, the Trustee did not seize anything. McCallan's suggestion that he is being held

in jail because he cannot rebut the Trustee's assertions and the Alan Carrol analysis is patently false. Moreover, as Eckstein testified, McCallan had the MAS 200 accounting program for "many, many, many years." The reason it was not produced was not, as McCallan suggests because the Trustee had seized it and she was keeping it from him, rather McCallan has known all along about the MAS 200 program and withheld that information from the Trustee. This is in the face of repeated demands by the Trustee for documents and evidence as to McCallan's business activities.

McCallan also misstates the reason for his continued incarceration in his January 4, 2019 Motion. He argues that he produced documents and responded to discovery at the May 24-25 hearing, and that his incarceration after that time is unlawful. He ignores the Court's finding that he continues to hide assets–the real reason for his incarceration. (Doc. 709, Order dated May 29, 2018, "McCallan was continuing to hide and secrete assets and that he had not truthfully disclosed the existence and location of his money and other valuable property.")(Doc. 771, Order dated October 2, 2018, entitled "Order Governing Defendant Timothy McCallan's Efforts to Purge Himself of Contempt," stating "In the Court's view, McCallan should offer evidence to show what efforts he has made to repatriate funds held outside the United States and those efforts to secure funds of his held by others."). Any professed bewilderment on McCallan's part, contending that he does not understand why he is being held in custody is, like everything else he has done to date in this Court–a sham.

On January 11, 2019, in response to McCallan's January 4, 2019 Motion, the Court entered an order which provided, in part, as follows:

> The Court notes that Timothy McCallan has been held in custody,
> on this Court's contempt of court orders, since October 23, 2017.
> The Court's most recent orders concerning McCallan's contempt

Case 11-03007    Doc 818    Filed 09/17/19    Entered 09/17/19 07:31:32    Desc Main
Document      Page 9 of 22

were entered on November 15, 2018, (Doc. 780) and October 2, 2018 (Doc. 771). In addition, the Court entered a Memorandum Decision on May 23, 2018 (Doc. 707) which discussed the matter of McCallan's contempt in detail. The Court is of the view that these Orders and Memorandum Decision are a fair summary of these contempt proceedings. The Court is also of the view that these orders put McCallan on adequate notice as to why he continues to be held in custody and what he must do to get out. McCallan has been represented by counsel at all stages of these proceedings, and the Court finds that he has adequate notice. Any argument by McCallan that he either does not know why he is in jail, or what he needs to do to get out, is rejected. This is a large and complex case, and a massive amount of evidence has been offered by the Trustee during previous evidentiary hearings. The Court would summarize the status of this proceeding by making two observations. First, the Court has found repeatedly that McCallan has secreted a significant amount of money and property and placed it beyond the reach of the Trustee. The Trustee's forensic accountant has placed the figure at $16.2 Million, which the Court has accepted as a finding of fact. The Trustee has not identified a specific fund of that amount sitting somewhere beyond the reach of the Trustee. Rather, this is a calculation based upon a considerable amount of evidence. Second, the Trustee has tried for years to secure all relevant documents. On any number of occasions, McCallan will make a "document dump" prior to a hearing and then claim that the Trustee has been given everything. Yet, the Trustee continues to find additional documents and evidence. Moreover, McCallan continues to pay out documents, in an effort to make a showing the compliance has been made, without making either a meaningful or complete disclosure. McCallan's long history of false statements no doubt hinders his efforts to demonstrate that he has purged himself of contempt. That difficulty is one of his own making. (Doc. 790, pp. 2-3)

The purpose of the January 11, 2019 Order was to set out why the Court was having

McCallan held in custody and to give him fair notice of what he must do to secure his freedom.

Because McCallan has failed to purge himself of his contempt, he remains incarcerated.

## C. The Legal Standard to be Applied

### 1. Violation of Court Orders

McCallan has been incarcerated on a finding of civil contempt of court. "A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992), *cert. denied* 506 U.S. 819 (1992). The Trustee must prove, by clear and convincing evidence, that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous, and (3) the alleged violator had the ability to comply with the order. *Securities and Exchange Comm'n v. Greenberg*, 105 F. Supp. 3d 1342 (S.D. Fla. 2015).

There are numerous orders under which McCallan has been held in contempt. A good example is this Court's Order of May 23, 2018. "The evidence shows and the Court finds that McCallan has secreted millions of dollars' worth of money and property in locations presently unknown to the Trustee. Until he discloses all of his property and turns over all of his ill-gotten gains, he remains in contempt." (Doc. 707, pp. 34-25). A more recent order was entered on January 11, 2019, which provides as follows:

> This is a large and complex case, and a massive amount of evidence has been offered by the Trustee during previous evidentiary hearings. The Court would summarize the status of this proceeding by making two observations. First, the Court has found repeatedly that McCallan has secreted a significant amount of money and property and placed it beyond the reach of the Trustee. The Trustee's forensic accountant has placed the figure at $16.2 Million, which the Court has accepted as a finding of fact. The Trustee has not identified a specific fund of that amount sitting somewhere beyond the reach of the Trustee. Rather, this is a calculation based upon a considerable amount of evidence.

> Second, the Trustee has tried for years to secure all relevant documents. On any number of occasions, McCallan will make a "document dump" prior to a hearing and then claim that the Trustee has been given everything. Yet, the Trustee continues to find additional documents and evidence. Moreover, McCallan continues to pay out documents, in an effort to make a showing compliance has been made, without making either a meaningful or complete disclosure. McCallan's long history of false statements no doubt hinders his efforts to demonstrate that he has purged himself of contempt. That difficulty is one of his own making. (Doc. 790).

Addressing the three requirements set out above, the Court first finds that its orders are valid and lawful. Indeed, for all of the arguments raised by McCallan over the past several years, he has never argued that this Court does not have the authority to supervise the collection of a judgment. Second, notwithstanding McCallan's protestations to the contrary, the orders under which he are held are clear and unambiguous. He must turn over his money and property–less any amounts which are determined to be exempt. The orders are clear. One should bear in mind that this is not a case where a debtor has turned over a significant amount of money and property–claiming that is everything I have, yet the Trustee wants still more. In this case, McCallan has completely stonewalled the Trustee. The third prong of the test, that he has the ability to comply with the Order, is plainly in dispute. McCallan claims he has nothing to turn over, but the Court has found to the contrary. This is a disputed fact which has been found against McCallan. The Court would welcome candor on McCallan's part. The money the Trustee's forensic accountant has determined that McCallan has secreted may well have been dissipated, at least in part. But he must show what he has, what he had, and where it went. Until McCallan is willing to be forthcoming, he will remain in contempt.

McCallan has been secreting assets for years. On Friday, October 7, 2016, the Trustee filed a Request for Entry Upon and Inspection of Premises, seeking an inspection of McCallan's

property at 6730 Still Point Drive in Melbourne, Florida and requested that the Court enter an order prohibiting McCallan from removing personal property or allowing it to be removed. On Monday, October 10, 2016, the Trustee filed a Process of Garnishment to Wells Fargo Bank seeking money and property for the satisfaction of the February 2016 judgment against McCallan. (Doc. No. 300). On Tuesday, October 11, 2016, before the Process of Garnishment could be served on Wells Fargo, McCallan obtained a cashier's check from Wells Fargo in the amount of $388,285.14, which he withdrew from his account ending 0716. (Transcript of March 27, 2017 Hearing, page 38, lines 16-20). On October 10 and 11, 2016, the Trustee filed her Second and Third Post-Judgment Requests for Production to McCallan, respectively. (Doc. Nos. 399 and 407).

## 2. McCallan Fails to Purge Himself of Contempt

McCallan is in contempt of court because he has failed to turn over his money and property to the Trustee. The judgment against McCallan is for more than $100,000,000. To be clear, McCallan has not been found in contempt because he has not paid the full $100,000,000. Rather, he must pay over what he has–less any allowed exemptions.[3]

---

[3] The Trustee has objected to McCallan's claim of exemption in separate proceedings. The Trustee has complained that she should not be put to the burden of proving her objection until McCallan has produced all of his records and information concerning his property. The Court has long ago grown tired of McCallan's games. The Court is inclined to simply rule, based upon what it has, drawing any appropriate adverse inferences against McCallan, rather than waiting on any further production. Counsel should be prepared to discuss this at the next hearing.

### a.  The Carrol Analysis (Exhibit 257)

To understand McCallan's contempt, one must understand the analysis prepared by the Trustee's forensic accountant Alan Carrol.  While the Trustee, with Carrol's help, has produced a raft of analyses, the Court has focused on Trustee's Exhibit 257, as a good summary of where this case presently sits.

To begin, Carrol selected a 9-year period–the years 2007 to 2015.  The first number in the analysis for each year is identified as "Distributions and Wages."  The wages are taken from IRS Form 1040's filed by McCallan during those years.  The distributions are amounts identified by Carrol as having been distributed to McCallan by 11 corporations found by the Trustee to have been controlled by McCallan.  These amounts are detailed on page 2 of Exhibit 257.  The distributions from the corporations are not taxable income, therefore the Trustee is not guilty of double counting money paid to McCallan.  The "Distributions and Wages" line on Exhibit 257 is amounts known to have come into the possession of McCallan.  From these amounts, for each year, Carrol deducted payments of State and Federal taxes, adding back refunds, arriving at an amount of cash actually available to McCallan, after the payment of taxes.

Carrol next conducted an in depth examination of McCallan's lifestyle.  From this examination, Carrol concluded that McCallan spent an average of $422,595 per year over the 9-year period.  That is, Carrol deducted from the cash available to McCallan, from wages and distributions, $422,595, giving him credit so to speak for spending this money to live–meaning that it was not available to have been saved or secreted.  One should bear in mind that this $422,595 figure for living expenses is after taxes.  One would have to earn considerably more than that after tax liabilities are considered.

Case 11-03007   Doc 818   Filed 09/17/19   Entered 09/17/19 07:31:32   Desc Main
Document     Page 14 of 22

After deducting the $422,595 per year, or $3,803,355 over the nine-year period, Carrol also deducted another $2,311,498 for purchases made by McCallan during that time frame. McCallan spent $2,261,998 for his home in Melbourne, Florid and he deposited another $49,500 into IRA accounts. These amounts were also deducted from the amount available to McCallan. Once these deductions were made, one is left with $16,251,649, which is the amount the Trustee contends has not been accounted for, meaning that McCallan has secreted this money.

The Court would point out that Carrol also factored in 5% for assumed growth of the funds over time. If one factors 5% for assumed growth, the $16,251,649 grows to $21,942,042. The Court does not adopt this portion of the Carrol analysis for two reasons. First, as it is supposed that McCallan is hiding this money, he may well not be able earn any interest or return on it. Second, the Trustee has not found any evidence of McCallan actually earning any of this supposed 5% return. This $16,251,649 ($16.2 million rounded for convenience) has not been identified as any known fund. Rather, its existence if inferred from a wealth of evidence. While the Court has inferred the existence of the $16.2 million based upon a mountain of evidence, it is unwilling to infer earnings on amounts that are themselves inferred.

Before leaving the Carrol analysis, the Court will discuss why it almost certainly underestimates the cash available to McCallan. First, it begins with amounts reported by McCallan to the Internal Revenue Service. While tax returns will in many cases provide an accurate picture of someone's financial situation, this depends on the honesty of the person who files the tax returns. In this case, McCallan is known, by his own admission, to have had in the past, large cash hoards. In addition, he is known to have dealt in large quantities of gold coins, buying and selling, yet not reporting trading profits to the Internal Revenue Service. One may only speculate as to the amount of the understatement; the Court is certain that the amount is not

Case 11-03007    Doc 818    Filed 09/17/19    Entered 09/17/19 07:31:32    Desc Main
Document        Page 15 of 22

zero. Therefore, the Carol analysis is necessarily low by some, as of yet, undeterminable amount.

Second, the Carol analysis does not account for any amounts prior to 2007. Yet, it was later learned that McCallan's net worth was at least $3.2 million on January 1, 2007. McCallan was known to have been in business for many years prior, yet that was all disregarded, to his benefit.

### b. McCallan Fails to Rebut the Carrol Analysis

McCallan has mad several attempts to rebut the Carrol analysis, most recently at the evidentiary hearing held on May 6-7, 2019. One should bear in mind that McCallan is a highly sophisticated individual who has been in business for 20 years or more, much of perpetrating fraud of one stripe or another. He has fleeced thousands of victims of more than $100,000,000. Any argument to the effect that he is not financially sophisticated or does not understand these proceedings is rejected.

To rebut the Carol analysis, McCallan must show where money the Trustee has placed in his hands, actually went. Of course, if it is hidden in off-shore bank accounts the Trustee will insist he return it before getting out of jail. Secondly, if it is held by others, such as his wife Jeanne, his brother Peter, his former CFO Vanessa Vinicombe, his friend Robert J. SanFilippo, or others not yet identified by the Trustee, she will no doubt insist that the money be returned before she agrees to request McCallan's relase. In sum, the Trustee has placed $16.2 million (or more) in McCallan's hands and he has not explained where it went.

At the May 6-7 Hearing, McCallan called bookkeeper and friend Kellie Eckstein, who prepared her own analysis, which McCallan contends explains everything and should result in

him being released from jail. The Trustee prepared a detailed analysis showing why the Eckstein analysis was incorrect. (Doc. 806, pp. 50-51). The Court will focus on one flaw, which the Court considers so egregious as to preclude any further serious consideration of it. Eckstein identified $14 million in transfers, which she contends explains the bulk of the money. However, further analysis shows that she did nothing more than count money transferred from one bank account controlled by McCallan to others also controlled by McCallan. This shifting of money from one account to another proves nothing. For this reason, the Eckstein analysis is not only flawed, but laughable. Just as moving money from one pocket to another results in no substantive change, so does a transfer from one account to another. The Court is not fooled by McCallan's game of Three Card Monte.[4] Eckstein, like a Three Card Monte dealer, has withdrawn the money card, leaving the Trustee, for the moment, zero chance of collecting.

In addition to the game of Three Card Monte, Eckstein's analysis was discredited in more subtle ways. For example, Eckstein deducted $1.4 million for cash withdrawals, assuming without any evidence that the money was spent. Second, coin and metal purchases of $920,000 were deducted improperly. Instead, that money was almost certainly secreted rather than consumed. Third, Eckstein deducted $4.76 million for "checks posted" without any proof of where the money went–yet another shell game. Fourth, money loaned was deducted improperly. Ordinarily, when money is loaned, cash in the bank is decreased but it is replaced by a note or an

---

[4] In Three Card Monte, a dealer places three cards face down on a table. One card is then exposed briefly, usually the Queen of Diamonds, and then turned over again, leaving three cards face down. The dealer then moves the cards repeatedly in an effort to fool the mark as to which of the three cards is the Queen. (In some versions of the game, the Queen is withdrawn through a sleight of hand, leaving the Mark no chance of winning.) When the dealer stops moving the cards, the mark is then called upon to point out which is the Queen. When played at a carnival for small stakes, the game is fun for the mark and the onlookers. However, this is not a game of Three Card Monte and the Court is not interested in playing the role of the mark for McCallan.

Case 11-03007    Doc 818    Filed 09/17/19    Entered 09/17/19 07:31:32    Desc Main
Document      Page 17 of 22

account receivable. If one asset is substituted for another, there is no explanation as to where the money went. (Doc. 806, pp. 50-51).

The Trustee undercut McCallan's claim that he has purged himself of contempt by showing that McCallan's family has not noticeably changed their lifestyle. In the Carrol analysis, it is assumed that the McCallan family is living on $422,000 per year, after taxes. Further evidence of a lifestyle significantly above what McCallan has claimed in Bankruptcy Court filings is shown in the Trustee's cross examination of Jeanne McCallan:

> Q: In 2016, the year that Mr. McCallan filed his bankruptcy, were your children, T and A, at HT School at that time?[5]
>
> A: Yes.
>
> Q: And your daughter, N, started [college] at that time, right? She started in the fall of 2016.
>
> A: Probably. Yes. I don't know the exact date, but yes.
>
> Q: And the total tuition – we can go look at Kellie's [Eckstein] spreadsheet if we need to – for the three of them was around $50,000 a year, correct?
>
> A: Uh-huh.
>
> Q: Is that a yes?
>
> A: Yes.
>
> Q: Same in 2017?
>
> A: Yep.
>
> Q: Same in 2018?
>
> A: Yep.

---

[5] The children's names and the names of their schools are abbreviated to protect their privacy. *See*, Rule 9037, Fed. R. Bankr. P.

Case 11-03007  Doc 818  Filed 09/17/19  Entered 09/17/19 07:31:32  Desc Main
Document  Page 18 of 22

Q: Same in 2019, this year?
A: Yep.

* * *

Q: '16, '17, '18, 19, 4 times 50, that's $200,000 in private school tuition, right?

A: That's four years.  She's also --

* * *

Q: Where did all that money come from?

(Doc. 803, pp. 45-47)(Hearing held May 6, 2019)(bracketed matter added for clarity).

Jeannie McCallan had no plausible answer to that question.  That is, the McCallan's are not only living in a multi-million dollar waterfront home, driving expensive late model automobiles and generally living a lifestyle one associates with the well-to-do, but they have paid $200,000 in private school tuition, all at a time when they have reported earning virtually no income and owning no assets.  This undercuts any argument that McCallan makes that he has purged himself of contempt.

### 3.  Release When Incarceration has Lost its Coercive Effect

McCallan claims that he does not have any money or property to turn over to the Trustee and, for that reason, should be released from custody.  The Court has conducted numerous hearings both evidentiary and non-evidentiary, heard days of oral testimony and considered countless documents, all to the effect that it has concluded that McCallan's claim is false.  In

fact, the Court concludes that McCallan has significant undisclosed assets which he continues to hide from the Trustee.

McCallan has not made an argument that even if he has money and property, the coercive effect of imprisonment will not compel him to turn over his money, and for that reason he should be released. Notwithstanding the fact that McCallan has not made the argument, the Court will consider it. In a case similar to the case at bar, where a bankrupt was imprisoned to compel him to turn over assets, the Eleventh Circuit provided the following guidance.

> As we affirm the challenged orders, we are constrained to remind the district and bankruptcy courts that civil contempt sanctions are intended to coerce compliance with a court order. In *Wellington* we acknowledged that "When civil contempt sanctions lose their coercive effect, they become punitive and violate the contemnor's due process rights." The district court must make an individual determination in each case whether there is a realistic possibility that the contemnor will comply with the order. We are mindful that, "although incarceration for civil contempt may continue indefinitely, it cannot last forever."

> Lawrence has not specifically requested the district court to review whether his continued incarceration has lost its coercive effect. This issue, however, should be considered under the contest of his claim of impossibility. If the bankruptcy judge determines that, although Lawrence has the ability to turn over the Trust *res*, he will steadfastly refuse to do so, the judgment will be obligated to release Lawrence because the subject incarceration would no longer serve the civil purpose of coercion.

*Lawrence v. Goldberg (In re Lawrence)*, 279 F.3d 1294, 1300-01 (11th Cir. 2002).

In observing this admonition, the Court is of the view that McCallan's incarceration continues to serve a coercive effect. All of the documents produced to date have been produced by McCallan, pursuant to tactical "document dumps" in response to either threatened or actual findings of contempt. The original "document dump" which produced a substantial portion of AmeriCorp's database, which for two years had been concealed, was made in June of 2013, after

more than two years of acrimonious discovery disputes which, at one point, has resulted in McCallan's first incarceration. Most recently, in November of 2018, McCallan engineered another document dump in an effort to secure his release. (Doc. 780). The Trustee has filed 10 Adversary Proceedings in an effort to collect from McCallan. *See*, Adv. Pro. Nos. 18-3084, 89, 91, 92, 94, 95, 96, 97, 98, and 99. The impact of McCallan's November 2018 document dump on the 10 enumerated Adversary Proceedings has yet to be demonstrated, and may never be demonstrated definitely, but the Trustee's possession of these documents will limit available defenses which could otherwise be raised by the Defendants in those Adversary Proceedings. For this reason, the Court finds that McCallan's incarceration continues to serve a coercive effect.

The Court has a hearing scheduled for September 17, 2019, on McCallan's motion for immediate release. (Doc. 810–McCallan's Motion; Doc. 811–Court's Order to Show Cause). In the event McCallan is not released pursuant to his motion, the Court will consider whether there is a continued coercive effect to incarcerating McCallan. At the September 17, 2019 hearing, the Court will: (1) call upon the Trustee to make a showing as to her view as to whether McCallan's incarceration has any continuing coercive effect, and (2) offer McCallan an opportunity to offer evidence or make an argument to his views on this question, separate from his contention that he has produced everything.

### III. Conclusion

The burden is on McCallan to prove that he has purged himself of contempt. He has not done so. First, he has failed to rebut the Carrol analysis, which proves he has secreted at least $16.2 million and probably more than $20 million. Second, he lives a lifestyle which is totally

inconsistent with his claims that he has only minimal income and property. Third, McCallan has been lying to this Court for years. The pace and the brazenness of his lies is unabated. As set forth above, the Court has found that McCallan's continued incarceration continues to serve a coercive purpose and that it is not merely punitive. For these reasons, McCallan's January 4, 2019 Motion is denied and he shall remain in custody until further order of this Court.

Done this 16th day of September, 2019.

William R. Sawyer
United States Bankruptcy Judge

c: Steve Olen, Attorney for Plaintiff
Lucy E. Tufts, Attorney for Plaintiff
Michael A. Fritz, Sr., Attorney for Timothy McCallan
Scott D. Widerman, Attorney for Timothy McCallan
Carly B. Wilkins, Trustee